# EXHIBIT G

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

PETTER INVESTMENTS, INC., a
Michigan corporation,

        Plaintiff,

   v.                           File No. 1:07-CV-1033

HYDRO ENGINEERING, INC., a Utah
corporation, and HYDRO ENGINEERING
EQUIPMENT & SUPPLY CO., a Utah
limited liability company,

        Defendants.
_____/

Markman Hearing

Before

THE HONORABLE GORDON J. QUIST
United States District Judge
December 17, 2008

Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter

<u>APPEARANCES</u>


EUGENE J. RATH, III
695 Kenmoor Ave., SE
P.O. Box 2567
Grand Rapids, MI 49501
Attorney for Plaintiff

BRETT L. FOSTER
MARK A. MILLER
60 E. South Temple
Suite 2000
Salt Lake City, UT 84111
Attorneys for Defendants


RICHARD A. GAFFIN
1200 Campau Square Plaza
99 Monroe Ave., NW
Grand Rapids, MI 49503
Co-Counsel for Defendants

```
 1                                  Grand Rapids, Michigan

 2                                  December 17, 2008

 3                                  10:06 a.m.

 4                            -      -      -

 5

 6                    P R O C E E D I N G S

 7

 8            THE COURT:  Good morning, counsel.  Good morning,

 9   everybody else.  No, you may be seated.

10            We're here in the case of Petter Investments, Inc.,

11   and others against Hydro Engineering, Inc. and others, case

12   number 1:07-CV-1033, time set for several motions, Markman

13   hearing, motion for summary judgment on equitable estoppel,

14   and motion for summary judgment on the merits.  Can I have the

15   appearance of counsel, please?

16            MR. RATH:  Yes, Your Honor.  Eugene Rath from Price

17   Heneveld for plaintiff, Petter Investments.

18            THE COURT:  Thank you.

19            MR. FOSTER:  Brett Foster appearing on behalf of

20   defendants.

21            MR. MILLER:  Mark Miller appearing on defendants'

22   behalf.

23            MR. GAFFIN:  Rick Gaffin for defendants.

24            THE COURT:  Okay.  Who's going to be the primary

25   spokesperson for the defendants?
```

1          MR. FOSTER:  We're going to break it up, Your Honor,

2     if you will allow.  I will handle the summary judgment

3     motion.  Mr. Miller will handle claim construction on the

4     Hydro Engineering patents.

5          THE COURT:  All right.  What I'm going to do is

6     change what I thought initially because there's so much here.

7     I mean, every little term and everything we could fight about

8     and we'd probably be here for the rest of our lives, so -- and

9     I've got other things to do, obviously.

10         I have worked hard on it, but I'm really prepared on

11    the '592 patent and somewhat prepared on the Hydro patents.

12    And regarding the Markman hearing on the Hydro patents, it's

13    my proposal that rather than listen to you and your not

14    knowing where I'm coming from is to give you some of my

15    tentative thoughts regarding the claim construction as to

16    those patents, that's the Hydro patents, the '591 and '749

17    patents, and then have another time where you can appear by

18    telephone or in person to argue with me about that.  Otherwise

19    I think we would be spinning our wheels a lot here today

20    because I'd forget at the end what we talked about at the

21    beginning.

22         Having said that, I'm wondering whether or not it

23    wouldn't be possible for the parties to really focus me in on

24    the claims in the Hydro patents that they think are critical.

25    In other words, rather than argue about things that may or may

1    not be critical, and ofttimes in these cases it's been my

2    experience that, you know, patent lawyers like to fight about

3    everything, but some things really don't make a big

4    difference, and it seems that they all sort of -- they start

5    out with twenty things they want to argue about and then you

6    finally get to the final pretrial or something and say, Well,

7    Your Honor, there are only three or four things that really

8    make a difference here.  So -- and I'm talking to you so that

9    you can respond to me.

10            So my thought is to give you like fourteen days to

11   get me focused in on -- although I have read it; I've read

12   them and I've got some preliminary thoughts -- to focus me in

13   on what you think are the really critical claims in the Hydro

14   patents.  And then I will give you tentative, and I mean

15   tentative, thoughts regarding claim construction within

16   another fourteen days, and then you can handle it from then on

17   as you wish, either another oral argument, and in these cases

18   oral argument is not really very effective, and I'll get into

19   that in a minute too, and then, you know, make a decision.

20            Mr. Rath, what's your gut reaction to that?

21            MR. RATH:  I think that's fine, Your Honor.  A

22   couple things.  You wanted to hear from both parties, I

23   assume, within fourteen days?

24            THE COURT:  Yes, yes.  And if you guys -- I mean,

25   you guys are good lawyers.  You practice in this area a lot.

1   Talk to each other and say, you know, Gene or whatever he
2   calls you, you know, let's focus in on this.  This is the
3   critical issue.  Like I think vacuum pump is the critical
4   issue in the '792 patent.
5            MR. RATH:  Right.
6            THE COURT:  Right.  So this is what we are talking
7   about, and then I can give you tentative conclusions on all of
8   them.  But if you focus me in on those, that would be helpful,
9   I think, to get you guys going.
10           MR. RATH:  We will do that, Your Honor, and we
11  received some exhibits earlier this week that I think is going
12  to resolve a couple issues at least, moot them, so I think
13  that will narrow it down too somewhat.  But we will certainly
14  do that for you.
15           THE COURT:  Okay.  Mr. Foster, what's your reaction
16  to that?
17           MR. FOSTER:  Let me --
18           THE COURT:  Oh, Mr. Miller, go ahead.
19           MR. MILLER:  Your Honor, with regard to the Hydro
20  patents, my argument today, I was prepared to do a pretty
21  minimal argument that would just be saying in our opinion here
22  are the critical three or four things in the Hydro patents
23  that should be focused on.  So were you asking us to kind of
24  give us -- give you that today a little bit?
25           THE COURT:  No, I don't want anything on the Hydro

1    patents today.  I'm sorry that you spent your time coming

2    here, but nonetheless, maybe it's good that you can see where

3    I'm coming from.  But talk to Mr. Rath, and if you guys can

4    get together and file it within fourteen days, you can file it

5    jointly, you can file it separately.  It doesn't make any

6    difference.  Joint seems to make more sense.  But these are

7    the things that are really critical, and we'll really focus in

8    on those, and then, Mr. Miller, you can come here and Mr.

9    Foster can stay home, whatever, instead of both of you here.

10   So whatever, so we will do it that way, then.

11        MR. MILLER:  Perfect.

12        THE COURT:  And then we can pay close attention to

13   those things.  I mean, I've got a list here that goes on and

14   on and on with all of this stuff, and by the time we got

15   three-quarters of the way through, like I said earlier, I'd

16   forget what we talked about at the beginning.  But if I do it

17   that way, then I will be more focused on it.

