# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

PETTER INVESTMENTS, INC.

      Plaintiff,

v.                                                      Case No. 1:07-CV-1033

HYDRO ENGINEERING, INC., and       HON. GORDON J. QUIST
HYDRO ENGINEERING
EQUIPMENT & SUPPLY CO.

      Defendants.
_____/

## OPINION

Defendants, Hydro Engineering Inc. and Hydro Engineering & Supply Co., LLC ("Hydro"), move for an order holding Plaintiff, Petter Investments, Inc. ("Petter"), in contempt of Court for violating the Court's November 6, 2009, Permanent Injunction, entered on stipulation of the parties. Hydro contends that Petter has violated the Permanent Injunction by continuing to make and sell wash pads that infringe the previously-adjudicated claims of Hydro's patents.

For the reasons set forth below, the Court will deny Hydro's motion.

### I. CONTEMPT STANDARD

In considering whether a party should be held in contempt for violating an injunction in a patent infringement case, a district court applies the law of the Federal Circuit. *Abbott Labs. v. TorPharm, Inc.*, 503 F.3d 1372, 1381-82. (Fed. Cir. 2007). Until recently, the Federal Circuit required district courts to engage in a two-part inquiry in contempt proceedings on infringement injunctions. The initial consideration was whether a contempt proceeding was an appropriate forum for determining whether the redesigned product infringed in violation of the injunction.

> In doing so, the district court must compare the accused product with the original infringing product. If there is "more than a colorable difference" between the accused product and the adjudged infringing product such that "substantial open issues with respect to infringement to be tried" exist, contempt proceedings are not appropriate.

*Id.* at 1380 (quoting *KSM Fastening Sys., Inc. v. H.A. Jones Co.*, 776 F.2d 1522, 1532 (Fed. Cir. 1985)). The district court could proceed to the second inquiry – the infringement analysis – only if it found no more than colorable differences. *Id.* In order to carry its burden on infringement, the patent owner had to show by clear and convincing evidence that "the modified device falls within the admitted or adjudicated scope of the claims and is, therefore, an infringement." *KSM Fastening*, 776 F.2d at 1530.

In *TiVo Inc. v. Echostar Corp.*, No. 2009-1374, 2011 WL 1486162 (Fed. Cir. Apr. 20, 2011), the Federal Circuit overruled the portion of *KSM Fastening*'s holding requiring district courts to separately determine whether contempt proceedings are appropriate. *Id.* at *6. This is now an issue "left to the broad discretion of the trial court to be answered based on the facts presented" and guided by the "'more than colorable differences' standard." *Id.* Thus, the party seeking to enforce the injunction must show "both that the newly accused product is not more than colorably different from the product found to infringe and that the newly accused product actually infringes." *Id.* at *7. "The primary question on contempt should be whether the newly accused product is so different from the product previously found to infringe that it raises a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Id.* (internal quotations omitted). This analysis must focus on the differences between the elements of the adjudged infringing product that were found to infringe and any modification or omission of those elements in the newly-accused device. *Id.* The newly-accused device will be deemed more than colorably different from the adjudged infringing one where the differences between the new and old elements are "significant." *Id.*

2

Even if there are no more than colorable differences, a finding of contempt must still be supported by a separate finding that the newly accused product continues to infringe the asserted claims. In conducting its infringement analysis, the district court is bound by any prior claim construction. *Id.* at *8. Moreover, the patentee must show both no more than colorable differences and infringement by clear and convincing evidence. *Id.*

## II. PREVIOUS PROCEEDINGS

### A.  The Infringement Litigation

Petter initially sued Hydro for infringing its patents. Hydro denied liability and counterclaimed against Petter for infringing *its* patents, U.S. Patent No. 6,799,591 (the "591 Patent") and U.S. Patent No. 7,258,749 (the "749 Patent"). After holding a *Markman* hearing on the disputed claim terms of Petter's patents, the Court entered summary judgment in favor of Hydro on Petter's infringement claims.

