**Brett L. Foster, 6089**
bfoster@hollandhart.com
**Mark A. Miller, 9563**
mmiller@hollandhart.com
**Christopher B. Hadley, 14055**
cbhadley@hollandhart.com
**HOLLAND & HART LLP**
222 S. Main Street, Suite 2200
Salt Lake City, Utah 84101
Telephone: (801) 799-5800
Facsimile: (801) 799-5700

*Attorneys for Defendants*
Hydro Engineering, Inc. and
CA Cleaning Systems, Inc.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **PETTER INVESTMENTS, INC. d/b/a RIVEER**, a Michigan corporation,<br><br>   Plaintiff,<br><br>vs.<br><br>**HYDRO ENGINEERING, INC.,** a Utah corporation; **CALIFORNIA CLEANING SYSTEMS, INC.,** a California company,<br><br>   Defendants. | **DEFENDANTS' MOTION FOR CLAIM CONSTRUCTION (LPR 4.2)**<br><br>Civil Case No. 2:14-CV-00045-DB<br><br>Judge Dee Benson |

Pursuant to LPR 4.2, Defendants Hydro Engineering, Inc. and CA Cleaning Systems, Inc. (collectively "Hydro") respectfully submit this Motion for Claim Construction concerning the three patents asserted by Plaintiff Petter Investments, Inc. d/b/a Riveer Environmental ("Petter").

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

ARGUMENT ...........................................................................................................................1

    I.      PERSON OF ORDINARY SKILL.................................................................3

    II.    THE '298 PATENT ........................................................................................3

          A.    BACKGROUND................................................................................3

          B.    ASSERTED CLAIMS........................................................................5

          C.    FRAME AND BOTTOM SURFACE ..................................................6

          D.    GRATE ...........................................................................................7

          E.    SLOPED TRAY ............................................................................10

    III.   THE '720 PATENT ......................................................................................11

          A.    BACKGROUND..............................................................................11

          B.    ASSERTED CLAIMS......................................................................17

          C.    SIDE TROUGH ADJACENT THE WASH FLOOR ...............................18

          D.    GUIDE RAIL SEPARATING THE SIDE TROUGH FROM THE WASH FLOOR........................................................................................21

    IV.   THE '774 PATENT ......................................................................................22

          A.    BACKGROUND..............................................................................22

          B.    ASSERTED CLAIMS......................................................................25

          C.    EVACUATION END ......................................................................26

          D.    ELEVATOR DISPOSED IN FLUID COMMUNICATION WITH THE EVACUATOR ..............................................................................28

          E.    ELEVATOR REMOVING DEBRIS FROM THE DEBRIS COLLECTOR AND ELEVATING THE REMOVED DEBRIS FROM A COLLECTION HEIGHT TO A DUMP HEIGHT FOR DUMPING............................................29

    CONCLUSION..................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*ACTV, Inc. v. Walt Disney Co.*,
    346 F.3d 1082 (Fed. Cir. 2003)................................................................29

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
    388 F.3d 858 (Fed. Cir. 2004)..................................................................3

*Innova/Pure Water v. Safari Water Filtration*,
    381 F.3d 1111 (Fed. Cir. 2004)...............................................................1

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (*en banc*) ................................................2, 3

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...............................1, 2, 3, 25

*V–Formation, Inc. v. Benetton Group SpA*,
    401 F.3d 1307 (Fed. Cir. 2005)................................................................28

*Vitronics Corp. v. Conceptronics, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)................................................................2, 3

### OTHER AUTHORITIES

*Webster's Unabridged Dictionary*, p. 833 (2001) .......................................8

*Webster's Unabridged Dictionary*, p. 9 (2001) .........................................21

7299433_2

## INTRODUCTION

The language used to describe Petter's wash rack inventions in the asserted patent claims is very simple. Although Petter cannot explain why, Petter contends the asserted claims can be read so broadly that they encompass the accused Hydropad® products. *See* A1-A3.[1] Petter's unreasonable and vague infringement contentions give rise to the disputes set forth herein concerning the plain and ordinary meaning of certain limitations recited in the asserted patent claims. When the claims are read in the context of the patent specifications, as they must be, the meaning of the disputed terms is clear. The Court should adopt Hydro's proposed constructions for the disputed terms, which will result in summary judgment of non-infringement for all three of Petter's asserted patents.[2]

## ARGUMENT

"Claim construction, or interpretation, is a question of law." *Innova/Pure Water v. Safari Water Filtration*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Id*. The language in the claims should be given its ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*). In addressing the customary meaning of claim language, however, it is important to recognize that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent,

---

[1] Citations to the Joint Appendix containing the parties' contentions, the asserted patents, and the relevant prosecution histories will be made with the page-number designation "A__." Citations to other supporting materials in Hydro's Claim Construction Appendix are made with the page-number designation "H.App. _" *See* LPR 4.2(b).

[2] Hydro has filed three motions for summary judgment of non-infringement concurrently with this Motion for Claim Construction pursuant to LPR 6.2.

7299433_2

including the specification." *Id*.  This contextual inquiry provides an "objective baseline from which to begin claim interpretation." *Id*.

