1              IN THE UNITED STATES DISTRICT COURT

2                      DISTRICT OF UTAH

3                      CENTRAL DIVISION

4

5    PETTER INVESTMENTS, a Michigan    )

6    corporation doing business as     )

7    Riveer,                           )

8              Plaintiff,              )

9    vs.                               )   CASE NO. 2:14-CV-45DB

10   HYDRO ENGINEERING, a Utah         )

11   corporation, et al.               )

12             Defendants.             )

13   _____)

14

15            BEFORE THE HONORABLE DEE BENSON

16            -------------------------------

17                  November 21, 2014

18

19                   Motion Hearing

20

21

22

23

24

25

1                    A P P E A R A N C E S

2


3
     For Plaintiff:              STEPHEN M. LOBBIN
4                                2020 Main Street
                                 Suite 600
5                                Irvine, California

6


7


8


9


10
     For Defendant:             MARK MILLER
11                              BRETT FOSTER
                                222 South Main Street
12                              Suite 2200
                                Salt Lake City, Utah
13


14


15


16


17


18


19


20


21
     Court Reporter:            Ed Young
22                              351 South West Temple
                                Room 3.302
23                              Salt Lake City, Utah 84101-2180
                                801-328-3202
24


25

```
 1   November 21, 2014                              11:00 a.m.

 2                     P R O C E E D I N G S

 3

 4        THE COURT:  Mr. Mark Miller is here and Mr. Brett

 5   Foster is here representing the defendants.

 6        All I have done, Ed, is call the case and said who

 7   is here.

 8        Mr. Lobbin is here.

 9        MR. LOBBIN:  I am here.

10        THE COURT:  Mr. Ford is not, correct?

11        MR. LOBBIN:  No.  Mr. Ford is traveling today.  He

12   would have attended otherwise, but it is just me as well as

13   a principal of Riveer, Matt Petter, who is here with me from

14   Michigan.

15        THE COURT:  This is Mr. Petter?

16        MR. PETTER:  Yes, it is.

17        THE COURT:  You're welcome to sit up here at

18   counsel table if you want, sir.

19        Do you have party representatives as well?

20        MR. MILLER:  Yes.  We have Alan and Jim McCormick

21   of Hydro Engineering.

22        THE COURT:  They are welcome to come to the table

23   behind you or wherever they would like to sit.  Maybe they

24   like it there.  I still don't know why they gave us four

25   counsel tables in this courtroom.  If it would have been up
```

1    to me, I would only have two permanent, and they would be

2    closer together and wider.  You can't put three people at

3    those tables.

4            We're here on a whole bunch of stuff.  I have

5    three different summary judgment motions.  I have a motion

6    for 56(d) relief or discovery, and at the end I want to see

7    if you're prepared to discuss the motion filed by the

8    defendants regarding local practice rules 4.1 and 4.2.  I

9    think that that is the entirety of it.

10           I think it makes the most sense to begin with the

11   summary judgment motion brought by the defendants with

12   regard to the first claim for relief.  Then we'll do the

13   third claim for relief, and then the motion regarding the

14   fourth, fifth and sixth claims for relief.  At some point

15   where it makes sense I will hear the plaintiff's motion for

16   56(d) relief.  They all relate.

17           If you're ready to go, Mr. Miller, and are you

18   doing to go this?

19           MR. MILLER:  Yes, Your Honor.

20           THE COURT:  You may begin.

21           MR. MILLER:  I have prepared some charts to help

22   me in my argument.

23           THE COURT:  Of course you did.  More paper.

24           MR. MILLER:  More paper.

25           THE COURT:  In fairness, you warned me that you

```
 1    would have charts.

 2              MR. MILLER:  I did.

 3              THE COURT:  I expected it.

 4              MR. MILLER:  I felt like I had an obligation after

 5    representing that last time.

 6              THE COURT:  You have them color coded.  How nice.

 7              MR. MILLER:  I came through on my promise.

 8              MR. LOBBIN:  Your Honor, if I may object, I just

 9    want to note for the record that I have not seen this before

10    just now.

11              THE COURT:  Really?

12              MR. LOBBIN:  I would object to their --

13              THE COURT:  Did you hear him mention them in our

14    last hearing?

15              MR. LOBBIN:  As you may recall, I was in the

16    hospital and I had trouble hearing what was going on.

17              THE COURT:  I didn't hear you say you had trouble

18    hearing.  Anyway, he did mention it and Mr. Ford heard it.

19    They are okay.

20              MR. MILLER:  They are not evidence or exhibits or

21    anything like that.  They are just kind of graphical

22    depictions of my argument.

23              Under tab 1, and that is kind of a good place to

24    start on this motion, and just to clarify what is going on

25    in this case, if you look at tab 1 and that time line, it is
```

1    important to recognize the damages period that Riveer is

2    claiming for their infringement of the 298 patent.  The

3    patent statute allows you to seek damages up to six years

4    prior to the complaint.  If you look at this time line, the

5    wash pad sales that they are accusing of infringement

6    encompass the same wash pad sales that were accused of

7    infringement in the Michigan lawsuit.  Their statutory

8    period for damages goes all the way back to May of 2007

9    prior to the filing of the Michigan complaint.

10        That is important when we're talking about things

11   like estoppel and claim preclusion and the Kessler Doctrine

12   and whether these are the same wash pads.  They are the

13   exact same wash pads.  They are the exact same sales

14   transactions.  It is not like we're talking about something

15   that we sold today and are trying to compare it to something

16   that we sold back then.  They are accusing the exact same

17   sales all the way back to May of 2007.  The Michigan case

18   ended in November of 2009, and then moving forward, there is

19   a continuation of sales of the same wash pads.

20        This is how all the doctrines come into play.  Res

21   judicata and claim preclusion would cut off liability up to

22   the end of the Michigan case.  Then the Kessler Doctrine

23   would kick in, the way the Federal Circuit describes it, as

24   filling in the gaps that claim preclusion does not have to

25   allow prospective preclusive effects.  Then laches would cut

1    off everything prior to them filing the Utah complaint in

2    2013.  Then we believe that laches should also bar

3    prospective relief in this case because of some egregious

4    circumstances that we can get into.

5            Let's start with laches.  If you go to the second

6    tab in this binder, the laches period we have is 12 and a

7    half years roughly.  They got their patent issued in

8    December of 2000.  They knew about the Hydropad product

9    dating back to May of 2000.  So from May through September

10   of 2000, they sent letters to Hydro Engineering saying we

11   think your Hydropad infringes one of our forthcoming

12   patents.  There are a bunch of letters exchanged.  At that

13   point they are on notice of our products.

14           THE COURT:  I assume that should say 298 patent?

15           MR. MILLER:  289 patent.  Well, there is my typo.

16           That should say 298.  Thank you.

17           So beginning in December of 2000, that is the

18   laches period.  They did not assert the patent for 12 and a

19   half years.  It is that simple.  We have the presumption of

20   unreasonable delay and we have the presumption of

21   prejudicial harm.  That is established by that period and it

22   is more than double the six-year period in the Patent Act

23   that provides for the presumption.

24           There are more egregious circumstances here other

25   than just the delay.  In a lot of laches cases you have a

1    party who just does not file suit.  Sometimes they are

2    completely silent and they don't do anything.  Here, in the

3    middle of this laches period, they actually did file suit

4    and they asserted the parent of the 298 patent.  They had

5    the 298 patent at their disposal and they could have

6    asserted it and they chose not to for strategic reasons.

7         Then they go through the whole litigation in

8    Michigan and they lose on liability on summary judgment in

9    Michigan, and then there is a settlement to avoid a damages

10   trial, and our clients move forward with confidence that any

11   problems with their patents at that point -- we're done and

12   we can move forward with our Hydropad and we're done.  The

13   12-and-a-half-year delay gives us laches, and at least

14   barring all recovery prior to the date they filed the

15   complaint in 2013.

16        Now, if you go to tab 3, Riveer has raised some

17   excuses for the delay, because the way the presumption in

18   laches works is you get unreasonable delay under the

19   presumption and you get prejudice under the presumption, and

20   then it is Riveer's burden to come forward with evidence to

21   demonstrate a legally recognized excuse for the delay.

22        Under tab 3 we can go through their excuses.  They

23   have raised three arguments.  At the first page of tab 3,

24   Riveer says that they were a young, small company with no

25   experience in patent litigation and they didn't have the

1     financial resources.  First, that is not really a very

2     credible excuse, given the fact that they did file a lawsuit

3     for patent infringement against Hydro in the middle of that

4     laches period, and to argue that we didn't have the

5     financial resources to add the child patent to that, where

6     you're analyzing the same specifications and the same

7     accused product, it is not a credible excuse.

8            Whether it is credible or not you can credit Mr.

9     Petter's testimony and his affidavit, and this is summary

10    judgment and you actually can take it as true and it does

11    not work.  The law is very clear that an assertion of

12    poverty or lack of finances is never a legally cognizable

13    excuse for laches.  It never has been.  That dates back to

14    the Supreme Court decisions from decades and decades, and

15    this first cite that I have here quotes the Supreme Court

16    and cites to that.

17           The other thing that a claim of poverty does not

18    do and another excuse that does not fly, which is something

19    that they try to allege here, where they say they had no

20    experience in patent litigation, but the Federal Circuit has

21    said personal lack of familiarity with the patent system

22    does not excuse a failure to file suit.  So the law is very

23    clear that excuse number one is not recognizable as a matter

24    of law.

25           Even if it were true that they felt that they

 1   didn't have the funds to add a second patent to that

 2   lawsuit, or to sue them all the way back in 2000 when the

 3   patent issued, even if it is true, it does not fly to excuse

 4   laches.

 5          The second page of tab 3 is Riveer's number two

 6   excuse, the other litigation.  They cite in their opposition

 7   brief, on about page 41, they cite a bunch of cases and they

 8   say laches can be excused when there is other litigation

 9   that the patent owner is dealing with.  Well, the idea of

10   other litigation refers to litigation against other

11   infringers.  There is no case or authority to support the

12   idea that you can sue a party on one of your patents, and

13   then use that lawsuit itself against that very party for

14   that same product as an excuse in other litigation for delay

15   to assert your second patent.

16          If you look at the law, every statement of other

17   litigation says reasonable explanations for delay include

18   attempts to enforce the patent such as filing suit against

19   another infringer.  You have got Chisum On Patents, and that

20   is a widely recognized treatise on patent law, and he

21   explains that an excuse that is very frequently used is

22   other litigation, which is that they were engaged in

23   litigating the patent against another infringer.  That is

24   the only time that excuse works.  They don't have that.

25          They are actually saying, well, we sued Hydro on

1    another patent and had some other litigation with Hydro, and

2    because of that, we didn't sue them on this patent that was

3    totally related to that case.  That is not an excuse as a

4    matter of law.

5          Another doctrine to recognize with this other

6    litigation excuse is typically the law requires, in my

7    bullet point number two there, the law requires the patent

8    owner to give the other side notice that, hey, we think you

9    infringe and we're going to sue you on this down the road,

10   but we can't do it now because we are involved in this other

11   lawsuit.  Riveer never did that.  Riveer never told Hydro,

12   listen, we still think you infringe our 298 patent and we're

13   going to enforce that, but right now there is just too much

14   going on.  They didn't do that.

15          In fact, they did the contrary.  They did the

16   contrary by conducting themselves in a way to lead Hydro to

17   believe that there is no infringement problem with the 298

18   patent.  They didn't assert it in the Michigan case.  They

19   never raised it once in letters, but they were asserting the

20   parent.  There is a reason that they asserted the 749 and

21   not the 298.  They drop that reason, the real reason in a

22   footnote in their opposition brief on page 6, and it is

23   footnote number five, and they acknowledge that the patent

24   that they asserted in the Michigan case is broader than the

25   298 patent.  The scope of those claims is broader, so it

1    could arguably encompass Hydro's Hydropad system.  The 298

2    patent is far more narrow.

3         They are on about their fourth or fifth law firm

4    here, and their counsel in the earlier cases didn't feel

5    there was a genuine claim there and didn't bring it.

6         Their third excuse and final excuse is also one

7    that is not legally recognized, that is that Riveer tries to

8    say that the laches period should start at the end of this

9    Michigan lawsuit because that is when they came up with

10   their best theory.  Well, there is no law to support the

11   idea that the laches period begins when a party comes up

12   with a new infringement theory.  You can't have a patent and

13   know of a product and then say, well, I don't think it

14   infringes now, and ten years down the road I just got an

15   idea of how they might infringe this, and now the laches

16   period restarts because you have a better legal idea or

17   argument.  That is not supported by any authority.

18        In fact, what the law says is that the period of

19   laches begins when they are on notice of the accused

20   infringing activities.  As long as they know we're selling

21   the Hydropad, it starts.  They have a duty to investigate it

22   and they have a duty to determine whether there is

23   infringement, and then they have a duty to timely enforce.

24   They didn't do that.  They were on notice.

25        They try to say that the time that we're on notice

1   of the Hydropad is irrelevant.  It is not irrelevant.  It is

2   the core of laches.  That is where it all begins.  They have

3   offered three excuses to get around the presumption and all

4   three are legally null.  They are not recognized in the law

5   and on summary judgment they can't be accepted as a matter

6   of law.

7        I think our motion has at a minimum established,

8   as a matter of law, laches, barring any recovery of damages

9   predating the complaint that was filed in 2013.

10       If we go back to tab 1, I also want to continue

11  with laches in the sense that I believe in this case laches

12  should also bar prospective recovery.  There is a statement

13  in the Supreme Court's recent case that talks a little bit

14  about laches.  I forgot the name of that case.

15       It is the Petrella case.  There is a statement in

16  the Petrella case from the Supreme Court that cites to

17  situations where laches can also bar prospective relief,

18  injunctive relieve, not just past damages.  It says it has

19  got to be egregious circumstances.  The cases it cites have

20  analogous circumstances.  The egregious circumstances here

21  are this 298 patent is going to expire in less than three

22  years.  There is hardly any time left on this patent.  They

23  get a 20-year period from the filing date, which was

24  September of '97, and the patent was issued in December of

25  2000.  So they had roughly a 16 to 17 year enforcement

1     period and they sat on their laurels for like 90 percent of

2     that period and did nothing for 12 and a half years.

3          Now if they want injunctive relief, and by the

4     time we get to the end of this case, and let's assume, but

5     it would never happen if we have to brief this thing on

6     claim construction and infringement and we would prevail

7     there, but if they could win and seek an injunction, they

8     would take Hydro's Hydropad out of play for a period of like

9     a year and a half, when Hydro has spent the last 15 years

10    building its company around this product.

11         It is the core of their product line.  They have

12    built it up and they waited until they built it up and they

13    have a huge reliance on it and their company depends on it,

14    and then they want to enforce a patent and say you're

15    precluded from selling that for two years now.  That is an

16    egregious result based on that delay and it is the result of

17    that delay.

18         Another egregious circumstance is the length of

19    their delay and actually pursuing litigation with the other

20    patent, and now forcing a new court to come in and expend

21    resources and looking at these same devices, the same patent

22    systems, same specifications and a lot of the same claim

23    limitations for the first time, and that is another reason

24    that laches should bar prospective relief.

25         In the cases cited in the Petrella decision, the

```
1    injunctive relief was precluded because the plaintiff had a

2    copyright claim against a building design, and they waited

3    and didn't assert it until they built the building and then

4    they asserted it, and the Court said you waited until they

5    made all of these investments, and we're not going to allow

6    you to get injunctive relief and tear down the building.

7    That is what they are asking you to do.  We want the ability

8    to go tear down this business that they have built up for 15

9    years and we sat around and watched them do it the whole

10   time.  That is why laches should bar the entire claim.

11         Beyond laches, and back to tab 1, we have claim

12   preclusion and the Kessler Doctrine.  Those two combined

13   also bar their claim.  I think the focus of claim preclusion

14   is really what are these devices about.  The question the

15   Court raised last week is how do I know if one is different

16   than the other of if these are the same device?

17         Well, the first thing I have told you is that they

18   are the exact same sales.  They are the exact same devices.

19   Even the ones post the decision, they are the same

20   structurally and they are essentially the same in the sense

21   that any differences have nothing to do with the patent.

22         If you go to tab 4, and I think this is just some

23   quick little education on the technology, and we have all

24   seen wash pads and we have seen car washes.  You go in and

25   there is a big concrete floor and there is a grate.
```

1    Underground there would be a basin to catch everything

2    falling off the car and all the water.  That is how things

3    used to be done.

