**Brett L. Foster, 6089**
bfoster@hollandhart.com
**Mark A. Miller, 9563**
mmiller@hollandhart.com
**Christopher B. Hadley, 14055**
cbhadley@hollandhart.com
**HOLLAND & HART LLP**
222 S. Main Street, Suite 2200
Salt Lake City, Utah 84101
Telephone: (801) 799-5800
Facsimile: (801) 799-5700

*Attorneys for Defendants*
Hydro Engineering, Inc. and
CA Cleaning Systems, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **PETTER INVESTMENTS, INC. d/b/a RIVEER**, a Michigan corporation,<br><br>　　　Plaintiff,<br><br>vs.<br><br>**HYDRO ENGINEERING, INC.,** a Utah corporation; **CALIFORNIA CLEANING SYSTEMS, INC.,** a California company,<br><br>　　　Defendants. | **DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF (LPR 4.2)**<br><br>Civil Case No. 2:14-CV-00045-DB<br><br>Judge Dee Benson |

Pursuant to LPR 4.2(c), Defendants Hydro Engineering, Inc. and CA Cleaning Systems, Inc. (collectively "Hydro") submit this Responsive Claim Construction Brief addressing the arguments and evidence presented in the Cross-Motion for Claim Construction (Dkt. 187) filed by Plaintiff Petter Investments, Inc. d/b/a Riveer Environmental ("Petter").

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ......................................................................................................1

ARGUMENT ...........................................................................................................1

I.      PETTER WAIVED THE RIGHT TO PROPOSE DEFINITIONS FOR THE DISPUTED CLAIMS TERMS ....................................................................1

II.     PETTER'S PROPOSED DEFINITIONS IGNORE THE CONTEXT OF THE PATENTS AND SHOULD BE REJECTED ..................................................3

      A.     THE "ORDINARY MEANING" OF CLAIM LANGUAGE IS NOT DERIVED THROUGH ABSTRACT REFERENCE TO DICTIONARY DEFINITIONS ...............3

      B.     '298 PATENT ...............................................................................6

           1.     "frame" – *e.g.*, "frame having a first wall, a second wall, a third wall, a fourth wall, each wall having an inner and an outer surface" ...................................................................6

           2.     "bottom surface" – *e.g.*, "a bottom surface extending between the inner surfaces of said first, second, third, and fourth walls of said frame to define a basin" ...................................7

           3.     "grate" ......................................................................8

           4.     "sloped tray" ..............................................................10

      C.     '774 PATENT .............................................................................10

           1.     "evacuation end" .........................................................10

           2.     "an elevator disposed in fluid communication with the evacuator" ..............................................................12

           3.     "the elevator removing debris from the debris collector and elevating the removed debris from a collection height to a dump height for dumping" ............................................14

      D.     '720 PATENT .............................................................................14

           1.     "a side trough adjacent the wash floor" .........................................14

7377497_2.doc

2.    "a guide rail separating the side trough from the wash floor" ............................................................................................16

**III.**   MR. PAULUS IS NOT QUALIFIED TO OPINE ON CLAIM CONSTRUCTION AND DOES NOT OFFER ANYTHING HELPFUL ............17

CONCLUSION.........................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACTV, Inc. v. Walt Disney Co.*,
  346 F.3d 1082 (Fed. Cir. 2003).................................................................................5

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*,
  224 F.3d 1308 (Fed. Cir. 2000).................................................................................19

*CCS Fitness, Inc. v. Brunswick Corp.*,
  288 F.3d 1359 (Fed. Cir. 2002).................................................................................19

*General Protecht Group, Inc. v. Int'l Trade Comm'n*,
  619 F.3d 1303 (Fed. Cir. 2010).................................................................................19

*Hill-Rom Services, Inc. v. Stryker Corp.*,
  755 F.3d 1367 (Fed. Cir. 2014).................................................................................11

*Hockerson-Halberstadt, Inc. v. Avia Group Intern., Inc.*,
  222 F.3d 951 (Fed. Cir. 2000)...................................................................................12

*IA Labs CA LLC v. Nintendo Co.*
  (R.App.0042-43).......................................................................................................7

*In re Nelson*,
  280 F.2d 172 (1960)..................................................................................................9

*Medrad, Inc. v. MRI Devices Corp.*,
  401 F.3d 1313 (Fed. Cir. 2005).................................................................................4

*Mycogen Plant Science, Inc. and Agrigenetics, Inc. v. Monsanto Co.*,
  261 F.3d 1345 (Fed. Cir. 2001).................................................................................11

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................................... passim

*Primos, Inc. v. Hunter's Specialties, Inc.*,
  451 F.3d 841 (Fed. Cir. 2006)...................................................................................4

*ScriptPro LLC v. Innovation Assoc.*
  (R.App.0032-40).......................................................................................................7

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
  511 F.3d 1132 (Fed. Cir 2007)..................................................................................19

