Stephen M. Lobbin (admitted *pro hac vice*)
**The Eclipse Group LLP**
2020 Main Street, Suite 600
Irvine, California  92614
Tel:  949.851.5000
Fax:  949.851.5051

Mark W. Ford (10659)
Rachel Jacques (13250)
**Maschoff Brennan**
1389 Center Drive, Suite 300
Park City, Utah  84098
Tel:  435.575.1387
Fax:  435.252.1361

*Attorneys for Plaintiff* Petter Investments, Inc. d/b/a RIVEER

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **PETTER INVESTMENTS, INC.** d/b/a **RIVEER**, a Michigan corporation,<br><br>        Plaintiff,<br><br>vs.<br><br>**HYDRO ENGINEERING, INC.**, a Utah corporation, and **CALIFORNIA CLEANING SYSTEMS**, a California company,<br><br>        Defendants. | **PLAINTIFF RIVEER'S RESPONSE TO DEFENDANTS' MOTION FOR CLAIM CONSTRUCTION PURSUANT TO LPR 4.2(c)**<br><br>Civil Case No. 2:14-CV-00045<br><br>Honorable District Judge Dee Benson |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II. ARGUMENT ....................................................................................................... 2

    A.  U.S. Patent No. 6,164,298 ........................................................................... 2

        1.  Background ...........................................................................................2

        2.  "frame"..................................................................................................2

        3.  "bottom surface" .................................................................................4

        4.  "grate".................................................................................................5

        5.  "sloped tray" .......................................................................................9

    B.  U.S. Patent No. 8,506,720 ........................................................................ 12

        1.  Background .........................................................................................12

        2.  "a side trough adjacent the wash floor" ...........................................12

        3.  "a guide rail separating the side trough from the wash floor" ...........15

    C.  U.S. Patent No. 8,499,774 ........................................................................ 17

        1.  Background .........................................................................................17

        2.  "evacuation end"...............................................................................17

        3.  "an elevator disposed in fluid communication with the evacuator" ...19

        4.  "the elevator removing debris from the debris collector and elevating the removed debris from a collection height to a dump height for dumping".........20

III. CONCLUSION.................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Elekta Instrument S.A. v. O.U.R. Scientific International, Inc.*
214 F.3d 1302 (Fed. Cir. 2000) ................................................................. 3, 5, 8, 18

*Hyperion Solutions Corp., v. Outlooksoft Corp.*
422 F. Supp. 2d 760 (E.D. Tex. 2006) ...................................................... 3, 5, 8, 18

*Kraft Foods, Inc. v. International Trading Co.*
203 F.3d 1362 (Fed. Cir. 2000) ................................................................. 16

*Phillips v. AWH Corp.*
415 F.3d 1303 (Fed. Cir. 2005) ................................................................. 6, 13, 20

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*
242 F.3d 1337 (Fed. Cir. 2001) .............................................................. 1, 6, 13, 20

*SRI International v. Matsushita Electric. Corp. of America*
775 F.2d 1107 (Fed. Cir. 1985) ................................................................. 12

*Vitronics Corp. v. Conceptronic*
90 F.3d 1576 (Fed. Cir. 1996) ................................................................... 21

*World Class Technical Corp. v. Ormco Corp.*
769 F.3d 1120 (Fed. Cir. 2014) ................................................................. 16

**Other Authorities**

Random House Webster's Unabridged Dictionary (2d ed. 1998) ......................................... 16, 17

Pursuant to LPR 4.2(c), Plaintiff Petter Investments, Inc. d/b/a RIVEER ("Riveer") responds as follows to Defendants' Motion for Claim Construction (Dkt. 176).

## I.    INTRODUCTION

In the *very first* sentence of Defendants' Motion for Claim Construction ("Hydro CC Motion"), Hydro states: "The language used to describe [Riveer's] wash rack inventions in the asserted patent claims is very simple."  Hydro CC Motion at 1.  Riveer agrees.  Indeed, it is because the claim language is so simple that Riveer contends no construction is necessary beyond the "plain and ordinary meaning" of the claim language itself.  Despite its acknowledgement that the claim language is "very simple," however, Hydro insists that certain of the claim terms require an explicit construction.

Hydro's proposed constructions are improper for a number of reasons.  In many instances, Hydro's proposed constructions are not limited to the terms Hydro identifies for construction.  Rather, Hydro attempts to "shoe-horn" definitions of claim terms ***it did not identify*** into the constructions of claim terms it did identify.  Not only is this tactic improper, but in each instance, Hydro's proposed construction renders other claim terms superfluous and moot.  Moreover, each of the constructions Hydro proposes (for terms it identified and terms it did not) is unjustified based on the ordinary meaning of the language used in the claims and the rest of the intrinsic record.  Hydro repeatedly attempts to import limitations from disclosed embodiments, which is "one of the cardinal sins of patent law."  *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001).  In one instance, Hydro even creates its own fictional embodiment from which it attempts to import limitations.  Finally, only Riveer, not Hydro, provides any evidence probative of the heart of the matter—*i.e.*, how a person of ordinary skill in the art would interpret the disputed claim terms.

