# EXHIBIT 1




KERRY G. SMITH,  AUGUST 22, 2008
VOLUME II

Page 68

```
 1            IN THE MICHIGAN WESTERN DISTRICT COURT
 2                     SOUTHERN DIVISION
 3   _____
 4   PETTER INVESTMENTS, INC.,    )Case No. 1:2007cv01033
 5                                )
 6        Plaintiff,              )
 7                                )Videotaped Deposition of:
 8     v.                         )    KERRY G. SMITH
 9                                )       Volume II
10   HYDRO ENGINEERING, INC., et al.,)    30(b)(6)
11                                )    Hydro Engineering
12        Defendant.              )
13   _____
14
15          Friday, August 22, 2008; 10:02 a.m.
16          Location:  HOLLAND & HART
17                     60 East South Temple
18                     Suite 2000
19                     Salt Lake City, Utah  84111
20
21          Reporter:  Angela L. Kirk, RPR, CCR
22
23
24
25
```

KERRY G. SMITH, AUGUST 22, 2008
VOLUME II

Page 69

```
              A P P E A R A N C E S
For the plaintiff:
        EUGENE J. RATH, III, Esq.
        PRICE, HENEVELD, COOPER, DeWITT &
        LITTON, LLP
        695 Kenmore S.E.
        P.O. Box 2567
        Grand Rapids, Michigan 49501
        Telephone:  616.949.9610
        Email:  erath@priceheneveld.com

For the defendant:
        BRETT L. FOSTER, Esq.
        HOLLAND & HART,, LLP
        60 East South Temple
        Suite 2000
        Salt Lake City, Utah 84111
        Telephone:  801.799.5836
        Email:  bfoster@hollandhart.com

Also Present:
        Gavin Bohne, CLVS Videographer
        Alan Gordon McCormick


              I N D E X
Witness                                    Page
KERRY G. SMITH
   Examination (Resumed) by Mr. Rath         70


              E X H I B I T S
Number    Description              Page Marked
523    AutoCad drawing of Hydropad system   71
```

Page 70

1    Friday, August 22, 2008; 10:02 a.m.
2              P R O C E E D I N G S
3         VIDEOGRAPHER: This is the continued
4    videotaped 30(b)(6) deposition of the defendant with
5    representative Kerry G. Smith in the matter of Petter
6    Investments vs. Hydro Engineering being held in the law
7    offices of Holland & Hart in Salt Lake City, Utah on
8    August 22nd, 2008. The time is 10:02 a.m.
9         My name is Gavin Bohne, certified legal
10   videographer. The court reporter is Angela Kirk with
11   Garcia & Love Reporting.
12        Will counsel please state their appearances
13   for the record and the witness be sworn.
14        MR. RATH: Eugene Rath on behalf of Petter
15   Investments.
16        MR. FOSTER: Brett Foster on behalf of the
17   defendants.
18             KERRY G. SMITH,
19   called as a witness at the instance of the
20   plaintiff, having been first duly sworn,
21   was examined further and testified as follows:
22             EXAMINATION (Resumed)
23   BY MR. RATH:
24     Q.   Good morning, Mr. Smith.
25     A.   Good morning.

Page 71

1         (Exhibit-523 was marked.)
2      Q.   Mr. Smith, the reporter has placed before you
3    a document that's been marked for identification as
4    Exhibit-523. It's some sort of drawing, and it bears
5    a -- what looks to be the date of 3/30/2004 on it. Are
6    you familiar with this document?
7      A.   I am.
8      Q.   What is this a drawing of?
9      A.   This is an AutoCAD drawing that I did on 3/30
10   of 2004. That's my handwriting on that date. This is
11   a drawing of a Hydropad system which discharges into a
12   side gutter which is displaced through a connection
13   pipe by gravity. This is a drive-in clean-out pit
14   style gutter.
15     Q.   You believe you drew this on or about March
16   30, 2004?
17     A.   When I located the file, that was the
18   creation date and the properties of the AutoCAD file.
19     Q.   So you did confirm that through the
20   electronic file of this?
21     A.   Yes.
22     Q.   Now, on the drawing, I notice two pipes, or
23   tubes, if you will, that go from the pad to the -- what
24   I'll call the trough. Do you see that?
25     A.   The drive-in clean-out pit part?

