FILED
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

2015 MAR 27  P 12: 08

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

| | |
|---|---|
| PETTER INVESTMENTS, INC., d/b/a RIVEER, a Michigan corporation,<br><br>Plaintiff,<br><br>v.<br><br>HYDRO ENGINEERING, INC., a Utah corporation, and CALIFORNIA CLEANING SYSTEMS, a California company,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER ON CLAIM CONSTRUCTION**<br><br>Case No. 2:14-CV-00045-DB<br><br>District Judge Dee Benson |

Before the Court are Defendants' Motion for Claim Construction and Plaintiff's Cross-Motion for Claim Construction, both pursuant to Local Patent Rule 4.2. A Tutorial was held before the Court on February 12, 2015 and oral argument was presented on February 13, 2015. Plaintiff was represented by Steven Lobbin and Mark Ford. Defendants were represented by Mark Miller. Based on the facts, briefs, arguments of the parties and relevant law, this Court enters this Memorandum Decision and Order on Claim Construction.

## Claim Construction Standard

The second paragraph of 35 U.S.C. § 112 provides that a patent specification "shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention," and the first paragraph requires the patentee to provide "a written description of the invention...[so] as to enable any person skilled in the art to which it pertains...to make and use the same...." 35 U.S.C. § 112 (2006). These two

paragraphs delineate the process of claim construction for courts—the second directs the court to examine the claim language to determine what the inventor "regards as his invention," while the first requires that the patent specification describe the invention disclosed in the claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1311–12 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted).

Construing courts are to give the claim terms their "ordinary and customary meaning," as interpreted by a person of ordinary skill in the art in question. *Id.* at 1313. For claim construction purposes, it is clear that a person of ordinary skill in the art is a person who has read the entire patent, not just the patent claims. *Id.* ("Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, *but in the context of the entire patent, including the specification.*") (emphasis added). Furthermore, the "ordinary meaning" of claim terms cannot be determined "in a vacuum"; rather, claims must be interpreted in light of the entire intrinsic record, including the written description and the prosecution history. *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005).

Especially relevant to Plaintiff's arguments is that courts are not to rely primarily upon dictionaries, relative to the intrinsic record, for determining the "ordinary meaning" of claim terms. *Phillips*, 415 F.3d at 1320. Extrinsic evidence, such as dictionaries and treatises, are "less significant than the intrinsic record in determining 'the legally operative meaning of claim language'." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004), quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n,* 366 F.3d 1311, 1318 (Fed. Cir. 2004). The *Texas Digital* approach, whereby courts limited the role of the specification to

"serving as a check on the dictionary meaning of a claim term," was disparaged by the *Phillips* court as "improperly restrict[ing] the role of the specification in claim construction." *Phillips*, 415 F.3d at 1320. The *Phillips* court clarified that the *Texas Digital* approach "placed too much reliance on extrinsic sources such as dictionaries, treatises and encyclopedias and too little on intrinsic sources, in particular the specification and prosecution history." *Id.* Instead, the "ordinary meaning" of a claim term is its "meaning to the ordinary artisan *after reading the entire patent*." *Id.* at 1321 (emphasis added). The court clarified that "the use of the dictionary may extend patent protection beyond what should properly be afforded by the inventor's patent." *Id.* at 1322. While extrinsic evidence may be useful to the court for understanding the technology, it is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

### The Court's Claim Construction

As a general comment, for almost every claim term Plaintiff relies on a dictionary definition for the term's ordinary meaning and argues that no construction is needed. Plaintiff cautions the Court against a construction which improperly imports limitations into the claim terms. Although Plaintiff expresses a valid concern, an approach that places "too much reliance on extrinsic sources such as dictionaries, treatises, and encyclopedias and too little on intrinsic sources, in particular the specification and prosecution history," is improper, as discussed above. *Phillips*, 415 F.3d at 1320.

Alternatively, Plaintiff proposes a construction of its own for each claim term. It is this set of proposed constructions that will be considered below.

