1          IN THE UNITED STATES DISTRICT COURT

2                    DISTRICT OF UTAH

3                    CENTRAL DIVISION

4

5   PETTER INVESTMENTS, a Michigan   )

6   corporation doing business as    )

7   Riveer,                          )

8            Plaintiff,              )

9   vs.                             )   CASE NO. 2:14-CV-45DB

10  HYDRO ENGINEERING, a Utah        )

11  corporation, et al.,             )

12           Defendants.             )

13  _____)

14

15          BEFORE THE HONORABLE DEE BENSON

16          -------------------------------

17                 February 13, 2015

18

19                  Motion Hearing

20

21

22

23

24

25

```
1                        A P P E A R A N C E S

2

3

     For Plaintiff:            STEPHEN M. LOBBIN
4                              2020 Main Street
                               Suite 600
5                              Irvine, California

6                              MARK FORD
                               1389 Center Drive
7                              Suite 300
                               Park City, Utah

8

9

10

11   For Defendant:           MARK MILLER
                               BRETT FOSTER
12                             222 South Main Street
                               Suite 2200
13                             Salt Lake City, Utah

14

15

16

17

18

19

20

21

22   Court Reporter:          Ed Young
                               351 South West Temple
23                             Room 3.302
                               Salt Lake City, Utah 84101-2180
24                             801-328-3202

25
```

```
 1   February 13, 2015                           2:30 p.m.

 2                    P R O C E E D I N G S

 3

 4        THE COURT:  Welcome back.

 5        Petter Investments, Inc. against Hydro

 6   Engineering.  The case number is 14-CV-45.  Mr. Stephen

 7   Lobbin is here along with Mark Ford and Rachel Jacques.

 8   Have I said that right or have I got the wrong name

 9   altogether?

10        MR. FORD:  This is actually our paralegal, Jessica

11   Garcia.

12        THE COURT:  I am sorry.  Didn't you have Ms.

13   Jacques here yesterday?

14        MR. FORD:  She was not, but she does at times help

15   out on the case.

16        THE COURT:  Well, it is nice to have you here.

17        I see that your expert is here, and I

18   momentarily --

19        MR. FORD:  Dr. Paulus is here.

20        THE COURT:  Then on the other side of this we have

21   got the usual suspects, Mr. Miller and Mr. Foster.

22        I have forgotten the names of the brothers behind

23   you.

24        MR. MILLER:  Jim and Alan McCormick.

25        THE COURT:  Jim and Alan McCormick.
```

```
 1              THE COURT:  Am I correct that they are brothers?

 2              MR. MILLER:  Yes.

 3              THE COURT:  Nice to have you here.

 4              We're here to hear argument on claim construction.

 5    I would like to hear argument first on the 298 patent, and

 6    then we'll move to the 720 patent and finish with the 774

 7    patent, unless you disagree.

 8              MR. FORD:  That is fine, Your Honor.

 9              THE COURT:  All right.  Then let's begin with the

10    298 patent and the claim construction regarding the word

11    frame.  Is that a good place to start?

12              MR. MILLER:  Sure.

13              THE COURT:  Okay.  That is the way it was in the

14    briefing, so that is how I have it outlined.

15              Mr. Lobbin.

16              MR. LOBBIN:  Thank you, Your Honor.

17              Good afternoon.

18              THE COURT:  Good afternoon.

19              MR. LOBBIN:  May it please the Court, and before I

20    get into the specifics of the 298 patent, first, as Your

21    Honor has outlined it, I want to give a discussion of claim

22    construction principles to make sure that everyone is on the

23    same page about what the Federal Circuit requires, does not

24    require, and the rules of the road for construing patent

25    claims.
```

 1              Your Honor I'm sure is familiar with that, but

 2      these exercises in claim construction have a tendency to --

 3              THE COURT:  Mr. Ford looks like he wants to tell

 4      you something.

 5              MR. FORD:  Can we just have the clerk turn on the

 6      computers?  We're going to be running a presentation from

 7      this table.

 8              Thank you.

 9              MR. LOBBIN:  My apologies, Mr. Ford.

10              I want to go through some very important claim

11      construction principles that are apropos to the specific

12      discussion we're having in reference to the three patents in

13      issue and the terms that have been proposed by Hydro for the

14      claim construction.

15              The first principle and a fundamental principle of

16      claim construction is that patent claims define the scope of

17      patent rights, not any specific embodiment or example of the

18      invention that is disclosed or discussed in the rest of the

19      patent including the specifications, the figures, the file

20      history, anything else.  The claims are of paramount

21      importance.

22              Now, of course, the Federal Circuit says that the

23      intrinsic record of a patent to be considered when

24      construing the patent includes the patent claims, the

25      specification and the prosecution history.  That is true,

1    but the claims are of paramount importance.  As the Federal

2    Circuit said in the SciMed case, which we have cited in our

3    papers, the Federal Circuit described that one of the

4    cardinal sins of patent law, which is reading a limitation

5    from the written description or specification into the

6    claims.  That cardinal sin is to be avoided by the parties

7    as well as the Court in construing patent claims.

8         It is important because it comes into play in just

9    about all of the claim terms that Hydro has proposed for

10   construction.  Their focus is on the specification while

11   Riveer's focus is, as it should be, on the claimed language

12   that is use and that is not used.

13        The second principle that I want to highlight is

14   what does the Patent Act require a patentee to do?  35

15   U.S.C. 112 says that the patentee has to provide a written

16   description of his or her invention, as well as provide the

17   best embodiment or the best mode for using that invention.

18   Does the patentee have to do more than provide one example,

19   his best example, his or her best example?  No.  The

20   patentee is only required to describe a single preferred

21   embodiment in the specification, not every possible

22   embodiment that falls within the scope of the claims.

23        A simple example of this is hypothetically if

24   there is a claim term that says fastener, something that

25   fastens two things together, either cloth or plastic or

1    something, and the patentee has decided that, you know, the

2    best way to do this invention is to use Velcro, Velcro is

3    described in the specification, then the patentee has no

4    obligation to then go on to say besides Velcro you could use

5    a snap, a clip, tape, a pin, a nail or any other type of

6    fastener.  The patentee has disclosed Velcro and the claim

7    term fastener is not limited to Velcro and it covers the

8    proper scope of that term, which would include any other

9    fastener besides Velcro.

10        The third principle I want to highlight, and I

11   highlighted it before but I want to emphasize it, is that

12   not only do we pay attention to the specific words used in

13   the patent claim, we pay attention to the words that are not

14   used in the patent claim.

15        Let me give you an example of this from this

16   particular case.  You'll hear later about a claim term

17   adjacent, and we actually talked about this back in

18   November.  The term adjacent is used in Riveer's patent

19   claims and the patentee chose not to use the word abutting,

20   which is a word that Hydro proposes that the term should

21   mean, and the patentee also determined not to use the phrase

22   immediately adjacent.  The phrase immediately adjacent

23   actually appears in the specification when the patentee is

24   describing the preferred embodiment of the invention.

25        The patentee says that the trough is immediately

1    adjacent, but in the claim the patentee said adjacent, so

2    that gives us an indication that the claim scope is broader

3    than what is disclosed in the specification.

4            The fourth principle I want to highlight is that

5    if the claim language used has a plain and ordinary meaning

6    to a person of ordinary skill in the art, normally no

7    further elaboration on the meaning of that claim language is

8    necessary or appropriate, because the jury, which is the

9    ultimate arbiter of infringement, applying the construed

10   patent claims to the accused infringing device, the jury can

11   readily understand the scope and meaning of the claim

12   according to the plain and ordinary meaning.

13           The Phillips case from the Federal Circuit en banc

14   in 2005 highlights this.  I am quoting.  A basic principle

15   of claim construction is that the words of a claim are

16   generally given their ordinary and customary meaning.  We

17   have cited the ActiveVideo case as well as the Typhoon Touch

18   Technologies case in our briefs, where the District Court

19   was affirmed in concluding that terms that have an ordinary

20   meaning don't require further construction.  So on the

21   motion for claim construction, the Court's conclusion is

22   plain and ordinary meaning without more.  Or another way to

23   say that is no construction required.  That is all the Court

24   says.

25           That highlights Riveer's position in this case,

1    which led to the motion to compel that Your Honor considered

2    and decided and we filed our opening brief anyway.  But our

3    position from the outset, and it is still today, is that the

4    plain and ordinary meaning controls and that no further

5    elaboration or construction is necessary.

6         The fifth principle is what is this person of

7    ordinary skill in the art and why is that important to claim

8    construction?  The testimony from a person of ordinary skill

9    in the art is particularly appropriate to confirm that claim

10   language that is plain and ordinary actually has a plain and

11   ordinary meaning to the intended audience.  Who is the

12   intended audience?  With a patent it is the person of

13   ordinary skill in the art.

14        Now, with Riveer, of course, we have provided

15   detailed testimony from Dr. Paulus, whose qualifications far

16   exceed any ordinary skill in this admittedly simple

17   mechanical art, which Hydro agrees, even compared to Hydro's

18   proposed definition of a person of ordinary skill in the

19   art.

20        Hydro, by contrast, has offered no evidence

21   regarding the understanding of any person of ordinary skill.

22   They made reference to what an ordinary person of skill

23   would understand in their briefs, but they don't offer any

24   evidence to support those arguments.  Thus, Riveer's

25   evidence about ordinary skill stands unrebutted.  Hydro

 1   never challenged Dr. Paulus by taking his deposition.  Dr.

 2   Paulus's qualifications as a person of ordinary skill in the

 3   art are also beyond any reasonable dispute.  They are

 4   disputed, but the dispute is not reasonable.

 5           Dr. Paulus has a Ph.D. in mechanical engineering.

 6   He spent many hours developing experience with Riveer's

 7   products and Hydro's products.  Hydro agrees, again, that

 8   this technology area is relatively simple.  Even under

 9   Hydro's definition, he far exceeds ordinary skill.

10           Hydro's argument is like, and I came up with an

11   analogy that I thought was helpful, and it would be like

12   saying that an airline pilot is not qualified to talk about

13   the technology of flying kites because he has never flown a

14   kite.  So if the Court has any question about Dr. Paulus's

15   qualifications as a person of ordinary skill in the art, we

16   request permission today to have him testify and answer any

17   questions the Court may have about his experience and

18   expertise and whether he is a person of ordinary skill in

19   the art.  Certainly we would offer to have Hydro ask any

20   questions to resolve that issue here today while he is here.

21           MR. MILLER:  Your Honor, we would object to them

22   bringing Mr. Paulus up for live testimony.

23           THE COURT:  Well, I don't think he is requesting

24   it.  He just said that he would be available if the Court

25   has any questions.  Let's just move on.  I am not planning

 1    on it.  Let's see what happens.

 2            Go ahead with your next argument.

 3            MR. LOBBIN:  I suppose I did equivocate my request

 4    that it was subject to the Court's invitation or subject to

 5    the Court's interest, but he is available.

 6            The next point I want to raise is that just like

 7    the person of ordinary skill in the art is considered to

 8    confirm what the plain and ordinary meaning of the claim

 9    terms is, the specification and the prosecution history,

10    although part of the intrinsic record, they are important in

11    a situation like this where everyone agrees to the plain and

12    ordinary meaning.  The specification and prosecution history

13    are important really only to confirm that the ordinary

14    meaning of the claim terms themselves has not been

15    restricted or narrowed by the patentee, either by a special

16    definition that the patentee applies to that term or by, as

17    the Federal Circuit has said, quote, distinguishing the term

18    from prior art on the basis of a particular embodiment.

19            In the Thorner case from the Federal Circuit, 669

20    F3rd 1362, the Federal Circuit clarified that the

21    specification and prosecution history only compel departure

22    from the plain and ordinary meaning in two instances,

23    lexicography and disavowing.  Now, lexicography, of course,

24    is a patentee applying a special definition, and disavow is

25    where there has been a specific disclaimer that says that

1    the plain and ordinary meaning of this claim term might

2    cover all of this stuff, but we are disavowing part of that

3    stuff so now it means something else.

4           So in this situation it is really considered as a

5    confirmation of what the plain and ordinary meaning of the

6    claim terms is, keeping the focus on, as it should be,

7    primarily on the claims itself, which Hydro does not do.

8    This is the cardinal sin.  Again, the Federal Circuit has

9    said many times, quoting from Silicon Graphics, which we

10   have cited in our papers, a construing court's reliance on

11   the specification must not go so far as to import

12   limitations into claims from examples or embodiments

13   appearing only in a patent's written description, unless the

14   specification makes clear that the patentee intends for the

15   claims and the embodiments in the specification to be

16   strictly coextensive.

17          So, again, patent claims, exemplary embodiment and

18   specification with all sorts of details, and we can't import

19   those details into the claim unless the patentee has made it

20   very specifically clear that that is what he or she intended

21   to do.

22          In the patents themselves, all three patents at

23   issue here include language, and I will give you an example

24   from the 298 patent, column 5, lines 34 to 42, quoting, the

25   above description in this specification is considered that

1    of the preferred embodiment only.  Modifications of the

2    invention will occur to those skilled in the art and to

3    those who make or use the invention.  Therefore, it is

4    understood that the embodiment shown in the drawings and

5    described above is merely for illustrative purposes and not

6    intended to limit the scope of the invention, which is

7    defined by the following claims as interpreted according to

8    the principles of patent law including the doctrine of

9    equivalents.

10           Again, patents are to be read by a person of

11   ordinary skill in the art.  So what does a person of

12   ordinary skill in the art think when they read that

13   provision in each of these three patents?  They get it.

14   They get that, look, we use the example in the specification

15   as just that and the claims stand on their own.

16           Finally, the final principle which applies to a

17   couple of the claim terms here today, as the Federal Circuit

18   has made clear, quoting, a claim interpretation that

19   excludes a preferred embodiment from the scope of the claim

20   is rarely if ever correct.  What that means is that if we're

21   construing the claim to include some things that not only

22   are not claimed but are not even shown in the preferred

23   embodiment, then, of course, that cannot be correct.  That

24   is the Online Technologies case, 386 F3rd, 1,133.

25           Now, I mentioned before that those are the

1   principles that we have to keep in mind and, of course, the

2   primary principle is the first one I mentioned, to avoid the

3   cardinal sin of importing limitations from the specification

4   into the claim unless there is absolute clarity on that.

5           I mentioned the motion to compel that Your Honor

6   is familiar with.  We filed our opening brief and Hydro

7   filed theirs and we both filed responsive briefs.  All of

8   the briefing under the local patent rules has been done

9   according to Your Honor's instruction.  We did that from the

10  outset.  But, again, our position is that no construction is

11  required.

12          Our position in the briefing, of course, responded

13  to what Hydro put forth.  Riveer put forth no construction

14  required, and Hydro put forth all of their constructions,

15  and so in the briefing -- claim construction is not an

16  exercise of the Court considering two positions and picking

17  the one it agrees with more.  It is really an exercise, as

18  the Federal Circuit has said, that, for better or worse, the

19  Court has an independent obligation to get it right.  If it

20  has parties that don't really get it, then the Court still

21  has to get it right.

22          In preparing our opening brief we had to consider

23  what Hydro's constructions were, and in our positions we

24  included our affirmative position, no construction required,

25  and then, in the alternative, if the Court decides that

1    elaboration is required for this claim term, then we propose

2    an alternate construction that we believe more closely is

3    faithful to the claims than what Hydro has proposed and we

4    explain why in the briefing.

5         Again, on all of these claim terms the parties

6    agree that the ordinary meaning controls.  As Hydro said,

7    quoting, the language used to describe Riveer's wash rack

8    inventions in the asserted patent claims is very simple.

9    That is at Hydro's brief, page 1, I think the first line of

10   the brief.  In their reply with the motion to compel at 2,

11   quoting, Hydro agrees with Riveer that the claim terms

12   should be given their ordinary meaning.  So we are all in

13   agreement that all of these claim terms should be construed

14   according to their plain and ordinary meaning.  Whereas

15   Riveer says that is enough.

16        Hydro goes much further and proposes what I would

17   consider to be elaborate definitions of what ordinary

18   meaning is, which is erroneously limited to the specific

19   preferred embodiment disclosed in the specification of these

20   patents.