18        All right.  Let's go forward, then, with the '592

19   patent, and I want the parties to address first the claim for

20   equitable estoppel, and I guess, Mr. Foster, you're going to

21   talk about that.  What is not going to be helpful today is

22   going to be the presentation you planned to make, you know,

23   the brilliant oratory and everything else.  What will be more

24   helpful to me is if you could answer just a couple of

25   questions.

1    And by the way, my hearing is shot, so it would be
2 helpful if you -- since November 5.  The court reporter and my
3 law clerks are sick of hearing about it.  My wife is sick of
4 hearing about it, but you guys ought to know.  Talk into the
5 speakerphones.  It would be very helpful.
6    You would agree with me, I think, that equitable
7 estoppel by its very definition is a matter of the Court's
8 conscience, and the very word "equitable" demands that the
9 Court, you know, apply a fair -- make a fair decision based on
10 the facts.  And I have to tell you that there was that
11 seven-year delay that Petter didn't take any activity, but I
12 don't see how, considering the fact that Hydro says, well,
13 it's been making these products since 1980, how Hydro was at
14 all adversely affected by this seven years of silence.  I'm
15 going to get some water here.  Maybe you could respond to
16 that.
17    MR. FOSTER:  You're ready for me to do that now?
18    THE COURT:  Sure.
19    MR. FOSTER:  Okay.
20    THE COURT:  Then I'm going to give Mr. Rath a chance
21 to get right up there and say that's wrong.
22    MR. FOSTER:  Your Honor, I think you've focused on
23 an important point, and I completely agree with the concept
24 that this is equitable.  It's not going to be a jury issue;
25 it's going to be your issue.

1          In regard to the prejudice, I think what you have is

2     you have the ten letters that went back and forth, a few in

3     1998, more in 2000 going back and forth.  You have a drop-dead

4     deadline of October 1.  Both sides understood and Mr. Petter

5     testified that he would have thought that Hydro should expect

6     a lawsuit, and Hydro said we expected a lawsuit if we didn't

7     satisfy them.

8          THE COURT:  But it didn't do anything.  I mean, it

9     went ahead and got its own patents.

10         MR. FOSTER:  What it did --

11         THE COURT:  And it kept manufacturing the product.

12    I mean, you know --

13         MR. FOSTER:  That's exactly right, Your Honor.

14    That's exactly right.  They kept doing what they were doing

15    that they accused them of infringement with respect to.

16    That's the issue.

17         When you have back in 2000 allegations in the

18    letters from Mr. Rath saying, Your Hydropad products look like

19    they're similar to ours, insinuate infringement, offer a

20    license, we don't say, We have any interest in a license.  We

21    say, We don't think we have to stop doing anything.  We're

22    doing the same thing we've been doing for a long time.  Should

23    we stop?  Now we get to the point we get a lawsuit filed and

24    there's been increase of employees, there's been increase in

25    profits, there's been capital investments, all toward

1    continuing to do what we've been doing.

2        Now, I think to try to mitigate a little bit against

3    the current of our equitable estoppel argument, they've more

4    narrowly tailored their arguments of infringement today as we

5    sit here, as we'll discuss later.

6        THE COURT:  Oh, really?

7        MR. FOSTER:  And so that's the issue.  So you start

8    with Hydropads.  Hydropads is the universe of pads they make.

9    We go forward, we move forward, we have capital investment, we

10   substantially increase the size of our employees, we work

11   forward, and I believe that the case law talks about in terms

12   of reliance it's sufficient if they lull you into a feeling

13   that you're not going to be sued and you can continue on with

14   business as usual.  That's what we did.

15       THE COURT:  Well, where did they threaten to sue

16   you?  I mean, they asked you to stop.  I went through the

17   letters, and maybe my notes aren't as thorough as they should

18   be, but the last letter I have before -- well, before you got

19   your patent '591 in 2004 is -- and quite frankly, these are

20   handwritten notes that are quite cryptic -- 9/6/2000, Petter

21   to Hydro, wants more detailed information regarding sales

22   prior to 9/97, and then Hydro responds, no material change.

23   That's it.

24       MR. FOSTER:  Your Honor --

25       THE COURT:  That's not a threat of a lawsuit or

1    anything.

2         MR. FOSTER:  Well, I guess what you have to look at,

3    first of all, the first letter that came out says we've spent

4    a lot of money.  This is Exhibit 1 to --

5         THE COURT:  Yeah, but that was even before they got

6    a patent.

7         MR. FOSTER:  Certainly.

8         THE COURT:  My notes on that say Petter warns Hydro

9    that it appeared that Hydro's system would violate several

10   claims in a pending patent application, will pursue whatever

11   means are available.  Is that what you're talking about?

12        MR. FOSTER:  Yes, okay.  And the testimony of Mr.

13   Petter that we've cited to indicates that that meant -- "all

14   means necessary" meant when the patent issued, taking them to

15   court, and that was his testimony.  That was his

16   understanding.  That was our understanding.  So you have the

17   testimony of our guys saying, We thought that meant when the

18   patent issued, they were going to sue, and their guy

19   testifies, We meant that we were going to sue.  That was part

20   of the "all means necessary."  So you've  got undisputed facts

21   supporting that.

22             Now, I think that's just the starting point, and

23   that gives the frame of reference to both parties that a suit

24   may be coming.  The patent issues, there's exchanges of

25   letters, and then we get down to the October 1 --

1        THE COURT:  Did they ever threaten a lawsuit once

2    they got the patent?  I mean, they couldn't sue you when they

3    sent that letter on 5/15/98.  Then the patent issues.  They

4    never threatened to sue you after that.

5        MR. FOSTER:  Well, you get to the final letter, Your

6    Honor, which was before -- this is the last letter.  This is

7    in October of 2000.

8        THE COURT:  All right.  Let me -- October, okay.

9        MR. FOSTER:  And it basically has a drop-dead

10   deadline of October 1.  Give us more answers to our questions

11   by October 1, 2000.

12        And what's the testimony of Mr. Petter about that?

13   He said -- this is in Exhibit L to our papers.  He says:  "You

14   previously informed Hydro that you'd take any means necessary

15   to enforce your intellectual property rights, correct?"

16   Answer:  "Correct."  "Would it fair to assume if you're

17   sitting in Hydro Engineering's standpoint that if they don't

18   provide something, they may well get sued?  That would be a

19   fair understanding, wouldn't it?"  And this is concerning the

20   October 1 deadline.  Answer:  "I would be concerned if I were

21   them, yes."  Question:  "Concerned about getting sued?"

22   Answer:  "Yes."

23        That's the testimony of their witness in respect to

24   the October 1 deadline.  It's exactly what they intended to

25   convey.  That's exactly the way it was taken.  The witnesses

 1    on both sides of the case testified they expected that Hydro

 2    would be sued if we didn't do what we needed to to solve the

 3    issue.