In its infringement claim, Hydro asserted that Petter infringed several claims of the '591 Patent, including Claims 1 and 15. Claim 1 provides:

> 1. A low profile pad upon which vehicles having weight, including heavy vehicles, and other items are positioned and supported to remove debris from any desired external location thereof:
>
> the pad comprising an impervious undulating top comprising ridges and sloped grooves; the ridges structurally supporting the weight of vehicles and other items to be cleaned and the sloped grooves accommodating immediate flow of cleaning liquid and debris removed from the vehicle along the slope in the grooves to prevent accumulation of debris on the pad;
>
> at least one trough at an edge of the pad into which the cleaning liquid and debris collectively flow and are temporarily stored, and from which stored cleaning liquid and debris are selectively removed, at one or more sites offset from without interference with any cleaning taking place on the pad.

('591 Patent at col. 6, ll. 38-54.) With regard to the disputed claim term "ridges and sloped groves,"

3

the Court defined "ridges" to mean: "the top, upper, or crest portions of the impervious top"; and "sloped grooves" to mean "channels or hollows in the impervious top deviating from the horizontal." (Docket nos. 173 & 154-2 at 6.)

Claim 15 provides:

A vehicle receiving pad comprising:

an impervious top comprising: (a) spaced generally transversely directed impervious ridge portions upon which vehicles, including heavy vehicles, and other items are supported in load-transferring relation for exterior cleaning using a cleaning liquid; and (b) impervious generally transversely directed sloped drainage corridors disposed below the ridge portions into which used cleaning liquid and removed debris collectively flow, each drainage corridor being sloped toward at least one side of the pad;

a trough into which the cleaning liquid and debris, discharged from the covering [or top], collectively flow and are temporarily stored, so as to prevent any material debris accumulation in the drainage corridors and from which the liquid and debris can later be generally segregated and separately removed.

('591 Patent at col. 7, l. 28 - col. 8, l. 6.)

Hydro also alleged that Petter induced infringement of several of the method claims of the '749 Patent, including Claims 2 and 3. Claim 2 provides:

2. A method of low profile washing of vehicles comprising the acts of:

placing a debris-ladened vehicle upon a flat wash pad which rests upon a ground level surface comprising a support base and a vehicle supporting top above the base, the top comprising an exposed top liquid impervious surface spanning continuous at a slight slope to at least one peripheral non-central pad edge;

washing solid debris from the vehicle onto the top liquid impervious surface using wash liquid and causing the solid debris and wash liquid on the top impervious surface collectively flow across the top liquid impervious surface to and directly over the at least one peripheral non-central pad edge and thereafter vertically downward directly through an opening at a top of and into a containment trough disposed above the ground level surface and vertically directly below the at least one peripheral non-central pad edge so that the subsequent cleaning of debris from the containment trough does not interfere with continuing simultaneous vehicle washing.

('749 Patent at col. 7, ll. 1-21.)  During claim construction, the Court construed the term "top" to mean "the upper, higher or highest part, section, point or surface."  (*Id.* at 12.)

Claim 3 of the '749 Patent provides:

3.  A wash liquid and debris containment method comprising the acts of:
providing an impervious flat wash pad;
placing a solid debris-carrying vehicle on an exposed top impervious surface of the impervious flat wash pad;
using wash liquid to remove the solid debris from the vehicle, such that spent wash liquid and removed solid debris are displaced first onto and second substantially horizontally across but not through the impervious flat wash pad to a non-central unobstructed peripheral edge of the impervious flat wash pad and third vertically downwardly through an opening in a top of and into a containment trough below the peripheral edge.

('749 Patent at col. 7, l. 22- Col. 8, l. 6.)  The Court construed the term "top" in Claim 3 in accordance with that term in Claim 2.

On October 6, 2009, the Court granted Hydro's motion for summary judgment of infringement in part, concluding that: (1) Petter's water channel side trough wash pads directly infringe claim 15 of the '591 Patent; and (2) Petter contributorily infringes claims 2 and 3 of the '749 Patent based on its sales of side trough wash pads with and without water channels.  (Docket no. 329 at 17-18.)  Although Petter argued that its water channel wash pads were not impervious because water could leak through a gap on the underside of the impervious top, the Court found that Petter's wash pads were substantially impervious.  (*Id.* at 11-12.)

Following the summary judgment ruling, the parties settled the case, and on November 6, 2009, the Court entered a stipulated Permanent Injunction, which permanently enjoined Petter from infringing the '591 and '749 Patents and

> from making, using, selling, offering to sale, or importing any impervious "side trough" wash pad, including Petter's impervious side trough wash pads with water channels and impervious side trough wash pads without water channels, and any other wash pads for which all of the components found in either of the two wash

pads determined to infringe ([1] impervious side trough wash pads without water channels and [2] impervious side trough wash pads with water channels) are components of any new product.