The Federal Circuit has identified four evidentiary categories that may be used to interpret the scope and meaning of patent claims.  They are "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id*. at 1314.  The context in which the term is used in the claims is "highly instructive" to the claim construction analysis. *Id*.  The claims, however, "do not stand alone," but "must be read in view of the specification, of which they are a part." *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*)).  Indeed, the specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id*. (quoting *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  "It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Id*. at 1317.

The Court "should also consider the patent's prosecution history," which forms a part of the overall "intrinsic evidence" along with the specification. *Id*. at 1317 (quoting *Markman*, 52 F.3d at 980).  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *Id*.

Finally, the Court may consider extrinsic evidence to understand the meaning of certain claim language, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id*. at 1317 (quoting

2

*Markman*, 52 F.3d at 980).  Extrinsic evidence, however, is "less significant than the intrinsic record."  *Id.* (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)).  "[U]ndue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history.'"  *Id.* at 1317-18.  Thus, extrinsic evidence such as dictionary definitions or expert testimony is only appropriate to the extent the asserted evidence "does not contradict any definition found in or ascertained by a reading of the patent documents."  *Id.* at 1322-23 (quoting *Vitronics*, 90 F.3d at 1584 n. 6).

## I.      PERSON OF ORDINARY SKILL

Hydro asserts that, for purposes of construing the claims of Petter's patents, the hypothetical person of ordinary skill in the art is one who has several years of experience designing vehicle or equipment washing systems.

## II.     THE '298 PATENT

### A.      BACKGROUND

Petter filed the '298 patent application on November 5, 1999.  The '298 patent has exactly the same specification as its parent patent, U.S. Patent No. 6,021,792, which issued from an application that was filed on September 11, 1997.  A617.  As depicted in Figure 1 below, the '298 patent discloses a "modular cleaning system" that includes one or more "wash racks," a "filtering system," and a "pressure washer."



**Pressure Washer**     **Wash Rack**     **Filtering System**

FIG. 1

*See* '298 at Fig. 1, col. 2, lines 14-28 (A618, A622).  The '298 patent explains that each wash

rack "generally includes a frame, a grate, and a drainage fitting" as shown below.  *Id*. at col. 2,

lines 36-38 (designation numbers omitted).



**Grate**

**Drainage Fittings**

**Frame**

The "frame" is constructed of four walls and a bottom to form a basin.  *Id*. at col. 2, lines 45-46;

Figs. 3, 5 (A618-19, A622).  The '298 patent explains that the grate rests on "grate supports"

located "on the inner side" of the four walls of the frame and "are positioned so that the top of

4

[the] grate ... will be flush with the top of walls[.]"  *Id*. at col. 3, lines 20-25 (A622).  The grate "has openings ... to offer sufficient drainage of the waste liquid from cleaning the dirty item."  *Id*. at col. 2, lines 50-53.  The wash rack can also include "a bottom tray" with a "trough," both of which reside beneath the grate to catch the drainage from the washing process.  *Id*. at col. 2, lines 57-67.  The bottom tray "has its highest point" along one of the frame walls so that it "slopes downward toward [the] trough."  *Id*.  When in use, "liquid drips off the dirty item *through the openings* of [the] grates of the wash rack and onto the bottom tray."  *Id*. at col. 5, lines 8-13 (designation numbers omitted, emphasis added) (A624).  It "then flows downward along the bottom tray ... to the trough ... and to the drainage fitting."  *Id*.

This is illustrated below in a color-coded version of Figure 5.



### B.   ASSERTED CLAIMS

Petter asserts one independent claim (claim 1) from the '298 patent in this case, which is reproduced below with an emphasis on the language being presented to the Court for construction.

> 1.  A modular cleaning system comprising:
>
> at least one modular wash rack for supporting an item to be washed, including:
>
> > a *frame* having a first wall, a second wall, a third wall, a fourth wall, each wall having an inner and an outer

surface, and a ***bottom surface*** extending between the inner surfaces of said first, second, third, and fourth walls of said frame to define a basin for collecting water used to clean the item as well as any debris removed from the item,

a ***grate*** operatively associated with said first, second, third, and fourth walls for supporting the item to be washed above said bottom surface while allowing water and any debris to flow into said basin,

a drainage fitting attached to the outer surface of one of said walls so as to allow water collected in said basin to flow out said drainage fitting, and

coupling means for coupling said modular wash rack to another modular wash rack;

a tube having a first end connected to said drainage fitting; and

a pump for causing the water to flow from the basin, through the drainage fitting and through said tube.

A624.  Petter also asserts dependent claim 4, which includes the additional disputed limitation of the "sloped tray."  *Id*.

### C.    FRAME AND BOTTOM SURFACE

The plain language of claim 1 essentially provides instructions on how to construct the "frame" of the claimed invention to form a "basin."  First, it states that the frame is made from four distinct walls, calling them "first wall, second wall, third wall, and fourth wall."  A624.  Claim 1 then states that each wall has to have "an inner and outer surface," indicating that the walls must be connected to each other to form an enclosed area defining an inside and an outside.  *Id*.  This configuration is also taught by the specification of the '298 patent, which describes a frame made from four interconnected walls that enclose an area.  A618-19.