4         If you go to tab 5, what these companies started

5    doing in the 1990s is they would make these portable wash

6    pads made out of steel.  They are very simple in design.

7    You have a basin, a steel basin, four walls, a bottom, and

8    it creates a basin and then you put a grate on top.  Then

9    you pull the car up onto that and you wash it off and

10   everything falls right through the grate and is collected in

11   the basin.  Then it can be pumped out with hoses.

12        In the 1990s that was the first style of wash pad

13   and Riveer got patents on that style.  They filed their

14   patents in 1997 and they were issued in the year 2000.  The

15   grate over the basin style, that is what was being done in

16   the '90s.

17        If you go to tab 6, Hydro made a system that had a

18   basin under it and had these guardrails over the top.  This

19   was their containment wash pad.  Everything fell right

20   through and was collected in the basin.  That is what they

21   sold in the '90s.  They don't sell that anymore.

22        If you go to tab 7, in the year 2000 Hydro

23   developed the invention that is covered by its patents.

24   This is the impervious top with a side trough system.  This

25   is a system where the top of the wash pad that the car is

1    sitting on is not a grate.  Water falls on it and flows over

2    to the edge of the wash pad and falls into a side trough.

3    It is not collected in the basin directly below where the

4    washing is taking place.

5           The benefit of that invention was on the grate

6    basin type wash pads, you had to pull the car off and you

7    had to lift up the grate to clean out the basin.  Okay.  In

8    the Hydro system where you have this impervious top that

9    flows over to a side gutter, kind of like the roof on your

10   house, and it flows off the roof and into those gutters

11   along your house edge, and that is what they invented, and

12   the benefit was you could clean out that side gutter without

13   interrupting the washing process.  The car does not have to

14   be taken off.  Hydro got patents on that system.

15          When the patent office considered Hydro's patent

16   application, they also considered Riveer's prior patents on

17   the grate over the basin system, and they said that Hydro's

18   system is a new invention and it is different than Riveer's

19   grate other the basin system and they were awarded patents.

20          Now, the way that Hydro used to make them is they

21   would take the rails and they would weld those rails onto a

22   steel plate.  They would take all these rails and they are

23   like a cattle guard, and that is where they got the idea,

24   and they went to a cattle guard company that put these

25   cattle guards on the freeways, and they got that same

1    structure, but they welded those rails right onto a steel

2    plate.  That is what created the impervious top of the

3    Hydropad.

4         If you go to tab 8, in about mid 2000, instead of

5    using the rails welded onto the plates, they started just

6    stamping the impervious top, and they would get a sheet of

7    metal and they would stamp it so it was corrugated.  It was

8    just a single piece of corrugated steel.  Then that would be

9    placed on the support frame instead of the rails welded onto

10   a plate.

11        A better way to show that, and I'm a little

12   duplicative, but if you go to tab 12, tab 12 is a better

13   depiction of Hydro's very first Hydropad design in 2000.

14   That is what is depicted in the figures of their patent.

15   You take the rails and they weld them right onto those

16   plates, and that is how the impervious top was made.  In tab

17   13 the impervious top was made by just taking a single piece

18   of steel and stamping it into that corrugated pattern so

19   that you have the little grooves that would collect the

20   stuff and channel it to the edge to fall into the side

21   trough.  Those are the changes.  That change happened about

22   in mid 2000.  Those changes are not relevant.

23        If you go to tab 14, this is where Riveer loses

24   their argument on claim preclusion.  They admit in sworn

25   interrogatory responses that their infringement allegations

1    in this case apply equally to the pads we sold in 2000 and

2    to the pads that we sold in 2007 and to the pads that we

3    sell today.  They admit that.  They said since 2007, and

4    this is Riveer's statement in its interrogatory response

5    which is binding, Hydro's wash racks exhibit the same grate

6    basin modular wash rack design covered by the 298 patent.

7    Since 2007 it has been the same they are arguing, but look

8    at the next sentence.

9         This is their theory of infringement.  They want

10   to argue that we simply collapse the grate and the basin

11   together and call it an impervious structure with upper and

12   lower portions.  That quote of impervious structure with

13   upper and lower portions comes from Hydro's patent

14   application that depicts the structure they sold in the year

15   2000, the very first Hydropad.  Their whole theory of

16   infringement rests on analyzing the first embodiment of the

17   Hydropad where you weld the rails onto the steel plate.

18        In their arguments of infringement they admit

19   there is no difference between the Hydropad in 2000 and the

20   Hydropad today as far as the 298 patent is concerned.  That

21   is how there is no dispute of material fact here.  It is

22   admitted by Riveer that infringement applies to all of them.

23   They don't have a unique or novel theory for a wash pad we

24   sell today that they claim is not applicable to the wash

25   pads that we sold in 2000 or the wash pads we sold in 2007.

1    It is all the same.  Because of that and because it is the

2    same accused product, there are no differences that make any

3    material difference regarding the 298 patent claims and

4    because of that claim, preclusion applies.  Claim preclusion

5    applies to bar recovery for all wash pad sales up to the end

6    of the Michigan lawsuit in 2009.

7            Then the Kessler Doctrine kicks in.  What does the

8    Kessler Doctrine say?  The Kessler Doctrine is a doctrine

9    that --

10           THE COURT:  While I'm thinking about it, can you

11   tell me, and maybe you don't want to, but can you tell me

12   what the novelty of the 298 patent was?  Why did they get a

13   patent, the 298 patent especially, that is different from

14   the 792 patent?

15           MR. MILLER:  The 298 patent and the 792 patent,

16   those are companion patents.

17           THE COURT:  I understand that.  What did the 298

18   patent have that was novel --

19           MR. MILLER:  Okay.

20           THE COURT:  -- and that was different that allowed

21   it to get its own patent?

22           MR. MILLER:  Why are the claims in that one

23   different from the claims in the 792?

24           THE COURT:  No.  Well, that might help answer the

25   question, but my simple question is what was novel about the

```
 1   298 that got it a patent?

 2            MR. MILLER:  First of all, we don't think their

 3   patent is novel at all because we have invalidity defenses.

 4            THE COURT:  What then impressed the patent office

 5   to give it a patent?

 6            MR. MILLER:  Well, the way that the 298 patent and

 7   the 792 patent are written, the specifications are

 8   identical.  They are disclosing the same invention.  The

 9   only difference between the two is how they are claimed.

10            THE COURT:  What does the 298 claim that the 792

11   does not?

12            MR. MILLER:  The 298 actually claims it more

13   narrow than the 792.  The 298 claims a basin, it says four

14   walls --

15            THE COURT:  The 792?

16            MR. MILLER:  No.  This is the 298 that is asserted

17   in this case.  You have four walls --

18            THE COURT:  Four walls is not novel.

19            MR. MILLER:  It is not novel.  Then they add --

20            THE COURT:  Nor is gravity.

21            Move on.

22            MR. MILLER:  A bottom surface that forms a basin,

23   and nothing novel yet --

24            THE COURT:  Nothing novel yet.

25            MR. MILLER:  -- and a grate that goes on top of
```

1   that basin, and then a drainage fitting in the basin that

2   would allow evacuation of anything collected in the basin.

3   That is what it claims.

4           THE COURT:  That is what I thought the 792

5   claimed.

6           MR. MILLER:  Well, the way the 792 patent claims

7   it, it is broader.  They claim just a wash rack that is

8   connected to a filtration system through a drainage fitting.

9   The 298 patent describes the wash rack with more narrow

10  detail by saying it has to be a basin with a grate on the

11  top of it and things like that.

12          The novelty, and I think in the '90s people are

13  making these wash racks, and it is not a permanent, in

14  ground system, a concrete system, and if you think of big

15  equipment rental companies that rent construction equipment,

16  they need to wash something sometimes, and --

17          THE COURT:  I understand the general concept.

18  Your whole premise here on your motion for summary judgment

19  rests on the fact, I think, that they sued you in 2007 for

20  infringing the 792 patent, and that they surely knew enough

21  about what we were doing and if they thought we were

22  infringing the 792 patent, they should have also sued us for

23  infringing the 298 patent and that would have all gotten

24  taken care of back then.

25          MR. MILLER:  Right.

1          THE COURT:  The end of the suit was we were not

2    infringing the 792, and now their cause of action is on the

3    298, and, whatever it is, the first cause of action, so that

4    is why my question.  There has to be some difference, and

5    that is what Mr. Lobbin is going to have to show me is that

6    there is enough difference between the 298 and the 792 to

7    justify waiting seven years or six years before they decide

8    to sue your client for infringing the 298 patent.  I have

9    just never yet in the briefing understood what made the 298

10   novel over the 792.

11          MR. MILLER:  Your Honor, there is --

12          THE COURT:  You say it in your brief, too, that it

13   is a tighter claim, but I have never quite understood it.

14   The one thing about patent law that always intrigues me is

15   that its premise is that the whole world is supposed to know

16   what made something new and novel so that they don't do it.

17   Often when I ask patent lawyers what is novel about this, I

18   don't get a very quick or clear answer.

19          MR. MILLER:  Your Honor, there is nothing

20   different between the 298 and the 792 that would justify

21   their delay, but I can tell you the reason they didn't

22   assert it back then and they are asserting it now has

23   nothing to do with that it is a stronger claim or that the

24   claim somehow has matured and now it is timely.

25          The difference is that the 298 patent claims the

1   wash rack with a grate.  It requires the basin and grate

2   design.  The 792 didn't do that.  That is why their counsel

3   in Michigan asserted the 792, because our wash pads don't

4   use a grate and basin design.  They have an impervious top

5   and a side trough, and so they didn't assert the 298 back

6   then because it is narrower and it requires a grate.  The

7   infringement argument is almost impossible.

8          The reason they filed this claim is similar to why

9   they filed the first one and it is for a leverage purpose.

10  We are in a big trade secrets lawsuit against them in front

11  of Judge Shelby, and they want something to have leverage in

12  settlement negotiations, so let's throw this stale, weak

13  patent claim at them and see if that creates leverage.

14         THE COURT:  In the Michigan case, if you can tell

15  me simply, what was their theory of infringement?  You claim

16  you have that side trough and they didn't, or that that

17  didn't infringe, clearly didn't infringe, right?

18         MR. MILLER:  Well, the 792 patent, I give it to

19  them that the 792 patent had a stronger infringement claim

20  because it just said a wash rack.  You could construe that

21  broadly perhaps.  Our claim construction argument was that

22  wash rack had to be construed to require a grate.  The court

23  didn't even reach that limitation to win.  Their claims in

24  the 792 also required a vacuum pump in the filtration system

25  and we didn't use a vacuum pump.  That was the easy button

1    that the court used in Michigan, no vacuum pump.

2         There is an easy button here on noninfringement,

3    we don't have a grate.  We don't have a basin with a grate.

4    They have not even explained how that could possibly happen.

5    The only allegations they have made relate to the design

6    that is shown in our patents which existed in 2000.

7         THE COURT:  But you didn't have a basin with a

8    grate in the 2007 case in Michigan either?

9         MR. MILLER:  No.

10        THE COURT:  But you didn't get there, because you

11   had an easier way to show noninfringement because of the

12   vacuum pump?

13        MR. MILLER:  Well, that is true on infringement,

14   but we did get to that point on invalidity, because the

15   interesting thing here is although they didn't assert their

16   298 patent for infringement against us in Michigan, they did

17   raise it as prior art against our patent.

18        THE COURT:  On an invalidity claim by them about

19   your patent?

20        MR. MILLER:  Yes.

21        There was a lot of analysis comparing their

22   disclosure of the grate over a basin system versus our

23   patent that claims the impervious top and side gutter.

24   There was a lot of argument that this grate over the basin

25   essentially, if you put the grate really close to the bottom

1    of the basin, it is kind of like an impervious top if you

2    just put them together.  All of those arguments were made in

3    an invalidity context, and we won that on summary judgment

4    with the Court saying an impervious top is not the same, and

5    your patent does not disclose an impervious top.  It

6    discloses a grate, which is porous, over a basin.

7           THE COURT:  I assumed generally that impervious

8    meant solid or not leaking?

9           MR. MILLER:  Yes.  It meant the water does not

10   pass through, and the portion of the wash rack at the top of

11   the frame where the car sits, it does not go through.  It

12   goes through the side.

13          THE COURT:  You used a big word.  You used a

14   four-syllable word.

15          MR. MILLER:  I will try to use shorter words.

16          THE COURT:  I mean in the patent.  It must have

17   said impervious in --

18          MR. MILLER:  Yes.

19          We're so used to that word from all of this

20   litigation, and impervious topside trough is kind of the

21   short language for Hydro's patented design.

22          THE COURT:  And you would like to deliver an

23   impervious argument.

24          MR. MILLER:  That is right, I would.  I believe we

25   have.

1           THE COURT:  I am not even sure that is true.  I

2     mean, I am not sure what that means and I just said it.

3           MR. MILLER:  If you go to tab 15, and at tab 15 I

4     want to just quickly address the idea of the Rule 56(d)

5     motions.  Rule 56(d) is a mechanism to ask the Court to

6     defer ruling pending further discovery.  Well, in this case

7     they have effectively got that granted to them, because when

8     they filed these motions, they filed these motions four

9     months ago, and in one case four and a half months ago.  We

10    are just over a week out from the end of discovery.

11          Now, in that four-month period have they tried to

12    supplement the summary judgment record with any evidence,

13    with any documents, with anything that would further support

14    their opposition to these motions?  They have not, not one

15    piece of paper.  There is not one thing in the evidentiary

16    record that they have tried to supplement during that period

17    of time that they could have been pursuing what they want.

18    If you look at their Rule 56(d) motions, they don't say

19    anything specific.  They don't specifically say this is the

20    fact we expect will come from this source and this is how it

21    will support our opposition.

22          They just say there are more witnesses to talk to

23    and there may be more documents and we expect that they may

24    support our arguments.  They are not specific.  The law in

25    the Tenth Circuit is clear that you can't just state that

1    discovery is incomplete without specificity to rebut summary

2    judgment motions.  Rule 56(d) does not compel the Court to

3    hold off on ruling to a party that has been dilatory in

4    conducting discovery.

5             Now, I have not seen any argument by them that

6    there is a reason to deny this motion because of evidence

7    that they think is out there, specific evidence and how it

8    will come into play.  They have to do that in order to defer

9    a ruling.

10             On the res judicata or claim preclusion, I think

11    it is clear that these are essentially the same product.

12    These are the same claims.  They are accusing the same

13    system of infringing the patent.  That patent is a child

14    patent of the one they asserted in the first case.  It

15    absolutely should have been brought there.  There are cases

16    we have cited in the record that have precluded a patent

17    infringement claim against a patent that was not asserted in

18    the first case.

19             THE COURT:  They claim that you have made a lot of

20    changes to your system since that Michigan case.

21             MR. MILLER:  Well, these are the changes they

22    cite.  They cite, hey, the space between the rails, those

23    little groove areas, and if you look at tab 13, again, you

24    see the little groove areas on that top plate, that

25    corrugated or angulating plate, the spacing between those

1    has altered over time by a few inches.

2           You can't just say there have been changes.  That

3    is not the doctrine.  The doctrine is have there been

4    material changes that relate to the claims in the patent?

5    What they have not done is they have not explained how any

6    of these changes actually relate to their ability to prove

7    infringement.  They have to say because of those changes we

8    can prove infringement now and we couldn't back then.  That

9    is not the argument they made.  In fact, their interrogatory

10   response that I pointed to earlier proves the contrary.

11   They say that the wash pads back in 2007, they say those are

12   the infringing product, every bit as much as the wash pads

13   today.

14          The other changes that have been talked about is

15   we painted them with different paint coatings, things like

16   that.  These are not significant changes that have anything

17   to do with the structure as it applies to the claims of the

18   patent.  They have not alleged that specifically.  They

19   can't just say there have been changes made and avoid the

20   summary judgment.  There is not a disputed issue of fact on

21   that.  I have not seen an explanation of how the width

22   between those could apply to the patent or could make their

23   claims stronger.