*Southern Mills, Inc. v. Polartec, LLC*,
  377 Fed.Appx. 2 (Fed. Cir. 2010)..............................................................................19

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
    550 F.3d 1356 (Fed. Cir. 2008)..................................................................................20

*Texas Digital Systems, Inc. v. Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002)..............................................................................3, 4

*V–Formation, Inc. v. Benetton Group SpA*,
    401 F.3d 1307 (Fed. Cir. 2005)..................................................................................5

## INTRODUCTION

After withholding its proposed claim constructions from Hydro in violation of this Court's Local Patent Rules, Petter blind-sides Hydro with proposed constructions presented for the first time in its Cross-Motion for Claim Construction ("Petter CC Motion").  Petter's Motion is remarkable for what it lacks.  Despite paying lip service to the legal standards emphasizing the importance of the intrinsic record of the patent (*i.e.*, claims, specification and prosecution history), Petter does not provide any substantive analysis of the intrinsic record of its patents to support its positions.  Instead, Petter evaluates the disputed claim terms in the abstract, divorced from the context of the patent documents, and relies wholly on general dictionary definitions.  Petter also presents a declaration from a purported expert witness, who offers nothing but conclusory statements and is unqualified to testify concerning the perspective of a person of ordinary skill in this case.  As set forth in Hydro's Motion for Claim Construction, (Dkt. 176; "Hydro CC Motion")[1], the intrinsic evidence of Petter's patents is consistent with and compels the claim constructions presented by Hydro.  The Court should reject Petter's invitation to turn a blind eye to the actual language and context of Petter's claimed inventions.  Hydro's proposed constructions should be adopted.

## ARGUMENT

## I.  PETTER WAIVED THE RIGHT TO PROPOSE DEFINITIONS FOR THE DISPUTED CLAIMS TERMS

The Local Patent Rules are designed to ensure that "all parties would have an understanding of each other's positions *prior to briefing*" on claim construction.  *See* LPR 4.2, comment (emphasis added).  To that end, the Rules require the parties to serve each other with a

---

[1] Hydro will not reiterate the details of its claim construction arguments in this responsive brief to avoid unnecessary duplication.  Instead, Hydro assumes familiarity with its opening Motion for Claim Construction and incorporates its position and arguments herein by reference throughout this brief.

notice of proposed claim constructions relating to disputed claim terms over 1 month before the deadline to file the simultaneous Cross-Motions for Claim Construction.  LPR 4.1(a) & 4.2(a).  Hydro received Petter's claim construction notice on November 3, 2014, which was woefully inadequate and did not proffer any proposed construction, just vague assertions that "ordinary meaning" governed.  *See generally* Dkt. 159, 169.  Hydro immediately began conferring with Petter to request that Petter give Hydro advance notice of its claim construction positions with more specificity as required by the Court's Rules.  Petter refused, resulting in Hydro's motion to compel Petter to comply with the Local Patent Rules.  *See Id.*; Dkt. 159-3.  Through all of that time, Petter doggedly refused to provide Hydro advance notice of what Petter believed to be the "ordinary meaning" of each disputed term.  *Id*.

Then, demonstrating clear contempt of this Court's Rules, Petter presented proposed definitions for the disputed terms *for the first time* in its Cross-Motion for Claim Construction.  Petter CC Motion at 6-17.  As is evident from Petter's Motion, Hydro's compliance with the Local Patent Rules enabled Petter to anticipate and address Hydro's position in Petter's Motion.  *See, e.g., id*. (criticizing "Hydro's proposed construction" on each disputed term).  In contrast, Petter's tactic of withholding its proposed definitions from Hydro prevented Hydro from addressing the merits of Petter's positions in Hydro's opening Motion.  *See* Dkt. 176.  Given Petter's willful disregard of this Court's Rules governing the claim construction process and the prejudice it has caused Hydro, the Court should find that Petter waived any right to propose its so-called "alternative" definitions for the disputed terms and prohibit Petter from advocating any definitions for the disputed terms.  Moreover, given Petter's refusal to comply with this Court's claim construction procedures, the Court can rightly adopt Hydro's proposed meanings.[2]

---

[2] At the summary judgment hearing, the Court informed Petter's counsel that the Court felt Petter was "not even close to being in compliance with the letter or the spirit of the rule."  *See* Transcript at 109:19-25 (Dkt. 193).  The

II.     **PETTER'S PROPOSED DEFINITIONS IGNORE THE CONTEXT OF THE PATENTS AND SHOULD BE REJECTED**

Apart from Petter's untimeliness and waiver, its proposed "alternative" definitions are not supported by the intrinsic patent evidence.  Indeed, Petter's Motion largely ignores the intrinsic evidence and advocates for abstract definitions based entirely on dictionaries divorced from the context of Petter's patents.  By so doing, Petter follows a flawed methodology discarded by the Federal Circuit long ago.  The Court should reject Petter's proposed definitions and adopt the definitions Hydro has proposed, which are consistent with and derived from the intrinsic patent records.  *See* Hydro CC Motion (Dkt. 176).