Therefore, Hydro's proposed constructions should be rejected.

## II.     ARGUMENT

### A.     U.S. Patent No. 6,164,298

#### 1.     Background

To the extent the asserted claims do not limit the claimed invention as implied in Hydro's "Background" via its characterization of the preferred embodiment of the '298 patent, the terms used (and not used) in the claims dictate the proper scope of the invention, not the features of a preferred embodiment.  Also, as discussed herein (*see infra* II.A.5), Hydro mis-labels a "bottom surface" in its labeled version of Figure 5 of the '298 patent.  *See* Hydro CC Motion at 5.

#### 2.     "frame"

| Riveer's Proposed Construction | Hydro's Proposed Construction |
|---|---|
| No construction of this term is necessary; however, should the court determine the "plain and ordinary meaning" of this term requires further definition, Riveer proposes: "a rigid structure joined so as to provide support" | "a weight-bearing frame made up of four interconnected walls that define a single enclosed area such that each wall has an inner surface facing toward the enclosed area and an outer surface facing away from the enclosed area" |

Hydro fails to provide any justification for limiting the scope of the term "frame" to only those frames that are "weight-bearing."  For this reason alone, Hydro's proposed construction for the term "frame" should be rejected.  Hydro's proposed construction also should be rejected because it is not limited to the term Hydro identified for construction—"frame;" instead, Hydro now seeks to construe the phrase "having a first wall, a second wall, a third wall, a fourth wall, each having an inner and an outer surface" to require that the recited "frame" be "made up of four interconnected walls that define a single enclosed area such that each wall has an inner surface facing toward the enclosed area and an outer surface facing away from the enclosed area."  Indeed, Hydro states:

> The plain language of claim 1 . . . states that the frame is made from four distinct walls, calling them "first wall, second wall, third wall, and fourth wall."  A624.  Claim 1 then states that each wall has to have ***"an inner and outer surface,"***

2

> *indicating that the walls must be connected to each other to form an enclosed
> area defining an inside and an outside*.

Hydro CC Brief at 6.  Hydro acknowledges that it is the "inner and outer surface" language of Claim 1 (and not the term "frame") that Hydro contends requires the frame walls to be "interconnected" and "define a single enclosed area."

If Hydro wanted to construe the phrase "inner and outer surface," it should have identified this term for construction months ago under LPR 4.1.  It chose not to do so.  Hydro's attempt to shoe-horn a definition of a claim term it did not identify into the construction of a claim term it did is improper, as it would render the claim term "inner and outer surface" superfluous and moot.  *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302 (Fed. Cir. 2000) (refusing to adopt a claim construction which would render claim language superfluous); *Hyperion Solutions Corp., v. Outlooksoft Corp.*, 422 F. Supp. 2d 760, 772 (E.D. Tex. 2006) ("[T]he parties' citations do not define [the claim term].  Instead, these citations relate to additional claim limitations.  To incorporate these limitations into the [claim term at issue] would render the limitations within claim 1 moot.  Bedrock principles of claim construction counsel against a construction that renders additional limitations superfluous.").

Even if it was not improper to include in a proposed construction for one claim term definitions for other claim terms, Hydro's proposed construction of "frame" should be rejected because it is unjustifiably too narrow.  Indeed, Hydro's proposed construction requires the frame to be "made up of four interconnected walls."  The plain language of Claim 1 is not so limited.  While Claim 1 requires the presence of a first, second, third, and fourth wall, it does not require the frame to be "***made up***" of only four walls.  Indeed, the language of Claim 1 is sufficiently broad to cover frames that include more than four peripheral walls, as frames often do especially when supporting heavy structures and objects.  In addition, nothing in the language of Claim 1

requires the frame walls to be "interconnected" so as to "define a single enclosed area."  The

language of Claim 1 is sufficiently broad to include frames that are not entirely "interconnected"

and that do not "define a single enclose area."  *See* Paulus Decl. ¶ 5.

### 3. "bottom surface"

| Riveer's Proposed Construction | Hydro's Proposed Construction |
|---|---|
| No construction of this term is necessary; however, should the court determine the "plain and ordinary meaning" of this term requires further definition, Riveer proposes: "a face or boundary that defines the lowest or deepest part of something" | "a surface that fills a horizontal cross-section of the enclosed area and intersects the bottom portion of the inner surfaces of all four frame walls" |

Hydro again fails to provide any evidence—intrinsic or extrinsic—that justifies limiting

the scope of the term "bottom surface" to a structure that "intersects the bottom portion of the

inner surfaces of all four frame walls."  For this reason alone, Hydro's proposed construction

should be rejected.  Hydro's proposed construction also should be rejected because it is not

limited to the term Hydro identified for construction—"bottom surface;" instead, Hydro now

seeks to construe the phrase "extending between the inner surfaces of said first, second, third,

and fourth walls" to require the "bottom surface" to "fill[] a horizontal cross-section of the

enclosed area and intersect[] the bottom portion of the inner surfaces of all four frame walls."