Page 72

1      Q.   Yeah. Let's start with the -- with the
2    various components of this so I get the terminology
3    right. There's a truck depicted on here, correct, with
4    some ramps in front of it?
5      A.   Yes.
6      Q.   And then what do you call the part that the
7    ramps go up to?
8      A.   The Hydropad.
9      Q.   Okay. And then after the Hydropad, where the
10   walls are, there's another platform surface, correct?
11     A.   This particular pad array has three Hydropad
12   sections.
13     Q.   Okay. Just -- just that the walls are only
14   covering two of them?
15     A.   That's correct.
16     Q.   Okay. And then there's ramps on the opposite
17   end as well. And beyond the wall, the nearest wall, if
18   you will, in this drawing, there's a rectangular type
19   structure there. Do you see that?
20     A.   Yes, the drive-in clean-out pit.
21     Q.   Okay. What -- what is that for?
22     A.   That allows --
23     Q.   No, I'm sorry, let's back up.
24        Right adjacent to the wall nearest us in this
25   drawing, there's a small little rectangular portion.

2 (Pages 69 to 72)

KERRY G. SMITH,  AUGUST 22, 2008
VOLUME II

Page 73
1    MR. FOSTER:  Are you talking about that right
2  there (indicating)?
3    A.   Are we talking about the gutters that are on
4  the side of the Hydropad?
5    Q.   Yes, if that's what that is, yes.
6    A.   Gutter troughs?
7    Q.   That's my question.  That's a gutter?
8    A.   Yeah, or a side trough.
9    Q.   Okay.  And what is the purpose of that?
10   A.   Well, the -- the fluid and debris fall off of
11 the impervious surface into the top of the side gutter.
12 It flows down the trough to the connection pipe by
13 gravity, flows through that pipe into the adjacent
14 drive-in clean-out pit, where the solids settle out,
15 most of the solids, in the main side of the pit.
16       The water then flows over a weir into the
17 second side of the pit, which is further left, where
18 there's a pump that picks it up and sends it back to
19 the wash pad.
20   Q.   Okay.  And then is that tube that's connected
21 to the pump, does that have a pressure washer on the
22 other side of it?
23   A.   It does not.
24   Q.   Okay.  What is the purpose of pumping the
25 fluid back to the wash pad?

Page 74
1    A.   In this case, the Hydropads are being used
2  for a wheel wash to demonstrate how you would wash the
3  wheels of a vehicle.
4    Q.   Okay.  So where is the wash water coming from
5  when it is washing the wheels of a vehicle?
6    A.   It's coming from the pump that's in the clear
7  well side of the -- of the pit.
8    Q.   Where does it exit at the wash pad location?
9    A.   Do you see the diagonal pipes that are
10 depicted on the -- on the other side of the pad
11 connected to those side walls?
12   Q.   Yes.
13   A.   Those would be spray bars.
14   Q.   Okay.  So the -- just so I get the flow
15 correct, the water would flow and debris would flow
16 into the side trough and then flow from the smaller
17 side trough into the drive-in clean-out pit?
18   A.   Correct.
19   Q.   Where it would travel past the weir and would
20 be pumped back through that other tube, back over to
21 the wash pad, where it would be reused, using those
22 spray bars that are on the walls; is that correct?
23   A.   That's correct.
24   Q.   Okay.  How does the water, once it is sprayed
25 onto the wheels and the water and debris fall off onto

Page 75
1  the pad, how is that water and debris conveyed into the
2  side trough?
3    A.   It flows off of one edge of the pad into the
4  top of the side trough.  And with the type of flow that
5  we have here, the -- the water is conveyed down the
6  trough to the pipe along with the debris.  The intent
7  is to keep it moving and not allow it to accumulate in
8  the side trough until it gets into the clean-out pit.
9    Q.   All right.  The walls nearest us in this you
10 drawing, is there a gap at the bottom of those walls
11 that allows the fluid and debris to fall basically past
12 them into the side trough?
13   A.   Yes.
14   Q.   Okay.  And does that extend most of the
15 length of those walls?  Or how big is that gap
16 lengthwise?
17   A.   Well, the -- that can be variable.  It also
18 has a deflector that when you're washing off the pad,
19 say with a handgun, it keeps the -- keeps the debris
20 from going under the wall and right over the top of
21 the -- of the side trough.  It ensures that it will
22 fall directly into the top of the trough.
23   Q.   Okay.  There are what appear to be bars on
24 top of the pads that have the walls.
25   A.   Yes.  Those are guide rails.