### U.S. Patent No. 6,164, 298 ('298 Patent)

(1) "frame"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | The Court's Construction |
|---|---|---|
| "a rigid structure joined so as to provide support" | "a weight-bearing frame made up of four interconnected walls that define a single enclosed area such that each wall has an inner surface facing toward the enclosed area and an outer surface facing away from the enclosed area" | "a weight-bearing frame made up of four interconnected walls that define a single enclosed area such that each wall has an inner surface facing toward the enclosed area and an outer surface facing away from the enclosed area" |

The claim language itself requires the frame to be made up of four walls: "a frame having a first wall, a second wall, a third wall, a fourth wall, each wall having an inner and an outer surface. . . ." (claim 1). The frame must be weight-bearing, or it would render the invention inoperative for its intended purpose—"for supporting an item to be washed" (claim 1). According to language of claim 1, the frame has four walls and a grate which is "operatively associated with [the four walls] *for supporting an item to be washed*" (emphasis added). It is clear that the frame must bear the weight of the item to be washed, via the grate upon which the item rests.

Plaintiff proposes a construction for "ordinary meaning" of the term "frame," as it would be interpreted by a skilled artisan who has never seen the remainder of the intrinsic record—the patent's written description and prosecution history. Such an interpretation is improper, as discussed above.

(2) "bottom surface"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | The Court's Construction |
|---|---|---|
| "a face or boundary that defines the lowest or deepest part of something" | "a surface that fills a horizontal cross-section of the enclosed area and intersects the bottom portion of the inner surfaces of all four frame walls" | "a surface that fills a horizontal cross-section of the enclosed area and intersects the bottom portion of the inner surfaces of all four frame walls, and which defines a basin for collecting water and debris" |

Claim 1 recites: "a bottom surface extending between the inner surfaces of said first, second, third, and fourth walls of said frame to define a basin for collecting water used to clean the item as well as any debris removed from the item. . . ." The claim language itself compels the Court's construction. In order to define a basin for collecting drainage, the bottom surface must be located on a lower portion (though not necessarily the *lowest* portion) of the frame walls.

(3) "grate"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | The Court's Construction |
|---|---|---|
| "a framework of parallel or crossed bars, used as a partition, guard, cover, or the like" | "a porous framework of parallel or crossed bars that fills a horizontal cross-section of the enclosed area and engages the top portion of the inner surfaces of all four frame walls" | "a porous framework of parallel or crossed bars that fills a horizontal cross-section of the enclosed area and engages the top portion of the inner surfaces of all four frame walls" |

This interpretation is in line with the written description of the patent. See col. 5, lines 8–10: "liquid drops off the dirty item *through the openings* of [the] grates of the wash rack...." This excerpt is not referring to merely a preferred embodiment, as the paragraph containing this passage begins with: "FIG. 10 shows the cleaning system in operation." It does not say that it shows "an embodiment" of the cleaning system; rather it refers to "*the* cleaning system." *See, e.g., Retractable Technologies, Inc. v. Becton, Dickinson and Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (construing a claim term narrowly as incorporating a feature where, inter alia, the specification recited that "the invention" has that feature). Furthermore, claims are to be interpreted in a way that gives meaning to each element—a construction that renders moot or void a recited element is an incorrect interpretation. One claim term should not be interpreted so as to render another term surplusage. *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395

F.3d 1364, 1372 (Fed.Cir.2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so"); *Texas Instruments, Inc. v. Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed.Cir.1993) (rejecting a claim interpretation because it would render other claim language mere surplusage). A grate that does not allow debris to pass *through* the grate into the basin would render the "bottom surface...*defining a basin* for collecting water used to clean the item as well as any debris removed from the item" an inoperative element of the claim, i.e. mere "surplusage."