21        Riveer, on the other hand, in their alternative

22   construction, proposed a simple rebuttal definition tied to

23   the claim language itself, not the embodiments in the

24   specification, which are exemplary and not restrictive.

25        So what are really the questions for the Court?

1    There are two.  There is really one, maybe two.  The first

2    question for the Court on claim construction is does the

3    ordinary meaning of these claim terms require further

4    elaboration at all?  If the answer to that is yes, then the

5    second question is what should that further elaboration on

6    the ordinary meaning be?

7            We have nine terms.  We'll start with the 298

8    patent.  In terms of the local patent rule, 4.1-B, quoting,

9    if the parties are unable to agree upon ten terms, then five

10   shall be allocated to the plaintiff and five to the

11   defendant.  Well, in this case the parties were not able to

12   agree, and Riveer has proposed that no terms require

13   construction, and Hydro has proposed nine terms, and

14   actually, as you'll see when we go through the analysis,

15   many more than nine terms, so it is Riveer's position that

16   this Court, under the local rule, this Court need not be

17   burdened with construing more than five claims, according to

18   what Hydro really wants the Court to construe.

19           There are two fundamental problems with Hydro's

20   proposed constructions that illustrate that.  First, Hydro

21   includes its identified terms within its proposed

22   constructions, which is improper and is the antithesis of a

23   meaningful and helpful definition.  As you can see, here we

24   have got the 298 patent highlighted, and the claim language

25   they propose to construe is frame, and their proposed

1    construction starts a weight bearing frame.  So if you read

2    the proposed construction, you never find out what a frame

3    really is.  That is not a helpful construction.  Rarely if

4    ever does a dictionary use the term to be defined in the

5    definition.  They do this with frame, bottom surface, slope

6    tray, almost all of the claim terms.

7          The problem is if you substitute Hydro's

8    constructions for the term in the claim, then other claim

9    language is rendered superfluous.  The Federal Circuit has

10   said you can't do that in the Elekta case and the

11   Hyperion case.  In Elekta the court said we refuse to adopt

12   claim construction which would render claim language

13   superfluous.

14         The second overall problem with Hydro's

15   constructions is that it is apparent, when you read their

16   brief and when you read their arguments, that Hydro is

17   really seeking to construe many claim terms and phrases, way

18   above nine, that, when you get right down to it, are not

19   terms that were ever identified in the local patent rule

20   disclosures prior to us filing briefs.

21         Hydro identified nine claim terms, which we have

22   seen, and then we get into the briefing and all of a sudden

23   they are wanting to construe all sorts of other claim terms

24   in phrases.  Instead of just frame, they are arguing that we

25   should construe the phrase having a first wall, a second

1   wall, a third wall and a fourth wall, each having an inner

2   and outer surface.  Instead of just bottom surface, they

3   want to construe the phrase extending between the inner

4   surfaces of said first, second, third and fourth walls.

5              THE COURT:  Are we going to ever get to just

6   talking about these terms?

7              MR. LOBBIN:  Yes.

8              THE COURT:  You seem to be just flying past them.

9   You hit frame and then you go on to other examples.  I think

10   I'm following your general argument, but sooner or later we

11   have got to focus on the specific claims that are at issue.

12              MR. LOBBIN:  Thank you, Your Honor.  I was three

13   lines away.

14              Going to frame, the term they propose for

15   construction is frame, and you can see here Riveer's

16   proposal and Hydro's proposal.  The parties agree that it is

17   a simple term, having a plain and ordinary meaning.  Other

18   courts have agreed.  Other courts in other cases have

19   construed the word frame, admittedly in different contexts,

20   but Riveer's brief at page 7 highlights a couple of other

21   examples of where courts have said frame is a term that has

22   a plain and ordinary meaning, nothing more to be said.

23              In its alternative proposal, Riveer basically is

24   telling this Court that if the Court is inclined to

25   elaborate on what frame means, then Riveer offers a

1    dictionary definition.  The Federal Circuit has said,

2    quoting the Praxair case, that dictionaries or comparable

3    sources are often useful to assist in understanding the

4    commonly understood meaning of words and have the value of

5    being an unbiased source accessible to the public in advance

6    of litigation.

7            Although dictionaries are not intrinsic evidence

8    under the claim construction rubric, the Federal Circuit has

9    blessed them with a special character of being authoritative

10   nonetheless.  I think that is probably not a point that we

11   would dispute, since Hydro also proposes some dictionary

12   definitions.

13           Hydro's proposed construction of the term frame

14   uses the term frame in it as we have seen.  It is not proper

15   and it is not helpful and it renders other claim language

16   redundant and superfluous.  Hydro's proposed construction

17   attempts to define the phrase inner and outer surface, which

18   is improper, because that phrase, inner and outer surface,

19   was never identified to Riveer during the exchange of

20   disclosures under the local patent rules.

21           Hydro's proposed construction, as you read through

22   the analysis, their support for their proposed construction

23   is focused entirely on the exemplary embodiment in the

24   specification of the 298 patent, nothing more and nothing

25   less.  This, again, is the cardinal sin of claim

```
1    construction to be avoided.

2            Hydro's proposed construction of frame would even

3    exclude the preferred embodiment, which is another one of

4    those principles that we discussed that is to be avoided.

5    How would it exclude the preferred embodiment?  Well, figure

6    3 of the patent shows crossbeam elements 51, and I don't

7    know if we can turn that, it is sideways, but I think that

8    it is fine sideways.  Figure 3 of the patent shows elements

9    51, and you can see there there is a 51 that is a frame

10   piece going down, and 51 on the right side is another frame

11   piece going down, which shows that there are crossbeam

12   elements that make up more than just the four external walls

13   of the frame, which Hydro claims that the frame has to be

14   limited to just four interconnected walls defining a single

15   enclosed area.

16           Well, element 51 results in defining many more

17   than one disclosed area.  These are frame pieces that

18   support the frame in addition to the four external walls,

19   like some of the images that we saw yesterday and some of

20   the framing elements of some of the wash racks from the

21   tutorial.

22           THE COURT:  It seems like your principal

23   difference is that they want weight bearing and you don't.

24   Do you see anything else at issue here?

25           MR. LOBBIN:  Well, they want four interconnected
```

```
 1    walls and --
 2           THE COURT:  Well, the patent says having a first
 3    wall and a second wall and a third wall and a fourth wall,
 4    each wall having an inner and an outer surface.  I don't
 5    know that that adds or takes anything away.  It is already
 6    written in the claim itself.  Maybe you have a technical
 7    point that it is in the claim itself, and they are not
 8    asking that to be construed, and they are using that to add
 9    to their proposed definition which is a weight bearing frame
10    made up of those four walls --
11           MR. LOBBIN:  Sure.
12           THE COURT:  -- and not eliminating the possibility
13    that there are beams inside those four walls, I suppose.
14    But it does seem to me the difference between the two of you
15    is you want one that does not necessarily have a limitation
16    of being weight bearing.
17           MR. LOBBIN:  Sure.
18           THE COURT:  Okay.  Can we just get down to that?
19           MR. LOBBIN:  Absolutely, Your Honor.
20           THE COURT:  Isn't that the fight here?
21           MR. LOBBIN:  It is one of them.  I have
22    highlighted a couple.
23           THE COURT:  What else is there?
24           MR. LOBBIN:  Well, like I said, in their arguments
25    they are talking about that the frame has to be four
```

1   interconnected walls, only four, and it has to define --

2        THE COURT:  Well, you say only four, and I don't

3   know that that is helping me.  As I read their proposed

4   construction and yours, it seems like that weight bearing is

5   the main issue.

6        MR. LOBBIN:  The weight bearing issue goes back to

7   that first principle again.  Let's look at the claim

8   language.  The claim does not say anything about weight

9   bearing.  The preferred embodiment certainly is weight

10  bearing, certain aspects of it, and if you actually read the

11  detail of the preferred embodiment, it is not necessarily

12  the frame in all instances that is bearing the weight, and

13  certainly it is within the scope of the claims of the

14  invention, the legal right that the patentee secured, to

15  have a frame that does not support any weight at all.

16        There could be other elements outside of the frame

17  that support the weight of the grate.  You could have a foot

18  outside of the frame and you could have posts that support

19  the weight of the frame, and there are all sorts of other

20  embodiments where it would not be a weight bearing frame.

21        THE COURT:  I am quoting from I think the plain

22  language itself or probably from the written description.

23  Preferably all parts of the modular wash rack are made of

24  steel so that parts and vehicles that weigh as much as

25  10,000 pounds may be positioned on the wash rack.

1           MR. LOBBIN:  Yes.  That is, again, describing the

2   preferred embodiment.  I agree with you there.

3           THE COURT:  It appears that it is clear that the

4   invention is intended for bearing the weight of the item to

5   be washed.

6           MR. LOBBIN:  Not from the claims, Your Honor.

7           THE COURT:  Well, it --

8           MR. LOBBIN:  Certainly from the specifications and

9   the example given --

10          THE COURT:  One of the --

11          MR. LOBBIN:  -- weight bearing frame.

12          THE COURT:  One of the general comments that I

13  suppose I have on that proposition is we are still

14  anticipating the claims, and the patent that is issued is to

15  give one of ordinary skill in the art the understanding and

16  the ability to know how to build this thing.

17          MR. LOBBIN:  Uh-huh.

18          THE COURT:  Okay.  Now you want to turn it into,

19  well, not necessarily, Your Honor, not in the claims, so how

20  is one like Dr. Paulus or anyone else supposed to go out and

21  know what am I prevented from doing so as not to violate

22  this patent?  It would seem to me it might be an obvious

23  question, when they look at this claim that says a frame

24  with these four walls and all the elaborate language about

25  four walls with an inside and outside surface, that a

 1   question would be does it need to be weight bearing?

 2        MR. LOBBIN:  That is a question that may come up,

 3   because there is a distinction between the claim language,

 4   that says nothing about weight bearing, and the preferred

 5   embodiment, which seems to clearly imply that the frame is

 6   bearing the weight of the grate.  There is an analytical

 7   issue there.

 8        THE COURT:  Well, there is a question and we still

 9   need to have a description in the patent from the claims

10   primarily, but then the specification isn't there for

11   nothing, and the written description for nothing, and the

12   entire idea is to give someone of ordinary skill in the art

13   an understanding of what the invention is so they don't

14   infringe it.

15        MR. LOBBIN:  Yes.

16        THE COURT:  When they read the word frame, they

17   need to know what it means so they don't go out and build

18   something that is infringing.  An obvious question might be

19   am I infringing if I build a non-weight bearing frame?  In

20   order to infringe this patent, do I need to have a weight

21   bearing frame that has this grate and the rest of the

22   components attached to it?  I am not exactly sure where

23   you're going, and you can try to convince me that it is not

24   required to be weight bearing, but if we could get to that I

25   can make a choice.

1          MR. LOBBIN:  Yes.

2          The principles I outlined at the beginning answer

3    the question, and the Federal Circuit's guidance answers

4    that question for us.  The focus is on the claims.  The

5    specification is considered to see if there is an explicit

6    definition or disavowal.  For example, the patentee says

7    that the frame of the present invention -- and this is often

8    the case, so this is not a hypothetical, the specifications

9    often say something like the frame of the present invention

10   is designed to bear the weight and must bear the weight or

11   is even designed to bear the weight of whatever is on it.

12   Well, now you have something, because you have got the

13   preferred embodiment and --

14         THE COURT:  But you're changing it.

15         MR. LOBBIN:  -- explaining that it is coextensive

16   with what is claimed.  It is redefining what the term frame

17   means in the claims from something in the specification.

18   Absent that, the Federal Circuit says the claim language

19   controls.

20         THE COURT:  I would like to get to talking about

21   what we're trying to construe here.  I would like to hear

22   from Mr. Miller as soon as you are finished with your

23   argument about what frame means, hear him, and then maybe we

24   can go back and forth.

25         MR. LOBBIN:  Okay.

```
 1              THE COURT:  Are we done with frame from your point
 2    of view?
 3              MR. LOBBIN:  Well --
 4              THE COURT:  I take it that you want me to just
 5    determine or construe the frame claim to mean frame?
 6              MR. LOBBIN:  Frame means the plain and ordinary
 7    meaning of frame, frame, yes, or no construction necessary,
 8    just like in the example that I gave where the claim says
 9    fastener.
10              THE COURT:  I know.  I have understood your
11    argument.  I just want to know what you say frame means, and
12    you say frame means frame.
13              MR. LOBBIN:  Essentially.
14              THE COURT:  Excellent.
15              Now let me hear from Mr. Miller, and then I am
16    going to hear from you to respond to him, and then we'll go
17    on to the bottom surface.
18              MR. MILLER:  Thank you, Your Honor.
19              Do you have my binder I gave you yesterday by
20    chance?
21              THE COURT:  No.
22              I do, too.
23              MR. MILLER:  First, Your Honor, I disagree with
24    the way Mr. Lobbin has characterized the law of claim
25    construction.  I don't need to go into those principles ad
```

1    nauseam right now, but for purposes of frame, he said over

2    and over again that the claim does not say it is weight

3    bearing.  Well, the claim does say it is weight bearing in

4    the claim itself.

5             If you look at the claim, and if you go to tab B,

6    tab B in the binder, and you go to page 2, the language at

7    the top of this page is directly quoted from claim one of

8    the 298 patent.  It says that the grate, operatively

9    associated with said first, second and third and fourth

10   walls, so the grate is operatively associated.  It engages

11   with these walls in some way for the operation of the wash

12   pad.  What for?  For supporting the item to be washed.

13            I think it is amazing that he would argue that the

14   frame of this wash pad does not have to be weight bearing.

15   That is the whole purpose of a wash pad.  It says for

16   supporting the item.  The grate gets its support from its

17   frame.  So right there in the claim that concept is clear.

18   It does not have the words weight bearing, but Mr. Lobbin's

19   view of claim construction law where you have got to have

20   that exact word in there or you're not allowed to use it to

21   define anything is way off base.

22            The frame, if you go to the first page of tab B,

23   and I want to go over the idea of the frame, and the main

24   idea of the frame -- claim construction is an iterative

25   process.  We put a definition together for this and --

```
1              THE COURT:  It is a what process?

2              MR. MILLER:  Iterative.  Sometimes you start out

3    somewhere and the ultimate definition you end up with is not

4    where you started.

5              This phrase, a frame with four walls having an

6    inner and outer surface, the concept there and the key

7    element we're trying to make sure is in here is it encloses

8    an area.

9              Mr. Lobbin loves the dictionary and so let's use

10   the dictionary that Riveer cites in its pleadings.  The

11   dictionary that they cite starts on our app 0020, and that

12   is the appendix page, and if you look at the definition of

13   frame, which is our app 0026, the first definition of frame

14   just says it is like a picture frame or a mirror frame.

15   That is clearly not what we're talking about here.

16             The second definition is a rigid structure formed

17   of relatively slender pieces joined so as to surround

18   sizeable empty spaces or nonstructural panels and is

19   generally used as a major support in building or engineering

20   works.

21             So this is the definition from the dictionary and

22   it talks about the concept that a frame is to surround an

23   enclosed area.  If you look at the context of the patent,

24   that is what the patent is talking about.  The patent is

25   talking about these four walls that are going to have inner
```

1    and outer surfaces.  It is inherently saying that you're

2    enclosing an area.  Why?  Because if you read down lower, it

3    talks about how you have a bottom surface with those four

4    walls to make a basin.