 4                THE COURT:  All right.

 5                MR. FOSTER:  We responded, and they do nothing for

 6    seven years.  So with all respect, Your Honor, while they

 7    don't in the letter expressly say we're going to sue you, the

 8    import of what they did according to the testimony of

 9    witnesses on both sides is initially when he said whatever

10    means necessary, that intended to convey the idea that they

11    may be going to court.

12                THE COURT:  Maybe, yeah.

13                MR. FOSTER:  And the October 1 deadline clearly, he

14    says, I'd be concerned about getting sued if I were you.  Our

15    guys said, We were concerned about getting sued.  When both

16    sides agree to the interpretation of that and both sides

17    understand that there's going to be a lawsuit, I don't think

18    there's a question of fact that prevents you from concluding

19    that they threatened a lawsuit; and when they didn't go

20    forward with it and Hydro continued to move forward with

21    business as usual, that you have the situation that equitable

22    estoppel -- for which equitable estoppel should afford relief.

23                THE COURT:  All right.  Thank you.

24                Mr. Rath?

25                MR. RATH:  A few thoughts in responding to what Mr.

1    Foster said and then I'd be happy to answer any questions you

2    have for me, Your Honor.

3            You know, Hydro's coming in here asking for

4    extraordinary relief, okay, and I think you've hit the nail

5    right on the head here.  You know, they have to prove three

6    things.  They have to prove that there was some misleading

7    communication and that that had to happen after the patent

8    issued, okay.

9            None of the letters that I sent to them threatened

10   litigation in any way.  In fact, the first letter I sent said

11   we're willing to entertain the possibility of granting you a

12   license and we'd like to resolve this in an amicable manner,

13   and it never changed, including the September letter that I

14   sent.  What happened there was the Petters were getting tired

15   of feeling like they were getting run around.  We kept asking

16   for information, asking for information.  Well, it's been

17   destroyed.  We don't have that.

18           And so these deadlines -- or the one deadline that

19   was implemented was simply to keep the thing going so the

20   Petters could decide how they were going to proceed, and at

21   that time they made a business decision that, you know, we're

22   not getting anywhere with this.  Why spend money on all these

23   letters and time and energy?  Let's just go on and do our

24   business.

25           The other thing you touched on, Your Honor, was how

1    was Hydro adversely affected?  Nothing has been quantified

2    here or even attempted to be quantified.  They say, Well, you

3    know, we went ahead and did business as usual and we had a

4    loss and relied on your statements.  Well, what loss was it?

5    Where is the potential increase in damages?  Where is the loss

6    in their business or anything else that they got as a result

7    of this so-called reliance on the misleading conduct that they

8    claim happened?  There is none.  They've provided nothing, no

9    specific evidence to show, Hey, we lost a million bucks.

10   We're looking at a million dollars in damages.  There's

11   nothing like that.

12          They also claim there's been a loss in evidence.

13   Well, what evidence?  Okay, apparently Mr. McCormick can

14   remember that he received a letter in 1998 even though Mr.

15   Petter doesn't remember sending it, but somehow the --

16          THE COURT:  Yeah, that's the letter that maybe came

17   out of discovery as distinguished from out of their -- from

18   you instead of them?

19          MR. RATH:  Correct, correct.  That letter did not

20   come out of their files at all.  And he has the memory back to

21   1998 that he received that letter, but yet there's somehow a

22   loss of memory about some other thing that we don't even know

23   about.  Again, there's nothing specific pointed to that, Hey,

24   we lost this evidence, and therefore, we're adversely affected

25   by it.

1           The last thing I want to touch on, Your Honor, is

2     that 1998 letter.  You are correct that Petters did not have a

3     patent at that time.  When you go through the patent

4     application process, you don't know what the scope of the

5     patent's going to be until it issues, and so there's no way of

6     knowing really until it issues about whether their product

7     would be covered by the claims of that patent or not.  It was

8     merely to put Hydro on notice.  Hey, we got a patent

9     application on file.  You should beware.

10          THE COURT:  All right.

11          Thirty seconds?

12          MR. FOSTER:  May I, just very quickly?

13          In regard to prejudice, among other things, even in

14    respect to the configurations they assert that are infringing

15    today, they claim that there are two installations that are

16    infringing.  Had we known what their position is, had they

17    sued and had they narrowed their position, then we would not

18    be here today because we would have configured the systems

19    differently, and we wouldn't have sales in 2005 and 2007 that

20    infringe.  That's prejudice.

21          THE COURT:  Well, of course, at this point in time I

22    take all the facts in the light most favorable to the party

23    opposing the motion, and that happens to be Petter.  And I

24    think that there are sufficient facts here that I'm not going

25    to grant the motion, and I'll go through a more thorough

1  analysis in a minute.

2       But just keep in mind the standard that we have for

3  summary judgment.  I mean, you've made the motion.  I'm not

4  going to grant summary judgment for either side, but as I

5  said, the facts must be construed in the light most favorable

6  to the plaintiff, then the counter-defendant, Petter, at this

7  point in time.  All right.

8       MR. FOSTER:  Fair enough.  I had a couple other

9  points that I'd be happy to make very quickly, but if you've

10 already made that decision, then we'll move on.

11      THE COURT:  Yeah, okay.  And let me give you the

12 grounds for it.  Bear with me as I try to do this.

13      A patentee is equitably estopped to assert

14 infringement of its patent if:  one, it misleads the alleged

15 infringer through conduct, such as words, action, inaction, or

16 silence when it had a duty to speak, to reasonably infer that

17 the patentee does not intend to enforce its patent against the

18 alleged infringer, and that's the prime test we're talking

19 about; the alleged infringer relies on that conduct; and the

20 alleged infringer will be prejudiced by its reliance if the

21 patentee is allowed to proceed with its claim.  That's <u>Scholle</u>

22 <u>Corporation against Blackhawk Molding Company, Inc.</u>, 133 F.3d

23 1469, 1471, Federal Circuit, 1998.

24      Petter warned Hydro in May 1998 that it would

25 infringe its pending '792 patent, and informed Hydro that

1    Petter had forwarded the matter to its attorney and would,

2    quote, "pursue whatever means were available," end quote, to

3    protect its intellectual property.  Petter wrote Hydro again a

4    couple of months after it received the '792 patent in February

5    2000.  That letter suggested that Hydro was infringing the

6    '792 patent, stated that Petter preferred an amicable

7    resolution, and raised the possibility of granting Hydro a

8    license.  The parties exchanged information about their

9    products for several months.  On September 6, 2000, Petter

10   requested Hydro to provide more information about its product

11   line by October 1, 2000, and communications ceased shortly

12   thereafter.