(Docket no. 345 at 2.)

### B.   Hydro's Post-Judgment Contempt Motions

On June 24, 2010, Hydro filed a motion for contempt and discovery based on Petter's alleged violations of the Permanent Injunction. The motion was referred to Magistrate Judge Brenneman. Following a hearing on the motion, Magistrate Judge Brenneman issued an order which, among other things, required Petter to provide Hydro certain information pertaining to wash racks Petter sold or installed since the entry of the Permanent Injunction. After obtaining discovery from Petter regarding those installations, Hydro filed the instant second motion for contempt.

In its motion, Hydro asserts that Petter has violated the Permanent Injunction by selling and/or installing several infringing wash racks of two types, which Hydro refers to as the "First Configuration" and the "Second Configuration." The First Configuration, which consists of a wash pad with a side trough, is exemplified by the installation for the Borough of Manasquan.[1] (Hydro's Br. Supp. at 8-11.) The Manasquan installation is nearly identical to Petter's Texas and Tulsa installations, which the Court found infringed Hydro's patents, in that it is a wash pad with a side trough. The sole difference is that the top of the Manasquan installation is a continuous metal-plate surface with pairs of uniformly-spaced lines of holes over grooves or drainage channels hidden beneath the wash pad surface, which accommodate the flow of wash fluid and debris from the surface of the pad to the drainage channels below. The top of the Manasquan Installation is depicted

---

[1] Hydro asserts that the wash rack Petter sold to H&E Equipment Services in Indianapolis, Indiana is another example of the First Configuration, (Hydro's Br. at 7 and 7 n.4), but it appears that the wash rack Petter actually sold to H&E Equipment Services was a Second Configuration design, with the trough located within the pad configuration rather than at its side. (Petter's Opp'n Br. at 11 n.1).

in Figure 2 in Hydro's opening brief. (Hydro Br. Supp. at 9.) Petter refers to its wash racks with this type of top as pervious wash racks.

The Second Configuration, like the First Configuration, includes the metal plating with holes over the drainage channels beneath the surface. The Second Configuration differs from the First Configuration in that the trough has been moved from the side to the interior and toward the back of the wash pad, such that it would be perpendicular to a vehicle placed on the pad for washing. The Second Configuration is exemplified by the drawings of the Township of Woodbridge installation, shown on pages 12 and 13 of Hydro's opening brief. The drawing on page 13 shows a Second Configuration wash pad with the trough (in blue) located between two sections of decking material (depicted in yellow and gray).

Most of Petter's post-injunction installations have been in the Second Configuration. These include the Woodbridge, Elms, Castroville, Turnwater, and Benicia installations described in Hydro's opening brief. (Hydro's Br. Supp. at 7.) The Indiana installation, which Hydro initially described as a First Configuration installation, also appears to be a Second Configuration installation. The Shell, Modesto, and Maui installations identified in Hydro's supplemental memorandum are also Second Configuration installations. Thus, it appears that the Manasquan installation is the only First Configuration installation at issue in this motion. Finally, in its supplemental memorandum, Hydro identifies an installation referred to as the CIBRF installation, which appears to be neither a First nor Second Configuration installation. According to Hydro, this installation does not incorporate Petter's newly-designed "pervious" surface but does include the relocated trough as in the Second Configuration. However, it is not entirely clear from the record, including the picture in Hydro's supplemental brief, whether the CIBRF installation in fact lacks Petter's newly-designed "pervious" surface. (*See* Petter's Opp'n Br. at 17 n.3 (stating that "the

Court should keep in mind that all wash racks with perpendicular troughs also have a pervious wash surface" and citing the declaration of Matthew Petter).)

Hydro contends that Petter's redesigned wash pads are merely a colorable variation of the enjoined device, such that they still infringe. For contempt sanctions, Hydro requests that the Court award it its attorney fees resulting from Petter's violation, compensatory relief for the infringing sales in the amount of $345,197, plus an undetermined amount for the profit on three installations for which Hydro has been unable to determine the profit. Finally, Hydro contends that an additional award – perhaps treble damages pursuant to 35 U.S.C. § 285 – is appropriate to punish Petter for its conduct.