Claim 1 also states that a "bottom surface extend[s] between the inner surfaces of" the four walls "to define a basin for collecting water used to clean the item as well as any debris

6

removed from the item." A624. By calling it a "bottom" surface and specifying that it extends between the "inner surfaces" of the four walls, claim 1 necessarily requires the "bottom surface" to fill the area enclosed by the four walls at the bottom level of the walls in order to form a basin that can collect and contain wash water and debris.



**Four Walls/Inner & Outer Surfaces**     **Bottom Wall Forming Basin**

Given the foregoing context of the '298 patent specification and claims, the **frame** limitation of the asserted claims should be construed to mean **a weight-bearing frame made up of four interconnected walls that define a single enclosed area such that each wall has an inner surface facing toward the enclosed area and an outer surface facing away from the enclosed area**.

In addition, the **bottom surface** of claim 1 should be construed to mean **a surface that fills a horizontal cross-section of the enclosed area and intersects the bottom portion of the inner surfaces of all four frame walls**.

### D.   GRATE

The '298 patent informs a person of ordinary skill in the art that the surface on which the washing process takes place is a *porous* surface that allows water and debris to fall *through* it, commonly called a "grate." *See, e.g.,* '298 patent, col. 2, lines 50-53 (the grate "has openings ... to offer sufficient drainage of the waste liquid from cleaning the dirty item") (A622); col. 5, lines

7

8-10 ("liquid drips off the dirty item through the openings of [the] grates of the wash rack[.]") (A624). The word "grate" is commonly understood as a "a framework of parallel or crossed bars[.]" *See Webster's Unabridged Dictionary*, p. 833 (H.App.38). That definition is perfectly consistent with the porous framework of crossed bars identified as the "grate" in the '298 patent.

The prosecution history of Hydro's U.S. Patent No. 7,258,749 ("the '749 patent", Dkt. 73-7) provides additional insight into the meaning "grate" as used in Petter's '298 patent. During the prosecution of Hydro's '749 patent, the Patent Office examiner initially rejected Hydro's claims based on Petter's '792 patent, which shares the same specification as the '298 patent. *See* Office Action at 3 (H.App.42). In response, Hydro explained that the *impervious* wash pad recited in its patent claims was completely different from the *porous* grate in Petter's patent.

> Petter (U.S. 6,021,792) is the antithetical problem solved by the present invention. … The top element (grate 32) of Petter is porous or pervious, not impervious as required by the pending claims. Note, spent wash liquid and debris do not land on and flow across grate 32 to a perimeter or peripheral edge but rather pass through relatively large holes in grate 32. Petter, at column 5, lines 2-4, states:
>
>> The liquid drips off the dirty item through the openings of grates 32 of the wash rack 12 and onto the bottom tray 38.

Response to Office Action at 5-7 (H.App.50-52). Thereafter, the Patent Office examiner personally met with Hydro's counsel to discuss the difference between water flowing *through* a porous wash surface to a basin below versus water flowing *across* an impervious wash surface to a side trough. *See* Interview Summary (H.App.56).

After extensive analysis, the Patent Office allowed the claims of Hydro's '749 patent and provided its expert view of the difference between the "grate" shown in Petter's patents and the impervious wash pad in Hydro's patent.

> The following is an Examiner's Statement of Reasons for Allowance:
>
> *None of the prior art discloses or suggests a process of washing vehicle [sic] on a impervious surface platform* by directing the solid debris and washing liquid towards at least one peripheral edge of the impervious surface and disposing the solid debris and washing liquid over the edge into an opening at a top of the perimeter trough.
>
> The closest cited prior art, Petter et al (6,021,792) disclose a method of washing vehicles on pad but *fails to disclose an impervious surface and disposing the debris and washing liquid towards one of the perimeter edge of the pad*.

Notice of Allowability at 4 (H.App.61) (emphasis added).   Consistent with the common understanding of "grate" and the context of the '298 patent, the term "grate" in the claims of the '298 patent cannot encompass a non-porous, solid washing surface that directs wash water across the wash pad, rather than allowing it to fall *through* the surface into a basin.   Clearly, the intended purpose of the invention claimed in the '298 patent can only be accomplished using a porous framework as the washing surface—*i.e.*, a grate.

The '298 patent also explains that the grate rests on "grate supports" located on the inner surfaces of the four side walls to support the item being washed above the basin.   *Id.* at col. 3, lines 20-25 (A622).   Claim 1 similarly states that the "grate" must be "operatively associated" with the four frame walls in order to "support[] the item to be washed above said bottom surface while allowing water and any debris to flow into said basin."   A624.   To do so, it is clear that the grate fills the area enclosed by the four walls near the top of the four walls juxtaposed to the bottom surface filling the area at the bottom of the walls, as illustrated below.