24          THE COURT:  Well, if you can wrap it up, and we

25   have got a lot to do, and it would help me most to hear Mr.

1    Lobbin as soon as I can get to him.

2              MR. MILLER:  Should we do the other two summary

3    judgment motions later and he can argue this one now?

4              THE COURT:  Yes.

5              MR. MILLER:  Okay.  Then I think I am done.

6              THE COURT:  Mr. Lobbin, please.

7              MR. LOBBIN:  Thank you, Your Honor.

8              May it please the Court, there are a lot of

9    questions that Your Honor asked and I want to address those

10   first.  Before I do, preliminarily, we think that as a

11   fundamental matter of procedural law and good jurisprudence,

12   that a summary judgment motion brought so prematurely just

13   procedurally does not give what Rule 50 says J.M.O.L.

14   motions must give, which is that before facts may be

15   determined, a party needs to be fully heard on an issue.

16             Secondly, there must be a finding that based on

17   the evidence presented on the motion, a reasonable jury

18   would not have a legally sufficient evidentiary basis to

19   find for the non-movant, Riveer.  Mr. Miller made reference

20   to the fact that we have not supplemented the record.  We

21   would be happy to.  We have lots of discovery since the

22   motions were filed that further bolster our position in

23   opposition to these motions, and many facts that we didn't

24   have then on which a jury would be able to grant it.  In

25   looking at the entire record, a reasonable jury would

```
 1    certainly be able to find in our favor on these issues,

 2    issues which the Tenth Circuit in the Jacobsen case has

 3    said, look, laches is an issue that is particularly

 4    inappropriate for summary judgment.  These are very

 5    factually intensive issues, and certainly to grant summary

 6    judgment before a party has been fully heard is

 7    fundamentally, as a matter of procedure, not appropriate.

 8              THE COURT:  Could you give me just an example?

 9    Give me one of these facts that you claim you could

10    supplement the record with if you had wanted to and that

11    would allow a jury to reasonably rule in your favor.

12              MR. LOBBIN:  Certainly.

13              On the unreasonable delay issue, we have put in

14    the declaration of Mr. Petter which must be credited,

15    because the facts must be construed in the light most

16    favorable --

17              THE COURT:  I have that.

18              MR. LOBBIN:  Right.  That is not a new one.

19              Mr. Petter explains what the delay is.  Those

20    facts are subject to corroborating facts from Hydro which --

21              THE COURT:  I have those.  You said that you could

22    supplement the record.

23              MR. LOBBIN:  Once we take the deposition of Hydro

24    on 30(b)(6) --

25              THE COURT:  I thought you already had.
```

1          MR. LOBBIN:  Well, they --

2          THE COURT:  I thought you were saying that you had

3     facts that you could have brought forward.

4          MR. LOBBIN:  Yes.

5          THE COURT:  But you don't know what they are yet?

6          MR. LOBBIN:  No.  There are documents in the

7     record that show all of these changes to their designs over

8     time, and --

9          THE COURT:  Can you give me one?  Do you still

10    need to discover them?

11         MR. LOBBIN:  No.  I have them in my office, but I

12    just didn't prepare to --

13         THE COURT:  Well, off the top of your head you

14    don't know?

15         MR. LOBBIN:  No, I don't have them with me.  I was

16    addressing these motions as of the date they were filed, but

17    certainly if we want to supplement the briefing I would be

18    happy to do that.

19         Your Honor asked about the 298 patent versus the

20    792 patent, and I think that is a key issue to understand

21    the course of events.  They have got their perspective on

22    the course of events and our perspective is, look, as Mr.

23    Miller admits, the 792 patent is a broader patent.  It

24    claimed a wash rack with vacuum pump and a filtration

25    system.  That patent was asserted in 2007 because it was a

1    broader patent.  Infringement was more clear.  It didn't
2    require what the 298 patent requires, which is a rack with a
3    grate, a basin to catch water, and that water being filtered
4    off the rack so that the rack could be cleaned without
5    stopping the process of whatever you were doing on the rack.
6    The prior art was in ground wash pads where you had to stop
7    doing the washing and clean the pads and then continue the
8    process.
9           The invention was, no, let's set up the grate and
10   have the basin, angle it a little bit, put a trough on the
11   side, draw the water out of the trough and filter it through
12   and recycle it back, and you can do all that cleaning while
13   you're still engaged in the wash process.
14          The 792, as Mr. Miller admits, is a broader
15   patent.  That is why we asserted it.  The basis that the
16   Michigan court found for noninfringement was they don't have
17   a vacuum pump.  They have a pump, it is just not a vacuum
18   pump.  So the fact of noninfringement in the Michigan case
19   says nothing about some alleged noninfringing status of the
20   products at issue vis-a-vis the 298 patent.
21          THE COURT:  Why would you not bring the 298 patent
22   infringement claim then?
23          MR. LOBBIN:  Because it was a narrower patent, and
24   it --
25          THE COURT:  Why wouldn't that make it even more

1    likely to be brought then?

2           MR. LOBBIN:  Well, because a broader patent has a

3    wider scope so it envelopes more infringement.  Their

4    infringement at that time in our view in bringing the 792

5    was clearly within that wide scope, whereas the narrower 298

6    patent was not so clearly infringed.  We didn't believe it

7    was infringed until --

8           THE COURT:  Why not?

9           MR. LOBBIN:  -- until their products changed

10   and --

11          THE COURT:  What changed to make you think it was

12   infringing?

13          MR. LOBBIN:  Well, the grating on the product

14   changed and it became more of a grate with the tighter

15   spacing between the rack portions of the product, and it

16   made it more in the definition of what the patent calls a

17   grate, and we'll have to get into those issues in claim

18   construction.

19          THE COURT:  Well, I would like to hear them now.

20   Can't you tell me how that made it essentially the same

21   thing?

22          MR. LOBBIN:  Well --

23          THE COURT:  For the requirement here for laches,

24   and he is telling me that we have essentially the same

25   thing, and you tell me we don't have essentially the same

1    thing because there were changes made.

2              MR. LOBBIN:  Right.

3              THE COURT:  I would just like to know what they

4    are.

5              MR. LOBBIN:  Well, at the time the motion was

6    filed and we had to brief this issue, we went into the

7    changes that we knew about then, and we have since developed

8    further evidence.

9              THE COURT:  What are they, just the narrower

10   spacing --

11             MR. LOBBIN:  The narrowing of the grating and --

12             THE COURT:  -- and the angulating ridges or --

13             MR. LOBBIN:  Correct.

14        We can see, if we go through their own exhibits,

15   and they have tab 7 where they talk about a 2000 product,

16   and then the next tab, tab 8, talks about 2005 to the

17   present.  So you can see that the grating on these and the

18   spacing between those steel rails has narrowed

19   significantly.  That is more of a grate in our view.

20   Particularly what they --

21             THE COURT:  Is pervious a word?  I know impervious

22   is.  Does it make a grate in the sense that something can

23   drop through it?

24             MR. LOBBIN:  Not in our view.

25             THE COURT:  Okay.

1              MR. LOBBIN:  Well, the --

2              THE COURT:  I thought that would be your view.

3              MR. LOBBIN:  No.  In our view the patent requires

4     a grate and basin.

5              THE COURT:  Right.  A basin because something is

6     going to drop through the grate?

7              MR. LOBBIN:  It can fall through the grate, but

8     the grate and the basin, as their products have done, might

9     be right on top of each other so that --

10             THE COURT:  It is impervious.

11             MR. LOBBIN:  Sure.

12             THE COURT:  Where is the basin, just out of

13    curiosity?

14             MR. LOBBIN:  The basin would be where the water

15    travels when it goes into the lower elevated portions of the

16    surface.

17             THE COURT:  Is there a difference then between a

18    grate and a basin if it is impervious?  I am no physicist,

19    but doesn't the water just hit and then move down to the

20    trough?

21             MR. LOBBIN:  Yes.

22             THE COURT:  Okay.  You think that their apparatus

23    has a grate and a basin?

24             MR. LOBBIN:  Yes.

25             THE COURT:  Okay.

1          MR. LOBBIN:  Principally not only were the designs

2    changed, but Hydro argued in the prior Michigan case that

3    no, no, no, you don't have to have a separate surface here

4    for a grate where the vehicle rests and a separate surface

5    down here for where the water is channeled.  This is their

6    argument in the Michigan case, which we are going to hold

7    them to here, because they are precluded from arguing

8    inconsistently, and they said no, it does not have to be

9    separate.  It can be one structure with upper and lower

10   portions, the upper portion where the vehicle rests and the

11   lower portion where the water drains.

12          Well, hallelujah.  All of a sudden infringement of

13   the 298 was abundantly clear through their representations

14   to the Michigan court.

15          THE COURT:  Wouldn't that have also been

16   infringing the 792?

17          MR. LOBBIN:  No, because the 792 has a vacuum

18   pump, and the issue there --

19          THE COURT:  In that way --

20          MR. LOBBIN:  In that way, yes.

21          If we wanted to relitigate the 792 patent, I

22   suppose we could do that excluding the fact that, but for

23   the fact that the 792 requires a vacuum pump, which as I put

24   in our brief the judge in Michigan explained why he felt

25   that on summary judgment there was not sufficient evidence

 1   to say that their pump was a vacuum pump, and --

 2           THE COURT:  Does the 298 require a vacuum pump?

 3           MR. LOBBIN:  No.

 4           THE COURT:  Well, how do you recirculate the

 5   water?

 6           MR. LOBBIN:  They are different kinds of pumps.

 7   The issue before the Michigan court was, yeah, they have a

 8   pump, but we are not quite sure it is a vacuum pump, and so

 9   the court granted summary judgment.  There are many

10   different kinds.  There are sump pumps and --

11           THE COURT:  The 298 patent didn't require a pump,

12   the same pump that the 792 apparatus had?

13           MR. LOBBIN:  The 298 patent has a pump, it is just

14   not limited to a vacuum pump.  So in reference to that --

15           THE COURT:  It is broader than the 792 patent?

16           MR. LOBBIN:  Well, on that limitation.  Overall we

17   agree with Mr. Miller that the 298 patent --

18           THE COURT:  Tell me again why you needed the 298

19   patent.  It is a child of the 792 patent, right?  Or the 792

20   patent is its parent?

21           MR. LOBBIN:  Yes.  So in another lifetime I was

22   actually a patent prosecution attorney, and I no longer do

23   that, so I had to go through the certification process --

24           THE COURT:  Well, that just might make this

25   easier.

1          MR. LOBBIN:  I am going to have to dig into that

2     history and say that in patent prosecution normally, which

3     is what happened here, you file a disclosure and then you

4     have different claim sets.  Let's use this claim set to talk

5     about the vacuum pump.  Let's use this claim set to talk

6     about the structure of the grate and the basin.  Let's use

7     this other claim set -- what the patent office does is they

8     split those out into separate applications, principally,

9     frankly, for revenue purposes.  They get another filing fee

10    and you get to prosecute this patent and --

11          THE COURT:  This is a long ways from my question.

12          MR. LOBBIN:  Well, the point was that these claims

13    were split out.  The ones directed to the parent were the

14    broader claims, and the claims directed to the grate and

15    basin design were the narrower claims that issued in the

16    child.  There was no grand strategy, other than to get

17    claims of different scope directed to different aspects of

18    the inventions.

19          THE COURT:  Is it possible to tell me what made

20    the 298 patent novel?

21          MR. LOBBIN:  Yes.

22          As I said before, the 298 patent was directed to

23    the ability to no longer have to stop the washing process to

24    clean the wash pad, and to have a mobile wash pad that you

25    can set up and use, relocate, transport somewhere, and --

1        THE COURT:  How is that different from the 792

2    patent?  Didn't the 792 patent also do everything that you

3    just told me?

4        MR. LOBBIN:  Yes.

5        THE COURT:  Okay.  What was different about the

6    298 patent?

7        MR. LOBBIN:  They are not necessarily

8    independently novel.  The 298 is not novel over --

9        THE COURT:  You don't need novelty or whatever the

10   word is, and I don't even know the appropriate word, but you

11   need to have something that is different --

12       MR. LOBBIN:  Than the prior art.

13       THE COURT:  -- than was ever done before in the

14   prior art, right?

15       MR. LOBBIN:  Right.

16       THE COURT:  We at least agree on that?

17       MR. LOBBIN:  Yes.

18       THE COURT:  What was it?

19       MR. LOBBIN:  The 298 patent and the 792 were both

20   novel over the prior art, not over each other.  So the 298

21   patent --

22       THE COURT:  The 298 patent was not novel over the

23   792 patent?

24       MR. LOBBIN:  No, because they are not prior art.

25       THE COURT:  Then how did you get a patent?

 1          MR. LOBBIN:  Well, they are not prior art to each

 2   other.

 3          THE COURT:  Okay.

 4          MR. LOBBIN:  The 792 was directed to the novelty

 5   of the wash rack with a vacuum pump.  The 298 patent was

 6   directed to a wash rack having a particular structure

 7   recited in the claim.

 8          THE COURT:  Recited in the claim?

 9          MR. LOBBIN:  Well, that is the rack, the grate,

10   the basin underneath the grate, and the orientation of the

11   basin such that the water is taken off the rack into the

12   trough, and then the pump and the filtration apparatus to

13   clean and recycle the water.

14          THE COURT:  Based on that answer from you, which

15   I'm sure is accurate, why doesn't that make his argument

16   almost better than he made it?  You are saying these two are

17   novel over the prior art, and you're claiming that their

18   invention infringes it, this new thing that has been

19   created, and because the patent office for some reason wants

20   to get another filing fee, that they somehow induce you to

21   make two patents rather than it could have been just one,

22   and maybe it is for having more breadth in the one or

23   whatnot, but why wouldn't your statement just now cause me

24   to grant his motion?

25          MR. LOBBIN:  Well, because of the fact that there

1    were two patents.

2         THE COURT:  You can just sue under one --

3         MR. LOBBIN:  Yes.

4         THE COURT:  -- even though they were sort of a

5    combined thing that made something novel, which allowed you

6    to clean out the dirt without having to pull the car off?

7         MR. LOBBIN:  So they are independent patents and

8    each independent patent is an independent right.

9         THE COURT:  Nobody is disputing that, but he is

10   saying you should have sued us on both of them a long time

11   ago.

12        MR. LOBBIN:  I understand.

13        THE COURT:  You knew then as well as you know now,

14   and I know Mr. Petter submitted a declaration on this, but

15   he says that no reasonable jury could believe that they

16   didn't have as much knowledge then about why their product

17   was infringing the 298 patent as they have now.  You have

18   essentially acknowledged that by recognizing in your

19   interrogatory answer that in 2000 they were making an

20   infringing product.

21        MR. LOBBIN:  No, that is not the import of that

22   interrogatory response.  Respectfully --

23        THE COURT:  You don't think that their product was

24   infringing from 2000 to 2005?

25        MR. LOBBIN:  No.  We didn't assert infringement

1  and we didn't think there was infringement, which is why we

2  didn't bring it in the first case.  We brought the 792 --

3       THE COURT:  No, not in that case, in this case.

4  In this case right now is it your contention that their

5  product that was being made and sold between 2000 and 2005

6  was infringing the 298 patent?

7       MR. LOBBIN:  No.  We don't assert that and we

8  can't assert that.  We filed a lawsuit in 2013 that goes

9  back six years under the patent statute.

10      By the way, and as an aside, Mr. Miller mentioned

11  the Petrella case, and I know that Hydro filed a notice of

12  supplemental authority, and I just want to add to that, if I

13  may, and bring the Court up to speed to the extent it is not

14  aware of what is going on at the Federal Circuit.

15      There have been two petitions for en banc review

16  at the Federal Circuit to basically review the Petrella

17  decision, which was under copyright law, and decide whether

18  that Petrella decision from the Supreme Court is also

19  applicable to patent law.  What that would do would say --

20  and the Federal Circuit is considering whether to hear that

21  en banc -- it would say, well, the same reasoning from the

22  Supreme Court in Petrella applies to patent law, which would

23  say that the patentee is not subject to laches because the

24  patentee by statute can only go back six years, so if they

25  filed suit in 2013, you are basically alleging infringing

1      products that are from 2007 to 2013, and anything that

2      happened before that is not subject to a finding of  laches.