A.     THE "ORDINARY MEANING" OF CLAIM LANGUAGE IS NOT DERIVED THROUGH ABSTRACT REFERENCE TO DICTIONARY DEFINITIONS

In the past, some Federal Circuit decisions suggested an approach to claim construction "in which the court has given greater emphasis to dictionary definitions of claim terms and has assigned a less prominent role to the specification and prosecution history."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319 (Fed. Cir. 2005) (*en banc*) (referring to *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002) and its progeny).  This approach, however, improperly "limits the role of the specification in claim construction to serving as a check on the dictionary meaning of a claim term if the specification requires the court to conclude that fewer than all the dictionary definitions apply, or if the specification contains a sufficiently specific alternative definition or disavowal."  *Id*. at 1320.

In 2005, the Federal Circuit issued the *en banc Phillips* decision to provide "clarification" about "the use of dictionaries in claim construction."  *Id*. at 1312.  In that decision, the Court explained that the methodology Petter has followed "place[s] too much reliance on extrinsic

---

Court also warned Petter that an appropriate remedy for Petter's failure to timely propose a definition would be to adopt Hydro's definition.  *Id*. at 111:25-112:4.

sources such as dictionaries … and too little on intrinsic sources, in particular the specification

and prosecution history." *Id*. at 1320. In rejecting the *Texas Digital* approach followed by

Petter, the Federal Circuit explained:

> The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent. Properly viewed, the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent. Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification. The patent system is based on the proposition that claims cover only the invented subject matter. … The use of a dictionary definition can conflict with that directive because the patent applicant did not create the dictionary to describe the invention. Thus, there may be a disconnect between the patentee's responsibility to describe and claim his invention, and the dictionary editors' objective of aggregating all possible definitions for particular words.

*Id*. at 1321-22 ("A claim should not rise or fall based upon the preferences of a particular

dictionary editor, or the court's independent decision, uninformed by the specification, to rely on

one dictionary rather than another.").

Much of Petter's error lies in a mistaken belief that the "ordinary meaning" of a word is

necessarily derived from general dictionaries. This is wrong. "[T]he 'ordinary meaning' of a

claim term is its meaning to the ordinary artisan after reading the entire patent." *Id*. at 1321.

This meaning is *not* determined in the abstract using general dictionary definitions. Instead, "[i]n

ascertaining the ordinary and customary meaning of a claim term, a court's *primary focus* should

be on the intrinsic evidence of record, *viz.*, the claims, the specification, and, if in evidence, the

prosecution history." *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir.

2006) (emphasis added). *See also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319

(Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term … in a vacuum. Rather,

we must look at the ordinary meaning in the context of the written description and the prosecution history"); *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms"); *V–Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005) (the intrinsic record "usually provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of the invention").  Petter's desire to exalt its hand-picked dictionary definitions over a contextual analysis of the patent documents is a brazen effort to broaden the scope of its alleged inventions far beyond anything Matthew and Doug Petter actually conceived or invented.

For every claim limitation addressed in Petter's Motion, Petter begins with the conclusory statement that the "intrinsic evidence" of the patent "supports a construction of the term ... that is consistent with the term's plain and ordinary meaning."  Petter CC Motion at 6-18. Yet Petter provides no analysis of the intrinsic record, no explanation about where in the intrinsic record such support is found, and no evaluation of what the "ordinary meaning" is from the perspective of a person of ordinary skill in in the wash pad industry.  The only alleged "support" Petter cites for these statements is the conclusory and irrelevant opinion of its so-called expert. *Id*.  *See also* Section II(E), *infra*.  Such conclusory statements do not present a genuine basis for Petter's position.  *See, e.g., Phillips*, 415 F.3d at 1318 ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.").

Petter's exclusive reliance on extrinsic, conclusory opinions and abstract dictionary definitions divorced from the context of the patents is an invitation for the Court to commit legal

error in construing the disputed claim terms.[3]   As set forth below, Petter fails to present any competent evidence to either support its position or refute Hydro's proposed definitions for the disputed terms.

**B.**   **'298 PATENT**

**1.**   **"frame" – _e.g._, "frame having a first wall, a second wall, a third wall, a fourth wall, each wall having an inner and an outer surface"**

Petter proposes its abstract definition of "frame" and criticizes Hydro's proposed meaning without once citing to the actual '298 patent documents for support.  Petter does not allege that Hydro's proposed definition conflicts with the patent specification; nor does Petter contend that Hydro's definition contradicts the express claim language.  Instead, Petter argues that "not all frames are weight bearing" and "not all frames are made up of four interconnected walls" and "not all frames define a single enclosed area."  Petter CC Motion at 8.  Petter's abstract argument misses the mark badly.