Indeed, Hydro states:

> Claim 1 also states that a "bottom surface extend[s] between the inner surfaces
> of" the four walls "to define a basin for collecting water used to clean the item as
> well as any debris removed from the item."  A624.  By calling it a "bottom"
> surface and *specifying that it extends between the "inner surfaces" of the four
> walls, claim 1 necessarily requires the "bottom surface" to fill the area enclosed
> by the four walls* at the bottom level of the walls in order to form a basin that can
> collect and contain wash water and debris.

Hydro CC Brief at 6-7 (emphasis added).  Hydro acknowledges that it is the "extending

between" language of Claim 1 (and not the term "bottom surface") that Hydro contends requires

the bottom surface to "fill[] a horizontal cross-section of the enclosed area."  If Hydro wanted to

construe the phrase "extending between," it should have identified this term for construction months ago under LPR 4.1. It chose not to do so. Hydro's attempt to shoe-horn a definition of a claim term it did not identify into the proposed construction of a claim term it did is improper, as it would render "extending between" superfluous and moot. *See supra* (*Elekta* and *Hyperion* cases).

Even if it was not improper to include in a proposed construction for one claim term definitions for other claim terms, Hydro's proposed construction of "bottom surface" should be rejected because it is unjustifiably too narrow. Indeed, Hydro's proposed construction requires the bottom surface to "fill[] a horizontal cross-section of the enclosed area." The plain language of Claim 1 is not so limited. While Claim 1 requires a "bottom surface extending between the inner surfaces of said first, second, third, and fourth walls," it does not require the bottom surface to "fill[] a horizontal cross-section of [an] enclosed area." Indeed, the language of Claim 1 is sufficiently broad to cover bottom surfaces that extend between frame walls but do not entirely fill a horizontal cross-section of an area enclosed by the frame walls. Hydro's proposed construction attempts to rewrite Claim 1 to require that the bottom surface "extend *entirely* between" the frame walls. *See* Paulus Decl. ¶ 6.

### 4. "grate"

| Riveer's Proposed Construction | Hydro's Proposed Construction |
|---|---|
| No construction of this term is necessary; however, should the court determine the "plain and ordinary meaning" of this term requires further definition, Riveer proposes: "a framework of parallel or crossed bars, used as a partition, guard, cover, or the like" | "a porous framework of parallel or crossed bars that fills a horizontal cross-section of the enclosed area and engages the top portion of the inner surfaces of all four frame walls" |

Hydro argues that "[t]he '298 patent informs a person of ordinary skill in the art that the surface on which the washing process takes place is a porous surface that allows water and debris

to fall *through* it." Hydro CC Brief at 7. But Hydro offers no opinion of any such person; rather, Hydro cites to an exemplary embodiment from the '298 patent where the disclosed grate is supposedly "porous." The Federal Circuit, however, has "repeatedly warned against confining the claims to those embodiments [disclosed in the specification]." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005). Indeed, reading additional features of exemplary embodiments into the claims is "one of the cardinal sins of patent law." *SciMed*, 242 F.3d at 1340 (describing "one of the cardinal sins of patent law—reading a limitation from the written description into the claims."). That limitations from an embodiment should not be read into the claims is true even if only a single embodiment is disclosed. *Phillips*, 415 F.3d at 1323 ("[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."). Hydro's attempt to read the word "porous" into the meaning of the term "grate" is a classic example of this "cardinal sin."

Hydro also relies on a dictionary to support its proposed construction of the term "grate." Interestingly, Hydro and Riveer both cite to the same dictionary definition for the term "grate," which recites "a framework of parallel or crossed bars." Hydro CC Brief at 8. According to Hydro, this definition "is perfectly consistent with the porous framework of crossed bars" in its proposed construction. Riveer disagrees. If adding the term "porous" was perfectly consistent with the definition of the term "grate," then Hydro should have been able to find a dictionary in which the term "porous" is used to define the term "grate." Such a dictionary definition does not exist because a "grate" is not necessarily "porous."

To the contrary, the ordinary meaning of the term "grate" includes both "porous" and non-porous structures. For example, the well-known "George Foreman Grill" includes a grate

that is not porous.  *See* R. App. 0048-0055 (Exhibits F-G).  Other non-porous cooking surfaces

are also described ordinarily as "grates."  *See* R. App. 0056-0058  (Exhibit H).  The specification

of the '298 patent never uses the word "porous" but instead describes the grate as allowing water

and debris to "flow into" the basin, not "fall through" open air as Hydro attempts to require.  *See*

'298 patent, col. 6, lines 13-16 ("grate . . . allowing water and any debris to ***flow into*** said

basin").