Page 76
1    Q.   Okay.  For the driver of the truck?
2    A.   Yeah, they help steer him through the washing
3  section.
4    Q.   Has Hydro ever built such a system like this?
5    A.   We have built one similar to this, but not
6  just like this.  This drawing was done to convey to
7  some prospective buyers of this system what we had in
8  mind.
9    Q.   Who were those prospective buyers?
10   A.   This was given to United Rentals, Hertz,
11 Ahern Rentals, and a number of other customers.  We
12 also took this to the Concrete Exposition with -- in
13 2005 when we met the Riveer folks.
14   Q.   Do you know when this was first given to any
15 prospective buyer?
16   A.   It would -- would have been shortly after the
17 time that it -- that the concept was drawn.
18   Q.   Has Hydro ever sold one of these type units?
19   A.   We have sold some track-out systems, but one
20 in this exact configuration, no.
21   Q.   Okay.  Can you describe for me generally the
22 differences between the one you have sold and what's
23 depicted in Exhibit-523?
24   A.   The style of the -- of the tank that the
25 solids were settled down in.

3 (Pages 73 to 76)

KERRY G. SMITH, AUGUST 22, 2008
VOLUME II

Page 77

1 Q. And when you say "tank," what are you
2 referring to? Are you referring to --
3 A. The drive-in clean-out pit.
4 Q. Okay, thank you. And that -- was that the
5 only difference, I mean as far as substance is
6 concerned, between the system that you sold and what's
7 depicted in 523?
8 A. I'm sure there were various other
9 differences. There may have been one spray bar instead
10 of two sets of them. I don't remember if it had guide
11 rails on it.
12 Q. Okay. Have you created drawings of revisions
13 or iterations of the system that's shown in Exhibit-
14 523?
15 A. We -- if -- if we do, I don't recall,
16 although there is in existence, and I have not yet been
17 able to locate it, a copy of the Hydropad with the
18 drive-in clean-out pit immediately adjacent to the pad,
19 so it is actually the collection trough, very similar
20 to what Riveer does.
21 Q. And you believe that a drawing was made of
22 that system?
23 A. Yes.
24 Q. Do you know when, approximately, that drawing
25 was made?

Page 78

1 A. Around this period of time. The -- the
2 reason why the pipes were added and it was -- and it
3 was moved away from the pad was to allow for
4 configurations on job sites where a high volume of
5 vehicles would require a clean-out pit with more
6 capacity.
7 Q. Now, you mentioned this period of time in
8 response to my question about when it was drawn.
9 You're referring to approximately March 30, 2004?
10 A. Somewhere in that year, it would have been.
11 Q. Okay. And was that drawing, the one with the
12 adjacent side trough that you described, ever disclosed
13 to anyone outside of Hydro?
14 A. Yes.
15 Q. To whom?
16 A. Generally the same customers that we would be
17 talking to about this. One in particular was -- was
18 Hertz.
19 MR. RATH: Counsel, two things. I would
20 like -- I request that the drawing that he's speaking
21 of be produced, if it can be found. And also, I'm
22 assuming that this drawing and the one he's referring
23 to, although I know you'd need to look at it, are not
24 attorneys' eyes only, since it was published to the
25 third party.

Page 79

1 MR. FOSTER: I would say attorneys' eyes only
2 at this time because it was provided to a customer in
3 connection with customer relationships.
4 But as to your first question, yes, they will
5 continue to look, and if they find the drawing, we will
6 certainly produce it.
7 And on that note, you've identified a number
8 of documents that you question whether they have or
9 have not been produced. I would ask you to do the same
10 thing we did, go through the transcript when it comes,
11 or even before, send us a letter, and identify the
12 points that you have of concern. We will do as you
13 have done and look at that and supplement where
14 appropriate.
15 MR. RATH: We will do that. Thank you.
16 MR. FOSTER: But I would -- I would designate
17 these attorneys' eyes only at this time.
18 MR. RATH: Okay. I just wanted to make sure
19 we were clear.
20 MR. FOSTER: It's conceivable, for purposes
21 of mediation, you know, we might make -- I hope -- I
22 guess that's a discussion off the record, we can deal
23 with that after.
24 MR. RATH: Okay.
25 Q. (By Mr. Rath) Mr. Smith, do you know of any

Page 80

1 other iterations of sketches or drawings of the system
2 that's depicted in Exhibit-523?
3 A. I don't recall anything specific to this,
4 other than the pit being connected to the pads, but
5 there may be others.
6 Q. Okay. Why did you create this system that's
7 depicted in Exhibit-523?
8 A. The -- there's a growing demand for cleaning
9 the wheels of vehicles as they exit wash sites to
10 eliminate track-out and fugitive -- and fugitive dust
11 at construction sites. The -- we've got a lot of
12 customers asking for this. We've been looking for an
13 inexpensive way, with existing technology that we're
14 familiar with, to fill that need.
15 But down at the Concrete Exposition that I
16 mentioned in 2005, there were a number of people
17 selling units like that. As a matter of fact, one of
18 the Riveer people came over and looked at our
19 Hydropads. We showed them a copy of our patent at that
20 time, sent him back to his booth with a copy of the
21 patent. Routinely, we take our patent with us to shows
22 and display it prominently.
23 And there were a number of competitors there
24 that had track-out systems. We looked at them, looked
25 at the price, did a little bit of market research, to