(4) "sloped tray"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | The Court's Construction |
|---|---|---|
| "a flat shallow container positioned at an inclined angle considered with reference to a vertical or horizontal plane" | "a slanted tray positioned within the enclosed area at a level above the bottom surface and below the grate" | "a slanted tray positioned within the enclosed area at a level above the bottom surface and below the grate" |

Such a construction is consistent with the written description. See, for example, the Summary of the Invention: "a grate positioned *over* the sloped tray and trough" (col. 1, lines 38–39) (emphasis added). The Detailed Description of the Invention refers to the "sloped tray" as a "bottom tray" and clarifies that: "The liquid drips off the dirty item *through the openings of [the] grates of the wash rack and onto the bottom tray*" (col. 5, lines 8–10) (emphasis added). Again, this passage is describing Figure 10, which does not appear to be merely a preferred

embodiment, as discussed above, because it "shows *the* cleaning system in operation" (col. 5, line 1) (emphasis added).

## U.S. Patent No. 8,506,720 ('720 Patent)

### (1) "a side trough adjacent the wash floor"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | The Court's Construction |
|---|---|---|
| "lying near" | "a side trough abutting the wash floor such that the wash fluid and/or debris flows directly from the wash floor into the side trough" | "a side trough immediately adjacent to the wash floor such that the wash fluid and/or debris flows directly from the wash floor into the side trough" |

Based on a review of the '720 patent's prosecution history, the patentee made several narrowing amendments to get this claim allowed over the Hydro and Midkiff references, alone and in combination. The Examiner ultimately allowed the amended claim because "the cited art does not anticipate or render obvious a *cleaning system having the feature of a guide rail separating the side trough and wash floor* and provided at least partly across a length of the cleaning system *between the wash floor and the side trough*." Because the guide rail must separate the side trough and wash floor, the side trough must be immediately adjacent to the wash floor, as described in the written description. *See, e.g.*, col. 2, lines 29, 37 (describing the

catch trough as "immediately adjacent" to the wash floor and reciting that "[w]all 42 defines at least one side of side trough. . . .").

**(2) "a guide [rail] separating the side trough from the wash floor"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | The Court's Construction |
|---|---|---|
| "keeping apart" | "a guide rail positioned near the intersection of the side trough and the wash floor to divide the side trough from the wash floor" | "a guide rail positioned near the intersection of the side trough and the wash floor to divide the side trough from the wash floor" |

It is clear from the '720 patent's prosecution history that in order to distinguish claim 1 as allowable over the Hydro and Midkiff references, this feature must be (1) a guide rail with openings; and (2) positioned at the intersection of the side trough and wash floor. To distinguish Midkiff, the patentee argued that the guide rail was sufficiently different than Midkiff's retaining wall so as to not be an obvious improvement in light of Midkiff's retaining wall. The Examiner ultimately allowed the claim because "the cited art does not anticipate or render obvious a cleaning system having the feature of a guide rail *separating the side trough and wash floor* and provided at least partly across a length of the cleaning system *between the wash floor and the side trough*." Accordingly, the prosecution history makes clear that both the Examiner and the patentee understood the guide rail to be an essential element of the invention for allowance, and

that the rail was specifically oriented "at least partly across a length of the cleaning system between the wash floor and the side trough" so as to "separat[e] the side trough and wash floor."

## U.S. Patent No. 8,499,774 ('774 Patent)

**(1) "evacuation end"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | The Court's Construction |
|---|---|---|
| "the last part lengthwise of something that is longer than it is wide, where contents of that thing may be discharged" | "an end of the catch trough at which the evacuator (including the fluid mover and the debris collector) and the elevator are located" | "an end of the catch trough at which the evacuator (including the fluid mover and the debris collector) and the elevator are located" |

"Evacuation end" has no ordinary meaning to skilled artisans in the general field of modular wash racks for vehicles. This is a case of the patentee acting as its own lexicographer—therefore, "evacuation end" can only be interpreted in light of the written description and prosecution history. Plaintiff proposes a construction for "ordinary meaning" of the term, as it would be interpreted by a skilled artisan who has never seen the remainder of the intrinsic record—the patent's written description and prosecution history. Such an interpretation, divorced from the context of the remainder of the patent documents, is incorrect.