5          The thing that Mr. Lobbin misses is he thinks that

6    you ignore the specification unless the words in the

7    specification say frame is defined as X, and if there is not

8    a definitional statement, then you ignore it and you don't

9    pay attention to the specification.  You pull the claim

10   language out of the patent and you put it in a vacuum and

11   you go get Webster's, and then you handpick your favorite

12   Webster's definition and you don't pay attention to the

13   context of the invention.  That is wrong.  That is what they

14   are doing.

15         THE COURT:  Could I ask you a question?  Why did

16   you think that the Court needed to construe frame when you

17   show me the plain language from the claim itself to support

18   your argument that it means weight bearing?

19         MR. MILLER:  Your Honor --

20         THE COURT:  You show me further language in the

21   claim which says that it is supporting the item to be washed

22   above.  Why wouldn't that be plain to a jury?  Why do I need

23   to define frame by saying that it is weight bearing when the

24   claim itself seems to say quite plainly, as your argument

25   suggested, that it needs to support the item to be washed?

1    So why does the Court need to construe it at all?

2            MR. MILLER:  One reason is --

3            THE COURT:  He might be right on this one, that we

4    just give it its ordinary meaning.  All this window

5    dressing, notwithstanding, but he might be right.  You just

6    pick one word, that frame is frame, and we can understand

7    what frame means by reading the rest of the first claim, and

8    we don't need a construction.

9            MR. MILLER:  Your Honor, I don't disagree

10   necessarily, but when I read the claim language, I think it

11   outlines in plain language, if you look at tab B, and I go

12   through this exact plain language, it outlines what our

13   definitions say.

14           Now, the reason we felt we needed to propose

15   definitions is if you go to the last page of tab B, page 5,

16   and this is kind of some excerpts from their infringement

17   contentions, and the way the local patent rules work is to

18   give everybody the context they need to pursue claim

19   construction, and you get infringement contentions from the

20   other side, and we look at their infringement contentions

21   and you'll see that they cite a lot of different beams to be

22   the frame, and kind of vaguely, and you can't really tell

23   what are they calling the four walls, and element three they

24   are calling a grate, and the top of the corrugated steel the

25   grate, the grooves in the corrugated steel they are calling

 1   the basin part, and so as we look at their infringement

 2   contentions, we are like they really are trying to stretch

 3   this claim beyond recognition.  We wanted to bring the focus

 4   back to what the claims say and the proposed definitions

 5   that are plain from the language that would kind of combat

 6   their efforts in those infringement contentions.  That is

 7   the context that arose and is why we proposed the

 8   definitions.

 9            Today with these charts I prepared I just want to

10   emphasize the main points.  One point is a frame and it has

11   to enclose an area.  It encloses an area and it is weight

12   bearing.  If those two concepts are in the definition, then

13   that is all we want.

14            THE COURT:  As I said, it seems like you are just

15   arguing over whether it needs to be weight bearing.

16            MR. MILLER:  Well, the problem is is if we don't

17   put a definition on it, based on their infringement

18   contentions, in the summary judgment context for

19   infringement they will say there is nothing in the claim

20   that says weight bearing and the Court didn't construe it to

21   be weight bearing, and the Court didn't construe it to say

22   it has to enclose an area, so there are questions of fact of

23   whether this infringes, and the purpose of claim

24   construction is to try and resolve those ambiguities in the

25   claim.

 1          I wouldn't think there is an ambiguity looking at

 2     this myself, but after you see how they are trying to push

 3     it, there is obviously a disagreement that needs to be

 4     resolved, which is a definitional question of law

 5     disagreement, to make sure that this frame, that it is clear

 6     that it is both weight bearing and it encloses an area.

 7     There could be beams inside of that area as an additional

 8     part of the frame, and we are not limiting it to four, but

 9     you have got to have four that enclose an area to have the

10     frame that they claimed in their patent.

11          THE COURT:  Thank you.

12          Mr. Lobbin?

13          MR. LOBBIN:  Your Honor, if you don't mind,

14     Mr. Ford will take the rebuttal.

15          THE COURT:  Sure.  We don't usually switch

16     attorneys in midstream, but --

17          MR. LOBBIN:  Your Honor, we had a plan for me to

18     do the whole thing for all of the claims, and then

19     Mr. Miller would go and then --

20          THE COURT:  Okay.  Well, I am happy to have you do

21     it any way you would like.

22          Yes, sir.

23          MR. FORD:  I will be brief.

24          You have really identified the issues here, Your

25     Honor.  The first issue is does the frame have to be weight

1    bearing, and the second issue is can it include more than

2    four framed pieces that define more than a single enclosed

3    area.  If you look at Hydro's proposed construction, it is

4    pretty clear that what they are trying to say, and maybe I

5    am misunderstanding it based on what Mr. Miller said just

6    now, but based on their construction it appears to us that

7    they are trying to say that a frame can include more than

8    four frame pieces.

9              THE COURT:  It can --

10             MR. FORD:  And it can enclose more than one area.

11             THE COURT:  Yes.

12             MR. FORD:  We disagree with that.

13             THE COURT:  I don't know that he said it can

14   include more than one area.  As I understand their

15   construction, it does include the area within those four

16   walls.

17             MR. FORD:  If you look at their construction, I

18   think their --

19             THE COURT:  Isn't that right, Mr. Miller?

20             MR. MILLER:  Yes.  The four walls enclose an area.

21   There could be other beams within that area, but four walls

22   enclose an area.

23             THE COURT:  That is how I understand their

24   proposal.

25             MR. FORD:  Then I guess the question is if there

```
1    can be more than four frame pieces, and there can be some

2    frame pieces inside, then that necessarily means there is

3    more than a single enclosed area.  There may be multiple

4    enclosed areas.

5            THE COURT:  That is not their position.  I think

6    their position is that you have essentially a square or a

7    rectangle and that is the frame.  If you have support beams

8    connecting inside, that does not lessen the area of the

9    frame.

10           Correct, Mr. Miller?

11           MR. MILLER:  Correct.  That is true.  In fact, the

12   four walls have to be part of the frame that encloses an

13   area.

14           THE COURT:  Right.

15           MR. MILLER:  I would even say that you could have

16   an octagon, which has eight walls, enclosing an area, but

17   there are at least four as part of enclosing that area.  You

18   have to have at least four walls that enclose one area.

19           Now, you could have beams in the middle and if you

20   want to chop it up, but those four walls have to be part of

21   enclosing one area.  The reason that concept is important is

22   for understanding the terms bottom surface and grate.

23           THE COURT:  Okay.  I don't see how you can have an

24   octagon.  Don't say that.  That confuses me.

25           MR. FORD:  I suppose with that explanation, and I
```

1    am not sure that -- I guess the concern was that they were

2    going to say at some point, well, if their construction was

3    adopted that this frame defines more than a single enclosed

4    area because you have frame members in between that each

5    individually enclose multiple enclosed areas, so to the

6    extent that I understand their position correctly, and I am

7    not sure I necessarily disagree with the fact that, yeah,

8    there are four frame walls and there can be some in between,

9    and there is at least one area enclosed and there can be

10   multiple areas enclosed if you have --

11          THE COURT:  Well, not to go too far, but it seems

12   like you want a construction that would make their side

13   trough a part of the frame and they don't because it is not

14   weight bearing.  I may be wrong about that, but that seems

15   like that is what is driving this.

16          MR. FORD:  Well, it may be, Your Honor, and just

17   turning to the weight bearing issue briefly, and I listened

18   to Mr. Miller's argument and he really identified one piece

19   of evidence from the patents, and he talked a lot about

20   context and that you have to read the claims in light of the

21   specification, but the one thing he identified was claim one

22   itself.  He specifically identified the claim language that

23   required that the grate be operatively associated with the

24   frame walls, and that the grate supports the weight of the

25   vehicle to be washed above it.  I suppose I disagree to the

 1   extent that something can be operatively associated with

 2   another thing without necessarily requiring that that thing

 3   bear the weight of whatever it is operatively associated

 4   with.

 5        Now, operatively associated does not necessarily

 6   mean that it has to bear the weight of the thing that it is

 7   operatively associated with.  Operatively associated could

 8   mean that you glue two things together.  I mean, it does not

 9   necessarily mean that the weight from one has to be

10   transferred to the other and bear the weight of the thing

11   that is operatively associated with it.

12        THE COURT:  But, again, you're describing this so

13   that the public, through the ordinary skilled person, knows

14   what not to build.  I can't read this, and I am not sure I

15   agree that we need to define frame, but I can't read it any

16   other way from the patent itself that there is a grate that

17   covers it and is on top of this frame and that is what you

18   drive a truck on or whatever you're going to wash, and the

19   grate supports the item to be washed, and it is associated

20   with the four walls of the frame.

21        MR. FORD:  Sure.

22        THE COURT:  It is not that difficult.

23        MR. FORD:  Sure.

24        Number one, I don't disagree that the term frame

25   does not need to be construed, but you identified a part of

1    the specification that said preferably the frame is -- I

2    can't remember the exact language -- preferably the frame is

3    able to bear the weight of the vehicle up to 10,000 pounds.

4    Well, I think what is critical in that passage is the term

5    preferably.  A person of ordinary skill --

6            THE COURT:  I am not even talking about that part

7    of it.  I am just talking about the claim language itself.

8    It seems like what Riveer would like is a construction that

9    goes beyond the thing that you got that patent on back

10   whenever it was, a long time ago, to include something that

11   is not weight bearing.  It is hard for me to see how anyone

12   of ordinary skill in the art would think, if asked the

13   question am I infringing if I add a side trough, for

14   example, because that seems to be pertinent here, and, oh,

15   yes, because I think frame means frame, and frame can extend

16   beyond this grate thing that is supporting a vehicle and

17   whatever you have got on the side of this description that

18   we are being given about what has been invented here, that

19   would probably be part of the frame too so you can't do

20   that, and I just can't imagine anybody saying that.

21           MR. FORD:  There are two reasons why a person of

22   ordinary skill in the art may read claim one and decide that

23   it --

24           THE COURT:  That broadly.

25           MR. FORD:  -- that it does not necessarily need to

 1    be weight bearing.

 2              THE COURT:  Back in 2000 or whenever this got

 3    issued, or --

 4              MR. FORD:  Or filed in -- issued in 2000.

 5              THE COURT:  I knew it was a long time ago.

 6              Yes.

 7              MR. FORD:  The first reason that a person of

 8    ordinary skill in the art may conclude that is the fact that

 9    the claim does not say weight bearing.  The claim just says

10    frame.  I think people would agree that there can be frames

11    that are weight bearing and there are frames that are not

12    weight bearing.  Now, Mr. Miller identifies --

13              THE COURT:  That person would read the entire

14    claim.

15              MR. FORD:  Right.

16              THE COURT:  Let's discount specification and

17    preferred embodiment and just reading the claim, how could a

18    person of ordinary skill in the art not come away with

19    thinking that this grate frame bottom surface thing didn't

20    require that structure to be weight bearing for the thing to

21    be washed?

22              MR. FORD:  The claim --

23              THE COURT:  That is the extent of the frame.

24              MR. FORD:  The claim clearly requires that the

25    grate support the thing to be washed, and that the grate be

1    operatively associated with the frame, which are the four

2    walls, at least, and --

3              THE COURT:  It sits on top of it.

4              MR. FORD:  Right.

5              THE COURT:  It rests on it and is supported by it.

6              MR. FORD:  I disagree.  That language is not in

7    the claim, Your Honor.  It says operatively associated with

8    the frame.  The grate is operatively associated with the

9    frame.  There are a number of different ways that something

10   can be operatively associated with --

11             THE COURT:  I will read from the claim.

12   Operatively associated with the walls for supporting the

13   item to be washed above.  I don't know what is so hard about

14   this.

15             MR. FORD:  Well, I disagree, Your Honor, that the

16   term operatively associated necessarily requires that the

17   thing that is operatively associated with the other thing

18   must be able to transfer the weight so that both bear the

19   weight of the first thing.

20             Secondly, going back to the specification, the

21   specification is clear.  It says that preferably these parts

22   of the frame are built in a way that they can support the

23   weight of a vehicle up to 10,000 pounds.  It says

24   preferably.  It does not say in all instances.  It does not

25   say this absolutely has to be the case.  It says preferably.

```
 1    A person of ordinary skill in the art would read that and

 2    say --

 3              THE COURT:  But that is referring to preferably

 4    they should all be made of steel.  That is all that says.  I

 5    will read it.  Preferably all parts of the modular wash rack

 6    are made of steel, so that the parts and vehicles that weigh

 7    as much as 10,000 pounds may be positioned on the wash rack.

 8              Isn't that all we're talking about here in this

 9    invention was a wash rack?

10         MR. FORD:  That is right.  It is a wash rack, but

11    it has lots of different components.

12              THE COURT:  It has a frame, and not exactly a lot

13    of components, but it has a frame and it has a bottom

14    surface and --

15         MR. FORD:  A grate.

16              THE COURT:  -- and it has a grate.

17         MR. FORD:  But the claim only specifically

18    requires that the grate bear the weight of the thing to be

19    washed above.

20              THE COURT:  The grate appears to be completely

21    consistent with and connected to the frame.

22         MR. FORD:  Again --

23              THE COURT:  You don't think so?

24         MR. FORD:  I think the frame -- I am sorry?

25              THE COURT:  You think the frame can be greater in
```

1    size than the wash rack?

2         MR. FORD:  Can the frame be greater in size than

3    the wash rack?

4         THE COURT:  Yes.

5         MR. FORD:  Absolutely.

6         THE COURT:  Well, why?  Just out of common sense,

7    why?  This whole thing was designed to have a frame with a

8    grate on top of it that will a support a truck.  As I

9    understand it, you wash it and then the water and debris

10   drop down through the opening in the grate and then it can

11   be cleaned out from there or vacated from the bottom

12   portion.

13        MR. FORD:  I don't disagree, Your Honor, that what

14   you are describing is the preferred embodiment that was

15   disclosed, but if you look at the claim language itself,

16   which is where the focus begins on claim construction, what

17   is the plain and ordinary meaning of those terms, and unless

18   we import limitations from the specification, we simply

19   can't get to --

20        THE COURT:  Well, then virtually anything anyone

21   would build that had a larger frame or a different

22   configuration, for example, and has this side trough, I

23   mean, the human mind can only imagine all of these things,

24   and you would say then later we can claim that they infringe

25   because that frame just meant whatever your description of

 1    it was, a rigid structure joined so as to provide support

 2    for anything.

 3           Right?

 4           MR. FORD:  That I believe, Your Honor, is the

 5    plain and ordinary meaning of the term frame.

 6           THE COURT:  Well, then it would seem to me that

 7    you would have the most beautiful patent in the world,

 8    because you can prevent just about anybody from doing

 9    anything so long as they build something with a frame or at

10    least on that part of the claim.

11           MR. FORD:  Sure, but there also has to be a grate

12    that is operatively associated with the frame, and there has

13    to be a drainage fitting and a coupling means and a couple

14    tubes and a pump and there are several different elements.

15           THE COURT:  I appreciate that.

16           We have spent enough time on frame.  Let's move on

17    to bottom surface.  We're going to have to move a little

18    faster.  Your briefing has been conscientious and

19    comprehensive on this, so let's move along as quickly as

20    possible in the interest of time.  I don't have a big time

21    issue, but we don't want to be here forever.

22           MR. LOBBIN:  Thank you, Your Honor.  I will move

23    quickly.

24           A lot of the issues tend to repeat themselves,

25    because on all claim terms the parties agree that the plain

1    and ordinary meaning applies, and on all claim terms our

2    position is that Hydro is impermissibly proposing

3    constructions that would impermissibly import limitations

4    from the specification to the claim.

5            So on bottom surface Riveer offers an alternate

6    definition, and if elaboration is necessary, again, from the

7    dictionary.  Hydro's proposed construction again uses the

8    term surface and bottom, which is not proper and not helpful

9    to the definition of bottom surface and renders other claim

10   language superfluous.

11           Really what is going on when you read Hydro's

12   argument is they are attempting to have this Court construe

13   the claim phrase extending between, which is not the

14   identified term, and the identified term is bottom surface.