13        Hydro contends that Petter threatened immediate

14   litigation and subsequently lulled Hydro into believing it had

15   abandoned its claim through seven years of silence.  While

16   threatening conduct followed by silence may establish

17   estoppel, silence will not suffice, quote, "unless there was a

18   clear duty to speak or the patentee's continued silence

19   reenforces the defendant's inference from the plaintiff's

20   known acquiescence that the defendant will be unmolested.

21   Furthermore, this inference must be the only possible" one to

22   merit summary judgment.  That's <u>A.C. Aukerman Company v. R.L.</u>

23   <u>Chaides Construction Co.</u>, 960 F.2d 1020, 1043-44, Federal

24   Circuit, 1992.

25        To demonstrate reliance, the parties must have had,

1    quote, "a relationship or communication that lulls the
2    infringer into a sense of security," end quote.  That's
3    _Aukerman_ at 1043.  Petter made no affirmative representation
4    that it had abandoned any claim against it, nor did it remain
5    silent when it had a duty to speak.  Hydro's reliance on
6    Petter's silence, then, does not rise to the point where
7    summary judgment should be granted, and it's a good question
8    whether it was reasonable if there was reliance.

9            In _Aukerman_, the Federal Circuit held that the
10   plaintiff's nine years' silence after setting a deadline for
11   the defendant to take a license created a reasonable inference
12   that the defendant could use the invention unmolested.  In
13   that case, the defendant had informed the plaintiff that
14   another party was responsible for any infringement.

15           In _Scholle_, the plaintiff was engaged in a number of
16   lawsuits against alleged infringers.  I think you have that
17   cite.  If you don't, I'll give it to you.  The defendant
18   informed the plaintiff it had developed a product it believed
19   did not infringe the plaintiff's patent and that it would
20   market the product unless the plaintiff informed the defendant
21   that it believed defendant's product infringed.  That's
22   _Scholle_, 133 F.3d at 1472.  The court held that this course
23   of conduct established the plaintiff's duty to speak and that
24   the defendant reasonably inferred from the plaintiff's silence
25   that it would not be sued.  Same cite.

1        The affirmative conduct that led the defendants in

2   the aforementioned cases to conclude from the patentees'

3   silence that they were abandoning any claims against them is

4   not present here.  Hydro did not inform Petter that it would

5   proceed unless Petter determined Hydro had infringed Petter's

6   patent, and there was no suggestion that Petter regarded

7   someone else liable for the alleged infringement.

8        The Federal Circuit has held that silence following

9   an attempt to negotiate a license was insufficient.  That's

10  Meyers against Asics Corp., 974 F.2d 1304, 1308-09, Federal

11  Circuit, 1992.  Although the delay was longer here, the facts

12  are somewhat similar to those in Meyers.  And let me emphasize

13  once again that these are equitable matters and one judge's

14  sense of fairness sometimes is different from another judge's

15  sense of fairness, but we still are guided to a large extent

16  by precedent from the Court of Appeals, and maybe sometimes

17  even from other district judges and sometimes even from

18  ourselves.  We don't even have to follow our own decisions, by

19  the way.

20       Hydro did ask Petter whether it was correct in its

21  belief that it could continue operating if its activities long

22  predated the '792 patent.  However, the evidence suggests that

23  Petter continued to request information because it had not

24  determined that Hydro was correct.  Petter never suggested it

25  believed that question had been resolved in Hydro's favor.

1        Hydro's assertion that Petter threatened an imminent
2    lawsuit is unpersuasive.  Although Petter stated it would
3    pursue whatever means were available to protect its interest,
4    Hydro knew at the time that Petter's patent was merely
5    pending.  A suit for infringement was not possible at that
6    time.  When the parties renewed communication after the '792
7    patent was issued, Petter did not threaten suit, but it
8    instead explained that it preferred an amicable solution.

9        Although the Federal Circuit held that threatened
10   litigation was not a prerequisite to estoppel by silence in
11   ABB Robotics against GMFanuc Robotics Corp., 52 F.3d 1062,
12   Federal Circuit, 1995, the parties in ABB Robotics had a more
13   extensive relationship than Petter and Hydro.  GMFanuc's
14   parent company was the plaintiff's largest customer.  GMFanuc
15   knew the plaintiff was not actively marketing the subject
16   matter of the patent, and furthermore, the parties continued
17   negotiating other licensing arrangements and the plaintiff
18   licensed other patents to the defendant.

19       Hydro and Petter do not have the extensive
20   relationship that justified equitable estoppel in ABB
21   Robotics.  In fact, they happen to be competitors and not any
22   business relationships with each other, other perhaps than
23   this lawsuit and perhaps some competition in trying to sell
24   their respective car wash systems.

25       Hydro has not provided sufficient evidence that it

1  relied on its belief that Petter had abandoned any claim

2  against it.  Hydro contends it invested substantial capital to

3  expand its operations, significantly increasing sales and

4  profits from its Hydropad products.  However, when initially

5  warned of potential infringement in 1998, Hydro replied that

6  it had been selling wash pads since 1980 and asserted that the

7  '792 patent would be unenforceable against Hydro because its

8  allegedly infringing activities long predated Petter's patent

9  application.

10          This evidence suggests that Hydro would have

11  continued its capital investment even if it believed Petter

12  would continue to pursue its claim.  Hydro had been conducting

13  business in this field for years.  There is no indication it

14  suspended operations when it was contacted by Petter only to

15  resume them after a time because it believed Petter had

16  relinquished its claim.  It appears that Hydro merely

17  continued along a course it had charted years before receiving

18  any of these letters.  At the least, whether Hydro relied on

19  its belief in expanding its business operations is a genuine

20  issue of material fact which you can look at again later, but

21  at this point in time I don't think that there's been any

22  clear showing for summary judgment, and that's the reason for

23  the ruling that I announced earlier.

24          So there we are on that, which brings us then to the

25  claim construction of the '792 patent.  On that, I think the

1    critical term is "vacuum pump," but I'm delighted to hear that

2    the parties have narrowed the issues somewhat.

3         Where are we?  What is this narrowing you're talking

4    about, Mr. Foster, if it's true?  And I'm not saying, you

5    know, that you would mislead.  I'm just saying --

6         MR. FOSTER:  I think that we're talking about the

7    Hydropads that are accused of infringement.  When Mr. Rath

8    wrote letters back in 2000, he said, We think your Hydropad

9    product may be similar to our product and may infringe, and so

10   that's really what Mr. Miller was prepared to talk about.

11        THE COURT:  I see, okay.

12        MR. FOSTER:  From our perspective we completely

13   agree that "vacuum pump" is the key limitation, and frankly,

14   we believe it should be dispositive.  While we raised three

15   other elements, we think the vacuum pump should be the

16   beginning and end of things.