### III. DISCUSSION

If there are significant differences between the elements of the adjudged infringing product and the modified features of the newly-accused product, the newly-accused product as a whole should be deemed more than colorably different from the adjudged infringing one. *TiVo Inc.*, 2011 WL 1486162, at *7. As *Tivo, Inc.* explains:

> Instead of focusing solely on infringement, the contempt analysis must focus initially on the differences between the features relied upon to establish infringement and the modified features of the newly accused products.
>
> The primary question on contempt should be whether the newly accused product is so different from the product previously found to infringe that it raises "a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Cal. Artificial Stone Paving Co.*, 113 U.S. at 618. The analysis must focus not on differences between randomly chosen features of the product found to infringe in the earlier infringement trial and the newly accused product, *Additive Controls*, 154 F.3d at 1350, but on those aspects of the accused product that were previously alleged to be, and were a basis for, the prior finding of infringement, and the modified features of the newly accused product. Specifically, one should focus on those elements of the adjudged infringing products that the patentee previously contended, and proved, satisfy specific limitations of the asserted claims. Where one or more of those elements previously found to infringe has been modified, or removed, the court must make an inquiry into whether that modification is significant. If those differences

>between the old and new elements are significant, the newly accused product as a whole shall be deemed more than colorably different from the adjudged infringing one, and the inquiry into whether the newly accused product actually infringes is irrelevant. Contempt is then inappropriate. *Arbek Mfg., Inc. v. Moazzam*, 55 F.3d 1567, 1570 (Fed. Cir. 1995) ("[T]he modifying party generally deserves the opportunity to litigate the infringement questions at a new trial.").

*Id.* at *7.

In the Court's judgment, the differences between Petter's re-designed wash pads and the accused products are significant, such that the redesigned products are more than colorably different from the adjudged infringing wash pads. Petter's prior infringing wash pads had an impervious top surface with ridges and grooves that allowed the wash fluid and debris to flow over the top surface to the edge of the wash pad and into the side trough. In contrast, Petter's redesigned wash pads have golf ball-sized (roughly) holes in the top surface that allow the wash fluid and water to drain into channels located directly beneath the drainage holes. This difference is more than merely one of appearance; rather, it affects how the wash pad functions. Given the nature of the product and the prior art, this difference is significant.

Petter's relocation of the trough from the side to the center of the pad is also a significant difference. Hydro asserts that this redesigned element is not a significant alteration from the prior infringing impervious side-trough wash pad because Petter has simply moved the trough to a different side of the pad and added more structural components extending away from the pad. Hydro may very well be correct. However, there remain substantial open questions about whether this redesigned element infringes, including whether the additional components on the other side of the trough are merely window dressing or whether they actually serve a necessary function – providing a surface on which the vehicle is washed (thus straddling the trough) – as Petter claims. Given Hydro's prior argument distinguishing the Gross reference partially on the basis that the

9

trough claimed in Hydro's patents is offset from the pad to allow access for cleaning the trough without interfering with the washing process, whether the additional decking material is actually part of the washing surface presents a significant issue inappropriate for determination in a contempt proceeding. The Court thus concludes that the newly accused wash pads, as a whole, are more than colorably different from and the adjudged infringing wash pads.

Even if Petter's redesigned wash pads are not more than colorably different from the infringing wash pads, Hydro is still not entitled to a finding of contempt because the First and Second configurations do not satisfy the impervious top limitation. Hydro contends that Petter has violated the Permanent Injunction by offering for sale and selling wash pads that directly infringe claims 1 and 15 of the '591 Patent and by contributorily infringing claims 2 and 3 of the '749 patent. Hydro further contends that Petter has violated the Permanent Injunction by offering for sale and selling products that include all of the components of the previously-adjudged infringing wash pads.

To prove direct infringement, a plaintiff must establish by a preponderance of the evidence that "one or more claims of the patent read on the accused devise literally or under the doctrine of equivalents." *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005). "Contributory infringement imposes liability on one who embodies in a non-staple device the heart of a patented process and supplies the device to others to complete the process and appropriate the benefit of the patented invention." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009). Contributory infringement "can only arise in the presence of direct infringement." *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004).