9



Given the foregoing context of the '298 patent specification and claims, the **grate** recited in the asserted claims should be construed to mean **a porous framework of parallel or crossed bars that fills a horizontal cross-section of the enclosed area and engages the top portion of the inner surfaces of all four frame walls**.

### E.    SLOPED TRAY

Claim 4 of the '298 patent states:

> The modular cleaning system as defined in claim 1 and further including a trough adjacent said first wall, said trough having a bottom sloping downward toward said drainage fitting, said frame including a **sloped tray**, said third wall being opposite said first wall, said sloped tray having its highest point as said third wall and terminating as its lowest point at said trough.

A624.  This narrow claim essentially describes the details of Figure 5 below.



FIG. 5

The '298 patent makes it clear that the sloped tray is placed beneath the grate and above the bottom surface within the area enclosed by the frame walls to catch wash water and debris falling through the grate and to direct them to the trough and drainage fitting.  *See* '298 patent at col. 2, lines 57-67 (A622); col. 5, lines 8-13 (A624).  Given the plain language of claim 4 and the context of the '298 patent specification, the term "sloped tray" means **a slanted tray positioned within the enclosed area at a level above the bottom surface and below the grate**.

## III.   THE '720 PATENT

### A.   BACKGROUND

In 2007, Petter began making and selling a portable wash pad system that included a washing floor/deck, a side collection trough big enough to accommodate a skid steer loader for cleanout ("skid-steer side trough"), and a guide rail separating the wash floor from the side trough as depicted below.





*See* Declaration of Alan McCormick ("McCormick Decl.") at ¶ 14, Exh. 15 (Dkt. 73-1, 73-17).

Petter filed a patent application on June 12, 2007 to protect its skid-steer side trough design, which issued six years later as U.S. Patent No. 8,506,720 ("the '720 patent"). *See* '720 patent (A213). The '720 patent describes Petter's system as comprising "a wash floor … being adapted to allow waste to escape the wash [floor]," a "side trough … adjacent the wash floor,

and … positioned to receive waste from the wash floor."  *Id.* at col. 1, lines 12-16 (A222).  As

depicted in Figure 5 (A219) below, the side trough is "sized to allow a skid-steer loader to fit

therein, at least partially, to allow removal of waste."  *Id.* at col. 2, lines 34-36 (A222).



FIG. 5

According to the '720 patent, a "[r]ail is attached at [the] side edge of the wash rack near

the side trough" which "helps guide a skid steer loader in [the] side trough."  *Id.* at col. 2, lines

45-47 (A222).  The '720 patent then explains the operational relationships between the wash

floor, the side trough, and the guide rail as follows:

> The wash floor … is tilted downward slightly toward the side
> trough 20, as will be explained in more detail below.  Side trough
> 20 is immediately adjacent wash floor 12.

*Id.* at col. 2, lines 25-29 (A222).

13

> Thus, given the downward tilt of wash floor 12 toward the side trough 20, and the lower deck of side trough 20 relative to wash floor 12, the waste from the washed object may flow through the openings 32 in the rail 30 down into the side trough 20.

*Id*. at col. 2, lines 49-52 (A222).

> Because wash floor 12 is at an angle with respect to the horizontal plane, downward toward the side trough 20, the water and waste have a tendency to flow toward the side trough 20, through the openings 32 in rail 30, and down into side trough 20 due to gravity. After the object is cleaned, the nozzle 62 or other means can be used to move the remaining waste from wash floor 12 to side trough 20.

*Id*. at col. 3, lines 49-55 (A223).

This description is illustrated below in Figure 3 from the '720 patent.



It took *six years* for Petter to make sufficient narrowing amendments to its claims before the Patent Office would grant the '720 patent. As originally filed in June 2007, Petter's proposed claims were broad and did not require the use of a guide rail or a large skid-steer side trough. A596. These claims were easily rejected by the Patent Office examiner based on Hydro's own prior patent disclosure concerning Hydro's side trough wash pad system. A422-430. *See also* Hydro Published Application (H.App.1-27). In order to overcome this rejection and distinguish

its claims from Hydro's design, Petter amended the claims to require (a) the side trough to be "sized to accommodate a skid-steer loader" and (b) a "guide rail … to guide the skid-steer loader[.]"  A406-410.  Petter explained that these features were <u>not</u> found in Hydro's design or any of the other prior art designs cited by the examiner.  A410.

Petter's amendments were insufficient.  The examiner again rejected the claims based on the combination of Hydro's prior art design with other prior art.  A369-382.  In response, Petter amended the claims further to require the guide rail to have openings through which wash fluid and waste could pass as it flowed from the wash floor into the skid-steer side trough.  A358-360. Petter's amendments were again insufficient, resulting in another rejection of the claims based on the same prior art.  A331-344.  The examiner specifically explained that "guide rails are well known for positioning and guiding vehicles along a desired path in confined spaces" and cited a prior art reference that disclosed the use of a guide rail in a cleaning system that had openings for allowing solids and liquids to pass through.  A336.  Petter again amended the proposed claims to specify that the guide rail is located "between the wash floor and the side trough" or "separate[es] the side trough from the wash floor."  A320-322.