3              It may be a reason to withhold a decision on this

4      motion to see what the Federal Circuit does and what the

5      Supreme Court does with the Petrella decision and it may

6      not.

7              THE COURT:  I received the supplemental authority

8      submitted by Mr. Miller.

9              Did you give me anything?

10             MR. LOBBIN:  You know, I read the local rules and

11     I felt like it was not --

12             THE COURT:  I am not saying you had to, I just

13     didn't want to have missed it.  They gave me something about

14     the Petrella case, but you didn't submit anything?

15             MR. LOBBIN:  No, because there really hasn't been

16     a decision yet.  I could have sent you the briefs arguing

17     for the applicability of Petrella to the Patent Act, but it

18     is just at the briefing stage and the Federal Circuit has

19     not made a decision yet.  I did want to appraise you of

20     that.

21             Here is what a jury should be entitled to consider

22     at trial on this laches issue.  They should be entitled to

23     consider that Riveer had two patents, and we both agree that

24     the 792 was broader than the 298, and in 2007 they filed

25     suit and they had a decision to make.  Do we think they

1    infringe the 298?  Do we think they infringed the 792?  What
2    they decided was, well, naturally the 792 is a broader
3    patent, so surely it is going to encompass more infringement
4    and so, yes, there is definitely a basis to assert
5    infringement of the 792 patent.  That is why they asserted
6    it.

7          Ultimately the Court said, well, no infringement
8    because the pump that they use is not the vacuum pump that
9    is claimed in the patent.  Okay.  That is fine.  Later in
10   the case, in 2011 Hydro got summary judgment by promising to
11   the Court and representing to the Court in that case that
12   no, no, no, you don't have to have a separate grate and a
13   thing down here that catches the water.  No.

14         You can have the one surface that has upper and
15   lower portions and that is the same thing.  Why did they
16   need to make that argument?  Because the accusing infringing
17   products of Riveer were distinguishable from the idea of
18   having those things separated.  So once we saw that argument
19   and saw it succeed, all of a sudden the 298 patent became
20   much more -- with a consistent argument it was obvious that
21   the 298 patent was also infringed, because what Hydro had
22   done with the product, besides the changes to the grating
23   and the fact that they took their side trough and attached
24   it to the rack, they --

25         THE COURT:  The light went on in --

1          MR. LOBBIN:  The light went on.

2          THE COURT:  -- in, what, 2008?

3          MR. LOBBIN:  2011.

4          THE COURT:  '11.

5          MR. LOBBIN:  2011.  The light went on and we

6    realized, wait a minute --

7          THE COURT:  They didn't make that argument until

8    at the very end of the process?

9          MR. LOBBIN:  At the summary judgment stage.

10         THE COURT:  Not earlier?

11         MR. LOBBIN:  No.

12         THE COURT:  These things take time, but --

13         MR. LOBBIN:  I was not involved in the Michigan

14   case.  In my brief I know I said 2011, so I must be citing

15   something there, but --

16         THE COURT:  Well, just out of curiosity, why did

17   it take until 2013 to get around to suing them for it?

18         MR. LOBBIN:  Well, because we were trying to

19   settle the other case, frankly.

20         THE COURT:  Well, that is only two years.

21         MR. LOBBIN:  With their arguments, infringement

22   became clear because we realized, wait a minute, what Hydro

23   has been doing with their new wash rack design is that they

24   have taken one piece of sheet metal or whatever, and they

25   have stamped out the valleys, and they have left the ridges

1    up top where the grating is to hold the vehicle, and their

2    argument is that it is only one piece of metal so it can't

3    have a separate grate and a basin.

4         What they said in the Michigan case was that that

5    was not important.  It can be one piece of metal with upper

6    and lower portions.  All of a sudden it is like the light

7    went on and we said, well, they have to be held to that, so

8    they are going to infringe the 298 patent, and, therefore,

9    we brought this suit.

10        The other two patents were brought because they

11   are brand new patents.  That story told at trial to a finder

12   of fact, you know, with the new evidence that we have

13   developed in discovery is something that at the very least

14   the jury should be entitled to consider.

15        THE COURT:  Well, then why would it matter if they

16   have made any changes to their product?

17        MR. LOBBIN:  Well, because that just further

18   emboldens the fact that the infringement case did not become

19   apparent to Riveer until they made the argument in the

20   Michigan case and they made the changes to the wash rack.

21        THE COURT:  Making the corrugations closer?

22        MR. LOBBIN:  Tighter.

23        It is within the claim term of grating, and we

24   have to establish that the term grate, g-r-a-t-e, in our

25   patent is represented by what their products are.  With the

1    design changes that argument became more clear for us.

2           Also, they brought the side trough where the water

3    drains off to the side, and in prior iterations it was a

4    separate piece, and they brought that into the singular

5    piece of the wash rack.  Now it is one item.  It is one

6    apparatus.  Rather than going for some sort of contributory

7    infringement theory based on the way they use it, now it was

8    much more clear that this is all part of the same structure,

9    the claim in the 298 patent, and that all happened with the

10   recent iterations of the product within the last several

11   years, and then the argument in the Michigan case.  That

12   story deserves to be decided by a finder of fact and not on

13   a premature motion on summary judgment.

14          Now, with respect to claim preclusion and the

15   Kessler Doctrine, with all due respect they are really

16   trying to stretch those doctrines into something that just

17   does not apply here.  Those doctrines are limited to the

18   same patent being asserted.  They cite a case from the

19   Southern District of California with very unique

20   circumstances having no relevance here -- let me get to my

21   notes here -- whereas the Kearns case and the Foster case

22   from the Federal Circuit, not district courts, reminds us

23   that claim preclusion requires the same claims in both

24   cases, not some other patent.  It also makes it clear that

25   each patent is a separate cause of action.

1          With regard to the Kessler Doctrine --

2          THE COURT:  Well, as I understand their position,

3    they are not claiming that the same claim was made but that

4    it should have been, could have been and should have been.

5          MR. LOBBIN:  Right.  I don't think that claim

6    preclusion doctrine allows for the should have been theory.

7          THE COURT:  Really?

8          MR. LOBBIN:  Well, I think it requires --

9          THE COURT:  We teach that in the first year of law

10   school.

11         MR. LOBBIN:  Well, if you read the cases that they

12   have cited, they are limited to situations where the same

13   patent was asserted against essentially the same product,

14   not that the claim could have been made.

15         The Kessler Doctrine is limited to a situation

16   where there is noninfringing status, and there are only two

17   cases applying it so far, but where the accused product

18   requires a noninfringing status vis-a-vis the patent.

19         Here, if you somehow accept from the summary

20   judgment record that the products that we are accusing them

21   of infringing are essentially the same as the products that

22   were accused back then, the basis for noninfringement was

23   the vacuum pump limitation of the 792 patent.  So not only

24   is it a new patent, but the basis for noninfringement is not

25   relevant to anything that is going on here, because there is

1     no vacuum pump limitation in the 298 patent.

2              And then also for laches they have to establish

3     that they were prejudiced, that they suffered prejudice by

4     the fact that there was some delay, and that there is a

5     nexus between that delay and the prejudice.  On that issue

6     certainly whether Hydro was prejudiced certainly should be

7     subject to some testing on cross-examination.

8              For example, at trial you wouldn't have Hydro

9     getting up to testify about all of the prejudice that they

10    have suffered and have the jury listen to that, and then

11    have me as opposing counsel not be foreclosed from

12    cross-examining that witness to test what they are saying

13    and those facts that they are asserting.  Certainly with the

14    motion that was filed we have not had an opportunity to do

15    that.  We didn't have the documents and we just started

16    discovery.  So how can you grant summary judgment when it is

17    certainly not how a trial would proceed?  It flies in the

18    face of everything that the J.M.O.L. standard stands for.

19             Again, the 298 patent was never discussed.  They

20    make all sorts of implications about, well, Riveer must have

21    known and they had the patent and they must have looked at

22    it, they must have evaluated it, and they wanted to assert

23    it against us, but there is no evidence that Riveer even

24    brought it to their attention.  I mean, it was raised as

25    prior art in the Michigan case, but this is not a classic

1    laches situation where you write a letter and sit on your

2    heels.  That just didn't happen here.  The 298 patent was

3    sitting on the shelf at Riveer and somebody looked at it and

4    decided it was not a clear case of infringement and didn't

5    bring it forward.

6         THE COURT:  On the 56(d) motion, do you want to

7    address that and then we'll move on to the third --

8         MR. LOBBIN:  Yes.

9         THE COURT:  -- the third claim for relief.

10        MR. LOBBIN:  I apologize for switching topics a

11   little bit as we go through the discussion, but I have

12   outlined some of the issues that at the time this motion was

13   filed, Riveer had no discovery on and no opportunity to

14   oppose the motion with evidence.

15        On laches we have got that there was an

16   unreasonable delay, and that there was prejudice because of

17   that delay suffered by Hydro, and so some of the discovery

18   we need is we need to cross-examine Hydro.  We need Hydro's

19   documents that show what they thought of the delay and were

20   they even thinking about the 298 patent.  Mr. Miller stands

21   up here and says, you know, that Hydro has been thinking

22   since the early 2000s that they were free and clear of being

23   sued on the 289 patent, but what evidence is there of that?

24   What opportunity to cross-examine the Hydro witnesses have I

25   had?

 1          They mention in their papers that Riveer has had

 2     all of this evidence for all of this time and that the

 3     parties have been engaged in litigation in the past.  These

 4     are different claims.  There was a Michigan case where the

 5     parties conducted discovery in that time frame, but that is

 6     a long time ago.  This case is with a new patent, three new

 7     patents, and the parties have exchanged documents relevant

 8     to those claims, so the prior discovery, even if it was

 9     available for use, is not relevant to these claims.

10          The second litigation the parties are engaged in

11     is in this court with Judge Shelby, I believe, and that is a

12     trade secret case.  Hydro brought a claim against Riveer

13     based on an employee who came from Hydro to Riveer.  The

14     discovery in that case, yes, there has been lots of

15     documents produced and, yes, there has been lots of

16     deposition testimony, but that does not mean that there is

17     any relevance of that testimony to this case and there has

18     not been.

19          For Hydro to suggest that these motions are not

20     premature because we have been litigating for years, but --

21          THE COURT:  Who is accusing whom of violating the

22     trade secrets?

23          MR. LOBBIN:  Hydro has accused my client, Riveer,

24     in that case.

25          The issues of fact that are classically in a

```
 1    laches determination are issues of fact for the jury, as

 2    well as for res judicata and the Kessler Doctrine in terms

 3    of assessing are these products essentially the same?  Is

 4    this the same claim?  Or have these products progressed and

 5    been redesigned through the years and we're looking at what

 6    is going on now as distinctly different, relevant to the

 7    claims at issue, than what came before?

 8                 THE COURT:  I think that covers it.

 9                 MR. LOBBIN:  Thank you, Your Honor.

10                 THE COURT:  Thank you.

11                 Mr. Miller, are you ready to go with your next

12    one?

13                 As I'm looking at it, we're going to be discussing

14    your motion for summary judgment on the third claim for

15    relief.

16                 MR. MILLER:  I can, Your Honor.

17                 THE COURT:  If you wanted to respond to him at

18    all, you can briefly, and then let's move on to --

19                 MR. MILLER:  Yes.  I would like to respond to him,

20    and I honestly think on the third claim for relief motion

21    that it is so straightforward that I don't have a whole lot

22    to say on it.  I don't think that it is difficult to find

23    that there is no offer for sale.

24                 On the arguments Mr. Lobbin made, he kept talking

25    about a story that the jury should hear, and everything that
```

54

1   he has said is a story, but I mean some of the stuff he said

2   is so off base and misleading about what is going on that I

3   have to correct it.  He mentions these arguments in 2011 in

4   Michigan and that that somehow gave Riveer this lightbulb of

5   how they could argue infringement of their patent.  Even if

6   it is true, it does not justify starting the laches period

7   over.  Laches is not based on, now I understand how I could

8   argue against that product, and it took me this long.  Too

9   bad.  If it takes you that long, it is too long.

10          The arguments they are talking about are arguments

11   we made about how to construe claim language in our patents

12   to apply them to Riveer's products.  That is irrelevant to

13   the analysis you have to make to construe the terms in their

14   patents to apply to our products.  The law does not let you

15   look at arguments about construing one patent with a

16   different specification and a different invention and

17   different inventors, and use that claim construction

18   argument to support your arguments for infringement of a

19   wholly separate patent from different inventors and

20   different inventions.  It is a mind-boggling argument that

21   they make.  It is apples and oranges.

22          He also kept saying that the 792 patent is

23   broader.  That means you draw a circle around it and this is

24   everything that fits under the claims of the 792.  If it is

25   broader than the 298, and the 298 is a subset, and the

1    Michigan court found that Hydro falls outside of the 792,

2    how can it possibly fall inside of the 298?  That is the

3    case we have here.

4         He tried to identify facts that would support it

5    and he didn't identify any new facts.  He tried to say,

6    well, there are documents about the design history of their

7    patents.  There are, but those were attached to our motion

8    for summary judgment.  They are in the sealed exhibits that

9    were filed with our motion, the entire design history.  They

10   have had those since May, so these are not new facts that

11   suddenly they can now present.  Those were the very first

12   documents produced in the case.

13        The width of the rails issue -- when you have got

14   a corrugated, angulated piece of steel, I don't know how

15   anyone could find that the top part could be called a grate

16   and the bottom channel can be called a bottom surface for

17   the basin.  It is crazy.  Even if you want to go with their

18   theory --

19        THE COURT:  I thought that is what he said you

20   argued to the Michigan court.

21        MR. MILLER:  No, I didn't.  Our argument to the

22   Michigan --

23        THE COURT:  Didn't he say that?

24        MR. MILLER:  Yes, he did, but he is wrong.  I

25   mean, I never argued that.

1          The argument we made to the Michigan court is the
2    impervious top limitation in our patent claims.  The
3    impervious top language talks about the top of the structure
4    that sits on the support members.  They had an impervious
5    top.  The court found that their redesign was still an
6    impervious top.  That is irrelevant to whether our
7    corrugated thing can be construed to be four walls with a
8    bottom surface that forms a basin and a grate.  It is
9    completely irrelevant.
10          It might have gotten Matt Petter thinking
11   differently about how he could construe his patent claims,
12   that is true, but if you accept that as true, just because
13   it gave them a new idea does not justify a
14   twelve-and-a-half-year delay.  You're required to come up
15   with your argument early on or face laches.
16          The width of the rails thing, they can't just say
17   there were differences.  They can't just say the width
18   changed.  They have to say that because of that change, here
19   is the limitation in the claim language that is affected,
20   and they can't.  They say the grate.  How is the grate
21   different if the space between the openings in the grate is
22   wider or more narrow?  There is nothing in their patent that
23   talks about the spacing of a grate.  Nothing.
24          There is nothing to support the idea that because
25   it was four inches between each valley and now it is two

1  inches between each valley, suddenly it is a grate now and

2  it wasn't before.  There is just nothing to support that

3  concept.

4          THE COURT:  It may not be that important, and just

5  out of curiosity, did the Michigan court construe the

6  meaning of the claim term grate?

7          MR. MILLER:  No.

8          The claim term grate is not in the 792 patent.

9  The Michigan court talked a lot about grates in the 298

10  patent in the invalidity context to show that in the prior

11  art you have a grate and in Hydro's patent you don't have a

12  grate so there is no invalidity.  There was a lot of talk

13  about grates, but there wasn't claim construction on the

14  term grate.

15          THE COURT:  But the Michigan court found that the

16  Hydro product didn't have a grate?

17          MR. MILLER:  Well, in the --

18          THE COURT:  Is that what you just said?

19          MR. MILLER:  It is not talking about the Hydro

20  product.  It is talking about the patent.

21          THE COURT:  I thought you just said that.

22          MR. MILLER:  Yes.

23          THE COURT:  I am just trying to understand what

24  you just said.

25          MR. MILLER:  The Michigan court said that Petter's

1    patent, which is prior art to Hydro's patent, discloses a

2    grate.

3           THE COURT:  Yes.

4           MR. MILLER:  Hydro's patent, which depicts its

5    early Hydropad, Hydro's patent claims don't require a grate.