Neither Hydro nor the Court has any interest in discovering a definition that applies to "all frames."  Indeed, such a definition does not exist.  Webster's provides 36 different definitions for the term "frame."  R.App.0026.[4]  This is why the patent specification, claims and prosecution history are so important—they provide the relevant context necessary to understand what the claim terms mean with respect to the claimed invention without sifting through dozens of abstract dictionary definitions.  The relevant inquiry here is: What is the proper scope and

---

[3] Petter also criticizes Hydro for using the disputed terms themselves in Hydro's proposed definition, as if such a practice is inherently problematic.  Petter CC Motion at 2.  But using the terms within a patent claim phrase to define the scope and meaning of that phrase is reasonable and unremarkable.  Indeed, even Webster's follows such a practice in defining certain phases.  _See_ R.App.0023 (defining "bottom bolt" to mean "a bolt at the bottom of the door"; and defining "bottom fish" to mean "fishes that live at or near the bottom of a body of water").

[4] Dkt. 188.  Contrary to Petter's position, Webster's defines "frame" consistent with Hydro's proposed meaning.  The dictionary evidence Petter relies on defines "frame" as "a rigid structure formed of relatively slender pieces, joined so as to surround sizeable empty spaces" and "a structure for admitting or enclosing something."  R.App.0026.  How can Petter say that the term "frame" cannot not be defined as a structure that encloses an area?

meaning of the frame *disclosed and claimed in Petter's '298 patent*?  Thus, the decisions Petter cites from cases interpreting the term "frame" from different patents covering different technologies are entirely irrelevant.  *See* Petter CC Motion at 7.[5]

Hydro's proposed definition applies to the entire "frame" clause of the asserted patent claims – *i.e.*, "a frame having a first wall, a second wall, a third wall, a fourth wall, each wall having an inner and an outer surface."  *See* Hydro CC Motion at 3-7.  The intrinsic record of the '298 patent clearly demonstrates that the "frame" limitation in the '298 patent is load bearing and is made of four interconnected walls that enclose an area, thus creating inner and outer surfaces.  *Id*.  While Hydro's definition may not apply to "all frames," it certainly is the appropriate definition for the frame recited in the '298 patent.  Petter's criticisms have no merit.  The Court should adopt Hydro's proposed definition: *a weight-bearing frame made up of four interconnected walls that define a single enclosed area such that each wall has an inner surface facing toward the enclosed area and an outer surface facing away from the enclosed area*.

> ### 2.   "bottom surface" – *e.g.*, "a bottom surface extending between the inner surfaces of said first, second, third, and fourth walls of said frame to define a basin"

For the "bottom surface" limitation, Petter once again ignores the specification and claims of the '298 patent, relying wholly on abstract dictionary definitions.  *See* Petter CC Motion at 8-9.  But the "bottom surface" clause of the claims requires the bottom surface to extend "between the inner surfaces of" the four frame walls in order to "define a basin."  A624.  It is the meaning of that clause within the context of the '298 patent that is at issue here.  Hydro

---

[5] *See ScriptPro LLC v. Innovation Assoc.*, (R.App.0032-40) (construing the term "frame" from patent directed to a collating unit used with automatic prescription drug dispensing systems); *IA Labs CA LLC v. Nintendo Co.*, (R.App.0042-43) (construing the phrase "a frame to support a user" from a patent directed to an exercise system).

has explained in detail what that meaning is with specific citations to the intrinsic record of the '298 patent as required by the governing law.  Hydro CC Motion at 3-7.

Petter's studied ignorance of the context of its own patent is astonishing.  Simply because the definitions Petter selects were contained in a dictionary "around the time of the inventions of the '298 patent" does not mean those definitions govern.  Petter CC Motion at 9.  The following definitions for "bottom" are also contained in the same dictionary: "the underside"; "the seat of a chair"; "the trousers of a pair of pajamas"; "a cargo vessel"; "the buttocks, rump."  R.App.0023. Yet Petter does not advocate using those definitions.  Again, the most important evidence to consider is the patent itself, which Petter ignores.  *See Phillips*, 415 F.3d at 1315 (the patent's specification is "the single best guide to the meaning of a disputed term" and is usually "dispositive").  When that evidence is considered, Hydro's proposed definition is clearly the correct one.

Petter's arguments raise one reasonable point.  The term "bottom" in the asserted patent claims denotes the "lowest or deepest part" of something.  Petter CC Motion at 9.  Claim 1 of the '298 patent clearly recites the "bottom surface" as a component of the "frame."  A624 ("a frame having a first wall, a second wall, a third wall, a fourth wall ... and a bottom surface...to define a basin...").  Thus, in addition to Hydro's proposed definition, Hydro agrees that the "bottom surface" is also the lowest part of the wash pad frame.  Accordingly, the Court should define the "bottom surface" clause in the asserted claims to mean *a surface that fills a horizontal cross-section of the enclosed area and intersects the bottom portion of the inner surfaces of all four frame walls and is the lowest part of the frame*.