Next, Hydro improperly cites to the prosecution history ***of its own subsequent, unrelated***

***patent***.  Hydro CC Brief at 8-10.  While the prosecution history of the '298 patent is "intrinsic"

evidence relevant to claim construction, the prosecution history of other, unrelated patents is

extrinsic.  Hydro itself notes that "undue reliance on extrinsic evidence poses the risk that it will

be used to change the meaning of claims in derogation of the 'indisputable public records

consisting of the claims, the specification and the prosecution history.'"  Hydro CC Brief at 3.

Even if Hydro's subsequent patent could be considered, for several reasons it is irrelevant.  First

and foremost, it is fundamental that a product design subsequently patented (a "species") does

not affect the scope or infringement of an earlier patent (a "genus").  *See National Presto Indus.,*

*Inc. v. West Bend Co.*, 76 F.3d 1185, 1191-92 (Fed. Cir. 1996) ("The grant of a separate patent

on the accused device does not automatically avoid infringement, either literal or by

equivalency."); *see also Atlas Powder Co. v. E.I. Dupont de Nemours & Co.*, 750 F.2d 1569,

1580-81 (Fed. Cir. 1984) (finding equivalent infringement despite the fact that the accused

device was separately patented).  Many patented products still infringe earlier, broader patents.

Second, clearly the full claim scope of the '298 patent was never considered or assessed by

Hydro or the Patent Office in the Hydro prosecution.  The '792 patent discussed in the

prosecution does not recite the claims of the '298 patent, and the preferred embodiment disclosed

in the specification is just that—a preferred embodiment, not representative of the full scope of the claims of the '792 patent, much less the '298 patent.  Third, because patent applications are *ex parte*, no disclaimer or estoppel could apply here based on Hydro's own *ex parte* mischaracterizations of the proper scope of Riveer's prior art patent.

Hydro's proposed construction for the term "grate" also should be rejected because it attempts to re-define other claim terms never before identified for construction.  Specifically, along with proposing a construction for "grate," Hydro attempts to construe the phrase "operatively associated with said first, second, third, and fourth walls for supporting the item to be washed above said bottom surface" to require the recited "grate" to "fill[] a horizontal cross-section of the enclosed area and engage[] the top portion of the inner surfaces of all four frame walls."  Indeed, Hydro states:

> Claim 1 similarly states that the "grate" must be "operatively associated" with the four frame walls in order to "support[] the item to be washed above said bottom surface while allowing water and any debris to flow into said basin."  A624.  To do so, it is clear that the grate fills the area enclosed by the four walls near the top of the four walls juxtaposed to the bottom surface filling the area at the bottom of the walls[.]

Hydro CC Brief at 9.  Hydro acknowledges that it is the "operatively associated" language of Claim 1 (and not the term "grate") that supposedly requires the bottom surface to "fill[] a horizontal cross-section of the enclosed area" and "engage[] the top portion of the inner surfaces of all four frame walls."  If Hydro wanted to construe the phrase "operatively associated," it should have identified this term for construction months ago under LPR 4.1.  It chose not to do so.  Hydro's attempt to shoe-horn a definition of a claim term it did not identify into the proposed construction of a claim term it did is improper, as it would render "operatively associated" superfluous and moot.  *See supra* (*Elekta* and *Hyperion* cases).

Even if it was not improper to include in a proposed construction for one claim term definitions for other claim terms, Hydro's proposed construction of "operatively associated" should be rejected because it is unjustifiably too narrow.  Indeed, Hydro's proposed construction requires the grate to "fill[] a horizontal cross-section of the enclosed area" and "engage[] the top portion of the inner surfaces of all four frame walls."  The plain language of Claim 1 is not so limited.  While Claim 1 requires a "grate operatively associated with said first, second, third, and fourth walls for supporting the item to be washed above said bottom surface," it does not require the grate to "fill[] a horizontal cross-section of [an] enclosed area" or "engage[] the top portion of the inner surfaces of all four frame walls."  Instead, the language of Claim 1 is sufficiently broad to cover grates that are operatively associated with the frame walls but do not entirely fill a horizontal cross-section of an area enclosed by the frame walls or engage the top portion of the inner surfaces of all four frame walls.  *See* Paulus Decl. ¶ 7.

### 5.    "sloped tray"

| Riveer's Proposed Construction | Hydro's Proposed Construction |
|---|---|
| No construction of this term is necessary; however, should the court determine the "plain and ordinary meaning" of this term requires further definition, Riveer proposes: "a flat shallow container positioned at an inclined angle considered with reference to a vertical or horizontal plane" | "a slanted tray positioned within the enclosed area at a level above the bottom surface and below the grate" |

For the claim term "sloped tray," Hydro goes a step further than importing limitations from the preferred embodiment, and actually creates its own embodiment from which it then attempts to improperly import limitations.  According to Hydro, Claim 4 "essentially describes the details of Figure 5 below."  Hydro CC Brief at 10.  To be clear, while Hydro's illustration

shown as "Figure 5" is *similar to* Figure 5 from the '298 patent, *they are not the same*.  Hydro's

re-created Figure 5 is reproduced below:



Hydro CC Brief at 11.  Hydro's Figure 5 illustrates what appears to be a side view of a wash rack

having, among other things, a bottom surface, a sloped tray, and a grate.  Actual Figure 5 from

the '298 patent is reproduced below:



*See* '298 patent, Figure 5 (A620).