4 (Pages 77 to 80)

KERRY G. SMITH, AUGUST 22, 2008
VOLUME II

Page 81

1  try to find a niche that would work.  And the simple
2  approach is the one that we ended up sticking with.
3     Q.  Now, you testified that you disclosed what
4  I'll call the second iteration where the drive-in
5  clean-out pit is directly adjacent to the pad to Hertz;
6  is that correct?
7     A.  Uh-huh.
8     Q.  Do you recall who in particular at Hertz that
9  was disclosed to?
10    A.  We -- we deal with, or dealt with, a number
11 of their regional maintenance managers.  I'd have to
12 take a look at my records.  It -- I don't want to
13 guess.
14    Q.  Okay.  And -- but you do believe you have
15 records that would reflect that?
16    A.  I believe I do.
17       MR. RATH:  Okay.  Counsel, I would ask that
18 those be produced as well.
19    Q.  (By Mr. Rath) What did you do to prepare for
20 this deposition?
21    A.  I was directed to look at some of the
22 documents that I was to testify about, met with our
23 counsel, and discussed what we should be prepared to
24 testify to.
25    Q.  How long did you meet with counsel for?

Page 82

1     A.  Several hours.
2     Q.  And did you talk to anyone outside of
3  counsel's presence about the substance of your
4  testimony?
5     A.  Other than the -- Alan and Jim McCormick.
6     Q.  But you did speak with them outside of your
7  counsel's presence about the deposition today or
8  yesterday?
9     A.  Primarily with regard to the timing of it.
10    Q.  Okay.  But I'm talking about the substance
11 and the topics and things like that.
12    A.  Nothing that I can recall.
13    Q.  Okay.  Mr. Smith, I don't believe I have any
14 other questions for you.  Thank you for your time.
15    A.  Okay.
16       VIDEOGRAPHER:  Going off the record, the time
17 is 10:20 a.m.
18       MR. FOSTER:  We want to make sure to read and
19 sign.
20       (The deposition concluded at 10:20 a.m.)
21            --oo0oo--

Page 83

Case Name:  Petter Investments v. Hydro Engineering
Case No.:  1:2007cv01033
Witness:  Kerry G. Smith
Date Taken:  8/22/08
Reporter:  Angela L. Kirk

WITNESS CERTIFICATE

I HEREBY CERTIFY that I have read the foregoing testimony consisting of 13 pages, numbered from 70 to 82 inclusive, and the same is a true and correct transcription of said testimony, with the exception of the following corrections listed below, giving my reasons therefor.

Page  Line    Change/Correction        Reason
___   ___    _____    _____
___   ___    _____    _____
___   ___    _____    _____
___   ___    _____    _____
___   ___    _____    _____
___   ___    _____    _____
___   ___    _____    _____
___   ___    _____    _____

___  NO CORRECTIONS

_____
Kerry G. Smith
Subscribed and Sworn to at _____,
_____, this ___ day of _____,
2008.

_____
NOTARY PUBLIC
My Commission Expires:
_____

Page 84

CERTIFICATE
STATE OF UTAH   )
                :ss
COUNTY OF SALT LAKE )

THIS IS TO CERTIFY that the deposition of Kerry G. Smith, the witness in the foregoing deposition named, was taken before me, Angie L. Kirk, a Registered Professional Reporter and Certified Court Reporter in and for the State of Utah, residing in Salt Lake City.

That the said witness was by me, before examination, duly sworn to testify the truth, the whole truth, and nothing but the truth in said cause.

That the testimony of said witness was reported by me in Stenotype, and thereafter caused to be transcribed into typewriting, and that a full, true, and correct transcription of said testimony so taken and transcribed is set forth in the foregoing pages, numbered from 70 to 82, and said witness deposed and said as in the foregoing annexed deposition.

I further certify that a copy of the transcript of the same was delivered to Brett Foster, Esq., to be by him submitted to the witness for reading, along with the original witness certificate, said certificate to be signed in front of a Notary Public and to be returned within 30 days of the date hereon.

I further certify that I am not of kin or otherwise associated with any of the parties to said cause of action, and that I am not interested in the event thereof.

WITNESS MY HAND at Salt Lake City, Utah, this 27th day of August, 2008.

_____
Angela L. Kirk, RPR, CCR

5 (Pages 81 to 84)

Esquire Deposition Services, LLC
(800) 866-5560