Based on the prosecution history, the patentee revised claim 1 after a phone interview with the Examiner who indicated that the claim would be allowed if the patentee amended the claim

10

to specify the configuration of Figure 6. Specifically, the Examiner's summary of the interview stated:

> "Applicant discussed the differences between the evacuator of the instant invention and the evacuator of the cited reference. Examiner indicated that the evacuator would need to be more narrowly recited to distinguish over the cited reference. Examiner indicated that reciting the two conveyors, their orientations, and their relative positioning to the debris collector, *as shown in Figure 6*, would distinguish over the cited references."

The "two conveyors" is understood to mean the conveyor and the elevator; the "debris collector" is a component of the evacuator. Therefore, the Court interprets this statement as indicating to the patentee that reciting the relative positioning of the conveyor, elevator, and evacuator, "as shown in Figure 6," would distinguish over the prior art.

After amendment which resulted in allowance, the claim does not explicitly recite that the relative configuration is "as shown in Figure 6." Rather, the patentee added only (i) the term "evacuation end" and (ii) the limitation of "a conveyor disposed along the catch trough and the elevator, the conveyor moving at least one of a wash fluid and the debris collected in the catch trough to the evacuator and elevating the debris from the evacuator to the dump height." Therefore, the Court must look to the written description to determine how "evacuation end" is defined.

Nowhere is "evacuation end" defined as the end of the catch trough closest to the elevator, as Defendants propose. A preferred embodiment (Figure 6) shows this to be the case, but nowhere does the written description define the evacuation end as necessarily the end of the catch trough closest to the elevator. Rather, the evacuation end is defined by the location of the evacuator. See col. 7, line 62, where evacuation end is first defined: "In the example shown, the evacuator is joined to an evacuation end of the catch trough which extends to or past a perimeter of the

platform." See also col. 10, lines 36–38: "The evacuator may be arranged to be connected to one end of the catch trough and the catch trough may be arranged to cause fluid flow towards the evacuator." The evacuation end is defined in the written description only in relation to the evacuator, not the elevator.

The second amendment in response to Examiner's indication that limiting the invention to the configuration depicted in Figure 6 would put in the claim in condition for allowance—"a conveyor disposed along the catch trough and the elevator, the conveyor moving at least one of a wash fluid and the debris collected in the catch trough to the evacuator and elevating the debris from the evacuator to the dump height"—does nothing to limit the evacuation end to the end of the catch trough nearest the elevator. Hydro argues that the phrase "elevating the debris *from the evacuator to the dump height*" limits the claim to the configuration of Figure 6. However, this language does not recite that the evacuator removes debris *directly* from the evacuator to the dump height; it may accommodate the recited function by removing debris from the evacuator and elevating it *eventually* to the dump height.

Nevertheless, despite the foregoing, it is an established canon of claim construction that for "close cases in which competing constructions are each supported to an extent by the patent claim language, the specification, and the prosecution history," DONALD S. CHISUM, CHISUM ON PATENTS §18.03 (2006), claims are to be construed so as to uphold the patent's validity. *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.,* 114 F.3d 1547, 1556 (Fed.Cir.1997) (clarifying that a construction court "seeks to interpret claims to preserve, rather than defeat, their validity"); *Modine Mfg. Co. v. United States Int'l Trade Comm'n,* 75 F.3d 1545, 1557 (Fed.Cir.1996) ("when claims are amenable to more than one construction, they should when

reasonably possible be interpreted so as to preserve their validity"). Although construing courts are "admonished against judicial rewriting of claims to preserve validity," *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999); *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 799 & n.6 (Fed. Cir. 1990), courts are encouraged to adhere to this canon "if possible"—i.e. if there are two reasonable interpretations, each supported to some extent by the intrinsic record. *Rhine*, 183 F.3d at 1345 ("We, too, have consistently employed the caveat, 'if possible,' to our instruction that claims should be construed to sustain their validity."); *Karsten Manufacturing Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1384 (Fed. Cir. 2001) ("Claims amenable to more than one construction should, *when it is reasonably possible to do so*, be construed to preserve their validity.") (emphasis added).