15   So under the local patent rules, we had no notice that

16   extending between was the real term at issue and that is

17   improper.

18           Again, reading the argument, they are focusing

19   entirely on the preferred embodiment to say what the bottom

20   surface is rather than reading the plain language, according

21   to what is a plain and ordinary meaning according to how one

22   of ordinary skill would read that language.

23           THE COURT:  Thank you.

24           Mr. Miller?

25           MR. MILLER:  Your Honor, I have never seen a

1    patent owner so intent to ignore the specification of their

2    own patent and their own invention.

3             MR. LOBBIN:  Your Honor, could I just object?

4    There has been a few comments today about Mr. Lobbin this

5    and I have never seen this and hyperbole and being aghast at

6    certain things, and I think it is improper and I just wanted

7    to make my objection for the record.

8             THE COURT:  Okay.  The objection is noted.  I

9    think you are both doing it.  You tell me that they and the

10   Court are violating the cardinal sin of claim construction,

11   and it is all fair argument, and I am not criticizing you

12   for that, and I think he is just trying to argue that he

13   thinks you're going too far, and you are telling him that he

14   is not doing it right either.  I appreciate your objection.

15   I don't think it was at all meant personally.

16            MR. MILLER:  No.  I said a patent owner.  I was

17   not talking about Mr. Lobbin.

18            I am saying that if you look at their briefing,

19   they cite the specification of the 298 patent in their claim

20   construction briefing and in their opening brief zero times.

21   Not one time.  It is because they don't want the context of

22   their invention to actually be used in interpreting their

23   claims, which is wrong.  It is completely wrong on the law.

24            Bottom surface.  If you look at page 1 of tab B in

25   my binder, and go down to that second half of the page, that

1    is the quoted language from the claim about the bottom

2    surface, and the main principle that that teaches is that

3    this bottom surface is the bottom surface of the frame.  If

4    you look at the claim in the patent, the claim in the patent

5    has various indented paragraphs.

6          The paragraph that starts with a frame has all of

7    these things in it describing what the frame is and one of

8    them is bottom surface.  So Riveer agrees that bottom

9    surface means it has to be the lowest part of something, and

10   they just use something, that it has to be the lowest part

11   of the frame.  Okay.  The concept that they are missing in

12   their proposed construction and that they are missing in

13   their infringement contentions is this bottom surface is the

14   bottom of the frame structure.  It extends between the frame

15   walls, and because it is called a bottom surface, it has to

16   be at the bottom of the frame.

17         The reason we wanted to propose this for

18   construction is, in their contentions on page 5 of tab B,

19   they are pointing to a structure that is at the top of their

20   frame walls.  They identify frame walls, but then they point

21   to the structure above them as being the bottom surface.  So

22   it has to be the bottom of the frame within that area, and

23   because it says it forms a basin, it has to fill the

24   enclosed area or else it is not going to hold the water.

25   That is why we proposed the construction we did.

1              The primary elements that are important are that

2    the bottom surface is the bottom of the frame and it fills

3    the area enclosed by those frame walls.  That is it.  I

4    think it is plain from the language, and it is also more

5    plain once you read the language in the context of the

6    specification, which you have to do.  You can't put blinders

7    on and ignore the specifications.  That is legal error.

8              The Phillips decision at page 1,316, and that is

9    where it goes through and explains why the specification

10   more than just expresses definitions, but the specification

11   itself has to be used.  When they ignore that, that is red

12   lights flashing, that is red flags that a patent owner is

13   trying to stretch their patent far beyond its lawful limits.

14             THE COURT:  Thank you.

15             Mr. Ford.

16             MR. FORD:  We just heard Mr. Miller talk about how

17   important the specification is, but I am not sure he

18   referenced the specification at all in his argument.  If you

19   look at figure 5 of the specification, you'll see, and this

20   is a side view of an embodiment of the present invention,

21   and number 38 there is referring to a bottom tray.  If you

22   look over on the other side at specification 40 it is a

23   trough.  The specification is clear that the bottom tray --

24   so I'm reading from column 2, beginning on line 57, and it

25   says as seen in figure 4, the modular wash rack 12 includes

1    a bottom tray, 38.  Bottom tray 38 has a trough.  This

2    bottom tray 38 includes this surface that it is pointing to

3    and it also includes that part 40 which is the trough.

4         What is this bottom tray really talking about?

5    The bottom tray is talking about both the trough and what we

6    could call a bottom surface, which is the portion of the

7    bottom tray that does not include the trough.  Mr. Miller is

8    talking about reading this claim in context, read this claim

9    in context, and I think that is really code for import

10    limitations from the preferred embodiment.

11         THE COURT:  Just for my information, what is 50

12    referring to?

13         MR. FORD:  50 is called a tab or --

14         MR. MILLER:  A grate support.

15         MR. FORD:  A support for the grate.

16         THE COURT:  Why doesn't that make his definition

17    the proper one all by itself?  It seems like all they want

18    to say is that the bottom surface is underneath the grate.

19         MR. FORD:  The problem with their --

20         THE COURT:  Isn't that essentially what you're

21    asking me to say, Mr. Miller?

22         MR. MILLER:  Yes.  The bottom surface --

23         THE COURT:  Is underneath the grate.

24         MR. MILLER:  -- is underneath the grate and within

25    the area of the frame.

1          MR. FORD:  There are really two issues, Your

2     Honor.  The first thing I think they are saying is that it

3     has to be at the very, very bottom of the frame.  36-D is

4     pointing out a frame member on the side.  I think if they

5     get the construction that they are proposing, they are going

6     to say, well, in order for a surface to be a bottom surface

7     it has to be below that.  Not even the preferred embodiment

8     discloses that.

9          THE COURT:  Below what?

10          MR. FORD:  Do you see 36-D on the right-hand side?

11          THE COURT:  Okay.

12          MR. FORD:  That is part of the frame.  That is one

13     of the frame members.  In their construction they are saying

14     the bottom surface of the frame has to be the very lowest

15     part of the frame.  Looking in my crystal ball, I think if

16     they get the construction they are advocating for, they are

17     going to say, well, this figure 5 wouldn't even fall within

18     the scope of the claim, because number 38, which is showing

19     the bottom surface, is not even at the bottommost part of

20     the frame.  It is somewhere in the middle.  Not even the

21     embodiment disclosed requires the bottom surface to be at

22     the very lowest part of the frame.

23          The second problem with their construction is they

24     are asking the Court to construe it so that it fills this

25     inner space that is defined by the four frame members.  That

1    simply is not required by the claims.  The claim requires a

2    bottom surface that extends between the inner surfaces of

3    the first, second, third and fourth frame walls.  That does

4    not require that it fill it entirely.  The word entirely is

5    completely absent from the claim.  There is no requirement

6    the it entirely fill the space that is defined by the four

7    frame walls.

8         I just think that those two parts of their

9    proposed construction are not supported by the claims and

10   they are not even supported by the preferred embodiment.

11        THE COURT:  Thank you.

12        MR. MILLER:  Your Honor, for bottom surface their

13   proposal was that the bottom surface is the very lowest part

14   of something.  That is their proposed definition.  We didn't

15   have it in our original, and then in the reply we saw that,

16   the very lowest part of something and we said, well, bottom

17   means that, but we wanted to make it clear that the bottom

18   surface is part of the frame, so it has to be the bottom of

19   the frame.

20        The part about filling the area, it does refer to

21   that in the claim here.  You have a bottom surface extending

22   between the walls to define a basin for collecting water.

23   If it is not filling that area and there are openings, it is

24   not going to collect water and it is going to leak out.  So

25   the context of the claim, and then you go to the specs and

1   you get the context of the invention, and this is how

2   somebody would explain this system, that you put a bottom

3   surface that extends between the walls to define a basin.

4   Well, now you have a basin concept and that is why it has

5   got to fill the area.

6           THE COURT:  All right.  Thank you.

7           Did you have something in response to that?

8           MR. LOBBIN:  I am ready to go on to grate.

9           THE COURT:  Great.

10          MR. LOBBIN:  Grate.

11          Like the other terms, it is a simple term and the

12   parties agree that the plain and ordinary meaning applies.

13   If elaboration is necessary, which our primary construction

14   says no elaboration is necessary, that the word grate is a

15   very simple word that the jury can understand, but, in the

16   alternative, Riveer offers a dictionary definition.

17          Hydro offers the same dictionary definition with

18   one exception.  Hydro inserts the word porous, which does

19   not exist in the dictionary, into the same dictionary

20   definition that Riveer has proposed.  I think it is clear

21   which one is more accurate.

22          Hydro's proposed construction attempts to define

23   the phrase operative associated which was not identified.

24   The identified term was grate.  We thought all along we are

25   defining grate, and now all of a sudden we are defining

1    operatively associating, which was never identified in the

2    local patent rule disclosure.

3            Again, Hydro's argument focuses on the preferred

4    embodiment and the specification.  Your Honor, I only use

5    the phrase cardinal sin because it is the phrase the Federal

6    Circuit used.  I am not even sure which kind of sin that is,

7    and I grew up Catholic, so I probably should know that.

8            Even the specification never uses the word porous.

9    Porous has no association with this patent whatsoever.

10           THE COURT:  There is someplace, and I am not going

11   to find it quickly, but it uses the word through, that the

12   debris is falling --

13           MR. LOBBIN:  Yes.

14           THE COURT:  -- through and from the grate above

15   it.

16           MR. LOBBIN:  Well, actually it does not use the

17   word through.  Hydro wants to use the word through.  What

18   the specification and the claim actually say is that the

19   grate allows water and debris to specifically flow into, not

20   through, flow into the basin, not fall through open air as

21   Hydro attempts to require.  That is at column 6, lines 13 to

22   16 of the specification, and it is also in the claim itself.

23   If you look at the claim language itself --

24           THE COURT:  I have column 5, lines 8 to 10, liquid

25   drops off the dirty item through the openings of the grates

1   of the wash rack.

2              MR. LOBBIN:  Column 6?

3              THE COURT:  Through.  You said it didn't say

4   through.

5              MR. LOBBIN:  Am I misquoting?

6              THE COURT:  No.  Column 5, lines 8 to 10.

7              MR. LOBBIN:  Column 5?

8              THE COURT:  Liquid drops off the dirty item and

9   through the openings of the grates of the wash rack.

10             MR. FORD:  I think you are right, Your Honor, that

11  there is some disclosure in the specification that talks

12  about water and debris dropping through the grate, but that

13  is in connection with the preferred embodiment which does

14  disclose a porous grate.  If you look at the language of the

15  claim is where you will find the language about the water

16  flowing off of instead of dropping down through.  I will

17  highlight it here on your screen.

18             MR. LOBBIN:  I think we are all correct, Your

19  Honor.  Your citation to column 5 is correct, and my

20  citation to column 6 where it says flow into is correct, and

21  my citation to the claim language itself where it says flow

22  into and not through is also correct.  There is some

23  inconsistency.  What does the Federal Circuit tell us when

24  there is inconsistency?  We look at what the patentee put in

25  the claim and leave what is in the specification under the

1   purview of the preferred embodiment.

2           THE COURT:  Okay.

3           MR. LOBBIN:  Now, on grate we have cited many

4   examples of nonporous grates that the jury also will readily

5   understand.  I am not sure how much of a boxing fan you

6   were, but the George Forman Grill, a very popular item and

7   every juror is going to know what that is, and it is a

8   nonporous grate.  We brought a nonporous grate.

9           Mr. Petter brought this all the way from Michigan.

10  This is a grate.  I think everyone will agree that that

11  shows a grate.  It is not porous.  Nothing falls through.

12  It falls into, and certainly you have a hamburger here and

13  the grease is going to fall off the burger and into the

14  interstices or the channels between the grate.  Certainly

15  there are porous grates, but there are also nonporous

16  grates, and the claim is not limited to one or the other.

17          Now, with respect to grate, Hydro makes much ado

18  about its own patent and the prosecution history of its own

19  patent.  For many reasons it would be mistaken to consider

20  that evidence.  It is irrelevant for many reasons.

21          First, as a practical matter, Riveer was not

22  involved in any of those proceedings.  Those were ex parte

23  proceedings where Hydro had the benefit of being able to

24  communicate with the patent office ex parte.

25          Secondly, as the Federal Circuit has said in the

1   Atlas Powder case, the seminal case from 1984, quoting, the

2   patent office has no concern with the scope of claims of a

3   prior art patent.  It is concerned only with the early

4   disclosure by the specification and drawings.  Patentable

5   difference does not of itself tend to negative infringement.

6            What does that mean?  Well, Hydro is citing the

7   prosecution history of a later patent where the patent

8   office agreed with Hydro that you have made a patentable

9   difference over the prior art and we're going to give you a

10  patent.  You have made an improvement.

11            Hydro is suggesting that that colloquy, ex parte

12  colloquy between the patent office and Hydro, suggests that

13  there can't be a match between Hydro's design and what this

14  earlier patent covers.  The Federal Circuit has said, no,

15  that is error.  Patentable difference does not of itself

16  tend to negative infringement.

17            As a theoretical example of this, imagine that

18  there could be a patent to a chair requiring four legs and a

19  back.  Then there was an improvement of the same chair

20  adding a swivel.  Well, even though the swivel was a new

21  improvement and could be entitled to its own patent, that

22  chair would still infringe the earlier patent requiring four

23  legs and a back, because it satisfies those limitations,

24  even though it added something additional.  So for many

25  reasons that analysis is legally erroneous.

1        Thank you.

2        THE COURT:  Thank you.

3        Mr. Miller?

4        MR. MILLER:  Your Honor, a grate is porous.  It

5   just is.  Okay.  George Forman's grill is irrelevant.  This

6   patent application was filed in 1997.  It says in the patent

7   this is in the field of portable wash racks.  It was granted

8   in the year 2000.  Now because somebody can jump on Google

9   15 years later and type in grate and see that a marketing

10  person in the George Forman company wanted to call that a

11  grate, for whatever reason, maybe to make people feel like

12  it is more like your barbecue grill that is porous, and to

13  give you the idea that this is more of a barbecue grill than

14  a griddle on your stove, who knows, but the marketing

15  personnel for the George Forman Grill using the word grate

16  15 years later is completely irrelevant to interpreting the

17  grate in this wash pad patent.

18         The specification is highly relevant.  The

19  specification, as the Court quoted, says that the grate has

20  openings in it.  The wash water falls through it and it says

21  that right there in describing the invention.  We are not

22  importing a limitation from the claim.  We are reading the

23  word grate in the context of the spec.  That is what you

24  have to do.  The Phillips decision, which is the --

25         THE COURT:  But, of course, you understand their

1   argument and they are telling me that you're reading a

2   limitation in it that is not fair, because the claim only

3   said what Mr. Ford showed me it said, and that is that water

4   just has to run off of this surface.  You know their theory,

5   that the bottom surface is like the George Forman Grill.  It

6   is in the interstices, or whatever that word is, and

7   certainly if it is captured in a side trough, like

8   apparently may be the case with your alleged infringing

9   device, then they want to say that that was embodied in and

10  described by the claims in their patent.

11          MR. MILLER:  That idea is in conflict with the

12  plain language of the claim.  There is no evidence that they

13  have given that somebody in this field would use the word

14  grate to refer to anything but a porous grate.

15          THE COURT:  In connection with this device.

16          MR. MILLER:  No, in the wash rack industry.

17          THE COURT:  That is what I was saying.  I looked

18  up grate in the dictionary, in the only one that I have

19  upstairs, and it didn't say porous.

20          MR. MILLER:  But it says a framework of parallel

21  or crossbars.