17        THE COURT:  Okay.  Just stand right there if you

18   would.  Mr. Rath, why don't you stand next to him so that I

19   can zero in on this here, and it might go back and forth.

20        Do you agree with him, Mr. Rath, that the claim

21   construction of "vacuum pump" might be dispositive?

22        MR. RATH:  I think it --

23        THE COURT:  If I buy his construction, that the case

24   is over with, because then if I buy his construction, then I

25   go on to summary judgment.  Assuming that I buy his

1    construction of the claim, and I've got the claim written out

2    here somewhere, do you agree then that at least you're in big

3    trouble on summary judgment?

4           MR. RATH:  I am a patent attorney and I hate to

5    concede anything, but this time I will because I do think it

6    is dispositive if Hydro gets the construction it wants because

7    I don't think there's an equivalence argument here, and so I

8    really think that the infringement issue would be decided.

9           THE COURT:  And let me, you can -- let me tell you I

10   have real trouble with your argued construction.  First of

11   all, I don't know the difference -- you talk about your

12   proposed construction uses the word "suck", which to me

13   implies some kind of a vacuum at some point in time.  I mean,

14   all pumps based on my one year of physics in high school and

15   one year in college, basic stuff, all pumps suck a little

16   bit.  I mean, a piston pump sucks.  A rotary pump sucks.  They

17   all suck as these chambers open and close.

18         But a vacuum pump sucks differently, doesn't it?

19   Because the piston pump as I understand it operates directly

20   on the water while the vacuum pump operates on air, and then

21   there's a sucking, but there's more than that.  It doesn't

22   operate directly on the water.

23         So I have a -- and then you have that, you know,

24   where you try to distinguish the Carter -- I could through all

25   this bit by bit, but I'll give you a chance to respond to all

1   this.  Then you have your distinction of the Carter patent,

2   and it looks to me like that distinction, that long paragraph

3   says exactly what Mr. Foster wants me to say.  This is your

4   big opportunity.

5         MR. RATH:  I think in that paragraph we definitely

6   limited it, okay.  And if I can back up a little bit, "vacuum

7   pump" is --

8         THE COURT:  But you say you limited it only to the

9   placement.  I don't read that at all.  You also limited it --

10  you limited it to the placement and you limited it to the

11  operation.  That's the way I read it.

12        MR. RATH:  I agree with you that we limited it to

13  the operation, but I don't agree that it goes as far as Mr.

14  Foster wants it to go to, and that's where we disagree, okay.

15  And I think the operation and placement go hand-in-hand,

16  okay.  But really what I believe that the construction should

17  be is that you need to pull water, it's a pump that pulls

18  water through the tube, okay, from the drainage fitting to the

19  filtering system, and that's the end of the story.

20        THE COURT:  Well, okay.  Tell me how their pump does

21  that.  You say pull.  Do you say push, Mr. Foster?

22        MR. FOSTER:  That's correct.

23        THE COURT:  Yeah.  He says push.

24        MR. FOSTER:  That's absolutely right, correct.

25        THE COURT:  Okay.  Tell me how it's pulled, and tell

1    me how it's pulled with a sucking.

2         MR. RATH:  Okay.  We provided you a video, I

3    believe, and a declaration from Mr. Doug Petter that showed

4    just how that pump sucks water from a trough over to the pump

5    box.  And what happens is, I don't want to get into too much

6    detail, but basically we're talking about pressure

7    differentials.  Vacuum and where we're talking about gravity

8    or sucking, really we're talking about pressure on this side

9    where the trough is, okay, and where there's a head of water

10   plus atmospheric pressure, gravity, and a pressure on this

11   side.  Well, what happens is gravity will cause or atmospheric

12   pressure will cause that water to flow.

13        THE COURT:  Of course.

14        MR. RATH:  Okay.  But once you put the pump in that

15   Hydro's using, it flows faster.  It's creating that suction.

16        THE COURT:  Of course.  Of course.

17        MR. RATH:  Okay.  So it's not a pushing; it's

18   pulling.  It's pulling that water.

19        THE COURT:  But it's not a vacuum pump.  In other

20   words, it's operating by gravity, not by the sucking of air

21   out of a chamber, and that's the point that you have with a

22   vacuum pump.

23        For example, you've got two chambers and they're

24   ten-gallon chambers.  They're side by side with a pipe between

25   them.  You put five gallons into the one on the right.  You

 1    put six gallons to the one on the left.  What happens?  They

 2    move.  They're each five and a half.

 3              MR. RATH:  That's correct.

 4              THE COURT:  They're each five and a half gallons.

 5    All right.  Is that what -- that's what you're talking about

 6    basically, but they're not talking about that.  They're saying

 7    it's a vacuum pump.  You've got ten gallons.  You've got five

 8    gallons on one side, you've got five gallons on the other

 9    side, and you suck the air out of the one on the right.  What

10    happens?  The water flows.  And if you put a spigot on it, the

11    water would flow also.  You get down to four gallons.

12              That's totally different from an ordinary pump

13    that -- what you're talking about is speeding up the flow of

14    water.  The pump is speeding up the flow of water.  That means

15    of course that the water in the pump on the left is going to

16    flow into the pump on -- into the chamber on the right.

17              MR. RATH:  This is --

18              THE COURT:  I don't get your argument.  In other

19    words, you're not -- you use the word "vacuum pump."  All

20    right.  The difference between drinking a Coca-Cola from a

21    glass and through a straw, I guess.  But the water is going

22    to -- you pump the water out of the receiving chamber, of

23    course the water's going to flow out.  But that's not anything

24    close to a vacuum, and it's not anything close to the

25    excavation of gas from a chamber.  What it is is simple

1   gravity, like you yourself said.

2          MR. RATH:  It's not just simple gravity, though,

3   Your Honor.  It's creating a higher pressure differential

4   between the two sides.  Their pump and our what we call the

5   vacuum pump, okay, it's working the same way.

6          THE COURT:  How does it create different pressure?

7          MR. RATH:  It creates a lower pressure, relative

8   pressure in the pump box by removing water and causing -- and

9   pulling air into it to move the water.

10         THE COURT:  Well, that's not anything close to a

11  vacuum as you yourself say, but that's simple hydraulics.

12  That's got nothing to do with the pump.  It's got nothing to

13  do with the vacuum pump.  It's -- anyway, Mr. Foster, where am

14  I wrong here?

15         MR. FOSTER:  I can't -- you're right on.  I did want

16  to point out one thing if I could.  I brought Mr. Miller to do

17  one thing.  Maybe he can hold this up for me.

18         THE COURT:  Go ahead.  Have you shown this to Mr.

19  Rath first?

20         MR. FOSTER:  Yeah.  This is just a figure.

21         THE COURT:  Have you shown this to Mr. Rath?

22         MR. RATH:  Well, I've seen this.  This is from the

23  brief.