Notwithstanding Petter's redesigned wash pad top, which includes drainage holes that render

it pervious[2], Hydro contends that the First and Second Configurations infringe because they retain the infringing impervious ridges and grooves under the pervious covering, all as part of an impervious top. Hydro asserts that because the Court previously construed the term "top" to mean "the upper, higher or highest part, section, point or surface," the term "impervious top" used in claims 1 and 15 of the '591 Patent means the upper section or higher part of the wash pad, rather than just the diamond plating top surface. Hydro reasons that because the water channels are located within the top 25% of Petter's redesigned wash pads, they meet the impervious top limitation.

As the Court explained during oral argument, it previously rejected Hydro's present argument – then made by Petter and in a different context – noting that the term "top" in claims 1 and 15 of the '591 Patent is used in a structural, rather than directional, context. In support of its anticipation defense in the prior proceedings, Petter argued that the term "top" as used in the '591 Patent refers to a "top section." In its September 8, 2009, Opinion, the Court observed that while it had construed "top" to mean "the upper, higher, or highest part, section, point or surface," that construction was of the term "top" in the '749 Patent, which was used in a directional context. In contrast, the Court held, the term "top" in the '591 Patent is used in a structural context, and the "impervious top" in the claims of the '591 Patent was shorthand for the "impervious top surface" in claim 1 of the '749 Patent. (Docket no. 277 at 8.) Summing up, the Court stated:

> The Court concludes that "top" as used in "impervious undulating top" and similar phrases in the '591 Patent refers to the upper surface of the wash pad. The Examiner withdrew the Gross reference because Gross did not recite an impervious top *surface*. (Docket no. 205-6 at 11.) . . . Despite Petter's arguments to the contrary, the Court finds that Petter's '792 Patent does not disclose an apparatus with an impervious top. Petter argues that its wash rack, consisting of a grate resting above

---

[2] In its Opinion granting in part Hydro's motion for summary judgment of infringement, the Court set forth the ordinary meaning of "impervious" as "not permitting penetration or passage; impenetrable." (Docket no. 329 at 10 (quoting *Random House Dictionary of the English Language* 960 (2d ed. 1987).) Conversely, "pervious" means "admitting of passage or entrance; permeable." *Random House Dictionary of the English Language* 1447 (2d ed. 1987).

> a tray and a trough, has an impervious top section. Petter argues that even though wastewater drains through the grate, this "top section" is impervious because wastewater does not drain through the tray underlying the grate. The Court disagrees. Water does not drain through the top surface on which the item being washed rests in Hydro's patents. By contrast, water does drain through the grate on which the item rests in Petter's '792 Patent. Any wash pad containing a substructure which was not porous would have an impervious "top section" as Petter seeks to define it. Petter's tray may well be impervious, but the grate is not, and the grate, not the tray beneath it, is the "top" of the Petter wash pad.

(*Id.* at 9.) Hydro's instant argument is thus straight out of Petter's playbook.

While the Court did not construe the term "surface" in claim 1 of the '749 Patent during claim construction, its usage in that claim indicates its ordinary meaning, which is "[t]he outermost boundary (or one of the boundaries) of any material body, immediately adjacent to the air or empty space, or to another body." *Oxford English Dictionary* (May 19, 2011 online ed.), http://www.oed.com/viewdictionaryentry/Entry/194886. Consistent with the discussion in the Court's September 8, 2009, Opinion, the impervious top is the area on which the vehicle rests – the surface – and not the area below the surface. Petter's redesigned pervious top wash pads in the First and Second Configurations therefore do not meet the impervious top limitation.

Although Hydro contends that Petter deceptively characterizes its redesigned wash pads as pervious, there is no evidence that the pervious surface is attached in a manner that makes it easily removable or that Petter's customers do so when using the wash pads. Because Petter's redesigned wash pads do not infringe Hydro's patents and do not contain all of the components of the infringing wash pads, Hydro has failed to carry its burden of demonstrating a basis for contempt.

### IV. Conclusion

In sum, the Court will deny Hydro's motion for contempt because there are more than colorable differences between Petter's redesigned wash pads and the adjudged infringing wash pads and, even if the differences are not significant, the First and Second Configurations and do not

infringe Hydro's Patents and do not contain all of the components of the infringing wash pads. Because the Court concludes that there remain substantial open issues as to whether the center-located trough infringes Hydro's Patents, contempt is also inappropriate for configurations such as the CIBRF installation, which include an impervious surface.


Dated:  July 18, 2011                                      /s/ Gordon J. Quist
                                                        GORDON J. QUIST
                                                  UNITED STATES DISTRICT JUDGE