Once more, the examiner was not convinced and rejected the proposed claims based on the prior art.  A304-317.  The examiner specifically cited a prior patent issued to Midkiff, which disclosed the washing system depicted below where the wash floor is separated from the collection trough by a wall.  A312-313.

15



*See* Midkiff patent (H.App.28).

The examiner argued "that substituting the wall of Midkiff with a guide rail to separate the wash floor from the side trough would have been obvious to a person of ordinary skill in the art[.]"   *Id*.   Petter disagreed, explaining that the separating wall in Midkiff is <u>different</u> from a guide rail, and that a guide rail would not have been an obvious substitute.   A297-298.   Once again, the examiner was not persuaded and maintained the rejections.   A285-287.   Petter reiterated its arguments in January 2013.   A255-258.   Finally, on May 23, 2013, the examiner relented and issued a Notice of Allowability explaining that the specific placement and configuration of the guide rail was the only feature that distinguished Petter's claimed invention

16

from prior art washing systems, including Hydro's prior designs.  A245-247.  Specifically, the

examiner stated:

> Midkiff teaches an apparatus for washing wheels and tires of heavy
> duty vehicles including a wash floor and side trough sized to
> accommodate a skid-steer loader.  McCormick teaches a wash
> floor comprising a deck to accommodate drainage.  Petter teaches
> a wash system in which spent wash liquid received from a
> collection trough is pumped to a separate filtering system to
> subject the spent fluid to extensive filtering.  However, the cited art
> do not anticipate or render obvious a cleaning system having the
> feature of a guide rail separating the side trough and wash floor
> and provided at least partly across a length of the cleaning system
> between the wash floor between the wash floor and the side trough
> to guide the skid-steer loader when the loader is used for cleaning
> out the side trough, the guide rail defining at least one opening for
> allowing solids and liquids to pass from the wash floor into the
> side trough, as required by the claim.  It is noted that it is known to
> use guide rails to assist movement of a vehicle along a pathway, as
> in car wash systems, as noted in previous Office actions.
> However, the prior art does not provide reasonable motivation to
> one of ordinary skill in the art to modify the cleaning system of
> Midkiff to replace the sidewall already present in Midkiff with a
> guide rail to separate the wash floor and trough.

*Id*.

## B.   ASSERTED CLAIMS

Petter contends that Hydro infringes independent claims 1, 11, and 16 of the '720 patent.

Each is reproduced below with an emphasis on the language being presented to the Court for

construction.

> 1. A cleaning system comprising:
>
> a wash floor comprising a deck and being adapted to allow waste to escape the
>   wash floor;
>
> ***a side trough adjacent the wash floor***, the side trough positioned to receive waste
>   from the wash floor, the side trough sized to accommodate a skid-steer
>   loader;
>
> ***a guide rail separating the side trough from the wash floor*** and provided at least
>   partly across a length of the cleaning system between the wash floor and
>   the side trough to guide the skid-steer loader when the skid-steer loader is

17

used to clean out the side trough, the guide rail defining at least one opening for allowing solids and liquids to pass from the wash floor into the side trough; and

a filtering system attached to the trough, comprising a pump for pumping liquid from the trough to the filtering system.

11. A cleaning system comprising:

a wash floor;

*a side trough adjacent the wash floor* being sized to accommodate a vehicle, wherein the side trough includes *a guide rail separating the side trough from the wash floor* and provided at least partly across a length of the side trough to guide the vehicle when the vehicle is provided therein, the guide rail defining at least one opening for allowing solids and liquids to pass from the wash floor into the side trough, the side trough comprising a drainage fitting; and

a filtering system comprising a tube and a pump, the tube attached to the pump and to the drainage fitting.


16. A method of cleaning an object, comprising the steps of:

(a) providing a cleaning system having a wash floor with a deck that facilitates waste removal from a wash rack; *a side trough adjacent the wash floor* being sized to accommodate a skid-steer loader and having *a guide rail at a side thereof and separating the side trough from the wash floor*, the guide rail provided to guide movement of a skid-steer loader therein positioned to receive waste from the wash floor, the guide rail defining at least one opening for allowing solids and liquids to pass from the wash floor into the side trough; and a filtering system attached to the trough having a pump for pumping liquid from the trough to the filtering system;

(b) placing an object on the wash floor;

(c) cleaning the object such that water and waste are eschewed into the side trough by way of the deck;

(d) pumping liquid from the side trough to the filtering system; and

(e) removing the remaining matter from the side trough using a skid-steer loader.

## C.   SIDE TROUGH ADJACENT THE WASH FLOOR

As stated above, the claims of the '720 patent require the use of a side trough big enough to accommodate a skid steer loader.  Hydro's wash pads, in contrast, have always used a narrow side trough that do not accommodate anything larger than a hand shovel.



Notwithstanding, Petter accuses Hydro of infringement for sometimes selling a drive-in clean-out tray accessory that is set apart from the wash pad and connected to the side trough by a hose or pipe.  A29.



As explained below, however, the intrinsic record of the '720 patent demonstrates that the phrase "side trough adjacent the wash floor" cannot be construed broadly enough to encompass a separate clean-out tray accessory.