6           THE COURT:  Okay.

7           MR. MILLER:  They require an impervious top.  The

8    court actually said that an impervious top is not a grate.

9    They are different.

10          THE COURT:  A grate is something that has openings

11   in it that allows stuff to drop through it?

12          MR. MILLER:  Into a basin.  You can't look at the

13   corrugations and look at the bottom of the little valleys in

14   a corrugated piece of steel and say, well, each one of those

15   valleys, we're going to call that the basin, and each one of

16   the ridges we are going to call a grate.

17          THE COURT:  I think that is what he said.

18          MR. MILLER:  That is what he is trying to argue,

19   but that argument applies equally to our wash pads from 2000

20   to 2007 and to today.  The spacing does not change the

21   nature of their infringement argument.  It is the same

22   argument.  It will fail on the merits, but it is not

23   something that is new enough to justify a suit twelve and a

24   half years after you know about our products.

25          The case law on that is clear.  All of their

1   excuses, like I show in my chart there, as a matter of law

2   you can accept everything that Matt Petter says in his

3   excuses as true, and it does not provide a legally

4   cognizable excuse.

5          THE COURT:  You want to submit the third claim on

6   your brief?  Why don't you let me hear from --

7          MR. MILLER:  Unless you have any questions, Your

8   Honor.

9          THE COURT:  Let me hear from Mr. Lobbin and then I

10  will hear your response to him.  That would make it more

11  efficient.

12         MR. MILLER:  The last thing I want to point out,

13  Your Honor, if I may, is when it comes to case law on claim

14  preclusion for claims that could have been brought, there

15  are cases cited in the record where a patent infringement

16  claim is precluded and it was not asserted in the first

17  case, but the transactional facts at issue were the same.

18  Even if the first case was just a trade secrets case and a

19  trademark case or a contract case, a patent infringement

20  claim later down the road has been precluded.  One of those

21  cases is the --

22         THE COURT:  Aren't they in the brief?

23         MR. MILLER:  They are in the brief.  I believe

24  they are in the briefing.

25         THE COURT:  Okay.

```
 1              MR. MILLER:  S.L.R. Partners and D-Beam, those two

 2   cases in our briefing both preclude patent infringement

 3   claims.  One of them is a Federal Circuit case and one of

 4   them is a District Court case.  They preclude patent

 5   infringement claims, even if the patent being asserted was

 6   never asserted in the first case.

 7              THE COURT:  Thank you.

 8              Mr. Lobbin, could I ask you to address the third

 9   claim for relief?

10              MR. LOBBIN:  Yes.

11              THE COURT:  Then we'll let him respond to you.  He

12   says it is very straightforward.

13              MR. LOBBIN:  Yes.  I agree.

14              May I make a couple comments on what he said?  I

15   don't have to, but I would like to.

16              THE COURT:  Well, if you want to I won't stop you,

17   but let's be quick.

18              MR. LOBBIN:  Okay.  The Venn diagrams that he

19   proposed -- I hate to say it this bluntly, but that would

20   just lead to legal error.  Just because the 792 is broader

21   than the 298 does not mean that because the 792 is not

22   infringed because there is no vacuum pump, that does not

23   mean that the 298 can never be infringed.

24              The Venn diagram is not apropos.  Why?  Because

25   the patents are directed to different inventions.  It is
```

1    part of the same disclosure, and they are not prior art to

2    each other, but that Venn diagram would just be legally

3    erroneous.  I'm surprised that he would make that argument.

4         THE COURT:  What are you calling it?

5         MR. LOBBIN:  Pardon?

6         THE COURT:  What are you saying?

7         MR. LOBBIN:  The diagram?

8         THE COURT:  Venn?

9         MR. LOBBIN:  The Venn, V-e-n-n, diagram.  It is

10   when you draw circles and there are circles inside of a

11   circle.

12        THE COURT:  I didn't know that word.

13        MR. LOBBIN:  Yes.  It is like --

14        THE COURT:  How do you spell that?

15        MR. LOBBIN:  V-e-n-n.

16        THE COURT:  Okay.  I didn't know that.

17        MR. LOBBIN:  It is the engineering background that

18   stuck with me all of these years.

19        THE COURT:  Okay.

20        MR. LOBBIN:  Hydro cites cases, a couple of cases,

21   I think two, where a court found that, well, it does not

22   have to be the same patent or the patent does not have to

23   have been asserted in the prior action, but in those cases

24   the facts were so specific and I, of course, invite the

25   Court to read those closely.

1          For example, in the S.L.R. case, the plaintiff,

2     the patentee admitted that the patent could have been

3     brought.  They admitted that there was infringement then and

4     for whatever reason they decided not to raise the patent.

5     Here we have a completely different story.  There wasn't

6     infringement then and we didn't raise the patent and we

7     don't believe we could have raised the patent because of our

8     belief at the time that it was not being infringed.

9          The next motion, you called it the third claim for

10    relief, and I am not sure, but the issue is the on sale

11    aspect of infringement.  This deals with the 720 patent.

12    The 720 patent is asserted by Riveer as having been

13    infringed by Hydro in several aspects, and the only aspect

14    that is at issue on this motion is Hydro's claim that even

15    though they had a product that they had displayed on their

16    Web site and during the period of infringement, no

17    reasonable jury could ever conclude that those activities

18    constituted an infringing offer for sale.

19         Now, under the Patent Act there are many different

20    activities that could constitute infringement.  You have the

21    selling of an infringing product, the importing of an

22    infringing product, using an infringing product, offering to

23    sell the infringing product.  So the basis for the claim or

24    the basis for our opposition to the motion is that on the

25    record, on the premature motion that they filed, number one,

1  we need more discovery, and specifically we need to

2  cross-examine a witness from Hydro who is actually going to

3  be held to their testimony and who has to prepare for the

4  deposition to discuss how that advertisement and how that

5  product was advised and how it was discussed with customers,

6  what did customers request in response to that, what sales

7  discussions were engaged in and were any sales consummated.

8          All of those issues you would expect at trial when

9  a witness from Hydro gets up there and says, yeah, we

10  advertised this product during the infringement period, but

11  it can't be an offer to sell because we never sold any.  It

12  can't be an offer to sell because nobody seems to remember

13  having that advertisement up on our Web site.  It can't be

14  an offer to sell because it does not have this term or that

15  term or it does not say what the price is.  At trial that

16  testimony would be subject to cross-examination, and so on

17  this motion it has to be subject to at least a deposition of

18  Hydro to go into those facts.

19          Our position is, well, the Federal Circuit has a

20  well developed -- fairly well developed body of law

21  regarding what is or what is not an offer to sell.

22  Basically in a nutshell the Federal Circuit has said, look,

23  you have to file a U.C.C.  We are not experts at contract

24  law and the U.C.C. somewhat controls, and the U.C.C.

25  basically says depending on the circumstances and what kind

1    of product is being sold, how the sales transactions

2    normally take place, at what stage discussions constitute an

3    offer to sell depends on what the product is and what that

4    background is.

5         Here we don't have a bottle of shampoo where you

6    walk into a store and have the price on it, okay, and it is

7    being offered for sale.  That is clear.  Here we have

8    custom, high priced wash racks that require significant

9    customer-vendor interaction and the terms of the sale are

10   discussed and bantered back and forth.  This is all from the

11   testimony of the one deposition that I had taken at the time

12   of the motions, which was the vice president, Alan

13   McCormick, from Hydro.

14        Again, this was an individual deposition and there

15   was no preparation required and many questions he didn't

16   know the answers to, and I didn't expect him to know the

17   answers to everything because it wasn't a 30(b)(6)

18   deposition.  But the testimony that was garnered at the

19   deposition confirmed that these are custom products, and

20   here is how the sales cycle usually goes, and here is how we

21   use our Web site.  We have a very robust Web site and it is

22   very important to our business, and we generate sales leads

23   from customers oftentimes seeing what is on our Web and

24   saying that they want something like that, calling us up and

25   giving us a deposit, and we want to sell and we would be

65

1    happy to sell.

2            I asked him, I said, well, if one of your

3    customers saw this image, and we had already established

4    that that image was on their Web site during the infringing

5    period, and I asked him, and I am paraphrasing, of course,

6    if a customer saw this image and wanted to buy the product

7    and called you up and gave you a deposit, or just called you

8    up, would that customer be reasonable in concluding that the

9    image on your Web site is an offer to sell this product?  He

10   said, yeah, that would be reasonable.

11           THE COURT:  Wasn't he saying that they might have

12   done that prior to the issuance of the 720 patent?

13           MR. LOBBIN:  No, because I was telling him --

14           THE COURT:  No?

15           MR. LOBBIN:  No.

16           I was talking to him about the image that was off

17   the Web site after the patent had issued.  There was no

18   limitation to that testimony.  If that is the spin that they

19   would like Your Honor to believe that that testimony is

20   limited to, then all the more reason why we need to depose a

21   30(b)(6) witness from Hydro, and we will, regarding what was

22   reasonable or what was not reasonable for a customer to

23   believe when and if a customer saw that image on their Web

24   site after the time that the patent had issued.

25           If they think that they can somehow testify in

1    response to those questions that, no, it wouldn't have been

2    reasonable for a customer to think that that was an offer to

3    sell, but it would have been reasonable if it had been two

4    years prior, with the same set of facts, that is just not

5    credible.  Certainly a jury has to be entitled to hear that

6    testimony and decide for themselves, which is a classic

7    issue of fact.

8              THE COURT:  Do you have any evidence right now

9    that Hydro offered this skid steer side trough for sale

10   after the issuance of the 720 patent, any evidence?

11             MR. LOBBIN:  Yes.  The Web site image as well as

12   his testimony.

13             THE COURT:  The one that they didn't take down and

14   that they say was inadvertently left up, and that is your

15   sole basis for believing that there was something that

16   qualifies as an offer for sale under the statute?

17             MR. LOBBIN:  That is right.  That is the basis at

18   the time of this motion, yes.  We still have not gotten

19   testimony about -- because Mr. McCormick didn't know --

20             THE COURT:  I am wondering what you think entitles

21   you to testimony.  What is it that allows a plaintiff to get

22   into court so that they can require a 30(b)(6) witness to

23   talk about something?  You say that is enough to get you

24   through the door, the discovery door, right?

25             MR. LOBBIN:  Well --

1          THE COURT:  You don't have evidence of anything

2   being asked to be made that would infringe.  All you have is

3   this one Web site piece of information that existed until

4   this deposition was taken, and then they took it down

5   immediately, and that is all that you have, right?

6          MR. LOBBIN:  Well, yes, but --

7          THE COURT:  That does not get you through the

8   discovery door, and I'm just wondering why you think that is

9   enough when we have the definition we have.  We have courts

10  defining the term offer for sale as they have since the

11  Patent Act was written in, whatever it was, '94.

12         MR. LOBBIN:  I guess I am not quite sure --

13         THE COURT:  It is a simple question.  That is all

14  that you have got.  You think if you allege that in a claim

15  for relief in your second amended complaint, that that

16  allows you to require them to bring in witnesses, including

17  a 30(b)(6) witness, so that you can explore everything that

18  ever happened in their company with regard to that one

19  little blurb of information that remained up on the Web

20  site?

21         MR. LOBBIN:  Well, we don't know whether it was

22  that one little blurb or not.

23         THE COURT:  That is all that you know about.

24         MR. LOBBIN:  Yes.  We filed a lawsuit based on the

25  information that we knew.  We didn't know that that was a

1   mistake.  The witness didn't even know that.

2          THE COURT:  Maybe I am not making my question

3   clear.  You think that is enough to allow a plaintiff, under

4   the current Rules of Civil Procedure, to get into court and

5   open that discovery door?

6          MR. LOBBIN:  Yes.

7          There is no challenge to the pleadings so, you

8   know, in my experience courts usually require -- not

9   require, but recommend that the parties start discovery

10  before there has been --

11         THE COURT:  I guess that is my question.  What

12  let's you get into the other party's files and their people

13  and ask a lot of questions that cost a lot of money, and you

14  can do it just because you find out there is this one Web

15  site piece of information that you think might possibly get

16  you -- they didn't file a Rule 12(b)(6) on this, and I'm

17  kind of wondering why they didn't, but they preferred to

18  come forward with a motion with summary judgment after you

19  had deposed their knowledgeable vice president, and he gave

20  you what you have got, and you think that that gives you the

21  right to move on to further discovery.  I understand that,

22  I'm just wondering why.

23         MR. LOBBIN:  I think that is the nature of our

24  litigation system.  The pleading was not challenged and we

25  are entitled to discovery that we can rely on.  Yes, we had

1    a witness who postulated some things about what may or may

2    not have been the source of this or what may or may not have

3    been up when, and --

4            THE COURT:  He told you in that deposition that

5    once the 702 patent was issued, that they thought they had

6    taken everything off any Web site, and he said before the

7    720 patent, as I understand it, issued, that, yes, they

8    would have been happy to make this for a customer if a

9    customer had responded to what they put up on their Web site

10   and said we would like to make this device.  He acknowledges

11   that.

12           He tells you in his deposition that we didn't sell

13   any.  They certainly didn't sell any.  Did anybody ask you

14   to make one?  No, not to my knowledge.  He is the vice

15   president of whatever.  Oh, there still is this thing up on

16   the Web site, but we are going to take that down

17   immediately.

18           That is enough, you think, to go into a 30(b)(6)

19   deposition, and these other people you want to fish around

20   with and see if there was some possibility that some person

21   out there acted on what you claim is an offer to sell --

22           MR. LOBBIN:  Well, Your Honor --

23           THE COURT:  -- after the patent was issued?

24           MR. LOBBIN:  I respectfully disagree with any

25   characterization of what I'm doing as fishing around.  I

1    take my obligations very seriously as a member of the bar --

2            THE COURT:  I am not suggesting that you don't.

3            MR. LOBBIN:  -- and I believe that if I file a

4    pleading that is not challenged, I have an obligation to my

5    client to nail down the evidence, that if I'm going to

6    dismiss a claim I better be damn well sure that there is no

7    basis for the claim that hasn't been challenged and that I

8    have pled it appropriately, the pleading hasn't been

9    challenged, and I have an unprepared witness who postulates

10   a few things.  I apologize for having to catch my breath

11   here, but --

12           THE COURT:  I am not impugning --

13           MR. LOBBIN:  I apologize for having to catch my

14   breath here, but I have to be honest, Your Honor, that we

15   believe in full disclosure, and we don't believe in expense

16   litigation, and we have certainly not engaged in any -- we

17   are not trying to gin up the fees.  They filed this crazy

18   motion and I suppose they could have just asked us to

19   dismiss the claim.  They never asked us to dismiss the

20   claim.

21           I mean, if Your Honor is correct and they wrote me

22   a letter saying what basis do you think that you have to

23   take a 30(b)(6) deposition after you took the deposition of

24   Alan McCormick, and you better dismiss this claim, well,

25   then maybe I would have dismissed the claim.  Maybe I would

1   have talked to my client and said, you know, I think it is

2   my obligation to see and explore some testimony that I can

3   count on as admissions of Hydro, rather than just relying on

4   Mr. McCormick who knows some things but does not know other

5   things.

6          I honestly think, and I am sitting here today

7   thinking back on what I would have done, but I don't think

8   it would have served my client to let the claim go just

9   based on what this person said in an unprepared deposition.

10          THE COURT:  I have not ruled yet, and I am just --

11          MR. LOBBIN:  I feel like I'm being sort of --

12          THE COURT:  You are being asked what I wonder

13   about as a general proposition, and certainly you are not

14   unusual or uncommon in seeking discovery, and it is an

15   interesting system that we have, and you know it as well as

16   I do that there are those times where an aggressive

17   plaintiff is fully entitled to get through that discovery

18   door and maybe there are reasons that the door shouldn't be

19   opened.  That is all I was asking.

20          I deal with these things so often, and I will

21   admit that this is kind of a close question.  You have got

22   what you have got.  Is it enough to allow you to pursue

23   further what people in their company knew based on what you

24   got from Mr. McCormick?  I can see that you say that there

25   are other people that might know more than he did, but --

1          MR. LOBBIN:  Well, he specifically referenced in

2    his deposition others who were intimately involved with the

3    Web site and the sales process and a gentleman who is

4    interested in selling these products.  I hear you about the

5    discovery door, and I suppose I thought the door was at the

6    pleading stage, and maybe I didn't know that I had to come

7    back and ask to take a 30(b)(6).  I thought I would just

8    notice it up.