### 3.     "grate"

Petter's primary contention regarding the meaning of "grate" is that it should not be defined to be a *porous* structure.  Petter CC Motion at 10.  Petter fails, however, to cite anything

within the intrinsic patent documents that would support the idea of using a non-porous structure as the "grate" recited in the claims.  That is because the intrinsic record, including the claim language itself, cannot be read without concluding that the grate is a porous structure that must allow water and debris to fall *through* it into a basin below the grate.  *See* Hydro CC Motion at 7-10.  Even the general dictionary definition cited by the parties inherently describes a porous structure: "a framework[6] of parallel or crossed bars[.]"   R.App.0027.  Given the nature of Petter's infringement position, and the unusual way Petter is attempting to apply the term "grate" to Hydro's wash pads, Hydro believes that the porous nature of the "grate" must be made express in the Court's definition, even though it is implicit in the claims and the dictionary definition.

Petter tries to support its position with a collection of extrinsic evidence comprised of internet searches relating to the George Forman barbeque grill.  *See* Petter CC Motion at 10, n. 5; R.App.0048-66.  This evidence is comical.  Whether or not Petter is joking, this position fails miserably.  Claim construction is an exercise performed from the perspective of a person of ordinary skill "in the field of the invention."  *Phillips*, 415 F.3d at 1313.  Moreover, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id*.  *See also In re Nelson*, 280 F.2d 172, 181 (1960) ("The descriptions in patents are not addressed to the public generally, to lawyers or to judges, but, as section 112 says, to those skilled in the art to which the invention pertains or with which it is most nearly connected.").  The '298 patent describes the field of the invention as follows: "This invention relates to a modular recycling wash rack system."  A622 (col. 1, lines 10-11).  Petter cannot provide any evidence to support the absurd notion that a person of skill in the modular

---

[6] The term "framework" refers to a skeletal structure.  R.App.0026.  When something is described as a framework (or skeletal structure) of parallel or crossed bars, the immediate picture that comes to mind is a structure that has empty spaces between the bars – *i.e.*, porous.

wash rack industry, after reading the '298 patent, would look to marketing materials for the George Forman grill in order to understand the meaning of the term "grate" in the patent claims. Barbecue grills are not used for washing vehicles and equipment.  The Hydropad® is never used to cook steaks or burgers.  The extrinsic evidence on which Petter relies is wholly unrelated to the field of the invention of the '298 patent and irrelevant to the claim construction analysis.

The intrinsic record of the '298 patent makes the meaning of "grate" clear—it is a porous structure that allows water and debris to fall *through* it.  *See* Hydro CC Motion at 7-10.  The Court should adopt Hydro's proposed meaning for "grate": ***a porous framework of parallel or crossed bars that fills a horizontal cross-section of the enclosed area and engages the top portion of the inner surfaces of all four frame walls***.

### 4. "sloped tray"

Petter's arguments concerning the "sloped tray" limitation again studiously ignore the intrinsic record of the '298 patent and rely exclusively on Petter's hand-picked dictionary definition.  Petter CC Motion at 11-12.  However, the '298 patent specification and claims unambiguously show that the sloped tray of Petter's claimed invention is a tray that resides within the frame, above the bottom surface, and below the grate.  *See* Hydro CC Motion at 4-5, 10-11.  Given the clear context and language of the '298 patent claims, the Court should adopt Hydro's proposed meaning of the term "sloped tray": ***a slanted tray positioned within the enclosed area at a level above the bottom surface and below the grate***.

### C. '774 PATENT

### 1. "evacuation end"

Petter repeats its cookie-cutter, conclusory arguments with regard to the term "evacuation end," as if anyone would know what an "evacuation end" is without any reference to the '774 patent.  As Hydro set forth in detail in its Motion for Claim Construction, the intrinsic record of

the '774 patent demonstrates that the "evacuation end" recited in Petter's patent claims refers to the end of the catch where both the evacuator and the elevator are located to remove solid debris and liquids. *See* Hydro CC Motion at 22-28. Specifically, the plain language of the claims in the '774 patent requires the evacuator and the elevator to be connected to each other at the same end of the catch trough. *Id*. at 26-28. Additionally, the prosecution history of the '774 patent unambiguously reveals the intent of both the patent examiner and the patentee to limit the claims to the embodiment shown in Figure 6. *Id*. at 24-25. The examiner expressly requested that the claims be limited to the configuration shown in Figure 6, and Petter obliged by amending the claims to include the "evacuation end" language—a term used in the '774 patent to describe the arrangement of elements in Figure 6. *Id*. The intrinsic record could not be more clear, which is why Petter is so keen to avoid any discussion of it.