One noteworthy difference between Figure 5 of the '298 patent and Hydro's Figure 5 is

that the latter includes a "bottom surface" that is separate and distinct from the "sloped tray."

This "bottom surface" is positioned below the "drainage fitting" (Element 34).   In the

embodiment illustrated in Figure 5 of the '298 patent, however, Hydro's "bottom surface" does

not exist; instead, the line Hydro labels "bottom surface" is merely the bottom of the side frame member.  This fact is clear from Figure 4 of the '298 patent, which is a front elevational view:



Clearly, the "bottom surface" in Hydro's Figure 5 does not exist, as Figure 4 shows no "bottom surface" positioned below the "drainage fitting" (Element 34).  Below is a modified version of Figure 4 having a dashed line to illustrate where the Hydro's proposed "bottom surface" would be located *if it existed*:



Despite Hydro's fabrication or, at best, error, Hydro asserts that "[t]he '298 patent makes it clear that the sloped tray is placed beneath the grate and above the bottom surface within the area enclosed by the frame walls[.]"  Hydro CC Brief at 11.  The '298 patent, however, does not

11

disclose any such embodiment.  If reading a limitation from a disclosed embodiment into the claims is "one of the cardinal sins of patent law," it is difficult to imagine how the Federal Circuit would describe reading in a limitation from an **undisclosed** embodiment.  *See* Paulus Decl. ¶ 8.

### B.   U.S. Patent No. 8,506,720

#### 1.   Background

Riveer does not doubt the accuracy of the Hydro's quotations from the prosecution history in its "Background," but Riveer does dispute Hydro's implication that Riveer waived or disclaimed subject matter within the "ordinary meaning" of the issued claims of its '720 patent.

#### 2.   "a side trough adjacent the wash floor"

| Riveer's Proposed Construction | Hydro's Proposed Construction |
|---|---|
| No construction of this term is necessary; however, should the court determine the "plain and ordinary meaning" of this term requires further definition, Riveer proposes that the Court construe the term "adjacent" to mean: "lying near" | "a side trough abutting the wash floor such that wash fluid and/or debris flows directly from the wash floor into the side trough" |

To begin with, it is improper to consider accused device when considering proper scope of claim terms.  *See SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc) (stating that claims may not be construed with reference to the accused device). Notwithstanding this, in its argument regarding the term "a side trough adjacent the wash floor," Hydro makes specific reference to and even provides an illustration of one of its two accused infringing "side trough" designs.[1]  *See* Hydro CC Motion at 19.  Hydro's desire to have this

---

[1] There are two different accused infringing designs, each of which Hydro has made the subject of independent motions among its six separate summary judgment motions.  *See* Dkt. Nos. 77 and 184.  While this Court appears to have no limit on the number of summary judgment motions permitted, six seems inherently excessive.  Moreover, regarding the '720 patent, only one motion should be allowed because Riveer's infringement claim (its Third Claim for Relief) would proceed unless **both** separate motions are granted.

Court consider its accused design is understandable: Hydro wants to ensure that the patent claims are construed in a way that excludes its accused product. To that end, Hydro's proposed construction requires the "side trough" to "abut" the wash floor and the wash fluid and debris to "flow directly" from the wash floor into the trough.

To be clear, the claims of the '720 patent do not include the terms "abut" or "flow directly." Rather, Hydro again relies upon a preferred embodiment showing such a configuration, asserting that "[t]he specification also states that the side trough must be 'immediately adjacent [the] wash floor.'" Hydro CC Brief at 20. Contrary to Hydro's assertion, however, the '720 patent specification does not use the word "must" but actually states: "Side trough 20 is immediately adjacent wash floor 12." *See* '720 patent at col. 2, line 29 (A222). This is not a "blanket statement" about claim scope, but instead a simple reference to the preferred embodiment illustrated in Figures 1-2. *Id.* at col. 2, lines 7-10 (A222).