Therefore, because the Examiner suggested that the patentee amend the claim to the configuration shown in Figure 6 in order for allowance, and it is ambiguous whether the patentee did so, the claim is construed so as to uphold its validity. Although the written description of the '774 patent does not explicitly limit the evacuation end to being the end of the catch trough nearest the elevator, an amendment adding "evacuation end" that does not limit the configuration to that shown in Figure 6 does not address the Examiner's concerns or distinguish over the McCormick reference. McCormick taught an "evacuator" that had the fluid mover and debris collector at the same location (just as in the '774 patent); consequently, the only narrowing distinction that the patentee could have made to distinguish over McCormick would have been to specify the location of the evacuator with respect to the *elevator*. If the "evacuation end" amendment did not limit the evacuator to the same location as the *elevator*, but rather only specified that the evacuator—comprising a debris collector and fluid mover—resided at one end

13

of the catch trough, i.e. the "evacuation end," this amendment would not have distinguished the claim over McCormick. Consequently, such an amendment would not put the claim in condition for allowance, as it would not have addressed Examiner's rejection over McCormick. Rather, the "claims should be read in a way that avoids ensnaring prior art if it is possible to do so." *Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1153 (Fed. Cir. 1997). *See also Wyttenbach v. Atoma International, Inc.*, 997 F. Supp. 1037, 1048 (N.D. Ill. 1998), *aff'd*, 185 F.3d 881 (Fed. Cir. 1999) (unpublished) (the patentees "fail to explain how their invention would survive comparison with prior art if we were to read the … patent in the broad manner advanced by plaintiffs.").

Therefore, the Court must construe the claim in accordance with the prosecution history, which suggests that the patentee and Examiner understood the amendment "evacuation end" as limiting the scope of the claim to the configuration shown in Figure 6, in order to distinguish the claim over the prior art.

(2) "an elevator disposed in fluid communication with the evacuator"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | The Court's Construction |
|---|---|---|
| "at least a liquid is permitted to flow from one position to another, for example from an elevator to an evacuator" | "an elevator connected to the evacuator such that debris can be moved from the debris collector directly into the elevator" | "a liquid is permitted to flow from one position to another, for example from an elevator to an evacuator" |

Defendants' proposed construction defines "fluid communication" in terms of the "debris," rather than a liquid. It seems that both parties understand, and have been using the term "debris," as it appears in the '774 patent, to mean *solid* debris. The Court understands "fluid communication" to mean that a *liquid* may flow between the elevator and evacuator. This is consistent with Figure 6, which shows that any residual fluid that did not initially flow through the debris collector into the evacuator, would, by force of gravity, run back down the elevator and into the evacuator. Such is the Court's interpretation of "fluid communication" between the elevator and evacuator.

(3) "the elevator removing debris from the debris collector and elevating the removed debris from a collection height to a dump height for dumping"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction | The Court's Construction |
|---|---|---|
| "the elevator includes a means to elevate debris to a dump height" | "the elevator includes a means to elevate debris to a dump height independent of the conveyor" | "the elevator includes a means to elevate debris to a dump height" |

Defendants rationalize that because the claims (and written description) recite *both* a conveyor and elevator for elevating debris to a dump height for dumping, that these must be two separate elements. However, the written description nowhere specifies that the elevator operates independently of the conveyor. In fact, the claim language indicates that the conveyor is "disposed along the catch trough and elevator, the conveyor . . . elevating debris from the evacuator to the dump height" (claim 1). Clearly, the elevator operates *via the conveyor* to

elevate debris to a dump height for dumping. Therefore, Defendants' construction that the elevator must elevate debris to a dump height, *independent of the conveyor*, is contrary to the claim language.

### Conclusion

The patent claims shall be construed as outlined herein.

IT IS SO ORDERED.

DATED this 27th day of March, 2015.

BY THE COURT:

_____
Dee Benson
United States District Judge