22          THE COURT:  Right.  It does not say porous.

23          MR. MILLER:  No, but that definition implies

24  porous.  You have a framework of parallel or cross bars and

25  there is going to be spaces between those bars as they

```
 1   cross.  It does not say porous, but then you look to the
 2   spec to get the context.
 3            THE COURT:  I don't know.  It seems to me in my
 4   common understanding, which this is beyond extrinsic
 5   evidence, but I would have guessed that you can have a grate
 6   that is not porous.  Don't we call those things like over
 7   manhole covers grates?
 8            MR. MILLER:  That have holes in them, yes.
 9            THE COURT:  No, just the thing that maintenance
10   workers go out and put something in it to pull it up, and I
11   don't know if that is a grate or not, but --
12            MR. MILLER:  I always called it a manhole cover.
13            THE COURT:  Let's just assume for purposes of this
14   discussion that you can have porous grates and nonporous
15   grates.
16            MR. MILLER:  Okay.
17            THE COURT:  Don't you still have your same
18   argument, that this one describes a porous grate?
19            MR. MILLER:  Yes.
20            Let's start with the claim language itself.  The
21   grate supporting an item to be washed above said bottom
22   surface, okay, so the bottom surface is what forms the
23   basin, while allowing water and debris to flow into said
24   basin.  The grate is above it and water flows into what is
25   below it.
```

1              Then you go to the spec to see what is this

2    invention about and let's get some context on the grate.  It

3    says there are openings in it and the water flows through

4    the openings.  The specification is important.  In the

5    Phillips decision they talk about this cardinal sin of

6    patent law, and they have a section that talks about that

7    and they say, yes, that led to the line of cases and Texas

8    Digital that tried to focus so much on dictionary

9    definitions, and then they said that is wrong.  That

10   cardinal sin of patent law language, that is not the big

11   deal that Texas Digital made it into.

12             They said sometimes there might be a fine line

13   between interpreting the claims in the context of the spec

14   and reading the limitations into the claims, but it is going

15   to be apparent that you'll see what the inventor really

16   invented.  Here is a good quote they use.  They say

17   ultimately the interpretation to be given a term can only be

18   determined and confirmed with a full understanding of what

19   the inventors actually invented and intended to envelop with

20   the claim.  The construction that stays true to the claim

21   language and most naturally aligns with the patent's

22   description of the invention will be in the end the correct

23   construction.

24             What you have here is you have got to make sure

25   that they are not getting this construction that gives them

1   more than they invented, and they didn't invent anything

2   other than a basin with a porous grate over the top of it to

3   support the vehicles, because that was the state of the art.

4          Now 15 years later as new wash rack designs have

5   evolved they want this old, ancient patent to cover all of

6   the new designs, and that is an improper use of your patent.

7   It is an improper use of patent infringement litigation to

8   pursue that type of interpretation.  It has to be a porous

9   grate.  That is the only way you can look at this patent

10  rationally.

11          THE COURT:  Thank you, Mr. Miller.

12          Mr. Ford.

13          MR. FORD:  Two points.

14          Number one, Hydro has not come forward with a

15  single dictionary definition that includes the term porous.

16  If I had to guess, I would bet every library in Salt Lake

17  City has probably had their dictionaries gone through to

18  look for the term porous in the definition of the term

19  grate.  It just is not there.  I'm sure if it was, they

20  would have found it and it would have been cited to us.  The

21  term porous does not exist in any definition of the term

22  grate.

23          Secondly, again, Mr. Miller uses the term context

24  and you have to look at the context of the specification.

25  That is code for you have to import limitations from the

1    specifications.  In other words, they are saying look at the

2    preferred embodiment.  The patentee has not acted as his own

3    lexicographer.  They are not making the argument that the

4    patentee has defined the term grate to mean a porous

5    structure.  They are not making the argument that the patent

6    owner has disclaimed anything during the prosecution history

7    or argued a more narrow definition of a term to get around a

8    prior art rejection.  They are asking the Court to do

9    exactly what the Federal Circuit has admonished that courts

10   not do, import limitations from the specification.  They

11   only identify a single piece of evidence to support their

12   porous argument and that is the preferred embodiment.

13              THE COURT:  Thank you.

14              Let's move on to sloped tray.  I think this is the

15   last one on this patent.

16              MR. LOBBIN:  Yes, it is, Your Honor.

17              Sloped tray.  This is in dependent claim four, and

18   all of the rest of the terms we have been talking about so

19   far are in independent claim one.  Again, the parties agree

20   it is a simple term and the plain and ordinary meaning

21   applies.  Hydro agrees.

22              This very Court actually in another case agreed

23   analogously in the CleanCut case we cited in our briefs, a

24   2012 decision, District of Utah, where the Court declined to

25   construe the term debris tray, and it is not exact, slope

1    tray and debris tray, and the key term there is tray, but

2    the Court said that the term is already adequately defined

3    by the patent claims and there is no need to provide

4    additional construction.  That is just an example of how the

5    word tray has been construed to be no construction required.

6            If elaboration is necessary and if the Court finds

7    that elaboration is required, Riveer has offered a

8    dictionary definition that more closely aligns itself with

9    the claim language used.  Hydro's proposed construction,

10   again, uses the term tray in the proposed construction.  It

11   is not proper and it is not helpful and it renders other

12   claim language redundant and superfluous.

13           Hydro actually goes so far in its briefing, and

14   I'm not going to go through it now, but we detailed this

15   point in our briefs, quite extensively in our response brief

16   at pages 9 to 12, and they propose an embodiment that turns

17   out to be a stretch, really kind of a fabrication of what is

18   actually disclosed, and they create another element that is

19   not disclosed in the patent and use that hypothetical

20   embodiment to attempt to import a limitation that, again,

21   does not exist into the claims.

22           THE COURT:  Thank you.

23           Mr. Miller?

24           MR. MILLER:  Your Honor, on slope tray our only

25   point there is claim four when it talks about a slope tray

```
 1    it adds it as an additional element to the claim.  Claim
 2    four depends from claim one.  Claim one has already
 3    identified a bottom surface.  Then if you go down to claim
 4    four it says said frame including a sloped tray.  So now the
 5    invention has to have a bottom surface and a sloped tray.
 6    Our only point is that the sloped tray has to be something
 7    other than the bottom surface.  It didn't say wherein the
 8    bottom surface is a sloped tray in that claim.  It said
 9    wherein the frame includes a sloped tray.  It is just
10    another thing.  We just think that the sloped tray cannot be
11    interpreted to be the same structure as the bottom surface.
12    It has to be an additional element.  That is our only point.
13             THE COURT:  All right.
14             MR. LOBBIN:  We can move on, if Mr. Miller is okay
15    with that --
16             THE COURT:  Okay.
17             MR. LOBBIN:  -- to the next patent, but just a
18    very, very brief statement.  We believe, as we have said in
19    our briefs, that sloped tray can be part of the bottom
20    surface when read in the appropriate context in claim 4.
21             I think the 720 was next?
22             THE COURT:  The 720, if you don't mind, yes.
23             MR. LOBBIN:  Okay.  720.
24             With the 720 patent there are two claim terms in
25    dispute.  Again, reserving our argument that only five
```

1    should be in play here, according to the patent local rules,

2    five total, and the first is a side trough adjacent to the

3    wash floor.  The parties agree, again, it is a simple phrase

4    having a plain and ordinary meaning.  If elaboration is

5    necessary, Riveer, again, offers a dictionary definition.

6          Hydro, on the other hand, would change the word

7    adjacent to the word abutting, but that word was never used

8    in the patent.  As I explained in my opening remarks talking

9    about the principles of claim construction, I gave this as

10   an example where the patentee chose the word to use in the

11   claim, and the patentee chose adjacent, and the patentee

12   chose the phrase not to use in the claim, and the phrase

13   that the patentee chose not to use was immediately adjacent.

14         Immediately adjacent was a word that the patentee

15   used in the specification to describe the preferred

16   embodiment, but when it came time to draft the claims the

17   patentee decided, do you know what, I am not going to use

18   immediately adjacent in the claim because immediately

19   adjacent describes a preferred embodiment.  I want to have

20   claims that give me legal rights broader than this preferred

21   embodiment, which is naturally what the patent process is

22   typically about.  So the patentee chose to use the word

23   adjacent and chose not to use the word immediately adjacent,

24   and certainly chose not to use the word abutting.

25         Again, Hydro's proposed construction uses the side

1    trough and wash floor terms that they are trying to define.

2    So, again, it is redundant and not helpful and not proper.

3    Here, again, we see a secret phrase or a phrase that wasn't

4    identified in the local patent rule disclosures, that when

5    you get into the briefing really, this is what they are

6    trying to construe, and the phrase is disposed in fluid

7    communication with, which was never identified in the patent

8    rule disclosures.

9            Again, the focus of their argument is on what is

10   in the specifications specifically as the preferred

11   embodiment, including the term immediately adjacent.

12   Hydro's argument is that, well, adjacent does not mean

13   adjacent, even though that is what the claim says, it means

14   immediately adjacent, which is what the specification says.

15           Finally, in deposition testimony one of Hydro's

16   employees, key employees in describing the accused

17   infringing product, one of the accused infringing products

18   said, and I quote, in that product fluid and debris flow

19   down the trough to the connection pipe by gravity and

20   through that pipe into the adjacent drive and cleanout pit.

21   In his testimony he decided to use, and probably just

22   because it was the appropriate term, but to use the same

23   term that is in the claim.

24           THE COURT:  This invention, as I understand it,

25   the novel feature of it in the end was the placement and

1    configuration of the guide rail, correct?

2           MR. LOBBIN:  The fact that you have a cleanout

3    tray, a side trough that is big enough to allow a small skid

4    steer or a bobcat to --

5           THE COURT:  And you don't want that skid steer

6    machine to go onto the wash floor, I take it?

7           MR. LOBBIN:  Of course.  You want it to be

8    contained within that area where the mud ends up being --

9           THE COURT:  That is why you have the guide rail --

10          MR. LOBBIN:  Correct.

11          THE COURT:  -- to keep the skid steer loader where

12   it is supposed to be and not over onto the wash floor?

13          MR. LOBBIN:  Correct, and appropriately positioned

14   within that tray.

15          THE COURT:  That is why you have the guide rail,

16   so it does not stray off onto the wash floor?

17          MR. LOBBIN:  Well, so it does not stray off into

18   whatever it is next to.

19          THE COURT:  Well, and that is not anticipated to

20   be the wash floor?

21          MR. LOBBIN:  Well --

22          THE COURT:  Isn't all of the wash water and debris

23   coming off of the wash floor?

24          MR. LOBBIN:  In the preferred embodiment yes, it

25   is.

1          THE COURT:  Anybody building something that they

2    think would infringe, why wouldn't they build it right up to

3    the guide rail?  That is what I don't understand.

4          MR. LOBBIN:  To try to avoid the patent.  That is

5    what Hydro did.  They tried to move it away from directly

6    abutting the wash pad and move it a few feet away and all of

7    a sudden you avoid the infringement.

8          THE COURT:  Where would the debris and wash water

9    go then?  I guess there could be different places it could

10   go depending on how it was manufactured.

11         MR. LOBBIN:  Just as in the accused product, the

12   debris and wash water go into a side trough and through a

13   pipe right into the side trough.  It is just one step

14   removed from being immediately adjacent, as the preferred

15   embodiment is, so now it is not immediately adjacent

16   anymore, but that is not what the claim requires.

17         THE COURT:  Okay.  Mr. Miller.

18         MR. MILLER:  That also means it is no longer a

19   side trough, because it is not this side trough.  It is

20   away.

21         The point that the Court just raised, I want to

22   point out a piece of file history, prosecution history that

23   is not emphasized in our brief.  It is on the appendix page

24   325 for the joint appendix, and in the briefing we

25   identified how they had to amend the guide rail limitation

1    three times.  They kept getting rejected and rejected and

2    they said, well, the guide rail guides the skid steer

3    loader, and then they had to say, well, the guide rail has

4    openings to allow wash water to flow through it.  Then they

5    said the guide rail separating the side trough from the wash

6    floor, and they added that language on their third

7    amendment, and this is how they explained that amendment.

8          This is appendix page 325 at the bottom of the

9    page, applicants have found that the claimed location of the

10   guide rail, so what we have said in these claims about the

11   location of the guide rail, provides a dual function of

12   guiding the skid steer through the trough and providing a

13   safeguard or barrier for persons washing items on the wash

14   rack.

15         Now, if the trough is not right up against the

16   wash rack where the guide rail is, that guide rail is not

17   providing the dual function that they told the patent

18   examiner and everybody else looking at this patent, this

19   guide rail has a dual function of not only guiding the skid

20   steer, but also providing a safeguard or barrier for the

21   people standing on the wash rack.  If the guide rail is way

22   over here and the people are over here washing, it is not

23   providing any safeguard.  That is why there has to be an

24   intersection with the side trough and the wash rack and the

25   guide rail is right there.

```
 1              THE COURT:  Why did you propose the word abutting?

 2   Why not immediately adjacent?

 3              MR. MILLER:  Well, let's start where Riveer likes

 4   to start and that is with the dictionary.

 5              THE COURT:  Well, they used the words immediately

 6   adjacent in the written description.

 7              MR. MILLER:  Sure.  In the context of the written

 8   description they are talking about wash water, and the wash

 9   rack is designed to allow wash water to escape the wash

10   rack, and that is what it says, and then it says the wash

11   water goes into the side trough.  That is why they have to

12   be adjacent, because as the wash water leaves the wash rack,

13   it goes into the side trough, and it talks about by force of

14   gravity, and the whole waterfall concept that we talked

15   about yesterday, and --

16              THE COURT:  Right.  I am just wondering why you

17   didn't use immediately adjacent.  Does it matter?

18              MR. MILLER:  It does not matter.  We used abutting

19   because I think it just paints a better picture.  The

20   dictionary identifies abutting as a synonym of adjacent.

21   That is on our app 0022, page 22 of Riveer's appendix, claim

22   construction appendix.  It is a synonym of adjacent.  In the

23   context of the patent that is what it says.  If immediately

24   abutting would be better, as long as that concept --

25              THE COURT:  Now you want immediately abutting.
```

1   No.  I said immediately adjacent.  I didn't see the

2   difference between abutting and immediately adjacent.

3          MR. MILLER:  In the context of this patent you can

4   tell that there is no difference between adjacent and

5   abutting.  If the Court construes it to be immediately

6   adjacent rather than abutting, that is fine.  It is the same

7   thing.  You get to the same result.

8          THE COURT:  Thank you, Mr. Miller.

9          Response?

10          MR. FORD:  Just two points, Your Honor.

11          That portion of the prosecution history that they

12   cite to, I don't disagree that the function of a guardrail

13   to protect somebody that is on top of the wash rack washing

14   a car, that can be accomplished even if the side trough is

15   not abutting the wash rack.  With adjacent, there are some

16   graphical restrictions on adjacent, but we are saying it

17   does not have to be touching and right up next to, forming

18   an intersection with.  I think it is fair to say that the

19   claim language is broad enough to include a system where you

20   have the side trough a little ways away but not necessarily

21   touching or at an intersection with the wash rack.

22          If you look at claim 18 of this patent, you'll see

23   that claim 18 is dependent on claim one, which means that it

24   has to be more narrow than claim one, and it recites wherein

25   the guide rail is provided at an intersection between the

1    wash floor and the side trough.  That claim implies that

2    claim one, from which claim 18 depends, is more broad and

3    does not necessarily have an intersection between the wash

4    floor and the side trough.

5            THE COURT:  Thank you.

6            MR. FORD:  One more point.  I apologize, Mark.

7            In our briefing I think we identified that as

8    claim four.  I just wanted to make it clear that it is

9    actually claim 18 where that dependent claim is found that

10   requires there to be an intersection.  I apologize.

11           THE COURT:  Thank you.

12           Yes.

13           MR. MILLER:  I just want to point out that in my

14   binder here under tab C, and if you go to page 5, for this

15   dual function, and Mr. Ford says that they don't disagree

16   that it requires a dual function, the structure in their

17   infringement contentions they identify as a guide rail is

18   not even a rail, but I don't understand how he was

19   explaining how it could serve the function of being a

20   safeguard to people on the wash rack.  If you look on page

21   5, what they call a guide rail, how does that safeguard

22   anybody standing on the wash rack?