24         MR. FOSTER:  It's from our brief.  I want you to

25  hold this one up, Mark, I think.

1            What I want to tell you is you are absolutely

2    right.  A vacuum is going to pull it by air, the sucking of

3    the straw.  What they did to get around Carter -- and this is

4    Carter, okay.  You've got the tub where they're going to put

5    the water in there.  You have pipe 112, it's a pipe, and then

6    you have the pump, and then you have the filters.

7            THE COURT:  Stick right there, Mr. Rath.  You'll get

8    a chance with them.  You get to use their chart too.

9            MR. FOSTER:  Not a problem.

10           So what they did is they said -- they didn't say

11   anything about the relative pressures or how fast fluid flows

12   from one tub to the next.  They said, We don't have this kind

13   of a pump.  We have a pump -- we don't have that.  We have our

14   pump right here and it's a vacuum pump, and we take with that

15   air that you're talking about, we pull it through the filters

16   with the vacuum pump.

17           THE COURT:  Right.

18           MR. FOSTER:  We don't push it through the filters,

19   and therefore, they said there are two whys.  Why is that

20   important?  This is what they told the Patent Office to get

21   their patent.  They said because this pump, being an in-line

22   pump, is going to have the junk coming here, it's going to,

23   you know, stop the impellers.  It will get clogged with

24   debris, okay.  If you vacuum it through the filters first,

25   there's no debris.  And this is important.  This is really

1    hitting his issue.

2         THE COURT:  The same like you have in a heart pump,

3    by the way.

4         MR. FOSTER:  They said --

5         THE COURT:  Well, that's the reason they have a

6    vacuum -- you know, that's why they have the filters in a

7    heart pump.  But anyway, go ahead.

8         MR. FOSTER:  Yeah.  And then they said the second

9    thing is this kind of a pump is big and you have to have -- in

10   order for the fluid to drain from here to the sump, you have

11   to have either the wash pad higher or you have to create a box

12   for it to flow into.  They were talking about the exact kind

13   of flow that he wants to argue now is some kind of a vacuum

14   pump, but at the end of the day they said, We pull it through

15   with a vacuum pump, and commercial manufacturers of vacuum

16   pumps thought this was not going to work.  They were

17   surprised.  An in-line pump that they want to call a vacuum

18   pump today, everybody knew about.  It's well-established in

19   the prior art, including in Carter.  And there's just -- when

20   you disclaim as they did here, you can't recapture it when

21   somebody has the same kind of a pump that Carter did in-line

22   with impellers that pushes the water through their filter.  It

23   doesn't draw through, so I think you're dead on, Judge.

24         THE COURT:  Hold it up for Mr. Rath.

25         MR. MILLER:  I'm happy to hold it for Mr. Rath as

1     well.

2          MR. RATH:  Well, sure you are based on what the

3     Judge said, but I want to reiterate the point we were making

4     to the Patent Office was both the placement and how it works.

5     How it works is it pulls water through this tube from the pad

6     to the filtering system, and that was the intention of this

7     what we call the vacuum pump.

8          You know, at the end of the day a vacuum pump

9     typically, like you said, removes air.  It was probably the

10    wrong terminology, but the way we tried to define it to the

11    Patent Office was simply that was to move that water through

12    the tube from the pad to the filters.  And I would concede we

13    did distinguish a pump that was right here at this pad, okay.

14    There's no denying that.  But the idea was that this pump was

15    to move this water to the filtration system through a tube.

16          THE COURT:  All right.

17          MR. FOSTER:  I just have one more thing to add,

18    Judge, just because I can't help myself.  Hockerson v.

19    Halverson, this is -- Halberstadt, 222 F.3d 951, they made the

20    same argument.  Gee, that was the wrong terminology.  That

21    must have been a mistake the way we called it a vacuum pump.

22          THE COURT:  Well, they called it that way more than

23    once.  I mean --

24          MR. FOSTER:  This is what the Federal Circuit said:

25    "Their argument therefore reduces to a request for a mulligan

1   that would erase from the prosecution history the inventor's

2   disavowal of a particular aspect of a claim term's meaning.

3   Such an argument is inimical to the public notice function

4   provided by the prosecution history.  The prosecution history

5   constitutes the public record of a patentee's representations

6   concerning the scope and meaning of the claims, and

7   competitors are entitled to rely on those representations

8   when ascertaining the degree of lawful conduct, such as

9   designing around the claimed invention."

10          THE COURT:  Well, final words, Mr. Rath?

11          MR. RATH:  I don't disagree with the law, obviously,

12  but I don't -- I've agreed, I believe, that there's been a

13  disclaimer here.  But I think what we did was define it, and

14  we have a difference of opinion on how that term was defined.

15          THE COURT:  Yeah.  Well, okay.  You're going to have

16  to find out if I can read my own handwriting here to a certain

17  extent, I think.

18          Well, the disputed term is "vacuum pump for pumping

19  a liquid through said tube from said drainage fitting to the

20  filtering system."  Hydro would say:  "Vacuum to draw water

21  from the fitting and through the filters rather than a pump to

22  push the water through the filters."  Petter says:  "A pump

23  located outside of the trough which utilizes suction to vacuum

24  up wastewater from the washing process."

25          Well, in support of its arguments Petter emphasizes

1    the language of the claim itself:  "vacuum pump."  It's not a

2    magic term of any kind.  Hydro also notes that the single

3    preferred embodiment described in the specification states

4    that the "filtering system generally includes two vacuum pumps

5    and a tank.  Vacuum pumps suck the liquid through the hose

6    from the drainage fittings on the various wash racks to the

7    filtering system."  Hydro contends that the specification

8    requires a vacuum pump inside the filtering system to apply

9    negative pressure to suck the water from the drainage

10   fittings, through the hose, and into the filtering system.

11        Hydro also relies on the prosecution history.  The

12   examiner originally rejected claim 1 on the grounds that it

13   conflicted with the prior art, the Carter patent that we were

14   just talking about.  And Petter distinguished the Carter

15   patent by noting that, quote:  "utilizing a vacuum to draw the

16   water from the fitting and draw the water through the filters

17   rather than utilizing a pump located directly at the fitting

18   for pushing the water through filters and the heater to the

19   pressure washer is much more advantageous, since the water

20   passes through all the stages of filters prior to reaching the

21   vacuum.  In the Carter patent pump 104 would be subject to

22   continuous jamming of the impellers by debris rinsed off the

23   object being washed.  Furthermore, pumps, such as the pump 104

24   utilized in Carter, take up a considerable amount of space and

25   require that the water flowing from the wash rack flow

1   downward into the pump.  Such an arrangement would require the

2   wash rack to either be elevated sufficiently or would require

3   that the pump be provided in a well formed under or adjacent

4   the wash rack. Thus, the use of a vacuum provides several

5   advantages not offered by the pump used in the Carter patent."