19

The term "side trough" itself connotes a collection trough located at the side edge of the wash floor to catch wash water falling off the edge of the floor.  In addition, every claim of the '720 patent identifies the "guide rail" as a structure that "separates" the wash floor from the side trough such that wash water flows through the guide rail to reach the side trough, indicating that the side trough and wash floor must abut each other.  For example, claim 1 states "a guide rail separating the side trough from the wash floor … [and] defining at least one opening for allowing solids and liquids to pass from the wash floor into the side trough[.]"  A223.  Claims 11 and 16 recite the same limitations.  A223-A224.  A person of ordinary skill in the art reading the plain language of the claims would conclude that the phrase "adjacent the wash floor" means that the side trough abuts the wash floor so that wash water flows off the edge directly into the top of the side trough.

The context of the specification compels the same conclusion.  The written description of the '720 patent makes it clear that the side trough is positioned to receive wash water and debris flowing off the edge of the wash pad surface.  Specifically, the '720 patent explains that the "[t]he wash floor … is tilted downward slightly toward the side trough" so that wash water and debris to flow into the side trough.  '720 patent, col. 2, lines 25-29 (A222).  The specification also states that the side trough must be "immediately adjacent [the] wash floor."  *Id*. at col. 2, lines 25-29 (A222).  Every description of the flow of wash water explains that it falls off the edge of the wash floor "down into the side trough" by force of gravity.  *Id*., col. 2, lines 49-55.  By explaining that the used wash water and debris flows "down into side trough 20 due to gravity," the '720 patent makes it clear that the side trough rests below and abuts the edge of the wash floor so that wash water enters through the top of the trough—not through a pipe connected at the base of the trough.

20

Every depiction of the claimed invention in the figures of the '720 patent shows the side trough immediately adjacent and abutting the edge of the wash floor. There is nothing in the '720 patent that would contemplate a trough that is not directly abutting the side or edge of the wash floor. Stated differently, there is no evidence that would suggest a person of skill in the art would use the term "side trough" to refer to a structure that is not located directly below the edge of the wash floor to receive spent wash water as it flows off the edge of the wash floor.

Reinforcing the clear context of the '720 patent, the claim term "adjacent" is a synonym for "abutting," which perfectly describes the relationship between the wash floor and the side trough set forth in the '720 patent. *See Webster's Unabridged Dictionary*, p. 9 (2001) (defining *abut* as: "to be adjacent; touch or join at the edge or border") (H.App.37). This understanding of "adjacent" comports with the context of the '720 patent claims and specification. Accordingly, the Court should construe "side trough adjacent the wash floor" to mean **a side trough abutting the wash floor such that wash fluid and/or debris flows directly from the wash floor into the side trough**.

### D.   GUIDE RAIL SEPARATING THE SIDE TROUGH FROM THE WASH FLOOR

The '720 patent claims set forth a very particular configuration of the recited guide rail limitation. Every claim recites the guide rail as "separating the side trough from the wash floor" much like a fence would separate the properties of two adjacent landowners. The "separating" language in the claims would make no sense if it were referring to a side trough that was offset from and not abutting the wash floor. The language requiring wash water to flow through openings in the guide rail in order to reach the side trough further indicates that the guide rail is located near an intersection between the wash floor and the side trough.

Petter was forced to make a series of claim amendments relating to the guide rail limitation to gain allowance of the claims in the '720 patent. It was not enough for the claims to

21

simply recite the use of a guide rail with the side trough.  A406-410; A369-382.  It was not enough to require the guide rail to have openings through which the wash water could flow. A358-360; A331-344.  Petter had to specify that the guide rail is "between" the wash floor and the side trough, "separating" the wash floor from the side trough.  A320-322.  Then Petter had to explain that the "guide rail" limitation could not be satisfied with just a side wall of the trough serving as the guide for the skid steer loader.  A245-247.

The intrinsic record of the '720 patent makes it clear that the guide rail must be an actual rail, not just a wall or barrier, that resides near the intersection of the side trough and the wash floor.  Any person of ordinary skill in the industry reading the '720 patent and its file history would reach that conclusion.  Accordingly, the Court should construe the phrase "a guide rail separating the side trough from the wash floor" in the asserted claims to mean **a guide rail positioned near the intersection of the side trough and the wash floor to divide the side trough from the wash floor**.

## IV.    THE '774 PATENT

### A.    BACKGROUND

On April 1, 2011, Petter filed the patent application that resulted in U.S. Patent No. 8,499,774 ("the '774 patent") entitled "Wash Pad With Evacuator."  A41.  The '774 patent discloses a wash pad that utilizes a particular collection system for the wash fluid and debris collected from the washing process.  As depicted below using Figure 1G from the '774 patent, Petter's system generally comprises a wash floor (grey), a catch trough (blue), an "evacuator" assembly (red), and an "elevator" assembly (yellow).  A48.