9          THE COURT:  Well, no, it is a summary judgment

10   motion so we are beyond the 12(b)(6).  You have got what you

11   have got, and this is unusual unlike anything else we are

12   dealing with, because you did get information directly from

13   a guy who seemed to know, and I don't know who they

14   designated as the 30(b)(6) if it was not him, and he can't

15   make up new facts, so I'll bet you get him again if they

16   designated a 30(b)(6), but I don't know --

17         MR. LOBBIN:  I realize that sort of the

18   progression of discovery in this case is a little unorthodox

19   and being the plaintiff it is frustrating, because as a

20   plaintiff you want document production and you want to read

21   the documents, right, and you want to figure out who you

22   need to depose and then go depose them.

23         It probably wouldn't serve my client and is maybe

24   not the best practice to take depositions before I have

25   10,000 pages of documents, because I am not going to get

1    those people again and I didn't have the documents I need.

2         We are at the stage now at the end of discovery

3    where we have got the depositions scheduled, and I have got

4    a deposition scheduled of a 30(b)(6) witness from them, and

5    I have got a deposition scheduled of the two gentlemen who

6    were more intimately involved in the sales activities,

7    according to Mr. McCormick's testimony and, so,

8    unfortunately, I can't stand here and tell you what I have

9    got.  What I have got is what we have.

10        THE COURT:  What you have got is what you have

11   got.

12        MR. LOBBIN:  What I have got is what I have got.

13        What I am saying is I am entitled to -- I have

14   been at this game long enough to know that you take one

15   person's deposition that is not prepared and you get a lot

16   of hemming and hawing, and then you take somebody else's

17   deposition who is more knowledgable and maybe is prepared,

18   and all of a sudden you get a whole treasure trove -- you

19   get a whole set of clarifying information with specifics,

20   rather than, well, I don't know what happened with that.

21   Maybe we got calls and maybe we did this or maybe we did

22   that.

23        Had summary judgment been granted against you

24   before you had the opportunity to take that deposition,

25   well, it seems like it wouldn't have been appropriate.

1        THE COURT:  Okay.  Well, thank you very much.

2        MR. LOBBIN:  Thank you, Your Honor.

3        THE COURT:  We have been going almost two hours.

4   Do you want to take a break?

5        Did you want to say anything in response, let me

6   first ask on this motion, and then we'll take a break?

7        MR. MILLER:  Okay.

8        Your Honor, first off, he keeps mentioning

9   something being displayed on our Web site during the period

10  of infringement.  There was never an image displayed on our

11  Web site during the period of infringement, ever.  The only

12  thing that --

13       THE COURT:  During the period of alleged

14  infringement?

15       MR. MILLER:  In other words, after the patent

16  issued.

17       THE COURT:  Okay.

18       MR. MILLER:  Okay.  Nothing was ever on our Web

19  site displaying this product after the patent issued.  What

20  there was was a link.  It didn't say side trough wash pad

21  and it didn't say anything that would indicate the product,

22  but if you clicked a link, it took you to a different Web

23  site, the P.R. Web site, and it took you to a 2011 press

24  release saying this is a new product.  That is all it said.

25       THE COURT:  I understand all of that.

1          MR. MILLER:  He admits that is all that he has

2     got.  Then he keeps saying that Mr. McCormick was an

3     unprepared witness and that he is hemming and hawing.  I

4     think that that is a disingenuous characterization of that

5     deposition.  He never was equivocal on the key question of

6     did you ever sell this?  Did anybody ever call and ask about

7     it?  He was not equivocal on that stuff.  He mentioned other

8     people that worked on the Web site and helped him do that

9     because he is not a Web site guru, but there is nothing in

10    that testimony that would give anybody a reasonable belief

11    that there may be some sales or offers for sale that

12    happened after the patent issued.  Nothing.

13          He also says that we never asked him to withdraw

14    this claim.  That is just not accurate.  I sent him multiple

15    e-mails and letters saying I don't think this qualifies for

16    a Rule 11 pleading.  The thing they cited in their complaint

17    was actually a Web site that they had to get off the

18    Internet from the way back machine on the Internet archive.

19    They had to go back in time and get something that was dated

20    prior to the patent.  That is what they used as evidence in

21    their complaint of infringement.

22          I mean, that is facially a violation of Rule 11.

23    You don't have a reasonable basis to believe something

24    infringed the patent, when the only evidence that you have

25    predates the patent.  I told them many times withdraw this

1    claim.  It is a bogus claim.  Well, we are entitled to

2    discovery.  Okay.  They take discovery and we have multiple

3    affidavits in the transfer proceedings in California of more

4    than one witness that says we never sold this ever.  We

5    never ever sold this.

6         Then he deposes the person most knowledgeable

7    about the product line, Alan McCormick, and he still refuses

8    to withdraw the claim.  He claims that this stray image on

9    somebody else's Web site in a 2007 press release could

10   possibly constitute an offer for sale.  I think that is

11   unbelievable.  This part of their claim needs to be

12   dismissed.

13        THE COURT:  Did you want to say anything in

14   response to that?  You can, and then we'll take a break.

15        MR. LOBBIN:  Only that there is nothing

16   disingenuous about what I'm saying.  My statements here to

17   the Court are based on my recollection of the testimony

18   after reviewing it and preparing for this hearing.  I think

19   the Court is well able to determine what are stretches of

20   the truth and what are characterizations made by an

21   advocate.  In contrast to the Venn diagram display, you

22   know, which I think was over the top, my representations are

23   not disingenuous.

24        THE COURT:  I am sure they are not.

25        Let's take about a ten-minute recess.  When we

1    come back I will hear argument on the motion -- I assume you

2    want argument on the motion regarding the fourth, fifth and

3    sixth claims for relief.  I will hear that.

4            That is the last one, isn't it?

5            MR. MILLER:  That will be it.

6            THE COURT:  Then I will hear whatever you are

7    prepared to address on your pending motion regarding claim

8    construction.  Then we'll be done.

9            Allow me to run up to my chambers, and if we can

10   start back in at 10 minutes after 1:00, then we'll wrap this

11   up.

12           Court is in recess.

13           (Recess)

14           THE COURT:  I have five criminal matters coming on

15   for hearing at 2:00, so if we could be done by then, that

16   would be appreciated by the Court.  If we can't, they can

17   obviously wait until we're ready for them, but I think that

18   should give us enough time.

19           Mr. Miller, you're up.

20           MR. MILLER:  Thank you, Your Honor.

21           On this motion really the things I want to point

22   out are that this motion highlights two sales transactions,

23   and these are the only sales transactions they plead in

24   their complaint.  In our opinion they are the only two sales

25   transactions that can be at issue in these claims.  The law

 1   says that if the fundamental premise of any claim, whether

 2   it is a required element of the claim or not, if it is a

 3   false statement or misrepresentation, then you have to plead

 4   it under Rule 9 enough to let people know what the false

 5   statement is and who made it, the who, what, when and why of

 6   the false statement.  Okay.

 7        I don't even think that they meet that in this

 8   pleading on these two sales transactions, but we're going on

 9   summary judgment here on these two sales transactions and we

10   have provided all of the documents for these sales

11   transactions and the testimony and they still have not

12   identified a false statement that Hydro made to the Army

13   that misrepresented their equipment somehow.  They still

14   have not done that.

15        They rely heavily on Rule 56(d) to oppose this

16   motion.  Like I pointed out earlier in the case law, you

17   can't rely on Rule 56(d) by supposition and, well, we should

18   be able to fish around all of their competitive bids and see

19   if we can find a false statement.  That is not permissible

20   in these types of claims.  We have to know what you think

21   the false statement is, just to get into the discovery door,

22   but we gave them all the documents anyway.

23        They are not specific enough when they are talking

24   about what facts they think they'll find in discovery.  If

25   you look at Mr. Lobbin's declaration that he files with

1    their opposition at page 8, and this is how he talks about

2    it, he says the probable facts which will be gleaned from

3    the requested discovery include the factual detail to

4    support and confirm Riveer's allegations, including, and

5    then all he does is quote their kind of vanilla allegations

6    in the complaint that Hydro's misrepresentations concerning

7    bid specifications prejudiced Riveer.  They don't say that

8    there is a specific fact or a certain person or a certain

9    document is going to show that Hydro said X and X is

10   actually false.  They don't do that anywhere.

11          They admit that all of these claims fall if they

12   can't prove a false or misleading statement.  They admit

13   that that is required for every one of these claims.  They

14   admit that on page 5 of their opposition brief.  They agree

15   with our statement of the elements, and then the only place

16   where they really give their theory, the only theory they

17   have in this case on these claims, is they try to say that

18   the equipment Hydro provided is not exactly what the

19   specifications in the Army's or military's solicitation

20   requested.  That is not a misrepresentation.  We're talking

21   about government bidding here, competitive bidding, and the

22   government issues a solicitation that says we're looking for

23   this equipment and here are the specifications.

24          We have testimony from Matt and Doug Petter where

25   they admit that it is not uncommon to propose something that

 1   is not exactly what the Army requests.  You propose the

 2   equipment that you have and the Army gets to decide if that

 3   is good enough.  It may not be exactly to our

 4   specifications, but is it good enough?  They can choose

 5   something that is not the exact specification.  The only way

 6   these claims can stand is if they point to something Hydro

 7   says about Hydro's equipment that turns out to be false and

 8   is not what Hydro provided.  They don't have any evidence to

 9   support that.  They have not identified a single alleged

10   false statement about Hydro's equipment.  They just want to

11   say that if you propose something that is not exactly the

12   specification of the military bid, that it is an inherently

13   misleading statement and that is not true.

14         There is just no evidence of a misleading

15   statement.  It is kind of hard to argue this motion.  We are

16   at the end of discovery here and I still don't have a

17   representation from them that says here is a statement that

18   was false from Hydro.  We still don't have that anywhere in

19   the record.  I think the motion has to be granted and these

20   claims dismissed.

21         THE COURT:  Thank you.

22         Mr. Lobbin, please.

23         MR. LOBBIN:  Thank you, Your Honor.

24         So, again, another example of a classic fact issue

25   that the jury has to be able to decide.  The claims are

1    fairly accurately characterized by Mr. Miller.  These

2    companies compete for government and other entities'

3    contracts.  Requests for bids go out and the requests

4    provide very detailed specifications and the companies bid

5    on those specifications.

6           Inherent in that process is that the bid submitted

7    is compliant with the specifications.  A false statement or

8    a misrepresentation can be, you know, hey, we don't meet the

9    specification, or, you know, we do meet the specification

10   requirement for stainless steel products but providing a

11   plastic product, or maybe not saying that they provide a

12   plastic product when they actually in fact do.  Well, that

13   would be a false statement.

14          A misrepresentation would be the specification

15   requires stainless steel and, you know, we comply with that

16   even though in the end the product ends up having some other

17   construction.  Those are misleading statements.  The

18   government relies on the bidders to state accurately as

19   meeting the specifications, and these government contracting

20   agents are not necessarily engineers, and they don't go out

21   and inspect the product.  They don't fly out to Utah and

22   inspect the product.  They rely on the bid to be accurate as

23   meeting the specifications, and if it is not, there has been

24   a misrepresentation.

25          As you would expect, particularly with the

1    government contractors, the bids are often awarded to the

2    lowest priced bidder, and so Hydro has gained an advantage

3    and caused damages to Riveer by providing low bids in

4    response to government requests that have exacting

5    specifications when they don't meet those specifications.

6            THE COURT:  Could you tell me what exactly the

7    misrepresentation was, the misstatement?  I understand your

8    broad theory, but just not complying with the bid

9    specification alone does not get us to an actual

10   misrepresentation.  It may be a breach of contract or

11   something else, but we need to have something that was

12   deceptive, false or misleading.

13           MR. LOBBIN:  In the declaration in docket number

14   106 we filed from Matt Petter, who is sitting here with me,

15   he goes through in paragraphs 3, 4, 5 and 6 the

16   misrepresentations concerning the V.C.I. bid, the Marine

17   Corps bid, and then in 7 the misrepresentations concerning

18   the Army's bid at Barstow, for example.

19           THE COURT:  Read 7 and 8 to me.  This is the Army

20   bid.  Read it just verbatim.

21           MR. LOBBIN:  Concerning the Army bid

22   specifications as set forth in Hydro's Exhibit M, the

23   specifications require a system including many material

24   features, including a high traction nonslip surface, two

25   center mud collection troughs, a 24-inch-wide and

1    four-inch-deep custom drag conveyor, low profile deck, wedge

2    wire screen filter, a final absolute polishing filter, a

3    heavy duty ozone injection odor control, water recovery via

4    diaphragm pumps, and climate controlled I.S.O. container

5    able to operate off the grid.

6            The deficiencies of Hydro's system offered as

7    satisfying these bid specifications are discussed fully in

8    Exhibit M.  The deficiencies were never substantively

9    addressed by Hydro or the Army during the evaluation

10   process.  As such, the substantive evaluation of these

11   aspects of Hydro's bid is necessary to determine whether

12   Hydro misrepresented the features and capabilities of its

13   system offered in response to these bid specifications,

14   which is the purpose and the basis for Riveer's allegations

15   in this action concerning the Army bid.

16           THE COURT:  You don't know of any actual

17   misstatement or misrepresentation, you just think from the

18   fact that the bid specifications were not honored by what

19   you think Hydro delivered that there may have been

20   misrepresentations along the way?

21           MR. LOBBIN:  Correct.

22           We know what the specification requires and we

23   know what Hydro's products are and so there is a mismatch.

24   It was either represented as complying with the

25   specifications, in which case it didn't, or it was

1    represented as off the specification and somehow approved.

2            So with a witness from Hydro explaining what

3    actually happened from their perspective, and testimony from

4    the contracting office saying if they evaluated the bid and

5    how they evaluated the bid, and whether these were

6    misrepresentations or whether these were somehow after the

7    fact waivers of the specification requirements for the

8    purpose of getting to that low bid and accepting it, and

9    those are all issues that go into whether this was an eyes

10   wide open exception to the specifications as Hydro contends,

11   or whether this was a look the other way or just, you know,

12   frankly the press of business on the part of the government

13   to say, well, we put out the specs and they bid on it so

14   they obviously think they meet the specs and they have the

15   low price so they get the contract.

16           If that is the case, and there were

17   misrepresentations that were not brought to the attention of

18   the government or didn't come to the attention of the

19   contracting office based on their own process, then that

20   substantiates the claim for misrepresentation and unfair

21   competition that we claim has damaged Riveer in both

22   instances.

23           Counsel mentions Rule 9(b), and I just wanted to

24   address that briefly.  We briefed this issue in our briefs.

25   9(b) is a pleading rule.  They never raised Rule 9(b) at the

1    pleading stage.  They are trying to use Rule 9(b) to

2    constrain the scope of our claim and constrain the scope of

3    discovery.  I understand why they are doing it, it is just

4    not proper.  The cases cited in our brief point out just

5    that fact.  Rule 9(b) is there to ensure that the pleadings

6    are pled in accordance thereof, and if there is a challenge

7    to the pleading, then you cite Rule 9(b) and file a motion

8    and the Court will rule on it.

9            Now we are in discovery and the pleadings have

10   been made.  The scope of discovery under the federal rules

11   includes broadly the scope of Riveer's claim, which, as

12   revealed in the discovery that we have asked for, and the

13   third parties that we have discussed the testimony with, is

14   significantly broader.

15           THE COURT:  It seems like --

16           MR. LOBBIN:  I think that issue is a red herring,

17   the Rule 9(b) issue.

18           The fact remains that in their motion all they

19   have addressed is the Marine Corps bid and the Army bid.

20   That is really all that we have before the Court, frankly,

21   on the motion.

22           On those two issues, besides what Mr. Petter says

23   in his declaration, which must be credited in a light most

24   favorable to Riveer, and besides the discovery that we need

25   from Hydro, in other words a witness that we can get

1    testimony from on behalf of the company as to what exactly

2    they were doing in making these bids not in compliance with

3    the specifications, to confirm perhaps the admissions that,

4    yeah, they were standing on one foot and holding one eye

5    open hoping that the government wouldn't catch on, and

6    testimony from the contracting officer to say, well, how do

7    we feel about these bids?