Petter accuses Hydro of improperly seeking to limit the claims to the preferred embodiment. *See* Petter CC Motion at 13. This accusation falls flat. It is true that courts should ordinarily not limit broad claim language to the preferred embodiment of a patent. But that cannon of claim construction applies only "absent some language in the specification or prosecution history suggesting that the [limitation in question] is important, essential, [or] necessary[.]" *Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367, 1373 (Fed. Cir. 2014). Given the circumstances in this case, it is entirely appropriate to limit the claims to the specific embodiment shown in Figure 6 based on the unambiguous prosecution history. *See, e.g., Mycogen Plant Science, Inc. and Agrigenetics, Inc. v. Monsanto Co.*, 261 F.3d 1345, 1350 (Fed. Cir. 2001) (construing claims to include limitations from the embodiment shown in the specification: "[T]he prosecution history reveals that what the examiner ultimately proposed, and

Mycogen accepted, was claim language limited to sequences taken from the preferred embodiment set forth in Figure 1.").

Hydro and others in the industry are entitled to rely on the record at the Patent Office demonstrating the examiner's and Petter's intent to limit the claims to the arrangement of elements depicted in Figure 6. *See Hockerson-Halberstadt, Inc. v. Avia Group Intern., Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000) ("The prosecution history constitutes a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention."). Given the intrinsic record of the '774 patent, the asserted claims cannot reasonably be read to encompass a wash system where solids and liquids are removed from opposite ends of the catch trough. Petter used the term "evacuation end" to describe the end of the trough where *both* the elevator and the evacuator reside as shown in Figure 6, and then incorporated that term into the claims. The Court should therefore adopt Hydro's proposed construction for "evacuation end": ***an end of the catch trough at which the evacuator (including the fluid mover and the debris collector) and the elevator are located as shown in Figure 6 of the '774 patent***.

### 2.   "an elevator disposed in fluid communication with the evacuator"

Petter does not cite to any evidence—intrinsic or extrinsic—that conflicts with Hydro's proposed construction of the phrase "an elevator disposed in fluid communication with the evacuator." Petter CC Motion at 14-15. The one example Petter cites from the specification of the '774 patent (*id*. at 14) perfectly illustrates Hydro's proposed meaning for the concept of being "in fluid communication." That example explains that the wash floor is in "fluid communication" with the catch trough. *See* A62 (col. 2, lines 43-55). That same concept is

reiterated several times throughout the specification.  *See* A41 (Abstract); A62 (col. 1, lines 50-53); A63 (col. 4, lines 27-28, 35-37); A64 (col. 6, lines 10-13, 61-63); A66 (col. 10, lines 2-3, 10-12).

The '774 patent explains that the catch trough may be placed at various alternative locations—but in every case it is either an integral part of the wash floor platform or it is "attached to or positioned next to the platform" so that wash fluid can flow off the platform directly into the trough.  A64 (col. 6, lines 50-60).  Every example of the catch trough and wash floor depicted in the '774 patent shows them abutting each other such that the wash water and debris can flow off the wash floor/platform directly into the catch trough.  A42-44, A48-51.  Thus, the example of the wash floor channels being in fluid communication with the catch trough only supports Hydro's position that two things must be connected or abutting in order to be "in fluid communication" with each other.   The '774 patent only uses the term "in fluid communication" when referring to components that are immediately abutting or connected such that fluid can flow directly between them.  As set forth above, the catch trough and wash floor are always abutting or connected.  In addition, the '774 patent explains that the elevator and evacuator are "connected."  A65-A66 (col. 8, lines 26-31; col. 10, lines 17-19).

Petter urges the Court to adopt an unreasonably broad view of "in fluid communication" that encompasses any arrangement that permits fluid to flow from one location to another.  Under Petter's view, the snow in the Wasatch Mountains would be "in fluid communication" with this Court's water faucets, because water could conceivably flow through various channels, aquifers, and treatment plants and end up in this Court's pipes.  Petter's overly broad view is not consistent with the context of the '774 patent and the invention described therein.  Given the intrinsic record of the '774 patent, the elevator and the evacuator must be connected such that

water and debris can move from one *directly* into the other.  *See* Hydro CC Motion at 28-29.

The Court should adopt Hydro's proposed construction: ***an elevator connected to the evacuator***

***such that debris can be moved from the debris collector directly into the elevator***.

> 3.    **"the elevator removing debris from the debris collector and
> elevating the removed debris from a collection height to a dump
> height for dumping"**

With respect to the meaning of the "elevator" clause of the '774 patent claims, Petter

again asks this Court to put blinders on and ignore the context of the '774 patent claims.

However, "the context in which a term is used in the asserted claim can be highly instructive."