Below is a simple diagram that illustrates the relative configuration of the embodiment Hydro cites, where the trough is at position "1" and the wash floor is at position "2":

| 1 | 2 |
|---|---|
| 3 | 4 |

According to Hydro's proposed construction, a trough at position "1" and wash floor at position "2" would fall within the scope of "a side trough adjacent the wash floor." However, a trough at position "3" and wash floor at position "2" would ***not*** fall within the scope of "a side trough adjacent the wash floor." Such a construction is improper. First, reading into the claims

13

limitations from exemplary embodiments provided in the specification is a "cardinal sin" that the Federal Circuit has "repeatedly warned against."  *See Phillips*, 415 F.3d at 1323; *SciMed*, 242 F.3d 1337 at 1340.  Second, the ordinary meaning of the claim term "a side trough adjacent the wash floor" does not require that the side trough "abut" the wash floor "such that wash fluid and/or debris flows directly from the wash floor into the side trough."  Rather, this claim term is sufficiently broad to cover systems (with reference to the above diagram) where the trough is at position "3" and the wash floor is at position "2."  Indeed, the ordinary meaning of the term "adjacent" is "lying near."  *See* Random House Webster's Unabridged Dictionary at 25 (2d ed. 1998) (Riveer CC Brief, Appendix Exhibit B at R. App. 0022).  Clearly, a trough at position "3" is lying near and to the side of a wash floor at position "2."  *See* Paulus Decl. ¶ 10.

Third, the impropriety of Hydro's proposed construction becomes more obvious if one simply rotates the above diagram by 45 degrees, as shown below:



After rotating this diagram 45 degrees, it is clear that a trough at position "3" and wash floor at position "2" falls within the ordinary meaning of "a side trough adjacent the wash floor." Finally, consistent with the ordinary meaning of the term "adjacent," Hydro itself has described the position of its side trough (or "drive-in clean-out pit") as "adjacent" to the wash floor.  *See*

Ex. 1 at 4 (Smith Depo. at 73:10-15)[2] (stating that "fluid and debris . . . flow[] down the trough

to the connection pipe by gravity [and] through that pipe into the **_adjacent_** drive-in clean-out

pit") (emphasis added).

### 3. "a guide rail separating the side trough from the wash floor"

| Riveer's Proposed Construction | Hydro's Proposed Construction |
|---|---|
| No construction of this term is necessary; however, should the court determine the "plain and ordinary meaning" of this term requires further definition, Riveer proposes that the Court construe the term "separating" to mean: "keeping apart" | "a guide rail positioned near the intersection of the side trough and the wash floor to divide the side trough from the wash floor" |

Given the fact that Hydro uses the claim terms "guide rail" and "wash floor" in its

proposed construction, it appears that what is really at issue is the ordinary meaning of the term

"separating." Riveer proposes this term be given its ordinary meaning, which is "keeping apart."

*See* Random House Webster's Unabridged Dictionary at 1746 (2d ed. 1998) (Appendix Exhibit

B at R. App. 0028). Hydro's proposed construction for this term requires that the guide rail be

"positioned near the intersection of the side trough and the wash floor" and that the guide rail

"divide the side trough from the wash floor." Hydro's proposed construction should be rejected.

By including the language "near the intersection" in its proposed construction, Hydro

attempts to limit the scope of the "guide [rail] separating the side trough from the wash floor" to

only those systems where a side trough intersects a wash floor. If this construction is adopted,

Hydro will presumably argue that an "intersection" requires that there be direct contact between

the side trough and the wash floor. However, the ordinary meaning of the claim term "a guide

[rail] separating the side trough from the wash floor" does not require any direct connection (or

intersection) between the side trough and the wash floor. It merely requires a guide rail that

---

[2] Exhibit 1 is attached to the Declaration of Stephen M. Lobbin filed herewith.

"separates" these two structures.  Clearly, two structures can be separated by a partition (such as a guide rail) even if the two structures do not "intersect" each other.  *See* Paulus Decl. ¶ 11.

If the patentees wanted to limit the scope of claim 1 to only systems where side troughs and wash floors "intersect" one another, they would have included the word "intersects" in Claim 1, as they did in Claim 4.  Claim 4 recites:  "The cleaning system of claim 1, wherein the guide rail is provided ***at an intersection*** between the wash floor and the side trough."  In Claim 4, the patentees did want to require an intersection between the side trough and the wash floor (and they wanted the guide rail provided "at" that intersection).  Clearly, the patentees were familiar with the word "intersection" and if they wanted to use that term to limit the scope of Claim 1, they would have done so.  The doctrine of claim differentiation requires that Claim 1 not be limited to the identical, narrower scope as Claim 4, which means that Claim 1 does not require the guide rail to be located "at an intersection" between the wash floor and the side trough.  *See World Class Tech. Corp. v. Ormco Corp.*, 769 F.3d 1120, 1125 (Fed. Cir. 2014) ("The doctrine of claim differentiation creates a presumption that distinct claims, particularly an independent claim and its dependent claim, have different scopes.") (citing *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000)).

Hydro relies heavily on claim amendments made in the prosecution history.  However, the patentees ***never*** asserted that the scope of Claim 1 ***requires*** an intersection between the side trough and the wash floor.  As Hydro notes, Riveer specified that the guide rail "separates" the side trough from the wash floor during prosecution of the '720 patent to obtain allowance of the claims.  As provided in Riveer's proposed construction, the ordinary meaning of the term "separate" does not require an intersection between the two structures being separated.  Thus, the prosecution history does not support Hydro's proposed construction.