23           The only way it is a safeguard is if it is right

24   at the edge of the wash rack to keep people from going over.

25   If the guide rail is at the edge of the wash rack, the side

1    trough has to be right up against it for the guide rail to

2    do anything on guiding the skid steer loader.  It does not

3    make sense unless they are abutting or immediately adjacent.

4              MR. FORD:  Briefly, Your Honor, and I don't know

5    if you have ever driven a bobcat, but they are squirrely,

6    and the fact that you're not right up next to it does not

7    mean that if a bobcat jumps the rail it is not going to

8    present a danger to somebody that is a few feet away.  If

9    you have a bobcat inside of a trough and it is contained

10   within that trough via some guide rails, that is going to

11   protect people not just that are on a structure that is

12   immediately abutting that, but it is also going to protect

13   people that may be a few feet away.

14             THE COURT:  Thank you.

15             Let's go to the next one which is a guide rail

16   separating the side trough from the wash floor.

17             MR. LOBBIN:  Thank you, Your Honor.

18             This one we have already touched on a little bit

19   in the prior discussion.  Again, the parties agree that the

20   plain and ordinary meaning applies.  If any elaboration is

21   necessary, Riveer has offered in its alternative

22   construction a dictionary definition which comports with the

23   claim language.  Hydro's proposed construction, again, uses

24   the guide rail and side trough and wash floor terms to be

25   defined.  It is not proper to do that and it is not helpful

1    and it renders the other claim language redundant and

2    superfluous.

3              Their analysis focuses entirely, again, on the

4    preferred exemplary embodiment which is improper.  Again,

5    claim 18, specifically under the doctrine of claim

6    differentiation, claim 18 specifically claims what they want

7    to limit claim one to, which is a guide rail located, quote,

8    at an intersection between the wash floor and the side

9    trough.  So under the doctrine of claim differentiation, the

10   doctrine requires that claim one not be limited to the

11   narrower scope of claim 18.

12             THE COURT:  Thank you.

13             How is this different from the last one?

14             MR. MILLER:  It is pretty much the same argument,

15   Your Honor, the location of the guide rail.  The claim

16   differentiation argument they make, there is plenty of case

17   law and we cite it in our briefing, that doctrine is a rule

18   of thumb, and it is not a hard-and-fast rule, and that is

19   the language that the cases use, and if you have got file

20   history or specification that shows that it has to be at

21   that intersection, then that trumps it and the claim

22   differentiation doctrine evaporates after that, because we

23   have got a file history statement that says that those dual

24   functions need to be there.

25             Plus, our proposed definition does not say it has

```
 1   to be at the intersection.  It says positioned near the

 2   intersection to divide the side trough from the wash floor.

 3   There is a difference in claim scope, and if the

 4   intersection is right along here in the middle, and the

 5   guide rail is attached right here, or the guide rail could

 6   be attached inside of the side trough right here, or it

 7   could be attached right at the intersection, which is what

 8   the dependent claim said, so there is a difference in claim

 9   scope between our proposed definition and that dependent

10   claim, so the doctrine of claim differentiation does not

11   even come into play to begin with.

12           THE COURT:  Thank you.

13           Your response, Mr. Ford.

14           MR. FORD:  Just briefly, Your Honor.

15           Maybe I misheard Mr. Miller, but I think he just

16   said that the wash floor and the side trough may not

17   necessarily be right up next to each other to create an

18   intersection.  He said it just has to be near the

19   intersection, but in their construction of the last term it

20   clearly requires an abutment which requires an intersection

21   and touching.

22           He says that a guide rail positioned --

23           THE COURT:  He confused me a little bit on that,

24   too.  Explain that again, Mr. Miller.

25           That confused me slightly, too.
```

1            MR. MILLER:  If we can leave this graphic up, this

2    will be helpful.

3            MR. FORD:  Sure.

4            MR. MILLER:  We are saying a guide rail positioned

5    near the intersection of the side trough.  Okay.  The

6    dependent claim we're talking about is claim -- which claim

7    is it, Mark?

8            MR. FORD:  18.  The last one.

9            MR. MILLER:  No, we are on the 720 patent.  I

10   apologize.

11           MR. FOSTER:  By the way, while he is looking, with

12   the abutting you're going to have the trough abutting the

13   wash surface, and the question is where is the rail.  Is it

14   right where they are abutted or is it a little bit into or a

15   little bit out of --

16           THE COURT:  And that is the reason for near.  I

17   think that explains it.

18           MR. MILLER:  The doctrine of claim differentiation

19   only applies when the only difference between the

20   independent claim and the dependent claim is that one

21   feature.  Well, the difference between 18 and claim 1 is not

22   that there is an intersection between the side trough and

23   the wash rack.  The difference is that the guide rail is

24   located at that intersection.  That is what the dependent

25   claim adds is the location of the guide rail.

1           What they wanted to argue on claim differentiation

2    is that because there is a reference to an intersection

3    here, there can't be an intersection in claim one, but that

4    is not what claim 18 is adding to the claim.  It is adding

5    the location of the guide rail, and that location in our

6    proposed definition is near the intersection, which could be

7    on either side, and this claim requires it to be right at

8    the intersection, but in either case there is always an

9    intersection between the wash pad and the side trough.  That

10   is why claim differentiation does not fly for their

11   proposal.

12           THE COURT:  Thank you.

13           Mr. Ford, we interrupted you.

14           MR. FORD:  That is okay.  I just have one more

15   quick point, and that is that their proposed construction is

16   a guide rail position near the intersection, and that

17   obviously implies that there exists an intersection, and it

18   is our position, for the reasons that we have already

19   stated, that there does not have to be an abutment or a

20   touching between the wash floor and the side trough

21   according to the plain language of the claim.

22           THE COURT:  Thank you.

23           MR. LOBBIN:  One final point?

24           THE COURT:  Now we are moving on to the 774

25   patent, and I want to take a short break, but I want you,

1    Ron, to see if we have got that other matter ready.  Okay.

2    I had a former legal intern who asked to be sworn into the

3    bar today, and she has her family with her and we thought we

4    would be done with this by 4:30 and it is 4:30 right now.  I

5    have asked Ron to go check on that.  She has some family

6    members and she wanted to do it in the courtroom.

7            Could I ask that we recess on this matter for 20

8    minutes, and you have been here a long time, and that will

9    give you a chance to take a break, a restroom break or

10   whatever you need, and we'll try to start right back in at

11   10 minutes to 5:00.

12           MR. LOBBIN:  Can we leave our things here?

13           THE COURT:  Yes.  Leave everything right where it

14   is.  If you will accommodate her on this, I think she should

15   be here any minute.

16           Court is in recess.

17           (Recess)

18           THE COURT:  Thank you for accommodating me on

19   that.  She got sworn in and we're ready to go on the 774

20   patent.

21           Mr. Lobbin.

22           MR. LOBBIN:  Thank you, Your Honor.

23           If you will indulge me just very briefly with a

24   quick point about your earlier question of Mr. Ford, and you

25   asked if there is a frame that is not weight bearing, and on

 1    the break, since we had time, figure 4 of the patent, if I

 2    can show you, shows these four support members.  These are

 3    support members 51 from the specification and those are

 4    internal.  They are not the walls of the frame.  They are

 5    internal.  Those are the only members called out by the

 6    patent specification that support the grate.  Okay.  The

 7    grate is actually not sitting on top of the frame walls.

 8    The grate in the preferred embodiment is actually sitting on

 9    top of those support members and is seated inside in a

10    seating fashion inside the perimeter of that frame.  I just

11    want to clarify that figure 4 and the support members answer

12    the question of, hey, where is this embodiment where the

13    frame is not weight bearing, and that is actually what the

14    preferred embodiment is and that is how the invention

15    worked.

16          Going to the 774 patent, and this is the conveyor

17    patent, and the first term for construction, and there are

18    three, and the first term Hydro proposes for construction is

19    the evacuation end, and, again, the parties agree it is a

20    simple term having a plain and ordinary meaning.  Riveer

21    proposes if any elaboration is necessary, a dictionary

22    definition should suffice.  Hydro's proposed construction,

23    again, uses the word end in the proposed construction of the

24    claim term for construction, which is evacuation end, so

25    there is a redundancy there that is similar to the others.

1          Really if you look at the analysis in their brief,

2     the proposed construction that Hydro really wants this Court

3     to undertake is to further define the phrase, quote,

4     disposed in fluid communication with, which was never

5     identified for construction and we believe would be improper

6     to construe.

7          Again, going back to the first point that I made

8     today when I first stood up to talk, the problem and the

9     balance in claim construction of construing claims in light

10    of the specification after reviewing the specification and

11    prosecution history is fine, but reading limitations from

12    the preferred embodiment into the claim is not.  That is

13    exactly what Hydro has proposed to do here.  They admit that

14    the focus of their analysis is entirely on figure 6 of the

15    774 patent.

16         Their argument is basically that whatever the

17    claim means, it has to be limited to figure 6 of the 774

18    patent.  There is no evidence in the specification or the

19    file history that the patentee was disclaiming anything but

20    what is in figure 6.  The claims, in fact, already define

21    the positional relationship between the evacuation end and

22    the evacuator and the elevator as being disposed in fluid

23    communication with, and that is in our opening claim

24    construction brief at 13 to 15.

25         Riveer never limited the claims to the embodiment

 1   depicted in figure 6.  In fact, the patent specification

 2   states that in the example embodiment, referring to figure

 3   6, the evacuator 320 is joined to evacuation end 311.  That

 4   is at column 7, lines 61 to 62.  Riveer did make a claim

 5   amendment in the prosecution history, but only to require

 6   the evacuator to be disposed in fluid communication with an

 7   evacuation end.  There is no evidence in the file history

 8   that Riveer assented to the examiner's suggestion of, well,

 9   maybe figure 6 is an appropriate way to amend the claims.

10   That was a suggestion and Riveer made its own amendment

11   according to what it believed was proper.

12          The claim differentiation argument here that is

13   appropriate and that we have made in our briefs, similar to

14   the one we discussed earlier, is that dependent claim 8,

15   which we have not asserted in this case, because dependent

16   claim 8 specifies that the same evacuation point for wash

17   water and solid debris is in the same location, the same end

18   of the trough.  So claim differentiation requires that

19   independent claim one is not so limited, allowing the

20   evacuator and the elevator to be at opposite evacuation

21   ends, which is what the infringement case is all about and

22   is what is driving claim construction here.

23          Hydro's accused product takes the solid debris out

24   of one end of the trough and takes the liquid debris out of

25   the other end of the trough, and they are attempting to use

1    the specification and the exemplary embodiment to limit the

2    scope of the claim terms so that Riveer's patent is limited

3    to that situation, and it is not as evidenced by dependent

4    claim 8.

5              THE COURT:  Not that I see necessarily how

6    important it is, but what would you say is the novel feature

7    of the 774 patent?  What was it that made it an advancement,

8    however incrementally, over the prior art?

9              MR. LOBBIN:  The use of the conveyor to

10   conveniently separate the fluid debris from the solid debris

11   and elevate it such that it drops into and can be dried and

12   evacuated that way, as opposed to the prior art where the

13   side troughs were cleaned out by -- we have seen the skid

14   steer loader with the wide trough or just the basic manual

15   labor of getting a shovel and --

16             THE COURT:  So the first time there was a conveyor

17   and an elevator system to get it up to a height where it

18   could be dropped into a waste reciprocal or truck?

19             MR. LOBBIN:  That is exactly right.

20             THE COURT:  The first time, really?

21             MR. LOBBIN:  The first time.

22             THE COURT:  Okay.

23             MR. LOBBIN:  With all of the other claim elements.

24    I am not saying that it was --

25             THE COURT:  Something had to make it patentable.

```
 1              MR. LOBBIN:  The claim itself and all of the

 2    features included in the claim, which included the ability

 3    to easily separate and scrape solid debris and separate it

 4    with a filtration mechanism from the liquid debris, having

 5    flights on the conveyor to automatically bring that solid

 6    debris through the trough and up the elevator and to dump it

 7    into a hopper.

 8              THE COURT:  As you know, Hydro is quoting from the

 9    prosecution history to tell me that the examiner, and I am

10    quoting from page 25 of their brief, indicated that the

11    evacuator would need to be more narrowly recited to

12    distinguish over the prior art and, quote, that reciting the

13    two conveyors and their orientations and their relative

14    positioning to the debris collector as shown in figure 6

15    would distinguish over the prior art.  That seems narrower

16    than what you just told me was novel about this invention.

17              MR. LOBBIN:  Well, right.  The examiner, quite

18    frankly, didn't understand the invention and got it wrong,

19    and the patent office made a suggestion for how he or she

20    believed a patentable distinction could be made, and with

21    that suggestion, as Hydro admits, the examiner indicated,

22    and the examiner didn't require, an amendment was

23    subsequently made and the patent was allowed.

24              THE COURT:  Well, they claim that it was required,

25    that this was the only way and this telephone call was what
```

1    allowed the patent office examiner to allow the patent to go

2    forward, and that it had been previously rejected they claim

3    on Hydro's prior art.

4         MR. LOBBIN:  Right, but you have to look at not

5    what the examiner thought was allowed but what Riveer

6    actually did.  So they took the examiner's suggestion and

7    they considered it, and then they --

8         THE COURT:  They didn't do it.  They didn't do

9    what was suggested but did something else and still got a

10   patent.

11        MR. LOBBIN:  They didn't do it all to the extent

12   that the examiner suggested, because the examiner was being

13   overly broad, and examiners have a job to do and they want

14   amendments and they want limitations and they want to allow

15   patents, but the exercise of patent prosecution is to take

16   what the examiner is suggesting you do, A, B, C and D, and

17   maybe do A and B, because you believe that A and B and those

18   amendments are enough to get you past the prior art.

19         That is exactly what happened here.  Riveer made

20   an amendment that required the evacuator to be, quote,

21   disposed in fluid communication with an evacuation end.

22   They didn't make an amendment that was on all fours with

23   what the examiner said because it was not necessary.

24        THE COURT:  All right.  Thank you, Mr. Lobbin.

25        Mr. Miller.

1          MR. MILLER:  Thank you.

2          Your Honor, I will pick up with that prosecution

3     history to start.  I disagree with Mr. Lobbin.  It is not

4     enough to say, well, we think the examiner was wrong.  The

5     purpose of the prosecution history is public notice.  A

6     person of ordinary skill in the art is entitled to read this

7     and draw a conclusion.  It says at one point, and if you go

8     to tab D in my binding on page 4, and the interview summary

9     you just quoted the examiner said this is what we talked

10    about, and I said you can get over the art this way.

11          Now you can go to page 5, and this is a little

12    depiction of the amendment they actually made.  What did

13    they add?  They added a reference to any evacuation end.

14    The only time that the patent specification refers to an

15    evacuation end is in reference to figure 6 and the

16    configuration of figure 6.  This is after the examiner said

17    make sure that you follow figure 6 and you can get over the

18    prior art.  Then they add evacuation end.

19          But, look, they also add that last clause about

20    the conveyor that is underlined.  That clause says at the

21    very end of it, it says that the conveyor moves wash fluid

22    and debris collected in the catch trough to the evacuator,

23    right, and it elevates the debris from the evacuator to a

24    dump height, which means the elevating part is coming from

25    the evacuator.  That is what figure 6 shows.  You have got

1    the evacuator there and you have got the elevator attached

2    to it.  When it says that you're elevating the debris from

3    the evacuator, they made an amendment that recites the

4    structure of figure 6, just like the examiner said, and the

5    public is entitled to rely on that in understanding the

6    metes and bounds of this claim.  That is what they did.

7    That is what their patent is limited to.

8            You asked about what is novel about this patent.

9    Hydro had a patent with an elevator and a conveyor in it

10   before and that was cited as prior art in this prosecution,

11   as the Court knows.  When you're in a field that is crowded

12   and there are a lot of people that have done similar things,

13   you're appropriately given a very narrow scope of a patent.