6       Hydro contends that Petter cannot construe its

7   claims, quote, "one way in order to obtain their allowance and

8   in a different way against accused infringers," end quote.

9   <u>Computer Docking Station Corp. against Dell, Inc.</u>, 519 F.3d

10  1366 at 1375, Federal Circuit, 2008, quoting another case.

11      Petter emphasizes its argument that the

12  specification describes a vacuum pump which "pumps a liquid

13  through the tube from the drainage fitting to the filtering

14  system," and notes that it states, quote, "vacuum pumps 70

15  suck the liquid through the hose 20 from the drainage fittings

16  34 to the various wash racks 12 to the filtering system 14."

17  Petter argues that during prosecution it distinguished, quote,

18  "a pump which utilized a vacuum to draw water from the

19  drainage fitting from a pump that was located directly at the

20  drainage fitting," end quote.  This limitation, it contends,

21  requires only that the pump be placed anywhere besides the

22  trough or the drainage fitting.

23      As we've already discussed, the proffered

24  constructions contain two fundamental differences:  the

25  location of the vacuum pump and the manner in which it acts

1    upon the liquid.  "Pumping," taken alone, could compromise

2    propulsion of a fluid through either positive or negative

3    pressure.  The fluid in question might enter the pump's intake

4    and be expelled more rapidly from its exhaust.  A pump might

5    also be used to evacuate a gas-filled chamber, using the

6    greater atmospheric pressure outside the chamber to draw the

7    fluid in question into the chamber.

8         Under its ordinary meaning, a "vacuum pump" is

9    understood by mechanical engineers to be, quote, "a compressor

10   for exhausting air and noncondensable gases from a space that

11   is to be maintained at subatmospheric pressure," end quote.

12   That's McGraw-Hill Dictionary of Scientific and Technical

13   Terms (Mark Licker, publisher, Sixth Edition, 2003).

14        The Court must construe the disputed language by

15   relying primarily upon intrinsic evidence.  That's the

16   Phillips case which even I am becoming familiar with at this

17   stage in my life, 415 F.3d at 1321, 1324.  Though the Court

18   carries with it this general understanding of a vacuum pump,

19   the construction of the term is not bound by this

20   understanding.  Instead, it will be molded by the use and

21   context of the language of the claims, specifications, and

22   prosecution history.

23        The first question, therefore, is whether Petter

24   intended "vacuum pump," end quote and quote, to be understood

25   according to its ordinary meaning within the art, or whether

it intended "vacuum pump" to encompass both devices that pump
the liquid by acting directly upon the liquid as well as those
that pump the liquid indirectly by evacuating a gas-filled
chamber and relying on the greater atmospheric pressure to
draw the liquid into the chamber. In other words, did Petter
intend that "vacuum pump" actually include a broader class of
pumps than indicated by the ordinary meaning of "vacuum pump"
within the art?

The claim itself states only that the vacuum pump
pumps the liquid. No other language in the claim reveals
whether the pump does so through indirect or direct action
upon the liquid. The specification describes a single
preferred embodiment of the invention. That embodiment
contains a, quote, "filtering system generally including two
vacuum pumps and a tank," end quote. These, quote, "vacuum
pumps suck the liquid into the tank 72," end quote. "Suck"
has many definitions. However, the only one applicable in
this context is "to draw water, air, et cetera, in some
direction, especially by producing a vacuum." That's Oxford
English Dictionary, Second Edition, 1989. This definition
strongly suggests the creation of a vacuum, but it does not
require that.

The specification warns that, quote, "draining
fitting 34 should have a properly sized hole to ensure the
greatest efficiency. If the hole has too large of a diameter,

1    the vacuum pumps pull on too much air, which is undesirable.

2    If the hole has too small of a diameter, too low of a velocity

3    of the liquid will result."  When the drainage fitting is not

4    filled with liquid, air enters the hose through the hole in

5    the drainage fitting.  That larger volumes of air entering the

6    hose reduces the flow rate of the liquid indicates that the

7    vacuum pumps remove air from the tank into which the liquid is

8    pumped.  The liquid is pushed into the hose toward the tank by

9    the difference in atmospheric pressure and the air pressure

10    inside the tank.  Air entering the tank through the hose via

11    the hole in the drainage fitting weakens the vacuum inside the

12    tank, diminishing the pressure differential on which the

13    pumping mechanism relies.  However, too small a hole restricts

14    the flow of liquid.

15         The preferred embodiment describes only a pump that

16    evacuates a chamber and uses the air pressure differential to

17    pump the water into the filter system.  The Federal Circuit

18    has made clear, however, that "absent a clear disclaimer in

19    the description of the preferred embodiment, the fact that the

20    inventor anticipated that the invention may be used in a

21    particular manner does not limit the scope to that narrow

22    context," end quote.  That's Brookhill-Wilk 1, 334 F.3d at

23    1301.  The admonition of this case prevents the Court from

24    narrowing the ordinary meaning of a claim term where, quote,

25    "the written description and prosecution history fail to

1    express a manifest exclusion or restriction limiting the claim

2    term, and where the written description otherwise supports the

3    broader interpretation," end quote.  In this case, Petter asks

4    the Court to ignore the limitation on, quote, "pump," end

5    quote, imposed by the modifier "vacuum" in the claim itself,

6    even though the specification provides ample evidence that

7    Petter intended the limitation contained in the claims, and

8    provides no evidence that "vacuum pump" was intended to be

9    read more broadly than its ordinary meaning within the art.

10        The prosecution history further belies an expanded

11   interpretation of the phrase.  Petter argues that during

12   prosecution it distinguished the pump claimed in the Carter

13   patent only with respect to its location; i.e. that the Carter

14   pump was located at the trough and the claimed Petter vacuum

15   pump was not.  However, as Hydro points out, Petter's request

16   for amendment distinguished the pump in the Carter patent on

17   additional grounds and with greater specificity than Petter

18   now argues.  Petter argued before the examiner that Carter did

19   not teach or suggest a "vacuum pump for drawing water from the

20   drainage fitting to a filtering system."  This statement does

21   not refer to the pump's location at all.  Instead, it

22   contrasts its operation with the Carter's pump.

23        Petter further distinguished a "vacuum to draw the

24   water from the fitting and draw the water through the filters"

25   from a "pump located directly at the fitting for pushing the

1    water through the filters."  In neither statement did Petter

2    specify the vacuum pump's location.  In both, Petter

3    highlighted the "vacuum" action of its pump, which "draws" the

4    water to the filtering system -- and both of those should be

5    in quotes, "vacuum" and "draws," by the way -- to the

6    filtering system and contrasted it with the action of the

7    Carter pump.  Petter now contends, however, that it merely

8    distinguished the pump's location without limiting the nature

9    of its action.  And I disagree with that, as I've said, for

10   the reasons stated.