FIG. 1G

The '774 patent explains that the evacuator assembly "removes or evacuates liquid collected by the catch trough" and includes (a) "a fluid mover" which is generally a pump, and (b) "a debris collector" which is generally a wire mesh screen.  '774 patent at col. 7, lines 35-37; col. 8, lines 3-14 (A65).  The elevator "lifts any remaining portions of the collected mixture (e.g., debris[])" up to a "dump height" allowing it to fall into a dumpster below.  *Id*. at col. 7, lines 37-39.

Although the '774 patent suggests that the evacuator assembly could conceivably "be disposed any where (sic.) along the catch trough," the arrangement of elements depicted in the patent figures, particularly Figure 6 (A52), shows the evacuator located at a single "evacuation end" of the catch trough serving to "connect[] the catch trough [] to the elevator."  *Id*. at col. 7,

line 61 – col. 8, line 13.  It is at this "evacuation end" where both liquids and solids are removed from the catch trough.  *Id.* at col. 8, lines 19-25.



FIG. 6

Describing the arrangement of elements shown in Figure 6, the '774 patent states that "the evacuator [] is in fluid communication with the elevator" and that the elevator "housing" is "connected to the evacuator."  *Id.* at col. 8, lines 26-31.  The "entrance" of the elevator housing is "connected to the evacuator."  *Id.* at col. 10, lines 17-19 (A66).  A conveyor runs along the length of the catch trough and up the elevator housing "for carrying the debris [] up the inclined elevator housing [] for dumping at the dump height."  *Id.* at col. 8, lines 30-39 (A65).  The conveyor can include "rubber flights … to scrape accumulated debris [] from the debris collector [] of the evacuator."  *Id.*

During prosecution of the application resulting in the '774 patent, the Patent Office examiner initially rejected Petter's proposed claims based on Hydro's prior art design of a wash pad with a conveyor and elevator.  A120-127.  Thereafter, Petter's counsel initiated a telephonic interview with the examiner to address the rejection and discuss "the differences between the evacuator of the instant invention and the evacuator of [Hydro's prior art patent application]."  A118.  The examiner "indicated that the evacuator would need to be more narrowly recited to distinguish over the cited reference" and "that reciting the two conveyors, their orientations, and their relative positioning to the debris collector, *as shown in figure 6*, would distinguish over the cited reference."  *Id.* (emphasis added).  In response, Petter amended the claims to recite that the evacuator be located at "an evacuation end" of the side trough, using the exact language used in the patent specification to describe the configuration in Figure 6 as requested by the examiner.  A101.  Thereafter, the claims were allowed.

### B.    ASSERTED CLAIMS

Petter asserts one independent claim (claim 1) from the '774 patent in this case, which is reproduced below with an emphasis on the language being presented to the Court for construction.

> 1. A wash pad comprising:
>
> a wash floor for supporting a wash item;
>
> a catch trough disposed in fluid communication with the wash floor, the catch trough collecting at least one of wash fluid and debris from the wash floor;
>
> an evacuator disposed in fluid communication with an *evacuation end* of the catch trough, the evacuator substantially removing wash fluid received from the catch trough, the evacuator comprising:
>
> a debris collector; and
>
> a fluid mover in fluid communication with the debris collector for drawing fluid through the debris collector, the debris collector configured to collect non-fluid debris;

25

>>*an elevator disposed in fluid communication with the evacuator*, *the elevator removing debris from the debris collector and elevating the removed debris from a collection height to a dump height for dumping*; and

>a conveyor disposed along the catch trough and the elevator, the conveyor moving at least one of the wash fluid and the debris collected in the catch trough to the evacuator and elevating the debris from the evacuator to the dump height.

A67.

### C.   EVACUATION END

The '774 patent explains that the "evacuator" components serve the function of removing liquids from the catch trough, while the "elevator" component serves to remove solid debris and lift it to a dump height for disposal.  '774 patent at col. 7, lines 35-39; col. 8, lines 3-14 (A65). Both the examiner and Petter viewed the term "evacuation end" to refer to a system where both liquids and solids were removed from the *same end* of the catch trough as shown in Figure 6. *See Phillips*, 415 F.3d at 1317 ("[T]he prosecution history provides evidence of how the PTO and the inventor understood the patent.").   As set forth above, the Patent Office examiner required Petter to limit the claims to the specific configuration depicted in Figure 6, A118, which has a single "evacuation end" of the catch trough where *both* liquids and solids are removed via the evacuator and elevator.   '774 patent at col. 8, lines 26-31 (A65).   Petter complied by amending the claims to recite the "evacuation end" limitation as explained in the specification with reference to Figure 6.  A101.  Indeed, the *only* use of the term "evacuation end" in the '774 patent is with reference to Figure 6.  Thus, the term "evacuation end" must be read to refer to the "relative positioning" of the elements "as shown in figure 6," which places the elevator and evacuator components at the same end of the catch trough.  A101; A52.