8            From our experience in this business, and not me

9    personally, but from our clients' experience in the

10   business, these are contracting officers and they are not

11   engineers, and they are not evaluating the products and they

12   are not looking at the products and they are not saying,

13   okay, the specification 47 requires an eight-inch-diameter

14   stainless steel -- rated for this rating and before we award

15   this bid, let's go look and see if Hydro's product does

16   that.  No, they don't do that.  They don't have the

17   capability to do that.  What they do is they rely on the

18   bidders to present accurate bids in compliance with the

19   specifications and the low bidder usually wins.

20           So at trial we're going to need to, and we will,

21   get that testimony and we will present a full picture of the

22   issues.  I think that although we are the plaintiffs in the

23   case, and I know that the plaintiffs, their feet get put to

24   the fire on summary judgment, and in general with raising

25   claims, you know, everyone likes to resolve cases, but I

87

1    think the theme and what I'm getting from all of the

2    objections from Hydro throughout this case, not only to

3    early summary judgment motions, to waiting six months to

4    produce documents, threatening not to produce documents and

5    then all of a sudden producing them once I threaten a motion

6    to compel, this is just not the way litigation is supposed

7    to be conducted if both parties are interested in getting to

8    the truth, which is I think what the process is about.

9            We are not trying to increase fees for anybody.

10   We are just trying to raise claims that were not challenged

11   on our pleadings, and we're trying to get what we need to

12   get to the truth, and we are trying to present those issues

13   before a fact finder.  I would just offer that as sort of an

14   overall theme of kind of how we have approached this

15   litigation, and all of the litigation between these parties.

16           The Michigan case was raised by Hydro.  We filed a

17   defense suit, but it was really Hydro's case against Riveer.

18   Then Hydro sues us here in Utah on this trade secret

19   allegation.  We really have been on our heels with the

20   history of the litigation between these two parties, and I

21   just didn't want the Court to get the wrong impression of us

22   being some sort of overbearing aggressor and being

23   ridiculous and overreaching in trying to get this discovery

24   that has no relevance to the case.  We just want to get to

25   the truth.

1          THE COURT:  Thank you.

2          Mr. Miller.

3          MR. MILLER:  Your Honor, with regard to these two

4    bid transactions, we are at the truth.  All of the written

5    communications exchanged between Hydro and the military are

6    in the record.  They still have not identified where a

7    misrepresentation is.  All they say is Matt Petter's

8    declaration, you can credit it as true, but all he says is,

9    hey, what they provided does not exactly match up with the

10   original specification.  What he does not say is what they

11   provided is not what they represented they would provide.

12   That is what he does not say, because that is not accurate.

13          It seems like their entire claim here is based on

14   this assumption that all of the contracting officers in the

15   Marines and Army are just Gomer Pyle, and they just sit

16   there, and if somebody bids they just assume, well, that is

17   probably exactly the specification and I am not smart enough

18   to figure it out.  That is not how the system works.

19          We have quoted Matt Petter and Doug Petter

20   admitting that it is not uncommon to submit a bid for a

21   product that does not comply with the specifications,

22   because the specifications are drafted usually to fit

23   exactly somebody's system.  One of these at issue is --

24   Riveer makes a product and they submit their specifications

25   and the Army uses that specification to put the bid out for

1    others, but the Army will accept equivalence and something

2    that will do it just as good without meeting every single

3    specification.  That is why there is this bidding process

4    with the contracting officer looking through it.

5         You'll see in one of the story lines, and I don't

6    remember if it is the Army one or the B.C.I. bid, but in one

7    of the story lines the contracting officer responded to all

8    four bidders and said resubmit your bids.  Three of them are

9    just not close enough and are deficient.  One of them is too

10   high of a price.  They know what they are doing.  They

11   compare them.  You are not misleading anyone by submitting a

12   bid that may not have everything in the bid specification.

13   That is why there is a protest system.  That fact pattern

14   that we have in this motion shows that Riveer protested both

15   of these.  The Marines took a second look and they asked

16   more questions.  They came to their own independent

17   conclusion that what Hydro was offering is good enough for

18   them.

19        What they are not doing in this case is pointing

20   to something in Hydro's bid that says we'll provide you with

21   this whatever component, and then evidence that shows Hydro

22   did not provide them with that component.  They have not

23   identified that type of a misrepresentation anywhere.  It is

24   all supposition.  At least for these two sales transactions,

25   summary judgment is warranted and they have no evidence to

1   rely on.

2          THE COURT:  Well, these are the only two at issue,

3   aren't they?

4          MR. MILLER:  In our opinion, yes.

5          If they wanted to raise more they would have to

6   justify amending their complaint to raise these -- in their

7   request for document production they talk about a bid with a

8   customer named Catch Can, and they talk about Kellogg and

9   Brown and they talk about Fort Riley and all these other

10  ones, and we don't know what they are talking about and we

11  don't know why they are raising them.  We have produced all

12  of those documents now, and if they fish through those and

13  they want to find a misrepresentation, well, then they are

14  going to have to justify amending their complaint to raise

15  it and then pursue that claim.

16          I think their claim begins and ends on these two

17  sales transactions and they can't win.  There is a policy

18  argument to consider here.  You have the military doing a

19  competitive bid process to get equipment.  They have their

20  own independent protest system which Riveer uses and Hydro

21  uses.  All of these competitors use this protest system.

22  Then the military resolves the protest and they can choose

23  whether something is important to them in the specification

24  or whether an equivalent would be enough.

25          What you're going to create here is you protest a

1    bid with the military, and if you lose the protest then you

2    get to run to court and call it false advertising because

3    what they are providing is not exactly what is in the spec.

4    You have to have a real misrepresentation and they don't

5    have that here.

6            THE COURT:  It is not in your brief, but even if

7    there was a false representation made by Hydro to the Army

8    in seeking a contract from the Army and winning the bid,

9    does the other bidder have standing to bring a Lanham Act

10   false advertising claim?

11           MR. MILLER:  Well --

12           THE COURT:  You don't address it in your brief,

13   but it was just a curiosity that I have.

14           MR. MILLER:  It is a good thought and there is a

15   good argument that they wouldn't, because the whole purpose

16   of the Lanham Act and false advertising is to protect the

17   consumer, the public and the customer.

18           Now, if the military wanted to sue Hydro because

19   they got a piece of equipment, and then they go back to

20   Hydro and say you said it was going to have this type of

21   final filter or this type of basket on it and that is not

22   what we got, then maybe they could get a false advertising

23   claim there because they are the damaged party.  I don't

24   know if Riveer would have standing.

25           THE COURT:  Well, if the allegation was that they

1    had misrepresented something about your product, if Hydro

2    misrepresented something about Riveer's products, and I have

3    never heard of a case like this asserting intentional

4    interference with economic relations by breaching a

5    contract, which is essentially what they are arguing, with

6    the Army.  I don't know about the Unfair Trade Practices Act

7    either and whether it envisioned a competitor having the

8    standing to bring the lawsuit.

9              MR. MILLER:  Well, it is --

10             THE COURT:  You didn't address it in your brief

11   and it is unfair for me to just throw it out there.

12             MR. MILLER:  It is a wild fact pattern to have

13   them arguing about something that is really something

14   between Hydro and the Army.  They don't claim they have

15   misrepresented anything about Riveer's products.  Riveer's

16   real gripe here is they want everybody to propose the exact

17   system they are proposing on these bids.  That is not the

18   requirement.

19             The Army does not expect everybody to have the

20   exact same components.  Riveer can't force everyone to

21   propose the exact same equipment that they are proposing.

22   They can't demand that through a lawsuit on such specious

23   claims.  We think this one should be granted, and we don't

24   think that, honestly, even if they try to find something

25   with these other sales, which I have not heard anything

 1    about yet, we don't think leave to amend would be justified.

 2              THE COURT:  Thank you, Mr. Miller.

 3              MR. MILLER:  Do you want to talk about claim

 4    construction or --

 5              THE COURT:  I want to hear his response to your

 6    comments first.

 7              MR. MILLER:  Okay.

 8              THE COURT:  Mr. Lobbin.

 9              MR. LOBBIN:  Thank you, Your Honor.

10         He keeps asking for what the misrepresentations

11    were and we have talked generally and I have not been going

12    over my brief in chapter and verse with you here, and just

13    discussing it more conceptually, but pages 27 through the

14    end of our brief expands on what the specific

15    misrepresentations are.

16         For example, at the top of page 27, citing some of

17    their exhibits, it talks about communications between Hydro

18    and the contracting office, and confirming in writing that

19    Hydro's bid satisfied the bid specifications, providing

20    stainless steel filtration components and other features.

21    That is a misrepresentation.  We know what their products

22    are and they are not that.

23              THE COURT:  Go back through that one again.  You

24    said the top of 27?

25              MR. LOBBIN:  I'm sorry.  Page 27 of our brief.

1          THE COURT:  Yes.  Tell me again what it is that

2     they misrepresented.

3          MR. LOBBIN:  Line 2 starts, for example, regarding

4     the Marine Corps B.C.I. bid, and there was some back and

5     forth from the Marine Corps to Hydro saying, well, wait a

6     minute.  We need to confirm that your bid actually satisfies

7     the specifications.

8          THE COURT:  That is Hydro providing confirmation

9     that its bid satisfied the bid specifications requiring

10    stainless steel filtration components and other features.

11         MR. LOBBIN:  Correct.

12         THE COURT:  I see.

13         MR. LOBBIN:  That is their motion at 14 and 15 and

14    citing Exhibit 4.

15         THE COURT:  Right.

16         MR. LOBBIN:  And then the Marine Corps

17    correspondence is Exhibits C, D and F.

18         So Hydro's evidence that they satisfied the

19    requirements is a letter from the contracting officer who

20    specifically took what Hydro told her and repeated it as

21    necessary as her assurance that, yes, Hydro has told me that

22    they satisfy these bid specifications.  I am taking them at

23    their word.  Therefore, we conclude that Hydro does satisfy

24    these bid specifications.

25         Then my brief continues.  In order to confirm that

```
 1   Hydro's product, the actual product delivered to the Marine

 2   Corps was not what they represented it to be, Riveer needs

 3   discovery.  Of course, that was six months ago and we have

 4   been getting documents from Hydro ever since and they

 5   finally completed the production last week, and we'll be

 6   able to present testimony at trial to confirm that the

 7   product actually delivered did not meet the representations

 8   that they were making to the Marine Corps.

 9              THE COURT:  Did not meet the representations that

10   they were making or did not meet the bid specifications or

11   is it the same thing?

12              MR. LOBBIN:  Same thing.

13              THE COURT:  Well, that is what I just don't know.

14   Again, to open up this discovery door, don't you have to

15   show me something where you know of a representation in a

16   letter or an oral statement or a document of some kind where

17   a misrepresentation has been made, a material

18   misrepresentation?

19              MR. LOBBIN:  Well, here they are saying we have

20   stainless steel filtration components.  That is what I just

21   read.  At the top of page 27 they are talking about assuring

22   the Marine Corps that they have the required specified

23   stainless steel filtration components.

24              THE COURT:  Right.

25              MR. LOBBIN:  We know that they don't.  That is
```

1    from I think Petter's declaration and from what we have

2    learned since, and we would be prepared to supplement that,

3    if the Court would invite further briefing on the issue to

4    show where the genuine issues of material fact are at this

5    stage of the game because, as Mr. Miller admits, they filed

6    a motion with documents that we had never seen before.

7            THE COURT:  Mr. Miller, tell me how you respond to

8    this.  He is claiming that it was a misrepresentation that

9    they satisfy the bid specifications requiring stainless

10   steel filtration components because they didn't.

11           MR. MILLER:  Your Honor, this is what he is

12   referring to.  Exhibit D of our motion is an e-mail from the

13   military to Mr. Felice at Hydro Engineering proposing a

14   bunch of questions.  The questions say are you using an

15   ozone injection system?  Does your product offer stainless

16   final filters?  There are a few questions there.

17           Exhibit E is the letter that Hydro sent back.

18   Hydro's letter responds to each question.  Yes, Hydro will

19   be providing an electrically generated Corona discharge

20   ozone injection.  Number two.  Yes, our system offers a

21   stainless final filter which is easy to visually inspect and

22   clean.  Number three.  Yes, our system offers stainless

23   steel filtration systems.  Our primary filter is all

24   stainless steel.  Those are their representations.

25           Hydro has testified that everything they state in

1  this letter they provided to the military.  They provided

2  them a stainless steel final filter.  They provided them all

3  that stuff.

4          Now, it might not be the exact same stainless

5  steel final filter that Riveer provided them, but they

6  represented what they would provide them in this letter and

7  that is what they provided.  There is no evidence to the

8  contrary.

9          THE COURT:  Tell me what your evidence is to the

10 contrary.

11         MR. LOBBIN:  Well, we have Mr. Petter's

12 declaration, and Mr. Petter is here and I am sure he would

13 be glad to explain it in gory detail, not that that is the

14 purpose of this hearing, but he explains in paragraph 5 how

15 we have pictures of the actual product delivered to the

16 Marine Corps which show that the system included all sorts

17 of things that were sub the specifications, including,

18 contrary to their representations, stainless steel

19 components.

20         The system included, and I am reading from his

21 declaration, Hydro's system included mostly less expensive

22 P.V.C., which is hard plastic, construction rather than the

23 stainless steel construction required by the specifications.

24         THE COURT:  How do you respond to that, Mr.

25 Miller?

1              MR. MILLER:  Your Honor, I am looking at paragraph

2    5 in Matt Petter's declaration that he cited.  This says

3    Hydro's system included mostly less expensive P.V.C.

4    construction.  Well, what does that mean?  He is not saying

5    that there was no stainless steel in our construction.  He

6    is not saying that our statement that we would offer a

7    stainless steel filter is false.  He is saying that we had

8    P.V.C.  Where did we represent that our system would not

9    have P.V.C. in it?  I mean, that is kind of a weird

10   statement to say there.  All systems have some P.V.C. in

11   them.

12             A media filter with a maximum P.S.I. rating of

13   only 60.  Where did we say in this letter that we would

14   provide a media filter with a maximum P.S.I. rating of 60?

15   We didn't.  Then he says the capacity of only 300 pounds of

16   media rather than the 750 pounds required.  Where did we say

17   that we would provide more than the 300 pounds of media?

18   This is assuming that Mr. Petter's representations here in

19   paragraph 5 are accurate about what we gave to the military.

20             THE COURT:  Going back to the stainless steel

21   filtration components, has Mr. Petter anywhere indicated

22   that they did not deliver a stainless steel filtration

23   component?

24             MR. LOBBIN:  I think what he means by that and

25   what his testimony is is that the bid required and they

1    confirmed, you know, again from the brief at 27 and the

2    evidence cited therein, that Hydro confirmed and the Marine

3    Corps accepted that Hydro satisfied the bid specifications

4    requiring stainless steel filtration components, and the

5    characterization that Mr. Petter has made in his declaration

6    shows that, no --

7              THE COURT:  Shows what?

8              MR. LOBBIN:  No.  Sorry.  I was being dramatic.

9    I'm sorry.  I was leading in with a no --

10             THE COURT:  I understand.

11             MR. LOBBIN:  No, they actually provided not a

12   stainless steel filtration system.

13             THE COURT:  He does not say that anywhere, does

14   he?

15             MR. LOBBIN:  Well, he says that the Hydro system

16   had mostly less expensive P.V.C. construction, not stainless

17   steel.

18             THE COURT:  That does not say they failed to

19   provide the stainless steel filtration components.

20             MR. LOBBIN:  Well, P.V.C. is not stainless steel.

21   That is the import of the testimony.

22             THE COURT:  I don't think there is any dispute

23   about that.  Somebody needs to tell me that they

24   misrepresented something, that they said they were providing

25   and offering to provide stainless steel filtration

 1   components and told that to the Army, even assuming that you

 2   have standing to bring it up, which really in some ways

 3   surprises me, and it is between the Army and Hydro it seems

 4   to me.  Otherwise we would have bidders on every contract

 5   that gets bid in the world every day complaining if the

 6   other person won the contract and they can prove that all of

 7   their specifications didn't meet the bid specifications, so

 8   there must have been a misrepresentation so we can sue them

 9   under the Lanham Act because they took the bid away from us.