*See Phillips*, 415 F.3d at 1314 ("To take a simple example, the claim in this case refers to 'steel

baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of

steel.").  In this case, claim 1 of the '774 patent recites the "elevator" as a mechanism that

"elevat[es] the removed debris ... to a dump height" and also recites the conveyor as a

mechanism for performing the same function.  A67.  The language of the claims alone makes it

clear that there are two elevating means.  *See* Hydro CC Motion at 29-30.  In other words, the

independent recitation of the conveyor as a means of elevating debris to a dump height "provides

a firm basis for construing" the elevator limitation as a mechanism for elevating debris

independent of the conveyor.  *Phillips*, 425 F.3d at 1314.  The Court should therefore adopt

Hydro's proposed construction of the "elevator" limitation: ***the elevator includes a means to***

***elevate debris to a dump height independent of the conveyor***.

> D.    **'720 PATENT**

> 1.    **"a side trough adjacent the wash floor"**

The variety of general definitions for the term "adjacent" highlights why the context of

the '720 patent is so important.  Petter hand-picks one definition from Webster's for "adjacent,"

but provides absolutely no explanation as to why that definition should govern over any others.

The dictionary evidence Petter cites also identifies "abutting," "touching," and "adjoining" as synonymous with the term "adjacent."  R.App.0022.  When the intrinsic record of the '720 patent is examined, it is clear that these meanings are the most appropriate for this case.  That is, in the context of enabling the wash water to flow off the edge of the wash floor down into the catch trough, it is clear that "adjacent" means "abutting."  *See* Hydro CC Motion at 11-14, 18-21.

Petter's desire to define "adjacent" more broadly is not supported in the intrinsic record of the '720 patent.  If the catch trough were permitted to simply lie near the wash floor, while not abutting it, the trough would not be positioned to receive wash water from the wash floor as required by the claims and described in the '720 patent.  *Id.*



**'720 Patent, Figure 3**

**Petter's Construction**

A "side trough" is a trough abutting the side of the wash floor so that the wash water falls off the edge of the floor into the trough, thus ensuring that no waste water hits the ground.  The

15

Court should not follow Petter's reliance on abstract dictionary definitions in derogation of the intrinsic record of the patent itself.  The Court should adopt Hydro's proposed construction: *a side trough abutting the wash floor such that wash fluid and/or debris flows directly from the wash floor into the side trough*.

2.    <u>"a guide rail separating the side trough from the wash floor"</u>

For the "guide rail" limitation, Petter again carefully selects one of several definitions from Webster's without any explanation for why that definition is the most consistent with the '720 patent records.  Indeed, Petter carves out the portion of the dictionary definition that is the most *inconsistent* with the claimed invention of the '720 patent and presents that as Petter's proposed construction.

Webster's provides nearly two dozen definitions for "separate."  R.App.0028.  But without reference to the intrinsic context of the '720 patent, Petter's abstract result-oriented selection of one definition is unfounded.  The definition Petter relies on states: "to keep apart or divide, as by an intervening barrier or space."  *Id*.  Petter CC Motion at 18.  But then Petter discards—without explanation—the portion of that definition that describes a dividing barrier and adopts solely the language "keeping apart."  *Id*. at 17.  A review of the '720 patent shows that Petter's hand-picked definition is wrong.

Because the claims and the specification of the '720 patent make it clear that the "guide rail" performs the separating function, the portion of the definition that refers to the use of an "intervening barrier" to divide two areas is clearly the most consistent with the context of the '720 patent.  The dictionary even provides the following example: "to separate two fields by a fence."  R.App.0028.  In that example, the two fields abut or intersect each other, necessitating the fence to be located near the property line to divide them.  That concept coincides perfectly with the context of the '720 patent, where the side trough abuts the wash floor, and the guide rail

16

serves as a barrier dividing the two.  *See* Hydro CC Motion at 11-14, 21-22.  As explained above with reference to the disputed term "adjacent," the "keep apart" language in the dictionary is not consistent with the '720 patent, because it suggests the concept of keeping the side trough and the wash floor physically apart, which defeats the purpose of the portable wash pads.  Given the unambiguous context of the '720 patent, the Court should reject Petter's abstract definition and adopt Hydro's proposed construction for the phrase "a guide rail separating the side trough from the wash floor": ***a side trough abutting the wash floor such that wash fluid and/or debris flows directly from the wash floor into the side trough***.

## III.   MR. PAULUS IS NOT QUALIFIED TO OPINE ON CLAIM CONSTRUCTION AND DOES NOT OFFER ANYTHING HELPFUL

Each section of Petter's Motion begins with the same cookie-cutter, conclusory statement that the "intrinsic evidence" of the patent "supports a construction of the term ... that is consistent with the term's plain and ordinary meaning."  Petter cites the declaration of David Paulus as support for these naked contentions.  Mr. Paulus, however, does not offer any meaningful analysis of the asserted patents at all.  Instead, he merely reiterates the same conclusory comments.  *See* R.App.0070-73.  Mr. Paulus' declaration is not helpful and provides no substantive support for Petter's positions.  *See Phillips*, 415 F.3d at 1318 ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.").  Even if Mr. Paulus provided substantive analysis—or attempts to do so in the future—he is not qualified to opine on the perspective of a person of ordinary skill in the relevant field.  Thus, his testimony is wholly irrelevant.