### C.   U.S. Patent No. 8,499,774

#### 1.   Background

Riveer does not doubt the accuracy of the Hydro's quotations from the specification and prosecution history in its "Background," but Riveer does dispute Hydro's implication that Riveer waived or disclaimed subject matter within the "ordinary meaning" of the issued claims of its '774 patent.

#### 2.   "evacuation end"

| Riveer's Proposed Construction | Hydro's Proposed Construction |
|---|---|
| No construction of this term is necessary; however, should the court determine the "plain and ordinary meaning" of this term requires further definition, Riveer proposes: "the last part lengthwise of something that is longer than it is wide, where contents of that thing may be discharged" | "an end of the catch trough at which the evacuator (including the fluid mover and the debris collector) and the elevator are located, as shown in Figure 6 of the '774 patent" |

What is really at issue with the claim term "evacuation end" is not what the term "evacuation end" means; rather, at issue is the relative positioning that exists between the "evacuation end," the "evacuator," and the "elevator."  Hydro's proposed construction requires that the "evacuator (including the fluid mover and the debris collector)" and the "elevator" be "located" at the same "evacuation end."  The claims, however, include language that identifies the required relative positioning between the evacuator, elevator, and evacuation end. Specifically, Claim 1 requires the "evacuator" to be "disposed in fluid communication with" the evacuation end and the "elevator" to be "disposed in fluid communication with the evacuator."

Hydro's proposed construction for the term "evacuation end" also should be rejected because it attempts to re-define other claim terms never before identified for construction. Specifically, along with proposing a construction for "evacuation end," Hydro attempts to construe the phrase "disposed in fluid communication with" to mean "located at."  If Hydro

17

wanted to construe the phrase "disposed in fluid communication with," it should have identified this term for construction months ago under LPR 4.1. It chose not to do so. Hydro's attempt to shoe-horn a definition of a claim term it did not identify into the proposed construction of a claim term it did is improper, as it would render "disposed in fluid communication with" superfluous and moot. *See supra* (*Elekta* and *Hyperion* cases).

Even if it was not improper to include in a proposed construction for one claim term definitions for other claim terms, Hydro's proposed construction of "evacuation end" should be rejected because it is unjustifiably too narrow. Indeed, Hydro's proposed construction requires the evacuator and the elevator to be ***located at*** the evacuation end. The plain language of Claim 1 is not so limited. While Claim 1 requires an "evacuator" to be "disposed in fluid communication with" an evacuation end and an "elevator" to be "disposed in fluid communication with the evacuator," it does not require the evacuator and elevator to be located at the same evacuation end. The proper construction for the claim term "in fluid communication with" is "at least a liquid is permitted to flow from one position to another, for example from an elevator to an evacuator." *See* Riveer CC Brief at 13-15.

Hydro argues that "the Patent Office examiner required [Riveer] to limit the claims to the specific configuration depiction in Figure 6." Hydro CC Brief at 26. Riveer disagrees that the examiner ***required*** it to limit the claims to the embodiment depicted in Figure 6. Also, Riveer did not so limit the claims. For example, in describing the Figure 6 embodiment, the '774 patent states: "In the example shown [referring to Figure 6], the evacuator 320 is joined to an evacuation end 311[.]" *See* '774 patent at col. 7, lines 61-62 (A65). In its amended claims however, Riveer did not require the evacuator to be ***joined to*** the evacuation end; rather, Riveer amended the claims to require the evacuator to be "disposed in fluid communication with an

18

evacuation end."  Moreover, because dependent Claim 8 specifies the same evacuation point for

water and solid debris, claim differentiation indicates that Claim 1 (the independent claim further

limited by dependent Claim 8) is not similarly limited but has a broader scope.  Thus, Claim 1

allows the evacuator and elevator to be in opposite evacuation ends.  *See* Paulus Decl. ¶ 13.

### 3.        "an elevator disposed in fluid communication with the evacuator"

| Riveer's Proposed Construction | Hydro's Proposed Construction |
|---|---|
| No construction of this term is necessary; however, should the court determine the "plain and ordinary meaning" of this term requires further definition, Riveer proposes that the Court construe the term "in fluid communication with" to mean: "at least a liquid is permitted to flow from one position to another, for example from an elevator to an evacuator" | "an elevator connected to the evacuator such that debris can be moved from the debris collector directly into the elevator" |

Given the fact that Hydro uses the claim term "elevator" and "evacuator" in its proposed

construction, it appears that what is really at issue is the ordinary meaning of the term "in fluid

communication with."  Riveer proposes this term be given its ordinary meaning, which is "at

least a liquid is permitted to flow from one position to another, for example from an elevator to

an evacuator."  Hydro's proposed construction for this term requires the elevator to be

"connected to" the evacuator, which proposal should be rejected.

Hydro states that the "arguments pertaining to the term 'evacuation end' apply equally to

determining what it means for the elevator to be 'in fluid communication' with the evacuator."