14   If their scope is limited to figure 6, that is because they

15   were not the first ones to think of using a conveyor with a

16   wash rack, and they were not the first ones to think of

17   using an elevating conveyor with a wash rack and dumping it.

18   They were not the first ones.

19           Maybe they were the first ones of doing that

20   specific configuration that was even in their marketing

21   video yesterday that showed the evacuator that pulls the

22   liquid out, right there connected to the elevator that

23   elevates the solids, and they are both connected and at the

24   same end.  That is what they are limited to.

25           That makes sense if you just read the plain

1   language of the claim.  Let's go to page 1 of tab D.  If you

2   go to page 1 of tab D, this is language that is just

3   straight from the claim.  This kind of describes the

4   invention in the same context of, you know, your foot bone

5   is connected to the anklebone, which is connected to the

6   shinbone, and that is how they do it.  They start with the

7   catch trough which is in fluid communication with the wash

8   floor.  That is because when water leaves the wash floor it

9   enters the catch trough.  It is in fluid communication

10  because when it leaves one it enters the other.

11         Next it says that the evaluator is in fluid

12  communication with an evacuation end of the catch trough,

13  because as it leaves the catch trough, it enters the

14  evacuator on the next page.  Then it says that the elevator

15  is in fluid communication with the evacuator, not the catch

16  trough, not the wash floor, the evacuator, the elevator,

17  because when it leaves the evacuator, the red component, it

18  enters the elevator.

19         That is just a plain reading of the claim.  It

20  never says the elevator is in fluid communication with the

21  wash floor.  It never says that.  Just because water can

22  flow from the wash floor and eventually make it to the

23  elevator does not mean it is in fluid communication.  This

24  patent uses that term to refer to components that are

25  connected to each other so that when liquid leaves one

1     component it is entering that other component.  That is how

2     it describes it.  That is why we proposed the definitions

3     that we did.

4              Finally, on the next page, page 3, we have some

5     excerpts from the patent which show how the patentee used

6     that phrase with reference to figure 6.  It says here

7     referring to figure 6, first it says that the catch trough

8     of the trough assembly is in fluid communication with the

9     evacuator.  So here they are saying that the evacuator and

10    the catch trough are in fluid communication.

11             Then you go down to the next full sentence where

12    it says in the example shown, and they are still talking

13    about figure 6, and now they state it a little differently.

14    The evacuator is joined to an evacuation end of the catch

15    trough.  So right there in that small paragraph describing

16    figure 6 they use in fluid communication synonymous with

17    joined.  The evacuator is joined to the catch trough and the

18    evacuator is in fluid communication with the catch trough

19    and they are the same thing in the context of this patent.

20    That is why you start with the claim language and you move

21    to the spec, you pay attention to the file history, and

22    dictionaries are the last resort.

23             The evacuation end is what the patent owner used

24    to identify the end of the trough where everything is

25    evacuated.  Everything.  That is the evacuation end.  The

 1    patent also talks about the other end as the free end.  When

 2    they added evacuation end to the claim language, they were

 3    limiting it to figure 6.

 4          When they talk about the elevator being in fluid

 5    communication with the evacuator, they are talking about

 6    them being joined, so that when something leaves the

 7    evacuator it enters the elevator.  Those two limitations and

 8    our proposed definitions are in perfect harmony with the

 9    specification and with what they actually invented and with

10    the scope that they are entitled to.

11          THE COURT:  Tell me how you interpret, and on your

12    page 3 there is a sentence in there that I don't understand,

13    and it says, however, in other examples the evacuator can be

14    disposed anywhere along the catch trough.

15          MR. MILLER:  Right.

16          At the time they filed this application, and this

17    is how patent applications work, when you file them you

18    draft them broadly and you put in language like this.  Well,

19    it can also be broader, there can be other configurations,

20    but then when you get into the prosecution of it with an

21    examiner, sometimes, and this is one of those times, in

22    fact, oftentimes, you have to go more narrow than what you

23    have described.  Here they are saying in figure 6 the

24    evacuator and the elevator are all at one end here.

25          THE COURT:  But that is just possibly the

```
 1    preferred embodiment.

 2              MR. MILLER:  Right.  They say in other examples it

 3    can be elsewhere, but the examiner said you have got to

 4    stick with figure 6, and they made an amendment, and so that

 5    is what they are stuck with.  Even if the spec says that,

 6    the prosecution history shows that they were required to be

 7    more limited than their disclosure, and because of that they

 8    are limited.

 9              THE COURT:  I see that that may have been what the

10    examiner required of them, but where in the written

11    description is the evacuation end required to be closest to

12    the elevator?

13              MR. MILLER:  Let's see.

14              THE COURT:  Tell me that first, if there is any

15    place that it says that, and that would help your argument,

16    and then --

17              MR. MILLER:  It is that paragraph, that paragraph

18    that we were just looking at --

19              THE COURT:  On page what?

20              MR. MILLER:  It is --

21              THE COURT:  Page 3?

22              MR. MILLER:  It is column 7 at the bottom of the

23    patent, the 774 patent.  It is appendix page A-65.  I am

24    going to read beyond what I have quoted in my argument

25    binder chart.  It starts by saying at the bottom of that
```

1    column, the last paragraph, referring to figure 6, and it is

2    talking about --

3              THE COURT:  Hold on.  Tell me where you are.

4    Column --

5              MR. MILLER:  Column 7.  Go down to the very last

6    paragraph where it starts referring to figure 6 --

7              THE COURT:  Okay.  I'm there.

8              MR. MILLER:  That is where it starts to talk about

9    this embodiment in figure 6.  It says that the catch trough

10   is in fluid communication with the evacuator.  Halfway

11   through that paragraph it says in the example shown the

12   evacuator is joined to an evacuation end of the catch

13   trough.  The only place it is used, evacuation end, is

14   referring to figure 6.

15             Now go up to column 8 and go to the second

16   paragraph.

17             THE COURT:  You didn't read, however, in other

18   examples the evacuator can be disclosed anywhere along the

19   catch trough.

20             MR. MILLER:  Right.  It says in other examples, so

21   it is not talking about figure 6 there.

22             THE COURT:  Right.

23             MR. MILLER:  It is saying alternatively you could

24   do that.

25             THE COURT:  Yes.

1          MR. MILLER:  That is what they were hoping to get

2   when they filed the application.  They were not allowed to

3   get that broad, and --

4          THE COURT:  But this does end up in the written

5   description.

6          MR. MILLER:  But that was filed in the beginning.

7   The written description does not change when you make

8   amendments to the claims.

9          THE COURT:  Okay.

10         MR. MILLER:  The claims can be far more narrow

11  than your written description.

12         THE COURT:  At some point you need to show me why

13  the claim is as narrow as you say it is.

14         MR. MILLER:  Okay.

15         THE COURT:  I am with you on 8 now.

16         MR. MILLER:  Column 8.  Go to about line 10, that

17  paragraph --

18         THE COURT:  Yes.  In the example shown --

19         MR. MILLER:  In the example shown, so they are

20  still talking about figure 6, and that is the example that

21  they are referring to here.  In the example shown, the

22  evacuator includes an angled trough connecting the catch

23  trough to the elevator.  The angled trough defines an

24  aperture.  It is saying that the evacuator is the connection

25  point between the catch trough and the elevator.

1          Now go down to the next --

2          THE COURT:  Wouldn't you agree that that is in the

3   preferred embodiment only?

4          MR. MILLER:  That is figure 6.

5          THE COURT:  And that is the preferred embodiment.

6          MR. MILLER:  Yes.

7          THE COURT:  But they claim that the claim is

8   broader.

9          MR. MILLER:  Well, the claim is not broader.  I

10  can go to the claim language to show how they amended it to

11  show --

12         THE COURT:  Isn't that what you're going to have

13  to do to convince me?

14         MR. MILLER:  Well, first you start with what we

15  talked about in the file history, and the interview summary

16  said the examiner in our interview said you have to limit it

17  to figure 6.

18         THE COURT:  Okay.

19         MR. MILLER:  Now look at the amendments they made.

20  If you go to page 5 of tab D in my binder --

21         THE COURT:  Okay.

22         MR. MILLER:  -- this is the prosecution history

23  and it is located at appendix page 103.  This is the claim

24  amendment that they made.  They added evacuation end of the

25  catch trough, which is the language used to describe the

1   configuration of figure 6 where there is just one evacuation

2   end that everything gets pulled out of, and they added that

3   and then they added that last paragraph.  The last paragraph

4   describes a system where the conveyor is pushing stuff

5   towards the evacuator and the debris gets elevated from the

6   evacuator.

7          Now, if the elevator is on the opposite end of the

8   trough and the evacuator, then nothing is getting elevated

9   from the evacuator.  Even if you go to the paragraph above

10  the amendment, and go to the paragraph that talks about the

11  elevator, it says that the elevator has to remove debris

12  from the debris collector.  Do you see that?  The elevator

13  removing debris from the debris collector.  That is right in

14  the claim.  The debris collector is in that evacuator

15  component.  It is the screen.  Okay.  The elevator removes

16  the debris from that screen.  That can't happen if the

17  elevator is not connected to the evacuator.  If it is on the

18  opposite end or if the evacuator is somewhere else in the

19  trough, it can't happen and that claim language cannot

20  occur.

21         THE COURT:  Well, doesn't that happen in Hydro's

22  alleged infringing device?  They have an evacuator, as I

23  understand it, at the opposite end of the elevator.

24         MR. MILLER:  Yes.

25         THE COURT:  And somehow the debris gets from the

```
 1    evacuator to the elevator.  It has to.

 2              MR. MILLER:  It does, but it is not the elevator

 3    that removes it.  The elevator is down here.  It gets

 4    scraped down at this end by the conveyor, and then it gets

 5    moved along, and it does not start elevating until it is at

 6    the opposite end.  You can't say the elevator is removing

 7    that debris, because in this patent the conveyor and the

 8    elevator and the evacuator are all described as separate

 9    components.  You can't call the end of the conveyor down

10    here that is going level, that is not part of the elevator.

11    They are separate.

12              THE COURT:  What is separate, the elevator and

13    the --

14              MR. MILLER:  The conveyor.

15              THE COURT:  That is another thing we need to

16    discuss.  The first two claim constructions that you want me

17    to construe are evacuation end and then an elevator disposed

18    in fluid communication with the evacuator.  I take it that

19    the disagreement between the parties on this one is just a

20    battle over whether the evacuator and the elevator are

21    located right next to each other?

22              MR. MILLER:  Yes.  And there are two limitations

23    that are really construed to --

24              THE COURT:  Together.

25              MR. MILLER:  -- to get the same point across.
```

1          THE COURT:  I'm getting an argument on both of

2     them.

3          MR. MILLER:  Yes.  I'm kind of arguing both of

4     them together.

5          THE COURT:  Right.  I think they are connected.

6     The word connected I think would help.

7          MR. MILLER:  The word joined is in the spec when

8     it is talking about the evacuator being in fluid

9     communication with the catch trough.  It also says it is

10    joined to the catch trough.

11         THE COURT:  Again, in column 8, farther down, and

12    maybe I'm jumping around, but it says on line 30 in some

13    implementations the elevator includes an elevator housing

14    connected to the evacuator and configured to support a roary

15    driven conveyor for carrying the debris up the inclined

16    elevator housing for dumping at the dump height.

17         What am I to take from the language in some

18    implementations?  Doesn't that suggest that there are others

19    where the evacuator and the elevator are not next to each

20    other, right next to each other and on the same end?

21         MR. MILLER:  Well, when they originally filed

22    their application, like I said, that written description was

23    written in a way that they -- at the beginning they probably

24    thought more broadly and that it could be in various

25    configurations, right?

1          THE COURT:  Okay.  So you're going to have to help

2     me understand that, that the prosecution history is enough

3     to read out of the written description those statements.

4          MR. MILLER:  Yes, because when you go through the

5     file history, and then the examiner requires you to make

6     amendments and when you make amendments to the claim, you're

7     not allowed to amend your spec and you don't have to cut out

8     the broader disclosure from the specification, but you amend

9     the claim and most times your claims get limited to

10    something more narrow than what the specifications

11    discloses.

12         That is what happened here.  They amended the

13    claim, and when you read the description in this claim, you

14    can't read it in a way to have an elevator not connected to

15    the evacuator.  It can't be read that way.

16         THE COURT:  All right.

17         MR. MILLER:  Let me see if I have any other

18    points.

19         One more point to make on that part of the

20    specification that you pointed to.  When it is talking about

21    figure 6 --

22         THE COURT:  Ironically you're sounding like you

23    are echoing Mr. Lobbin.  Judge, just read the claim and it

24    means what it says, and if the specification language is

25    different, you can't read that into the claim.

1          MR. MILLER:  Well, you can't broaden your claim

2     when you have narrowed it during prosecution.

3          THE COURT:  It is the prosecution history that you

4     think makes a difference here, all the difference?

5          MR. MILLER:  The prosecution history --

6          THE COURT:  Without that telephone call then you

7     wouldn't have your argument?

8          MR. MILLER:  No, I think the argument is there

9     just on the plain language of the claim, too.  How does the

10    elevator remove debris from the debris collector within that

11    evacuator --

12         THE COURT:  All right.

13         MR. MILLER:  -- if they are on opposite ends?

14         THE COURT:  I know I have asked this before, but

15    in the written description which you're telling me does not

16    ever get amended, even though the claim gets amended, it

17    does seem to suggest that this invention, to someone reading

18    it, of ordinary skill in the art, would see that, well, I

19    can configure this differently than that preferred

20    embodiment.

21         MR. MILLER:  If the claim didn't have the language

22    that said the elevator removes it from the debris collector,

23    then it would be described more broadly in the claim and

24    that would have been supported by the spec.  They didn't

25    draft the claim as broadly as their spec.  They just didn't.

1    The claim itself says the elevator removes debris from the

2    debris collector, and that is required, which means the

3    elevator has to be joint with the debris collector.

4         THE COURT:  But that language was in the claim

5    before the amendment.

6         MR. MILLER:  It was.  It was.  It was there.  They

7    were already pretty narrow.  After the amendment they made

8    more narrowing amendments.  They got even smaller than their

9    specs.  But that language also shows that you have to have

10   them connected.

11        THE COURT:  Well, then why did the examiner have

12   to tell them to do anything at all if it was already that

13   narrow?  In the conversation it sounds like he was telling

14   them to do what they had already done.  If the elevator

15   removing debris from the debris collector was already

16   indicating, unquestionably, that the evacuator end was

17   adjacent to -- now I'm using adjacent -- was connected to

18   the elevator.

19        MR. MILLER:  Well, I have had interviews with

20   examiners before and oftentimes they say, listen, this is

21   what you need to do.  You say it is already kind of that

22   narrow.  Look at this claim limitation.  Look at this claim

23   limitation.  They say, well, you have to narrow it down a

24   little bit more in this respect and in this respect.  Even

25   though you have a point, you still made narrowing

1    amendments.

2          What the public has notice of in this file is the

3    examiner said you limit your claim to figure 6.  They made

4    some additional amendments that are clearly related to

5    figure 6 configuration.  You read the claim as a whole.  It

6    does not make sense and you cannot read it to apply to

7    something where the evacuator and the elevator are on

8    opposite ends.  It can't be read that way.

9          THE COURT:  Why don't they require the written

10   description to get cleaned up so it's consistent with what

11   the examiner wanted?

12         MR. MILLER:  I don't know.  That is the patent

13   system that we have.  That might be a better system.

14         THE COURT:  It is like internally inconsistent.

15         MR. MILLER:  That is why we have to analyze not

16   just --

17         THE COURT:  Now you're talking Mr. Lobbin's way

18   and Mr. Ford, just look at the claim --

19         MR. MILLER:  No.

20         THE COURT:  -- the claim language.

21         MR. MILLER:  No, that is why you have to look at

22   the entire intrinsic evidence, including the file history,

23   because you have to have an understanding that you start

24   with the application as drafted, but then there is this big

25   process that lasts three or four, or, for one of these

1   patents, six years, talking to the examiner back and forth.