11       The contention is not only inconsistent with

12   Petter's argument in its request for amendment, it is also

13   undermined by Petter's explanation to the examiner of the

14   advantages of its vacuum pump over the pump claimed in the

15   Carter patent as was just pointed out in my judgment by

16   Hydro.  Petter noted that, quote, "utilizing a vacuum to draw

17   the water from the fitting is much more advantageous," end

18   quote, than, quote, "utilizing a pump located directly at the

19   fitting for pushing water through filters since the water

20   (drawn by a vacuum) passes through all the stages of filters

21   prior to reaching the vacuum.  The Carter pump would be

22   subjected to continuous jamming of the impellers by debris,"

23   end quote.  This advantage, by which Petter distinguishes the

24   Carter patent, requires a vacuum pump which acts indirectly

25   upon the liquid.  Using a pump which acts directly upon the

1    liquid, as the Carter pump does, requires the liquid pass

2    through the pump before it reaches the filter.

3          Petter also noted in its request for amendment that

4    the Carter pump "requires that the water flowing from the wash

5    rack flow downward into the pump.  The wash rack must be

6    elevated sufficiently or the pump must be in a well formed

7    under or adjacent the wash rack."  Of course, I've read all

8    this before, but anyway, the gravamen of Petter's argument

9    before the examiner was that the liquid must flow downhill via

10   the gravitational force to reach a pump acting directly upon

11   the liquid.  Furthermore, to pump the liquid to the filter,

12   the liquid must be accelerated by the pump before it reaches

13   the filter.  Using a pump which acts directly upon the liquid

14   requires the liquid flow through the pump prior to reaching

15   the filters.  Petter argued to the examiner that its use of a

16   vacuum pump to draw the liquid to the filter solved the

17   shortcoming of the Carter patent.

18         Quote:  "A patentee may limit the meaning of a claim

19   term by making a clear and unmistakable disavowal of scope

20   during prosecution."  Computer Docking, 519 F.3d at 1374.  It

21   may do so, quote, "by clearly characterizing the invention in

22   a way to try to overcome rejections based on prior art," end

23   quote.  Same case.  Petter explicitly limited the scope of its

24   vacuum pump in precisely this fashion.  Petter argues that

25   this limitation applies only to the pump's location.  However,

1    we've gone over that, but it relied not only on that fact, but

2    also on the fact that its vacuum pump acts indirectly upon the

3    liquid by evacuating a chamber and using the resulting air

4    pressure differential to draw the water to the filter, while

5    the Carter pump acts directly upon the liquid as it flows

6    through the pump en route to the filter.

7            "Prosecution disclaimer does not apply to ambiguous

8    disavowal."  <u>Computer Docking</u>, 519 F.3d at 1375.  A disavowal

9    is ambiguous, quote, "if the applicant simply describes

10   features of the prior art and does not distinguish the claimed

11   invention based on those features," end quote, or if the

12   specification, quote, "expressly defines a claim term and

13   'remarks made to distinguish claims from the prior art are

14   broader than necessary,'" end quote.  <u>3M Innovative Properties</u>

15   <u>Company against Avery Dennison Corp.</u>, 350 F.3d 1365, 1373,

16   Fed. Circuit, 2003, quoting another case.

17           Neither circumstance was the case in Petter's

18   prosecution.  Petter expressly distinguished its claimed

19   invention from the described features of the Carter patent.

20   Petter's distinguishing remarks regarding its vacuum pump were

21   not broader than necessary to distinguish the prior art, nor

22   did they limit a claim described more broadly in its

23   application.  Consequently, the Court cannot give Petter's

24   "vacuum pump" a broader construction than Petter gave it when

25   it distinguished the prior art during prosecution.  That's

1    <u>Chimie</u>, 402 F.3d at 1384.  Now, just bear with me a minute

2    here.

3          Well, regarding the talk about the inventor's

4    testimony and the hypothetical posed to Mr. Petter, I'm not

5    going to concern myself with that because I think that the

6    intrinsic evidence in the prosecution of this particular

7    patent, '792 patent, is unambiguous.  So there's no

8    augmentation from the inventor that cuts one way or the other

9    in my judgment.  So for the foregoing reasons I'm going to

10   adopt the -- although if I were writing it myself, I probably

11   would have written it a little differently, but I'm going to

12   adopt the proposed construction submitted by Hydro.

13         That brings us to the motion for summary judgment,

14   and that, the parties agree that the construction that I just

15   gave should lead to summary judgment on the complaint for

16   Hydro.  Just bear with me a minute.

17         Regarding the proposed construction by Petter and

18   the argument that it worked by suction, I think quite frankly

19   that that's the wrong use of the word "suction" under the

20   circumstances of this case.  As we talked about before, for

21   example, if you had a spigot or you had water taken out of the

22   second chamber, there would be a movement of the water, and

23   that's the same thing that could occur with a motor in the

24   second chamber, but that does not amount to suction.  That

25   amounts to gravity and water seeking its own level, which we

1    all learned about in probably the ninth-grade science class we

2    all had to take and I hated at the time.

3         But anyway, removing water from the second box

4    increases the flow rate, increases the velocity, but there

5    certainly is no vacuum and no space has been evacuated, no

6    gases have been evacuated from that chamber, so water moves

7    from one container to the other by virtue of the difference in

8    the weight of the water per unit.  In other words, that's why

9    it evens out at five and a half gallons in my prior example.

10   I just don't get Petter's argument here.

11        But anyway, the action that is being talked about

12   here cannot be regarded as a vacuum.  Moving the water from

13   the second container increases the flow rate, but any pump

14   regardless of the action would create suction as it's defined

15   by Petter.  But that does not equate to a vacuum.  That's true

16   no matter how broadly that's construed.

17        So regarding the complaint, summary judgment will be

18   entered on behalf of Hydro, and we will now go forward with

19   the counterclaims under the circumstances that I outlined

20   earlier; that is, that the parties get me the terms.  Is

21   fourteen days -- that ought to be sufficient.  I mean, you got

22   them to me already.  You just have to nail down the ones that

23   you want.

24        Okay.  We're adjourned.

25        (Proceedings concluded at 11:07 a.m.)

CERTIFICATE OF REPORTER

        I, Kevin W. Gaugier, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the within-entitled and numbered cause on the date hereinbefore set forth.

        I do further certify that the foregoing transcript was prepared by me.

/s/  Kevin W. Gaugier

Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter
110 Michigan N.W.
622 Federal Building
Grand Rapids, MI 49503