Even the plain language of the claims necessarily requires the arrangement of elements depicted in Figure 6.  For example, claim 1 (and therefore all claims) requires the conveyor to move debris "to the evacuator" and then to elevate the debris "from the evacuator to the dump

26

height" residing at the top of the elevator.  A67.  This could not occur if the evacuator were located at the opposite end of the catch trough from the elevator.  In addition, the claims require the elevator to be "in fluid communication with" the evacuator, A67, which would not make sense if the entire catch trough resided between the evacuator and the elevator.  The claims also require the elevator to "remov[e] debris from the debris collector," which is a component of the evacuator, further highlighting the fact that the elevator and evacuator are connected and located at the *same end* of the catch trough.  *Id*.  In short, the arrangement of elements recited in the claims unambiguously requires the wash fluid and debris to be removed from a *single evacuation end* of the catch trough, the fluids via the evacuator elements and the solids via the elevator.

The context of the specification reinforces this understanding of "evacuation end."  The written description of the '774 patent repeatedly explains that the evacuator and the elevator are "connected" to each other.  '774 patent at col. 7, line 61 – col. 8, line 13; col. 8, lines 26-31; col. 10, lines 17-19 (A65-A66).  As illustrated below, a configuration with both evacuator and elevator elements at the same end is consistent with the specification and claims, because the evacuator and elevator are connected such that debris is moved toward the evacuator and elevated "from the evacuator" to be dumped.  In contrast, placing the evacuator at the other end of the trough is inconsistent with the '774 patent disclosure and the claim language.



Given the context of the claims, the specification, and the prosecution history of the '774 patent, a person of ordinary skill would conclude that the claimed "evacuation end" of the catch trough is the end through which both liquids and solids are removed via the evacuator and elevator respectively. *See V–Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005) (the intrinsic record "provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of the invention"). Accordingly, the Court should construe "evacuation end" to mean **an end of the catch trough at which the evacuator (including the fluid mover and the debris collector) and the elevator are located as shown in Figure 6 of the '774 patent**.

### D.   ELEVATOR DISPOSED IN FLUID COMMUNICATION WITH THE EVACUATOR

The foregoing arguments pertaining to the term "evacuation end" apply equally to determining what it means for the elevator to be "in fluid communication" with the evacuator. In short, the specification repeatedly explains that the evacuator is "connected" to the elevator. The

language "in fluid communication" itself indicates that something can pass from the evacuator *directly* into the elevator without traveling through some other component.  When using that language (*i.e.*, "in fluid communication"), the '774 patent specification explains that the elevator "housing" is "connected to the evacuator" and that the "entrance" of the elevator is "connected to the evacuator."  '774 patent at col. 8, lines 26-31; col. 10, lines 17-19 (A65-A66).

Given context of the '774 patent, the Court should construe the phrase "elevator disposed in fluid communication with the evacuator" to mean **an elevator connected to the evacuator such that debris can be moved from the debris collector directly into the elevator**.

### E. ELEVATOR REMOVING DEBRIS FROM THE DEBRIS COLLECTOR AND ELEVATING THE REMOVED DEBRIS FROM A COLLECTION HEIGHT TO A DUMP HEIGHT FOR DUMPING

Every claim of the '774 patent states the function of the "elevator" limitation as follows: "the elevator removing debris from the debris collector and elevating the removed debris from a collection height to a dump height for dumping."  A67.  Claim 1 also identifies the "conveyor" as independently fulfilling this same function: "the conveyor … elevating the debris from the evacuator to the dump height."  *Id.*  Thus, the plain language of the claims identifies two separate mechanisms for elevating debris—the elevator and the conveyor.  The "elevator" limitation must therefore be interpreted to have an elevating mechanism independent of the conveyor if all of the surrounding language in the claims is to be given meaning and purpose.  *See, e.g., ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms").

The specification of the '774 patent also refers to two independent elevating mechanisms when describing the claimed invention.

> The conveyer system also includes an evacuator disposed in fluid communication with the catch trough and *an elevator* disposed in fluid communication with the evacuator. The evacuator substantially removes wash fluid received from the catch trough, and *the elevator elevates debris from a collection height to a dump height* for dumping. *The conveyer system also includes a conveyer* disposed along the catch trough and the elevator. *The conveyer moves at least debris along the catch trough at the collection height and elevates the debris to the dump height for dumping.*

'774 Patent, col. 3, lines 38-45 (A63).[3] Thus, the system as a whole includes both an "elevator" and a "conveyor," each of which elevates debris to the dump height.

Given the unambiguous context of the '774 patent specification and claims, the phrase "the elevator removing debris from the debris collector and elevating the removed debris from a collection height to a dump height for dumping" should be construed to mean **the elevator includes a means to elevate debris to a dump height independent of the conveyor**.

## CONCLUSION

Given the clear language of the claims and simple context of Petter's asserted patents, the Court should adopt the constructions proposed by Hydro for the disputed claim terms.

Dated this 8th day of December, 2014.

HOLLAND & HART LLP

/s/ Mark A. Miller
Brett L. Foster
Mark A. Miller
Christopher B. Hadley
*Attorneys for Defendants*
Hydro Engineering, Inc. and
CA Cleaning Systems, Inc.

---

[3] *See also* A64, col. 6 lines 6-9 (discussing "mover or elevator"); A65, col. 7 lines 35-39 and col. 8 lines 26-30.

30