10   That may be the law, but it would surprise me if it is.

11            Going back to this specific point, and I am just

12   asking you, and when I ask for contrary evidence, it would

13   be something that shows that Hydro did not provide the

14   stainless steel filtration components.

15            MR. LOBBIN:  I suppose my evidence at the time

16   this motion was filed was Mr. Petter's photographs and

17   testimony about the fact that rather than a stainless steel

18   filtration system, they --

19            THE COURT:  Rather than, and it does not say that,

20   it says it was mostly P.V.C.  The irony here is I may be

21   getting more representation from you and Mr. Petter than

22   you're accusing them of.

23            MR. LOBBIN:  Well, I --

24            THE COURT:  It is not that hard.  I am willing to

25   let you go past this motion, and especially since they are

```
1    not raising the standing issue, but if you can show me where

2    you have some basis to allege that they told the Army this

3    and they didn't do what they said they were doing.

4              MR. LOBBIN:  Well, I suppose, without conferring

5    with my client, which I could do, what I'm left with is what

6    is in the record.  What is in the record are the

7    communications between the Marine Corps and Hydro where they

8    say, yeah, we meet the bid specifications requiring

9    stainless steel filtration components, and Mr. Petter

10   saying, well, we saw what they delivered, and maybe they

11   should have taken out the word mostly, but the effect of his

12   testimony is what they gave the Marine Corps was not

13   stainless steel.

14             THE COURT:  That is what he does not say.  That is

15   what he never says.

16             MR. LOBBIN:  Well, he says rather than the

17   stainless steel construction required --

18             THE COURT:  Does it say rather than?

19             MR. LOBBIN:  Yes.

20             THE COURT:  You're quoting from the document?

21             MR. LOBBIN:  From Petter's declaration.

22             THE COURT:  Okay.

23             MR. LOBBIN:  He says rather than --

24             THE COURT:  Well, that is closer, Mr. Miller.

25             I don't have it in front of me.  That would have
```

1    been easier.  If he says rather than -- that is still a

2    little ways away.

3              MR. LOBBIN:  Well, it says --

4              THE COURT:  Mr. Petter, do you claim to know that

5    Hydro, your competitor, did not provide stainless steel

6    filtration components?

7              MR. PETTER:  The key word there is components.

8    The government says are you providing a stainless steel

9    filtration and final filter.  That is what they asked.  They

10   replied we are providing stainless steel filter components.

11   They have a paper bed media filter that has a stainless

12   steel shell around it.  The rest of their system is plastic.

13   So they didn't lie, but they didn't answer the question

14   accurately.

15             THE COURT:  Thank you.

16             That is the basis for your misrepresentation

17   claims --

18             MR. LOBBIN:  Yes.

19             THE COURT:  -- that support all three causes of

20   action or claims, as you call them, four, five and six?

21             MR. LOBBIN:  Yes.  Correct.

22             With regard to the Army, the discussion there is

23   at the bottom of 27 and at the top of 28.  The bases for

24   that claim are discussed in Mr. Petter's declaration, the

25   last paragraphs, but also Exhibit M which details in chapter

1    and verse the substance and components that were represented

2    as satisfying the bid specifications but were not

3    satisfactory.  That is a protest letter.

4            Now, again, those are just the two bids that they

5    challenge.  At trial we'll present other examples that we

6    have fleshed out in discovery.  There is always a balance.

7    You want to plead what you know and then there are other

8    instances of this same conduct that have revealed themselves

9    through the discovery we have been able to garner from the

10   documents that they have produced and our testimony that we

11   have obtained from the third parties that were actually

12   contracting these services and can testify as to what was

13   misrepresented and what was delivered.

14           THE COURT:  Thank you, Mr. Lobbin.

15           Mr. Miller, anything from you?

16           MR. MILLER:  One quick thing.

17           On that last bid and when they talk about Exhibit

18   M, that is a protest letter Petter put together on that bid

19   just talking about Petter's opinion on what was wrong with

20   awarding it to Hydro.  That protest was not granted.  The

21   only protest that was granted was a supplemental protest

22   that had to deal with additional communications.  It was not

23   granted on the fact that our bid didn't satisfy the

24   specifications.

25           They are not pointing to evidence of a

1    misrepresentation.  They are pointing to evidence of their

2    protest, which was not granted.

3              THE COURT:  What do you say to my question to Mr.

4    Petter and his answer to it where he seems to be saying that

5    he could add some more information in his declaration or his

6    affidavit and say, well, my position is that they

7    misrepresented to the Army by using this broader word

8    component that they were going to deliver more stainless

9    steel than they did?  I may be paraphrasing it wrongly, but

10   that is what I took from what he said.  You heard it as

11   well.

12             Is that enough to allow them to proceed to the

13   further discovery that they want?

14             MR. MILLER:  No, I don't believe it is.

15             THE COURT:  Why not?

16             MR. MILLER:  He didn't say that they lied.  He

17   said they didn't lie.

18             THE COURT:  He said they misrepresented.

19             MR. MILLER:  He said the wrong question was asked.

20             THE COURT:  You can misrepresent something by not

21   telling the whole truth.

22             MR. MILLER:  The Army's question is do you provide

23   a stainless steel final filter?  They said, yes, we do.

24   They provided a stainless steel final filter.  Maybe it has

25   less stainless steel than Riveer's final filter, but there

1    is nothing in the Army's question that would require Hydro

2    to answer that any differently.  If they have evidence to

3    show what this final filter is and what the Army thought

4    that meant, that is one thing, but they don't.

5         The discovery of third parties is done.  They

6    can't depose any of these military people.  They have waited

7    and you have ruled on that.  The discovery cutoff date is

8    December 1st.  They don't have time to give anybody

9    reasonable notice for depositions.  After last week's

10   ruling, they hurried up and tried to serve a bunch of

11   depositions to try to get seven depositions in six different

12   states to occur on the same day.  I mean, that is just an

13   admission that they know it is unreasonable and the

14   subpoenas are not reasonable.

15        They don't have evidence to support the idea of a

16   misrepresentation here.  Even if you give his theory some

17   credence, it does not rise to the level of a false

18   advertising claim.  It just does not.  You have to have the

19   evidence.  You can't have an unfounded opinion that I think

20   it means this and they should have answered it this way.

21             THE COURT:  Thank you.

22             Now, where are we on the last matter?

23             MR. LOBBIN:  May I make one very small comment

24   very quickly?

25             THE COURT:  Sure you can.

1          MR. LOBBIN:  I just want to clarify, because I

2     know we have talked a lot today about getting through the

3     door, and you mentioned just recently whether Riveer is

4     entitled to more discovery, but in opposition to the summary

5     judgment motions, we are not asking for more discovery.  We

6     are asking for the summary judgment motions to be denied on

7     the basis of 56(d) because they are premature and, as the

8     rules of judgment, as a matter of law, require, Riveer has

9     not been fully heard on the issue.

10          We are not necessarily asking for the Court to

11     rule that we are or are not allowed to take certain or other

12     discovery.  We can go about that as a matter of course in

13     the case without the Judge's involvement.  Our opposition

14     and the Rule 56 motion are in support of our argument that

15     the summary judgment motions should be denied on the basis

16     that they are premature under the J.M.O.L. rules and Rule

17     56(d).

18          THE COURT:  Thank you.

19          Now, on the remaining matter, this claim

20     construction issue, is it something that you're ready to

21     present or talk about today or not?

22          MR. LOBBIN:  No.  Not us, Your Honor.  I'm sorry.

23          MR. MILLER:  Your Honor, we are.

24          I was under the impression that they would have

25     filed an opposition by now, given our discussion last week

1    at the hearing, but it is something that is time sensitive.

2           THE COURT:  Why is it that you chose not to

3    respond since our last hearing?

4           MR. LOBBIN:  Your Honor, I have tried to put it

5    together and I have been preparing for this hearing.  I was

6    traveling all day yesterday.  I have been in communication

7    with Mr. Miller and there is just a lot to say in response

8    and I have just not completed the response.  I know that the

9    local rules give us 14 days, and I am about halfway through

10   the brief, and I could probably get it filed at the pleasure

11   of Your Honor.

12          THE COURT:  Thank you.

13          As I understand it from what I have read from the

14   submissions by the defendants, the defendants have filed

15   their final contentions pursuant to local patent Rule 4.1,

16   correct?  You're complaining that their submission is not

17   compliant, right?

18          MR. LOBBIN:  Correct.

19          THE COURT:  I will say this, that from what I have

20   read, Mr. Lobbin, and I'll give you some time to submit a

21   brief, but I'm going to ask for it to be done soon.  From

22   what I have read so far, my strong inclination is that you

23   are not even close to being in compliance with the letter or

24   the spirit of the rule.  It anticipates that each side gets

25   to understand what the other side is advancing by way of the

1    claims that need to be construed and the claim construction

2    that they are offering.  I am just giving you my best

3    warning.

4              MR. LOBBIN:  Sure.  I can comment on that, if you

5    would like.

6              THE COURT:  I would be glad to hear you.

7              MR. LOBBIN:  Yes.  A lot of local rules require

8    claim construction --

9              THE COURT:  And this one is fairly new.

10             MR. LOBBIN:  Yes.

11             THE COURT:  We have not had it very long.

12             MR. LOBBIN:  I understand.

13             Part of the reason it has taken me time on the

14   response, and there are so many cases I want to bring to

15   this Court's attention where the parties have issues that

16   they want construed, and they are all issues that only one

17   side wants construed.  The other side, typically the

18   plaintiff, views their patent as stating claim terms that

19   are normal words, adjacent, grate --

20             THE COURT:  It sounds like we might need grate

21   construed.

22             MR. LOBBIN:  You might think.

23             In claim construction rulings from district courts

24   for the last 15 years, there are probably 25 of them that I

25   am planning to put in our brief.  The court goes through

1   each claim term and says, okay, the plaintiff's position on

2   claim construction, no construction necessary.  The

3   defendant's position on claim construction, the word

4   adjacent means blah, blah, blah, and 42 words to define

5   adjacent.  The same thing with grate.  That is basically

6   where we are in this case.

7          It is a valid position for a plaintiff to say,

8   Your Honor, on the construction of this term our position is

9   that no construction is necessary.  I'll cite all of the

10  cases, many, many cases where the court says, you know what,

11  the defendant wants sort of this long-winded constricting

12  construction of this word that really does not need

13  construction, and so I'm going to rule in favor of the

14  plaintiff on this one and say no construction is necessary.

15         That is a legitimate position and that is the

16  position we take, and if Your Honor is inclined, and I take

17  your comments seriously, and if you really think I am

18  swimming uphill and you're going to grant the motion or want

19  me to do something, I am more than happy to adopt a

20  compromised position which says that I'll file a brief, an

21  opening claim construction brief, but I can tell you right

22  now what it is going to say is the word grate is a grate.

23  Everyone knows what a grate is.  The jury knows what a grate

24  it.  There is no construction necessary for the word grate.

25         Similarly with the word adjacent, the jury should

1    know and everybody knows what adjacent means.  We are

2    dealing with the English language.  It is not with

3    mathematical precision, but patent law excepts the fact that

4    a word like adjacent used in a patent claim can be presented

5    to the jury and the jury gets to decide, okay, I know what

6    adjacent means.  In the accused product this is adjacent to

7    this.

8              You have not told them, well, adjacent means that

9    it can be near or next to or within 20 inches, but not

10   further away than 72 inches.  No.  You get to trial and you

11   tell the jury that adjacent means adjacent.  Those are our

12   positions.

13             I can file a brief that says that.  It won't take

14   long.  It would probably take me longer to do the opposition

15   to this motion than to present an opening claim construction

16   brief that says -- I think we are at eight or nine terms

17   that they have raised, so here is what we think they should

18   mean, and here is why our position is legitimate, and the

19   case law is replete with rulings that say no construction

20   necessary.

21             THE COURT:  Are you adjacent to Mr. Miller right

22   now?

23             MR. LOBBIN:  I am.

24             THE COURT:  How about to me?

25             MR. LOBBIN:  I am not.

1              THE COURT:  We could probably debate that.  That

2       is quite an interesting thing.  I just think in my

3       experience these words that the parties are going to have a

4       difference of opinion on, the words that make up the claims,

5       that you need to know what the other side says they mean.

6       You tell me in the brief that you submitted or the

7       contention that you submitted to them, I guess, that I don't

8       need to construe them beyond their ordinary and customary

9       meaning.

10             Well, then tell them what you think that ordinary

11      and customary meaning is.  It all is relative to what a

12      person of ordinary skill in the art would think that

13      ordinary meaning is.  I don't know why this is a problem, I

14      don't.

15             MR. LOBBIN:  Well, I'll tell you why it is a

16      problem.

17             THE COURT:  This would be like two football teams

18      and we decide we are going to let them change game plans

19      beforehand, and say it is a bad rule, but one team complies

20      with the rule and sends over what they are going to run on

21      Saturday, and the other team says we have decided not to.

22      Everybody kind of knows what football is and we are not

23      going to do that.  That strikes me as the sort of argument

24      you're making here.

25             I will tell you this, that I will let you not

1    construe them, but on everything that you don't construe or

2    offer a construction on that you think needs to be

3    construed, and they give me a construction, I will adopt

4    theirs.

5            MR. LOBBIN:  Well, no, because we are entitled to

6    oppose their constructions with evidence that says that

7    their construction is not --

8            THE COURT:  All we're asking for now is an

9    exchange.

10           MR. LOBBIN:  Okay.

11           THE COURT:  Exchange the claim construction, the

12   terms you feel need to be construed and what construction

13   you think they should be given.

14           MR. LOBBIN:  Okay.  If I may, I think I can flag

15   sort of the issue.  I mean, in my experience in this case

16   they try to sort of prevent things and strike things, and so

17   I think the concern is that they want me to not only file a

18   brief that says grate means grate and adjacent means

19   adjacent, but they want me to come up with some cobbled

20   together definition that I don't really advocate, but --

21           THE COURT:  I only want the definition that you

22   advocate.

23           MR. LOBBIN:  Okay.  Then the next step is going to

24   be when I file an opposition to their claim construction

25   motion, and I have all sorts of reasons why their

1  constructions are not accurate, and I submit an expert

2  declaration saying what the person of ordinary skill in the

3  art would think about what they are proposing, they are

4  going to say, no, we are going to strike that expert

5  declaration because you didn't file that expert declaration

6  in your opening brief.

7          If Your Honor is willing to consider that issue

8  and give me an indication of whether that is going to be

9  something I should worry about, I would be more than happy

10  to compromise and file the opening brief and the positions

11  that I take.

12          THE COURT:  I just want you to follow the two

13  rules and they are pretty sample.  We'll deal with other

14  matters down the road.  I am not giving you an advisory

15  opinion about whether some argument they make later is

16  outside the rules.  The rule is pretty simple and you need

17  to follow it.  It is simple.

18          If you want to oppose their motion, which is a

19  motion -- how did they style it -- a motion to compel

20  plaintiffs to comply with local patent Rules 4.1 and 4.2,

21  that is still a pending motion and I'm going to need a brief

22  by next Tuesday at 5:00.  You have the option of opposing

23  their motion and telling me why, and then they can respond

24  with a reply or tell me they don't want to reply.  You have

25  that opportunity.

1          You also have the opportunity to just comply with

2     the rule as it is written and provide, rather than this

3     thing you have provided, which gives me no claim

4     construction requests, and it only says plain and ordinary

5     meaning, and if you think these things are going to be

6     construed pursuant to their ordinary and customary meaning,

7     well, then, tell me what that is.

8          MR. LOBBIN:  Understood.

9          THE COURT:  It is up to you.  You can dispense

10    with fighting their motion and conceding and --

11         MR. LOBBIN:  That is not an option.

12         THE COURT:  -- do whatever you want, or you can

13    give them your submission and then we'll follow Rule 4.2 for

14    a simultaneous brief exchange.

15         MR. LOBBIN:  Thank you, Your Honor.

16         THE COURT:  All right.  Thank you.

17         I will take all of these other motions under

18    advisement.

19         Thank you.

20         (Proceedings concluded.)

21

22

23

24

25