Expert testimony is only helpful to the extent the expert is able "to provide background on the technology at issue, to explain how the invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in

17

the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Even then, it should be considered with caution, because "extrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in the intrinsic evidence." *Id.* "The effect of that bias can be exacerbated if the expert is not one of skill in the relevant art" as is the case with Mr. Paulus. *Id.*

Every one of Petter's asserted patents describes the relevant technical field pertaining to the claimed invention as particularly limited to the wash pad industry. *See* A62 ('774 patent, "wash pads"); A222 ('720 patent, "a cleaning system or cleaning facility for parts or machinery"); A622 ('298 patent, "modular recycling wash rack system"). Thus, both parties agree that the hypothetical person of ordinary skill must have meaningful experience in the portable wash pad industry. Hydro contends that a person of ordinary skill in the art is one "who has several years of experience designing vehicle or equipment washing systems." Hydro CC Motion at 3. Petter proffered a similar definition during the claim construction proceedings in Michigan, defining the person of ordinary skill pertaining to Petter's patents as "a person with engineering education or training and two to three years in the wash rack system industry." *See* Petter's Responsive Claim Construction Brief at 1 (H.App.67). [7]

Mr. Paulus has absolutely no experience in the portable wash system industry. While he is a mechanical engineer, he does not have any background from which to opine on how a person of ordinary skill in the portable wash pad industry would understand the claims of the asserted patents. The fact that he relies on marketing materials for the George Forman grill further emphasize his lack of qualifications for this case. Consequently, even if Mr. Paulus provided the

---

[7] Hydro has filed a Supplemental Claim Construction Appendix containing appendix pages H.APP.63-H.APP.85 with this Responsive Claim Construction Brief.

Court with substantive opinions on claim construction, the Court would be right to disregard them as irrelevant, particularly where the intrinsic evidence of the asserted patents is so clear. *See CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1318 (Fed. Cir. 2000) ("Given this overwhelming clarity of the intrinsic evidence, we conclude ... that the district court properly ignored CAE's proffered extrinsic evidence on this issue, the testimony of Mr. Frejborg. ... [W]hen the intrinsic evidence is unambiguous, it is improper for a court to rely on extrinsic evidence such as expert testimony when construing disputed claim limitations."). *See also Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1145, n.3 (Fed. Cir 2007) (giving no weight to expert testimony purporting to speak to the perspective of one of ordinary skill without any evidentiary foundation; "Under such circumstances, testimony as to how one skilled in the art would interpret the language in the specification is entitled to little or no weight."); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1368 (Fed. Cir. 2002) ("First, we can resolve the ordinary meaning of the claimed 'member' by resort to the intrinsic evidence and dictionary definitions only. Thus, we do not need to examine expert testimony.").

Moreover, it would not be helpful for Mr. Paulus to simply opine on how he would construe the claim language after analyzing the asserted patents. Doing so is the function of the Court, and no amount of mechanical engineering education or experience in patent cases can qualify him to provide competent testimony in that regard. *See Southern Mills, Inc. v. Polartec, LLC*, 377 Fed.Appx. 2, 6 (Fed. Cir. 2010) ("Dr. Adanur's testimony was unhelpful because it constituted only a recitation of how he would construe that term, not an explanation of its 'accepted meaning in the field' to one skilled in the art."); *General Protecht Group, Inc. v. Int'l Trade Comm'n*, 619 F.3d 1303, 1310 (Fed. Cir. 2010) ("None of the experts identified a

particular meaning in the art, and an expert's subjective understanding of a patent term is irrelevant.").

The result is the same even if Mr. Paulus attempts to opine on other issues such as non-infringement or invalidity. He simply is not qualified to offer competent or helpful testimony to the Court on such matters. *See Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1364 (Fed. Cir. 2008) (disregarding expert testimony; "[A] witness not qualified in the pertinent art may not testify as an expert as to ... any of the underlying questions, such as the nature of the claimed invention, what a prior art reference discloses, or whether the asserted claims read on the prior art reference."). Given Mr. Paulus' lack of experience in the wash pad industry, the Court should disregard any opinion testimony he may offer regarding the merits of Petter's claim construction arguments or Petter's patent infringement claims in this case.

## CONCLUSION

Given Petter's dogged persistence in ignoring the actually disclosure and context of its patents, the Court should steer clear of any proposals Petter makes concerning the meaning of the asserted patent claims. Hydro's Motion for Claim Construction (Dkt. 176) presents a detailed evaluation of the intrinsic record for each asserted patent in order to propose a contextual, rational meaning for the disputed claim terms. Petter's positions should be rejected, and the Court should adopt Hydro's proposed constructions.

Dated this 5th day of January, 2015.

HOLLAND & HART LLP

/s/ Mark A. Miller
Brett L. Foster
Mark A. Miller
Christopher B. Hadley
*Attorneys for Defendants*
Hydro Engineering, Inc. and
CA Cleaning Systems, Inc.

20