Hydro CC Brief at 28.  Hydro's statement is an acknowledgement that what it really attempts to

construe in its proposed construction for the term "evacuation end" is the term "in fluid

communication with."  As provided above, it is improper to shoe-horn a definition of one claim

term into the proposed construction of another.  With regard to the term "an elevator disposed in

fluid communication with the evacuator," Hydro proposes that the court construe claim term "in

fluid communication with" to mean "connected to."   For the reasons provided above, this proposed construction is too narrow.   Hydro also states that "the specification repeatedly explains that the evacuator is 'connected' to the elevator."  Hydro CC Brief at 28.  But reading into the claims limitations from exemplary embodiments is a "cardinal sin" that the Federal Circuit has "repeatedly warned against."  *See Phillips*, 415 F.3d at 1323; *SciMed*, 242 F.3d at 1340.  Hydro's proposed construction should be rejected.  *See* Paulus Decl. ¶ 14.

> ### 4. "the elevator removing debris from the debris collector and elevating the removed debris from a collection height to a dump height for dumping"

| Riveer's Proposed Construction | Hydro's Proposed Construction |
|---|---|
| No construction of this term is necessary; however, should the court determine the "plain and ordinary meaning" of this term requires further definition, Riveer proposes: "the elevator includes a means to elevate debris to a dump height" | "the elevator includes a means to elevate debris to a dump height independent of the conveyor" |

At issue with regard to the phrase "the elevator removing debris from the debris collector and elevating the removed debris from a collection height to a dump height for dumping" is whether the elevator has an elevating mechanism that is independent of the conveyor for elevating debris to a dump height.  According to Hydro, the recited elevator and conveyor each have a means to elevate debris to a dump height independent of each other.  Riveer disagrees.

The claims of the '774 patent require an elevator that "elevat[es] the removed debris . . . to a dump height" and a conveyor that "elevat[es] the debris . . . to the dump height."  Nothing in the claims requires that the elevator and conveyor each elevate debris to the dump height independently of each other.  Indeed, the claim language is sufficiently broad that the elevator and conveyor could together elevate the debris to a dump height, or the elevator could incorporate the conveyor mechanism.  *See* Paulus Decl. ¶ 15.

Contrary to Hydro's assertion, the '774 patent does not disclose any embodiment having two independent elevating mechanisms. Indeed, the very language that Hydro quotes as establishing that the elevator and conveyor each include their own mechanisms for elevating debris actually establishes the opposite: that the conveyor is part of the elevator.

> The conveyer system also includes an evacuator disposed in fluid communication with the catch trough and an elevator disposed in fluid communication with the evacuator. The evacuator substantially removes wash fluid received from the catch trough, and the elevator elevates debris from a collection height to a dump height for dumping. *__The conveyer system also includes__* a conveyer disposed along the catch trough and *__the elevator__*. The conveyer moves at least debris along the catch trough at the collection height and elevates the debris to the dump height for dumping.

'774 patent at col. 3, lines 38-45 (A63).

If, as Hydro suggests, the specification of the '774 patent supports its assertion that the elevator and conveyor each include their own mechanisms for elevating debris, these independent mechanisms for elevating debris should be illustrated in Figure 6, the figure that Hydro asserts illustrates the scope of the claims of the '774 patent. Absent from Figure 6, however, are two independent mechanisms for elevating debris. Instead, the elevator and conveyor (which is positioned within the elevator) together elevate the debris to a dumping height.

Hydro's proposed construction would narrow the scope of the claims to the extent that none of the embodiments disclosed in the '774 patent would fall within the scope of the claims. "Such an interpretation is rarely, if ever, correct and would require highly persuasive evidentiary support[.]" *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). The evidentiary support for such a construction is simply not present in this case. Therefore, there is no justification for including the phrase "independent of the conveyor" in a proper construction of the phrase at issue.

21

## III.  CONCLUSION

Riveer respectfully submits that this Court should reject the claim construction positions advocated by Hydro, which do not confirm the plain and ordinary meaning of the claim terms and phrases at issue, as they would be understood by a person of ordinary skill in the art.


Dated: January 5, 2015                     Respectfully submitted,

                                           **The Eclipse Group LLP**

                                           /s/ Stephen M. Lobbin
                                           Stephen M. Lobbin (admitted *pro hac vice*)
                                           *Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing document—**PLAINTIFF RIVEER'S**

**RESPONSE TO DEFENDANTS' MOTION FOR CLAIM CONSTRUCTION**

**PURSUANT TO LPR 4.2(c)**—to be filed via the Court's CM/ECF system and thereby served

on the parties as follows:

> Brett L. Foster
> Mark A. Miller
> Christopher B. Hadley
> **Holland & Hart LLP**
> 222 S. Main Street, Suite 2200
> Salt Lake City, Utah 84101

Dated: January 5, 2015                    /s/ Stephen M. Lobbin
                                          *Attorney for Plaintiff*