2        What you get out in the claims is what your

3   protection is, and that is always more narrow than what you

4   disclosed in the spec.  The spec always says that there are

5   always these other options and embodiments, but you're

6   always making claim amendments to get what the examiner will

7   allow you to have.

8        That is why you can't just read the claim language

9   and then run to the dictionary and ignore the intrinsic

10  evidence.  You have to read the claim language and you read

11  the spec, but you also read the file history.  If the file

12  history shows something that says you don't get the full

13  breadth of what you said in the spec, then that is what you

14  get.

15       THE COURT:  How does the elevator remove the

16  debris from the evacuator?  How is that different from the

17  conveyor?

18       MR. MILLER:  The claim just says the elevator

19  removes debris from the debris collector.

20       THE COURT:  Right.  How does it do that?

21       MR. MILLER:  It has got some way to do that.

22       THE COURT:  What is the elevator, just the thing

23  that goes up?

24       MR. MILLER:  The elevator is that housing in the

25  spec, that housing that goes up.

 1                  THE COURT:  But what does housing mean?  Is that a

 2       conveyor?

 3                  MR. MILLER:  The housing is just that frame

 4       that --

 5                  THE COURT:  Just that thing?

 6                  MR. MILLER:  Just the thing.

 7                  THE COURT:  That is an elevator?

 8                  MR. MILLER:  Here is one of the confusing things

 9       about this patent.  It talks about the elevator performing

10       functions.  The elevator elevates debris.  It does not say

11       wherein --

12                  THE COURT:  Does it elevate debris or allow debris

13       to be elevated?

14                  MR. MILLER:  It says the elevator, removing debris

15       from the debris collector, and elevating the removed debris

16       from a collection height to a dump height.  I would point

17       out that the word collection height in the spec in column 8,

18       around line 38, says that the collection height is at the

19       evacuator, so that goes perfectly in-line with the rest of

20       this claim where the point of elevation begins at the

21       evacuator.

22                  Maybe that is the main point.  When you read this

23       claim, when debris starts to be elevated, whether it is the

24       conveyor or some other means within the elevator, when the

25       debris starts to be elevated, this claim expressly says at

 1    every point that is being elevated from the evacuator.   The

 2    point of elevation begins at the evacuator.

 3         Now, if the evacuator is here and you have a

 4    trough, and then you have an elevator over here, it is not

 5    being elevated from the evacuator, and that is what the

 6    claim says plainly is the elevator removes debris from the

 7    evacuator and the conveyor elevates the debris from the

 8    evacuator.   Every time you are talking about elevating, the

 9    words from the evacuator or from the debris collector, which

10    is part of the evacuator, are used.   That is the origin of

11    the elevating point is from the evacuator.

12         Honestly you don't even need a spec or the

13    prosecution history to get that point that it starts at the

14    evacuator, the elevating, but the spec and the prosecution

15    history reinforce that and give the public notice that that

16    is the only way you infringe this patent.

17         THE COURT:   So I'm taking that as an argument on

18    both of the first two claim terms in the 774 patent.

19         Mr. Ford?

20         MR. FORD:   Yes.

21         Number one, I just want to point out, and I know

22    we have gone over the law of claim construction, but

23    Mr. Miller made a statement about dictionaries that is just

24    not accurate.   He said that dictionaries are a last resort.

25    In the Phillips case the Federal Circuit said a judge who

1    encounters a claim term while reading a patent might consult

2    a general purpose or specialized dictionary to begin to

3    understand the meaning of the term before reviewing the

4    remainder of the patent to determine how the patentee has

5    used the term.  That is just not right.  It is just not

6    right that it is a last resort and not to be consulted

7    first.

8         Secondly, Mr. Miller is making the argument that

9    the examiner during this phone interview required the patent

10   owner to make a specific amendment.  I was trying to quote

11   him.  He said the examiner said you have to limit it to

12   figure 6 and that the examiner required it to be limited to

13   figure 6.

14        THE COURT:  Well, now he is saying that he does

15   not even need figure 6.

16        MR. FORD:  Right.  I will move on to the claim

17   language, but to address that point, if you look first at

18   their motion for claim construction on page 26, they say the

19   patent office examiner required Petter to limit the claims

20   to the specific configuration depicted in figure 6.  Compare

21   that with what they say in their responsive brief, and they

22   back off of the strength of that assertion a little bit, and

23   in their response they say, well, the examiner expressly

24   requested that the claims be limited to the configuration

25   shown in figure 6.  That is on page 11 of their response

1    brief.

2           Originally they say, oh, the examiner required it,

3    and then they back off that a little and say, no, they just

4    requested it.  If you read that part of the prosecution

5    history, there is no requirement and the examiner is not

6    telling the patent owner what he has to do.  That is not how

7    the prosecution system works.  It is a back-and-forth

8    system.  The examiner makes suggestions and the patent owner

9    then makes some amendments that either conform to or don't

10   necessarily conform to those suggestions, and that is how

11   the process works.

12          Our position is that the examiner made a

13   suggestion that the patent owner decided, do you know what,

14   I don't think I need to go that narrow.

15          Mr. Miller tries to argue that you don't even need

16   to look at the prosecution history because the claim

17   language itself is so clear that the evacuator -- let's see

18   here -- he makes the argument that the plain language of the

19   claim requires that the elevator and the evacuator be on the

20   same side of the trough, and that it excludes any reading

21   that would allow the elevator and the evacuator to be on

22   opposite sides.

23          He cites principally to support this the fact that

24   the claim says that there is an elevator that removes debris

25   from the debris collector and elevates the removed debris

 1    from a collection height to a dump height for dumping.  The

 2    next limitation reads a conveyor disposed along the catch

 3    trough, and the elevator -- disposed along the catch trough

 4    and the elevator, the conveyor moving at least one of the

 5    wash fluid and the debris collected in the catch trough to

 6    the evacuator, and elevating the debris from the evacuator

 7    to the dump height.  It simply does not require that the

 8    elevator and the evacuator be on the same side of the

 9    trough.

10            I'm going to do my best to paint a picture for you

11    of how this would work.  You have an elevator, like a shaft,

12    and within that elevator there is a conveyor.  That conveyor

13    extends not only the length of the shaft of the elevator,

14    but it also extends through the trough.  So there are maybe

15    some wheels that turn, and you have a conveyor system that

16    makes something like an L shape that goes around the trough

17    and up the elevator and back down, and it grabs the debris

18    from inside of the trough and takes it over to the elevator

19    and lifts it up and dumps it.  This conveyor has little tabs

20    on it and it grabs the dirt as it goes.

21            Well, as it is going this way, so you have the

22    elevator on this side, and you have the evacuator on this

23    side, and liquid being taken off over here and solids being

24    taken off over here.  You have a screen on one end that

25    prevents the debris from clogging up the evacuator where the

1    liquid escapes.  Like I said, part of this conveyor is you

2    have these little flanges that grab that debris, and first

3    of all it pushes it over there because it is going in a

4    circle, and it pushes it towards the evacuator, both the

5    debris and the liquid to be honest, and then it comes around

6    the bottom and the liquid will go through the screen but it

7    continues to grab the dirt --

8              THE COURT:  The solids.

9              MR. FORD:  -- and up the elevator.  That is

10   perfectly consistent with what is recited in the claim.

11   Perfectly consistent.

12             Again, the conveyor is moving at least one of wash

13   fluid and debris.  I would suggest that in that example it

14   is moving both.  Collected in the catch trough to the

15   evacuator, again, to the side where the evacuator is, and

16   then elevating that debris from the evacuator to the dump

17   height.  It comes back around and up the elevator and

18   deposits it somewhere.

19             I also wanted to point out briefly, and this

20   argument Mr. Lobbin is going to make, but in fluid

21   communication does not mean joined directly.  In fluid

22   communication could be a tube that connects two things that

23   allow liquid to pass through.  I say that just because they

24   have touched on that, but I will allow Mr. Lobbin to address

25   that claim term more thoroughly.

```
1              THE COURT:  Thank you, Mr. Ford.

2              MR. MILLER:  Can I address that point, Your Honor?

3              THE COURT:  Yes.

4              MR. MILLER:  The example that Mr. Ford explained

5    showed an example where it was not the elevator that was

6    removing the debris from the evacuator.  It was the portion

7    of the conveyor that runs through the catch trough.  It is

8    important to look at their patent.  How are they describing

9    the components of their patent?  If you look at figure 1-D

10   in the 774 patent, and it is on appendix page 45, their

11   patent describes this system and the various components or

12   various kinds of areas, and number 230 in figure 1-D is

13   called the catch trough.  That whole section there, 230,

14   that is the catch trough.

15             Then section 320 in figure 1-D, that is the

16   evacuator housing.  Number 330 is the elevator housing.

17   Then they say there is a conveyor that runs through both the

18   catch trough area and the elevator area, but the claim says

19   that the debris is elevated from the evacuator.  If that

20   evacuator, number 320, is down at this other end, then the

21   debris is not being elevated from that evacuator.  It is

22   being elevated from the catch trough, because the evacuator

23   is way down here, and the elevator is only 330, only that

24   section, so his example did not square with the claim

25   language at all.
```

1          THE COURT:  When it says that the elevator will

2     remove debris from the debris collector, how do you define

3     debris collector?  What does that mean?

4          MR. MILLER:  If you look at the claim it talks

5     about the evacuator having a debris collector and a fluid

6     mover.  It is a component of the evacuator assembly.  It is

7     the screen.  The fluid mover is the pump and the debris

8     collector is a screen.  Those two components are part of the

9     evacuator assembly that has to be separate from the catch

10    trough.  That is what the prosecution history shows us.  The

11    elevator has to elevate things from that evacuator assembly,

12    not from the opposite end of the trough, and not from the

13    trough, but from the evacuator assembly.  That is how it is

14    elevated and the claim language says that.

15         THE COURT:  This entire dispute among you embraces

16    all three of the claim terms you want the Court to construe

17    under the 774 patent, doesn't it?  The third one is just the

18    elevator removing the debris from the debris collector --

19         MR. MILLER:  Yes.

20         THE COURT:  -- and elevating the removed debris

21    from a collection height to a dump height for dumping.

22    Aren't we arguing the same thing with all three of these

23    construction issues?

24         MR. MILLER:  Well, the point of the third claim

25    limitation that we're talking about -- it is really the

1   first two, the evacuation end and the elevator in fluid

2   communication --

3            THE COURT:  Yes.

4            MR. MILLER:  -- and those two are this point that

5   we have been arguing.

6            THE COURT:  Yes.

7            MR. MILLER:  The third one and the reason that we

8   put that in there is if you read this claim, it says that

9   the elevator elevates debris, and then down in the next

10  section where it talks about the conveyor, it says that the

11  conveyor elevates debris, and it does not say that the

12  conveyor is the means within the elevator to elevate debris.

13  It describes two different, independent mechanisms that

14  elevate debris in the claim.  I don't know what the one in

15  the elevator is, it just says that this elevator component

16  elevates debris, and then it says that the conveyor elevates

17  debris.

18           THE COURT:  Doesn't the --

19           MR. MILLER:  It was drafted confusingly, but the

20  plain language and on its face there are two elevating

21  means, and so we raise the third point just to say that that

22  is a means of elevation independent of the conveyor.

23           THE COURT:  I don't know how the debris gets to

24  the top of the elevator shaft other than by a conveyor.

25           MR. MILLER:  Well --

1          THE COURT:  I thought it was the same conveyor

2    belt or whatever the mechanism is.

3          MR. MILLER:  When you read the claim, candidly

4    that is what you would think, but you read the claim and it

5    talks about two means of elevating.  When it talks about the

6    conveyor it does not say wherein the conveyor is the means

7    of elevating in the elevator.  It says the elevator elevates

8    means and the conveyor elevates means.  I don't understand

9    it.  It is not drafted well.

10          THE COURT:  Elevates debris.

11          MR. MILLER:  Elevates debris.  Sorry.

12          That limitation is not the most important that we

13    are seeking claim construction on out of this patent.  It is

14    the other ones where you're talking about --

15          THE COURT:  Where you want the evacuator end right

16    next to the elevator?

17          MR. MILLER:  Yes, because otherwise you are not

18    elevating anything from the evacuator unless that elevator

19    and evacuator are joined.

20          THE COURT:  Thank you, Mr. Miller.

21          Any response to that?

22          MR. LOBBIN:  Thank you, Your Honor.

23          The last claim term is this conveyor and elevator

24    distinction and, frankly, their proposal would violate that

25    principle that we talked about earlier today, when I first

 1   got up here, of claim construction, and that would exclude

 2   the preferred embodiment.  It is clear from the patent

 3   specification that it is exactly as Your Honor pointed out,

 4   that there is a conveyor, as Mr. Ford describes, that runs

 5   along the trough and up the elevator and back and through

 6   and it is one conveyor.

 7        For Hydro to suggest that, well, we can't

 8   understand this claim and it seems to suggest that there are

 9   two separate mechanisms, that would exclude the preferred

10   embodiment and that can't be correct.  In fact, when you

11   look at the specification of the patent, it clarifies any

12   confusion over this by saying that the conveyor system also

13   includes a conveyor disposed along the catch trough and the

14   elevator.  The conveyor moves at least debris along the

15   catch trough at the collection height and elevates the

16   debris to a dump height for dumping.  It is clear that the

17   conveyor mechanism is the sole mechanism through which all

18   of this takes place.  The fluid and the debris are moved

19   around a catch trough, moved up the elevator, and that is

20   the only construction that would make sense, not theirs that

21   would read out and exclude the preferred embodiment.  That

22   is at column 3, lines 38 to 45.

23        Even figure 6 itself, figure 6 that they cite to,

24   fails to show an independent mechanism for elevating debris.

25   Instead, the elevator and the conveyor, which are positioned

1    along the elevator, together elevate the debris to a dumping

2    height.  Hydro's proposed construction is simply too narrow.

3           THE COURT:  I take it you're saying that the

4    references in the claim language that the elevator elevates

5    does not mean that literally, it means that the conveyor is

6    elevating within the elevator?

7           MR. LOBBIN:  Exactly.

8           THE COURT:  Okay.

9           MR. LOBBIN:  We could go through a semantic

10   exercise and perhaps find --

11          THE COURT:  That is what we have been doing all

12   afternoon.

13          MR. LOBBIN:  Yes, but in this particular claim,

14   and we could find some discontinuity.  Yes, we would love to

15   look to the specification to provide some clarity here,

16   because it shows that their construction can't be correct,

17   because it would exclude the preferred embodiment, and you

18   construe patent claims not to find little nits that would

19   say, oh, this can't be, it is internally inconsistent, and

20   you construe patent claims to preserve their validity.

21          THE COURT:  I believe you just told me that I can

22   use the specification to provide clarity.

23          MR. LOBBIN:  In this instance, yes, but you can't

24   do what I told you at the first to --

25          THE COURT:  I can't go too far.

 1                    MR. LOBBIN:  Beware of the cardinal sin.

 2                    THE COURT:  Thank you, Mr. Lobbin.

 3                    MR. LOBBIN:  Thank you, Your Honor.

 4                    THE COURT:  Any final words, Mr. Miller?

 5                    MR. MILLER:  No.

 6                    THE COURT:  All right.  Well, I will try to get

 7       something out in a written opinion fairly soon.

 8                    I guess I have pending a couple of motions for

 9       summary judgment from the defendant.

10                    With that, I think we are done.  Thank you for

11       your patience and thank you for your arguments.  They have

12       been very helpful.

13                    MR. MILLER:  Thank you, Your Honor.

14                    THE COURT:  Court is in recess.

15                    (Proceedings concluded.)

16

17

18

19

20

21

22

23

24

25