1              IN THE UNITED STATES DISTRICT COURT

2                      DISTRICT OF UTAH

3                      CENTRAL DIVISION

4

5    PETTER INVESTMENTS, a Michigan    )

6    corporation doing business as     )

7    Riveer,                           )

8              Plaintiff,              )

9    vs.                               )   CASE NO. 2:14-CV-45DB

10   HYDRO ENGINEERING, a Utah         )

11   corporation, et al.,               )

12             Defendants.             )

13   _____   )

14

15             BEFORE THE HONORABLE DEE BENSON

16             -------------------------------

17                     May 22, 2015

18

19                     Motion Hearing

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2

 3

    For Plaintiff:              STEPHEN M. LOBBIN
 4                              2020 Main Street
                                Suite 600
 5                              Irvine, California

 6                              MARK FORD
                                1389 Center Drive
 7                              Suite 300
                                Park City, Utah

 8

 9

10

11  For Defendant:             MARK MILLER
                               BRETT FOSTER
12                             222 South Main Street
                               Suite 2200
13                             Salt Lake City, Utah

14

15

16

17

18

19

20

21

22  Court Reporter:            Ed Young
                               351 South West Temple
23                             Room 3.302
                               Salt Lake City, Utah 84101-2180
24                             801-328-3202

25
```

```
 1    May 22, 2015                                  11:00 a.m.

 2                     P R O C E E D I N G S

 3

 4              THE COURT:  Good morning.

 5              We're here in Petter Investment, Inc. against

 6    Hydro Engineering, Inc.  The case number is 14-CV-45.

 7              I am getting used to all of you now.  Mr. Lobbin

 8    and Mr. Ford are here representing the plaintiff.

 9    Mr. Foster is here and Mr. Miller are here representing the

10    defendant.  I have forgotten your assistant's name.

11              MR. MILLER:  Sherry Stucki.

12              THE COURT:  Sherry Stucki is here.

13              Is this Mr. Hydro?

14              MR. MILLER:  Jim McCormick.

15              THE COURT:  Mr. McCormick is here as a

16    representative of Hydro.

17              You don't have anybody here from Petter?

18              MR. FORD:  No, we don't.

19              THE COURT:  Okay.

20              MR. FORD:  Not today.

21              THE COURT:  We're here on a number of pending

22    matters.  There is a joint stipulated motion for

23    adjudication of plaintiff's second and third claims for

24    relief, and that stipulated motion will be granted by the

25    Court.
```

```
1              I will sign the proposed order that was sent.
2     That is out of the way.
3              Then we have the plaintiff's motion seeking leave
4     to serve amended final infringement contentions.  That is
5     contested.  That is one matter.  Then we have the
6     defendant's motion for supplemental claim construction.
7     That is also contested.  That is a second matter.  Then we
8     have -- I guess that is all I'm going to hear today.
9              We heard argument on the summary judgment motion a
10    couple of weeks ago and that is still pending.  I have not
11    issued a rule on the summary judgment motion, but I think I
12    have only the two matters today.
13             MR. MILLER:  Yes.
14             THE COURT:  Your request for leave of Court to
15    assert final infringement contentions, and you want me to
16    adjust the claim construction on grate or whatever it was,
17    the grate and the basin.  All right.
18             There is the Great Basin in Utah, by the way.
19    That is not what we're talking about.
20             MR. LOBBIN:  That might be easier.
21             THE COURT:  Which order do you want to take these
22    up in?  Did you have a preference among you?  Which makes
23    the most sense?
24             MR. LOBBIN:  We had not discussed it, Your Honor,
25    but I think ours is the first filed.  It does not really
```

```
 1   matter to us.

 2              THE COURT:  You go ahead.  I have read your

 3   briefs.

 4              MR. LOBBIN:  Thank you, Your Honor.

 5              I am getting old enough that I now need my

 6   glasses.

 7              Good morning, Your Honor.  May it please the

 8   Court, one other open motion that Your Honor didn't mention,

 9   because it is not set for hearing today, is there is a prior

10   motion for reconsideration that we filed in I think January.

11   That has not been decided.

12              THE COURT:  Correct.

13              MR. LOBBIN:  For completeness sake I thought I

14   would mention that.

15              Our motion for leave centers around -- if we could

16   get the --

17              MR. FORD:  Could I have you put the output to

18   our --

19              THE CLERK:  Sure.

20              MR. LOBBIN:  -- centers around local Patent Rule

21   3.4, which is cited there at the top half of the first page,

22   the first full page of our brief.  There have not been any

23   cases to our knowledge interpreting the local patent rule in

24   question, probably because the local patent rule is

25   relatively new, and there are similar local patent rules
```

1    from other jurisdictions that can give guidance on this, and

2    there are certainly cases from other jurisdictions that give

3    guidance on the issue at play, which is what happens when

4    you put forth your infringement contentions and then you go

5    through the claim construction process and, of course, you

6    have got your own infringement contentions and the other

7    side has their infringement contentions, and then the Court

8    comes out with its claim construction, which it may agree

9    with one or the other or may agree with some parts of one or

10   some parts of the other, and the Court may construe the

11   elements of the claims differently than either party

12   proposed.

13         What do you do in that situation?  Well, local

14   Patent Rule 3.4 -- before I get into that, let me just say

15   that the two motions today are really related, so I think it

16   is appropriate that we're talking about them on the same

17   day, because if the Court decides, as we discussed last

18   time, if the Court decides, well, maybe we need to

19   supplement or revise the claim construction on the grate or

20   the porous part of the grate, then that just shifts the

21   target further from the initial construction, which was

22   different from what Riveer or we had proposed.

23         So now you have our initial proposal on

24   infringement contentions, then you have got the Court's

25   claim construction that differs from what we had proposed,

1   and what we had based our analysis on, and then now

2   potentially you have a supplemental amended claim

3   construction which sort of shifts the analysis further.

4          Rule 3.4 talks about what do we do in that

5   situation?  We think the reason why our motion for leave was

6   so short, frankly, was because we thought that the rule was

7   fairly clear, not only based on its own language but based

8   on experience in prior cases in other districts and how

9   other courts interpret this issue.

10          Local Patent Rule 3.4 says that a party may amend

11   its final infringement contentions where there is good cause

12   and no unfair prejudice.  It says specifically that an

13   example of a circumstance that may support a finding of good

14   cause, absent undue prejudice, includes a claim construction

15   by the Court different from what, different from that

16   proposed by the party seeking amendment.

17          I think a lot of this dispute on the motion is

18   Hydro contends that, well, Riveer could have anticipated

19   that the Court might end up with Riveer's construction, the

20   Court might end up with Hydro's construction, and the Court

21   might end up somewhere in between or somewhere different and

22   Riveer, under the local patent rules, was supposed to take

23   care of all of those contingencies by putting forth

24   contentions early in the case which accounted for all of

25   that.

1              So we would have a first set of contentions based

2    on Riveer's proposed construction.  Then we would have a

3    second set of contentions based on Hydro's proposed

4    construction.  Then we would have a third set of contentions

5    based on some likely or possible or probable outcome in

6    between.  I understand that and if that was the rule we

7    would have done that, but that is not the rule.

8              The way this Court's local patent rules are set

9    up, you have to put forth your infringement contentions in

10   April of 2014, when nobody was even talking about claim

11   construction yet, and then the final contentions were in

12   September of 2014, and that was three months before anyone

13   had any obligation to set forth any claim construction

14   positions at all.

15             So we have got a situation where the local patent

16   rules are set up for Riveer to fail, if you accept what

17   Hydro is saying, because we had to say here are our

18   contentions in April, here are our final contentions in

19   September, and now three months later we get to find out for

20   the first time what Hydro thinks the claim mean, and so I

21   suppose in December we should have run to the Court and

22   said, Your Honor, Hydro is proposing a claim construction

23   that we didn't take account of in our final contentions

24   served three month ago, so please give us leave in December

25   of '14 to amend our final infringement contentions.

```
1              We could have done that, Your Honor.  I don't know
2   what the Court would have done, but if you recall at that
3   time we were dealing with the close of fact discovery, we
4   were dealing with briefs on claim construction, we were
5   dealing with three summary judgment motions filed in early
6   December, and we're dealing with the rule -- and I don't
7   know if it is still up on the screen -- we are dealing with
8   the rule that said, wait a minute, an example is claim
9   construction by the Court different from that -- well, in
10  December of '14 we knew that this rule was there.  We knew
11  this rule allowed for amended final infringement contentions
12  when the Court came out with its construction.  We didn't
13  know when that was going to be, but we were in the middle of
14  claim construction briefing, so we knew it was going to be
15  in 2015.  As it turns out, the Court came out with its claim
16  construction in late March of 2015.
17             I think when you sit down and you look at sort of
18  how the local patent rules are set up, and what this rule in
19  particular says, and then when you look at the case law, and
20  they have cited some cases, and there are cases, you know,
21  kind of going every which way saying that the parties have
22  to be held to not sandbag the other side, to tell the other
23  side what their contentions are and not wait until the end
24  of the case, but with most of those cases if you look at the
25  facts there really was a surprise.  I mean, one party was
```

1    saying you never mentioned anything about the doctrine of

2    equivalents or never mentioned anything about alternate

3    scenarios, depending on the claim construction, but the

4    cases that are on all fours with our facts actually say --

5    well, the best example I can give you is from our reply

6    brief, which is the Robocast case.  That is a 2014 case from

7    the District of Delaware, which Your Honor probably knows

8    handles patent cases all the time and has one of the busiest

9    patent dockets in the country.

10           In the Microsoft example, and the quote from the

11   court, and this is in our reply brief at page 6, says

12   Microsoft argues that Robocast cannot put forth a doctrine

13   of equivalents argument as untimely.  The court says but the

14   Robocast doctrine of equivalents, arguments are based on the

15   court's claim construction rules and Microsoft was on

16   notice.

17           I think if you follow the balance of the cases,

18   you're going to find that -- again, these are from other

19   districts, and we don't have any guidance from this

20   particular district on this particular patent local rule,

21   but when you look at the cases you're going to find, and

22   when you look at the facts, you're going to find that on

23   balance courts have allowed amendments after claim

24   construction when a party like Riveer is going throughout

25   the whole case saying once our claim construction is adopted

1    you can rely on our infringement contentions that we told

2    you back in April of 2014, and then again in September, but

3    then, lo and behold, if the claim construction does not work

4    out the way we contend, which it didn't, you have got an

5    opportunity under the local rule to say, okay, let's see how

6    the Court's claim construction is different from what we

7    proposed.  The rule does not say if the Court issues a claim

8    construction different from that which anyone proposed, our

9    side or their side, it says when the Court issues a claim

10   construction different from what the party requesting leave

11   proposed.

12           I think that clearly shows you that the drafters

13   of the local patent rules, and probably from the local

14   patent bar here, and I don't know if Your Honor was

15   involved, but whoever put together this rule was envisioning

16   a scenario where you're not responsible for taking into

17   account for your own claim construction and how that would

18   play out through the infringement analysis, and the other

19   side's proposed claim construction and see how that would

20   play out through the analysis.  So I think it is clear that

21   we are well within the letter and the spirit of local Rule

22   3.4, local Patent Rule 3.4.

23           Again, I think Hydro, in their arguments, they

24   take the position and there are other cases out there based

25   on different facts that say you have got to tell the other

1    side.  You have got to tell the other side what your

2    contentions are.  Well, those are cases where, one, it

3    really came late and it really was a surprise, and, number

4    two, the patentee never mentioned the doctrine of

5    equivalents.

6           Here we have been talking about the doctrine of

7    equivalents since April of 2014 when we put it in our

8    initial contentions.  Did we spell it out?  No, because we

9    were contending there was literal infringement.

10          What did Hydro do?  If anyone is sandbagging here,

11   Mr. Miller or Mr. Foster could have called me up and said,

12   wait a minute, you have this footnote talking about the

13   doctrine of equivalents.  What do you mean?  Serve an

14   interrogatory.  What do you mean?  Give us more meat on the

15   bone here.

16          What would have happened had they done that is I

17   would have said our contentions are based on our claim

18   construction which is literal infringement.  If you want to

19   fight about what we need to tell you at this point in the

20   case about the doctrine of equivalents, let's go talk to

21   Judge Benson, or it might have been a discovery matter and

22   we would have been talking to the magistrate judge, and I

23   would have brought a motion then last summer saying, Your

24   Honor, we have put forth our contentions and they want more

25   about this alternate, you know, subsumed theory of doctrine

1   of equivalents if we don't get our claim construction, let's

2   have a motion to compel and if the Court wants me to do

3   that, sure, I can theorize about what a claim construction

4   might turn out to be, and under that theoretical claim

5   construction, sure, I can give you an expert declaration

6   now.

7           That didn't happen.  I think that if anyone is now

8   using these local rules as sort of a procedural sandbagging

9   tool, it is Hydro, it is not Riveer, not to mention the fact

10  of where was this argument when we actually briefed the

11  doctrine of equivalents issues on the motion for summary

12  judgment?  Hydro moved in December for a motion of summary

13  judgment of no infringement.  They didn't make a motion for

14  no literal infringement, which happens all the time in

15  patent cases, they said no infringement, which means now

16  Riveer has to sit back and say they moved for no

17  infringement, so now we have to come in with the kitchen

18  sink in opposition to the summary judgment motion and tell

19  them why there is infringement for one reason, for two

20  reasons, for three reasons, it is summary judgment time.

21          So what did Riveer do in December?  We filed our

22  papers in early January, and all the arguments on literal

23  infringement based on our claim construction, all of the

24  arguments on doctrine of equivalents based on what they

25  proposed, which we just found out the month prior, again,

1    our final infringement contentions had closed three months

2    prior, so we were not then at liberty to even amend.  I

3    suppose, as I mentioned, I suppose we could have rushed to

4    Your Honor and filed a motion for leave then.

5             So we laid out all of our arguments in opposition

6    to the summary judgment motion, and we prepared the

7    declaration of our expert, one of ordinary skill in the art,

8    which is a key factual consideration on a doctrine of

9    equivalents theory, and we laid all of that out in

10   opposition to the summary judgment in early January.

11            What did Hydro do?  They didn't rush to the Court

12   and file a motion to block the assertion of the doctrine of

13   equivalents.  They just replied.  They replied and they

14   said, you know, Riveer's expert does not do a thorough

15   enough analysis, and Riveer does not make winning arguments

16   on their alternate theory of the doctrine of equivalents,

17   therefore, the Court should grant summary judgment -- again,

18   no literal infringement, no infringement, which takes into

19   account both.

20            I think that a fair reading of the procedural

21   history of the case is that not only are we on the right

22   side of local Patent Rule 3.4, both the letter and the

23   spirit, but Hydro is the one that should have raised this

24   issue sooner and they didn't.  Essentially, and I didn't put

25   it in my papers, and I may have, but it is almost like they

 1    have waived this argument that, oh, this whole case is about

 2    literal infringement and that is it because we have somehow

 3    sandbagged them.  They knew it all along.

 4             We had a deposition in April of last year, so over

 5    a year ago, and we went through this ad nauseam in the

 6    deposition.  How do the products function?  How do they

 7    work?  What is the result of the accused infringing product?

 8    They are smart guys.  They knew what was going on.  They

 9    know this was not just a literal infringement case.  Again,

10    in the contentions I explicitly told them that the doctrine

11    of equivalents is at play if the Court does not agree with

12    our claim construction, which is exactly what local Patent

13    Rule 3.4 and the Microsoft case says.

14             Again, on the last point in their opposition they

15    focus on the prejudice issue and, yes, the rule says that

16    you have to have good cause, which we believe we do, and as

17    the movant for leave you have to demonstrate there is an

18    absence of undue prejudice.  I guess I was a little short in

19    my moving papers.  I accept that.  Did I specifically have a

20    paragraph analyzing why there is no undue prejudice to Hydro

21    if the Court grants leave?

22             I suppose not, but the reason I didn't was because

23    I thought it was pretty clear that the issue was already in

24    play.  We had already fully briefed a summary judgment

25    motion which addressed those issues, and we had already had

1    the Paulus declaration of our expert in January, so two

2    months prior that delved into these issues and they had a

3    chance to depose him.  We had issues about the deposition

4    and they can still depose him if they want.  They replied to

5    the arguments by putting forth all of their arguments in the

6    reply on summary judgment saying why the doctrine of

7    equivalents was not applicable.

8            In my reply brief I addressed the prejudice issue.

9    I don't think that procedural bone to pick that they have

10   that, hey, the motion should be denied because he did not

11   specifically say why Hydro would not be unduly prejudiced if

12   the Court granted the motion to leave, which is kind of

13   proving a negative, and I didn't address it in detail, but I

14   certainly did in the reply brief and certainly they can

15   respond here today.

16           I suppose I can wait to address the other motion.

17           THE COURT:  Yes.  You can reply to Mr. Miller

18   after he addresses this motion.

19           MR. LOBBIN:  Thank you.

20           THE COURT:  Mr. Miller.

21           MR. MILLER:  Thank you, Your Honor.

22           Your Honor, the plaintiffs are so off base on this

23   issue that there is a lot to cover, but I want to start by

24   giving a context to what this motion to amend is about.  In

25   our summary judgment motion, when we hit the doctrine of

1   equivalents we identified two reasons to grant

2   noninfringement under the doctrine of equivalents.  One of

3   them was waiver and we hit it right up front.  They did not

4   satisfy the local rules.  So for Mr. Lobbin to say where has

5   this argument been, they never raised in their motion in

6   summary judgment or in their reply, well, we did.  Our

7   opening argument on the doctrine of equivalents, page 10 of

8   our opening motion, they waived it because it is not in

9   their contentions.

10       All they had in their contentions was a

11   boilerplate statement of reservation.  To the extent

12   something is not literally infringed, we contend it is

13   infringed under the doctrine of equivalents, and we reserve

14   the right to say function, way, result later.  What their

15   infringement contention said then is we don't have a

16   doctrine of equivalents to state right now but we want to

17   come up with one, boilerplate, reservation language.

18       Then in our motion we also argued on the merits.

19   We said, listen, even if they had properly alleged the

20   doctrine of equivalents, the facts in this case don't permit

21   doctrine of equivalents as a matter of law.  There is not

22   sufficient evidence to support the jury verdict on that

23   issue.  So we hit the merits and we hit waiver.

24       This motion to amend is an effort to backfill

25   their infringement contentions and then cross out our waiver

1    argument in the summary judgment motion.  That is what it is

2    designed to do.  That is all it does.  It does not take away

3    our merits argument in the summary judgment motion, but that

4    is how this motion fits into the summary judgment papers.

5           I want to go through two primary points as to why

6    the Court should deny the motion to amend.  The first one is

7    they have not shown good cause.  I didn't hear the words

8    good cause come from Mr. Lobbin very much.  I certainly

9    didn't hear him establish prejudice very forcefully.  He did

10    try to outline why he thinks it is okay to choose one horse,

11    literal infringement, and ride that all the way to the end,

12    and if that horse does not make it, you get to go back and

13    start over with a brand new horse.  That is not what the

14    local rules say.  First is good cause.  They have not shown

15    that.

16           The second point I will hit is that even if they

17    made this amendment, it is a futile amendment.  It does not

18    change the outcome of the summary judgment motion.  It is

19    moot.  It is not relevant.

20           The first one is good cause.  I appreciate Mr.

21    Lobbin saying that because this Court does not have its own

22    precedent on some of these local rules yet that it is good

23    to look to other jurisdiction for guidance.  I agree with

24    him that the Northern District of California is a great

25    option and it has the same language in their rules, and that

1    is Mr. Lobbin's backyard, and he can't claim ignorance to

2    the standards that are applied to these types of rules and

3    this language.

4              In the preamble of our local rules it says that

5    the purpose of the rules is to provide meaningful disclosure

6    of each party's contentions.  It makes a distinction between

7    complaints and answers and pleadings that are what it refers

8    to as bare bones.  We don't want bare bones pleadings.  We

9    want meaningful contentions.  Then our rules set forth

10   initial contentions, and then you get four or five months of

11   discovery to dig in and make sure that when you do final

12   contentions, that you know that you have had ample

13   opportunity and you're going to be stuck with these final

14   contentions.  They had four and a half months between the

15   initial and final to do that.

16             Then our local rules explain the purpose.  Why do

17   we do this system?  The purpose is to get to a point where

18   claim construction can identify outcome determinative claim

19   construction.  That is why they are there.  I will read what

20   it says.  The decision to place claim construction near the

21   end of fact discovery is premised on the determination that

22   claim construction is more likely to be a meaningful process

23   that deals with the truly significant disputed claim terms

24   if the parties have had sufficient time, via the discovery

25   process, to ascertain what claim terms really matter and why

1  and can identify when, as the rules require, when they are

2  outcome determinative.

3       That is why we have initial contentions, four

4  months of discovery, final contentions, so when we get to

5  claim construction it is outcome determinative, not, well,

6  because you lost you get to reset the clock and redo your

7  contentions like Mr. Lobbin argues.

8       Let's do what Mr. Lobbin suggested and look at the

9  other rules.  Okay.  The primary argument they make in their

10 briefing and their big statement on how they are

11 interpreting these rules is the word or.  When it says this

12 is what is required in your infringement contentions, our

13 rules say you have to identify whether each element is

14 present literally or under the doctrine of equivalents.

15 They spend three or four pages in their brief saying or

16 means that you only have to pick one.

17      We cited in our brief the Genentech case, which is

18 interpreting the Northern District of California rules.  The

19 Northern District of California rules, when they are talking

20 about infringement contentions, state that you have to

21 identify whether each limitation in each asserted claim is

22 alleged to be literally present or present under the

23 doctrine of equivalents.  The Federal Circuit in the

24 Genentech case looked at Riveer's argument on or, and it is

25 the exact same argument on interpreting this language, and

1    this is what the Federal Circuit said.  That argument flies

2    in the face of common sense and years of Federal Circuit

3    precedent.

4             Just because our local rules are new does not mean

5    our local rules are using new language.  The committee

6    putting the local rules together borrowed from the Northern

7    District of California and Illinois and others.  This

8    language is out there and it has precedent with it.  The

9    Federal Circuit governs the interpretation of the local

10   rules.  This says that Petter's position on how to interpret

11   these rules flies in the face of common sense.

12            Then it says something else in this case.  It says

13   that unlike the liberal policy of amending pleadings, the

14   philosophy behind amending claim charts or infringement

15   contentions is decidedly conservative and designed to

16   prevent the shifting sands approach to claim construction.

17   So you don't get to use boilerplate reservation language and

18   say that you have met your burden and you have preserved the

19   right on the doctrine of equivalents.  That is clear from

20   the Northern District of California case law.

21            There is a case called Rambus versus Hynix, and

22   there is also the Nozomi case, and that is one of the cases

23   that Petter cites purportedly to support their position.

24   This is what the Nozomi case says and I will cite that one

25   first.  This is from the Northern District of California.

```
1    It is cited in Petter's brief.  It says a boilerplate

2    reservation is inadequate and courts have frequently

3    dismissed claims under the doctrine of equivalents based on

4    boilerplate language in their infringement contentions.

5    That is a direct quote.

6           Then it cites another case, Rambus.  In the Rambus

7    case the same thing happened.  Rambus put in their

8    infringement contentions this language, that to the extent

9    any limitation is not found to be present literally, Rambus

10   asserts that such limitation is present under the doctrine

11   of equivalents.  The Northern District of California said

12   that the local patent rules require a limitation by

13   limitation analysis, not a boilerplate reservation, and the

14   doctrine of equivalents exists to prevent what the Supreme

15   Court called a fraud on the patent, when somebody truly is

16   making a minuscule, insignificant change to a patented

17   invention to get around it.  That is what the doctrine is

18   for.  The Northern District of California said the doctrine

19   of equivalents is not designed to give a patentee a second

20   shot at proving infringement to the extent any limitation is

21   not found literally.  That is not what it is for.

22          Mr. Lobbin said to look at the balance of the case

23   law which is in our favor.  They cite no cases in their

24   favor that actually talk about infringement contentions.

25   Not one.
```

```
1              Now, let's move on from Rambus and Nozomi.  How do
2    we look at the standard for good cause?  The standard is one
3    that requires diligence.  Diligence is required.  We cited
4    the France Telecom case in our briefing, and the France
5    Telecom case states that the court's differing claim
6    construction in and of itself does not constitute good
7    cause.  Okay.  Mr. Lobbin has been up here arguing, hey, the
8    claim construction went contrary to what we proposed, ergo,
9    good cause and we get to amend.  The Northern District of
10   California said that is not in and of itself good cause and
11   the moving party must still show diligence.
12             Now you have to say when does the diligence period
13   start?  Where the court adopts an opposing party's proposed
14   claim construction, the moving party's diligence, without
15   which there is no good cause, is measured from the date the
16   moving party received the proposed constructions, not the
17   date of the issuance of the court's claim construction
18   opinion.  So the diligence period is not when the court
19   issues the claim construction, it is when they were aware of
20   what the potential construction could be.  At the very
21   latest in this case, that is November.  Mr. Lobbin admitted
22   that we could have sought to amend back then.  He gave no
23   excuses and he said it right here that we could have done
24   that.
25             They didn't.  They waited over five months from
```

1    that point to do it.  We cite cases in our brief that delays

2    like that do not demonstrate diligence.

3              There is another case, the Cisco case from the

4    Northern District of California, again, talking about

5    diligence.  In that case it talks about how the plaintiff

6    received the defendant's proposed construction in April of

7    2011, and this date marked the beginning of the relevant

8    time period for evaluating their diligence, because that is

9    when they first became aware of the risk that the District

10   Court could adopt that construction.  They argue, yeah, but

11   we just waited until they did adopt the construction, and

12   the Court said they don't provide any explanation as to why

13   they did not begin their investigation of the accused

14   products when it received the proposed construction.

15             Instead, they chose to wait until the District

16   Court construed that limitation.  The plaintiff's failure to

17   justify this delay is sufficient to deny its motion.  They

18   don't have a justification for their five-and-a-half-month

19   delay, because Mr. Lobbin stood right here and said we could

20   have done it back then.  No excuses.  We just didn't want

21   to.

22             The next point that is important to focus on --

23   well, let's look at the balance of the law as Mr. Lobbin

24   wanted us to.  The Eastern District of Texas also has local

25   rules.  Their local rules have way more permissive language

1    for amending contentions.  In fact, this is what their local

2    rules say.  Leave is not required in the following

3    circumstance, if a party claiming patent infringement

4    believes in good faith that the court's claim construction

5    ruling so requires.  So these local rules in Texas say if

6    you think you need to amend because of the claim

7    construction, in good faith, you get to serve amended

8    constructions, but in Texas you can still move to strike the

9    amended construction, and Texas still applies the same

10   rationale to their contentions.  In the Nike case that we

11   cite in our brief --

12          THE COURT:  This is amended construction or an

13   amended contention?

14          MR. MILLER:  Contention.  Sorry.  Amended

15   contentions.

16          In the Nike case, the Eastern District of Texas

17   said this exception, the exception to allow amendments

18   because of claim construction is intended to allow a party

19   to respond to an unexpected claim construction by the Court.

20   This does not mean that after every claim construction order

21   new infringement contentions may be filed.  Then it explains

22   that the local patent rules are designed to have full

23   disclosure, and they are not designed to create loopholes

24   through which parties can practice litigation through

25   ambush.  A party cannot argue that because its precise

1    proposal for construction of a claim term is not adopted by

2    the court, that it is surprised and must prepare new

3    constructions.   That is what Riveer is arguing.   Hey, new

4    construction and we get to start over and we can say, oh, we

5    were surprised.   Excepting such an argument, and this is the

6    Eastern District of Texas, excepting such an argument would

7    encourage parties to file narrow proposed constructions with

8    an eye towards hiding important contentions until shortly

9    before trial.

10           So the policy that Mr. Lobbin is advocating here

11   is the best thing to do is let's propose a claim

12   construction that is way off base.   If you're the plaintiff

13   let's propose it like crazy broad.   If you're the defendant

14   let's propose it super, super narrow so that we know the

15   Court is not going to adopt it, and then when the claim

16   construction goes against us, we go back to our infringement

17   contentions and we ambush them with all new contentions that

18   they have never heard of before.   That is why the local

19   rules have never in any case been interpreted the way they

20   are proposing they be interpreted.

21           Now I want to talk about prejudice.   They want to

22   say there is no prejudice.   The irony of their motion for no

23   prejudice, as they say, is there is no prejudice because

24   they argued doctrine of equivalents in their summary

25   judgment motion.   They argued against it, so it is not like

1    they were taken off guard.  How did we argue it?  As I said

2    earlier we argued waiver, and then we argued on the merits

3    based on our own creative thinking of what could they say,

4    and we put into our briefing that there is no evidence here

5    to support it on the merits.

6          Well, there is prejudice.  If you allow this

7    amendment, it takes away the waiver argument and here is how

8    that prejudices my client.  If the Court were to grant our

9    summary judgment motion, and in that order if the Court were

10   to say no infringement under the doctrine of equivalents

11   because of waiver and, alternatively, even if they didn't

12   waive it, they didn't present sufficient evidence to create

13   a genuine issue of fact, so the Court gives alternative

14   grounds for no doctrine of equivalents.

15         On appeal that waiver argument is an abuse of

16   discretion standard.  The Federal Circuit in Genentech said

17   this Court defers to the District Court when interpreting

18   and enforcing local rules so as not to frustrate local

19   attempts to manage patent cases according to prescribed

20   guidelines.  On appeal for the doctrine of equivalence issue

21   my client would have an abuse of discretion standard issue

22   as well as the merits issue which would be de novo.

23         If they are allowed to amend their contentions

24   without showing good cause, then we lose the deferential

25   point on appeal and it is only de novo on the issue of

```
1    doctrine of equivalents.  That is prejudice to my client.

2    We relied on that in our summary judgment briefing and we

3    brought up this argument in our reply brief in summary

4    judgment, contrary to Mr. Lobbin's suggestion, and he says

5    where has this argument been?  They have never made it.  But

6    in our reply brief to this motion on page 20 --

7              THE COURT:  In your opposition?

8              MR. MILLER:  No.  In the summary judgment motion

9    that --

10             THE COURT:  You said to this motion.

11             MR. MILLER:  Sorry.  I meant summary judgment

12   motion.

13             THE COURT:  That was the only thing that confused

14   me.  You said reply brief.  In your summary judgment motion?

15             MR. MILLER:  Yes.

16             We state instead of following the local rules and

17   disclosing its doctrine of equivalents positions before

18   claim construction briefing, Petter hoped to spring its

19   alternative arguments on Hydro for the first time in

20   opposition to the motions for summary judgment.  We put a

21   whole argument in there right along these lines, and this is

22   not like something brand new that Mr. Lobbin can argue we

23   have never raised before.

24             They can't say there is no prejudice, and they

25   certainly can't say, well, because Hydro is able to brief it
```

1    in summary judgment there is no prejudice.  That is an

2    argument that the Eastern District of Texas addressed in the

3    Nike case.

4          THE COURT:  Can you really say it is prejudice

5    when your argument is that it is only prejudice because you

6    lost a good appeal point?

7              MR. MILLER:  Yes, that is prejudice.  Absolutely.

8              THE COURT:  I am trying to figure that one out.

9              MR. MILLER:  Well, if they don't fulfill their

10   duties under the local rules, how is our effort being good

11   lawyers in our summary judgment motion to try and anticipate

12   every possibility, how does that benefit their failure to

13   follow the rules?  The Eastern District of Texas said that

14   such an analysis would present a pernicious consequence.

15          This is how they explained it.  Excepting Nike's

16   argument that Adidas was on notice because its lawyer had

17   considered the doctrine of equivalents would have pernicious

18   consequences.  Lawyers who attempted to analyze the possible

19   range of claims against the client would be punished while

20   slothful dullards would be rewarded.

21          THE COURT:  Right, but I don't think that is going

22   to my question.  That is prejudice, what you just read, that

23   you were not on notice of the claims so you weren't capable

24   of preparing for them properly.  That is what I usually

25   think of with prejudice, not that I lost a good argument of

```
1   waiver on appeal, which would have been not de novo but

2   abuse of discretion, and that is all I'm wondering about.

3              MR. MILLER:  Well --

4              THE COURT:  That is all my question is about.

5              MR. MILLER:  Well, if you don't like that

6   prejudice argument, I think it is prejudice and when I am

7   going up on appeal, I want an argument where I can say we

8   have got an abuse of --

9              THE COURT:  You are hurt, I just think -- I see.

10  Okay.

11             MR. MILLER:  Well, there is more prejudice than

12  that, Your Honor.  The other prejudice --

13             THE COURT:  I just thought it was an interesting

14  argument.  I don't have the answer.  I am just saying that

15  my brain is kind of getting fried on that one.

16             MR. MILLER:  Well, let me go through --

17             THE COURT:  If I don't win this, I have a worse

18  time on appeal.  I don't know.  I think they usually look at

19  it as this really hurt us, because if they would have told

20  us sooner, we could have taken depositions, we could have

21  prepared for it in other ways and in our briefing and in our

22  preparation and in our hiring of experts and all of that.

23  That is how a person gets prejudiced.

24             MR. MILLER:  I agree.  All of those reasons are

25  present here, too.
```

1    THE COURT:  And you articulated that, but I just

2    never quite focused on this, that if we don't win on waiver

3    we don't have such a good appeal.  I'm not articulating it

4    very well, but I wonder if that is the kind of prejudice

5    they were thinking about.  It kind of collapses in on

6    itself.

7        Go ahead.

8        MR. MILLER:  Well, I think we did pretty well in

9    our briefing to explain how we were prejudiced the way that

10   you were articulating it, the other way where if we had been

11   aware, our summary judgment briefing could have gone

12   differently, and we could have hired an expert on the front

13   end if we had specific allegations.

14       Instead, our doctrine of equivalents arguments in

15   our summary judgment briefing are pretty short because they

16   didn't give us anything to go on.  We said they waived it

17   and then we said they are different from our perspective and

18   that is it.  We do have that prejudice, and I guess since

19   you have read our brief, I was trying to come up with

20   something new to make the argument a little more

21   interesting.

22       THE COURT:  Spring it on them late?

23       MR. MILLER:  Let me point to the second point.  I

24   have talked about how they can't establish good cause, but

25   the other reason why this should be denied is because their

1    amendment is a futile amendment.  It does not change the

2    outcome.

3            Sherry, can you bring up the presentation?

4            Your Honor, you have a definition of grate.  Now,

5    we added the language that we asked you to add in our motion

6    to clarify the claim construction.  Whether the Court does

7    that or not does not change the merits of anything, because

8    it is pretty clear in the Court's claim construction order

9    what it meant by porous.  This language is exactly what is

10   in the Court's order.

11           Anyway, from day one in this case, all the way

12   back into April and May when they deposed Alan McCormick and

13   when they got our first noninfringement contentions there

14   has been no secret.  The theme in our case is, one, Riveer's

15   patent covers the grate over a basin.  Our patents and our

16   devices are impervious top, side trough.  They are

17   different.

18           Next slide, Sherry.

19           Different functions.  Petter's supports a vehicle

20   above the basin so the water flows through the wash surface.

21   Our devices support a vehicle to the side of the collection

22   trough, not above where the water is collected, so the water

23   flows across it.  Those are different functions.

24           Next one.

25           THE COURT:  Stay on that.  I have a question on

1    that.

2              MR. MILLER:  Go back, Sherry.

3              THE COURT:  No, you don't need to go back.

4              On the drawings, and I have always been curious,

5    and forgive me if this is a question that will reveal my

6    ignorance, but on your green one there on the right are the

7    grooves deeper?  Surely the water flows to the right the way

8    the arrows are indicating because of gravity.

9              MR. MILLER:  Yes.

10             THE COURT:  Okay.  Does that happen because the

11   platform is sloped or because the grooves get deeper?

12             MR. MILLER:  Sloped.  Water will flow into those

13   grooves, that is true, because it gets it off the walking

14   surface into those grooves, but those grooves are not the

15   collection point for water.  They channel it over to the

16   trough.

17             THE COURT:  I have never been sure whether the

18   surface was sloped slightly or whether the grooves got

19   deeper.

20             MR. MILLER:  In all of the user manuals it always

21   talks about a slope.  The patents even talk about some range

22   of slope that works to make sure that the water flows.  If

23   you look at it, these perform those functions in different

24   ways.  One is using a porous washing surface so everything

25   falls down to the collection point below and one is using

1    impervious.

2            Next one, Sherry.

3            The result is different.  The result in their

4    patent is the wash water and debris is collected below the

5    washing surface, and ours is not collected below the washing

6    surface.  It is to the side.

7            Let's look at bottom surface.  I think the terms

8    grate and bottom surface are all you need.

9            Next slide, Sherry.

10           They are two different things.  One is a basin

11   that is at the bottom of the frame, and that is what the

12   Court's claim construction requires, and one has water

13   channels that reside at the top of the frame.

14           Next slide, Sherry.

15           The function.  What is the function of the claimed

16   basin?  The function of the claimed bottom surface is to

17   collect.  I have highlighted it in blue here, the water

18   channels that they want to call the bottom surface and the

19   basin, and what are the function of those water channels?

20   Those are for directing and diverting and channeling the

21   water off the washing surface to the edge, not to collect

22   it.  The collection happens at the side.

23           Next slide, Sherry.

24           The way.  The way the bottom surface in Riveer's

25   patent says it is it has to fill the enclosed area to create

1   a basin by intersecting the bottom of the frame walls.  We

2   have just the opposite.  These water channels do not fill

3   that entire area.  They rest on top of the frame.  You don't

4   have doctrine of equivalents.  There is no way.  One of the

5   biggest ways you can tell that is that we got our patent on

6   our product.

7          Go to the next slide, Sherry.

8          Hydro was awarded two patents.  Here is one of

9   them.  Do you see where I have boxed it out there?  That is

10  Petter's patent.  That is the parent patent to the 298 that

11  they are asserting.  It has the exact same disclosure as the

12  patent they are asserting in this case.  The patent office

13  looked at Hydro's design and looked at Riveer's patent and

14  said it is different enough to be nonobvious and patentable.

15         Next slide, Sherry.

16         Let's look at the claim that was allowed in

17  Hydro's patent.  It says it is an impervious, undulating top

18  and it talks about the ridges supporting the vehicle and the

19  grooves accommodating the flow of liquid.  This claim is

20  describing the product that they accuse of infringement.

21  The patent office says it is nonobvious and that means it is

22  not equivalent.

23         THE COURT:  That is what you claim is the novel

24  aspect that got the patent --

25         MR. MILLER:  Yes.

```
 1                    THE COURT:  -- for Hydro.

 2                    MR. MILLER:  In fact, that is what was argued at

 3      the patent office.

 4                    THE COURT:  From your point of view, what is the

 5      novel feature of the 792 and the 298 patent here that is at

 6      issue?  What was the novelty there?  What got the patent?  I

 7      have always been curious about that.

 8                    MR. MILLER:  We have not been into invalidity a

 9      whole lot here, but there is not a whole lot of novelty

10      there.

11                    THE COURT:  Well, they got a patent.

12                    MR. MILLER:  They did get a patent.

13                    THE COURT:  Was it the first time anybody had ever

14      used a grate --

15                    MR. MILLER:  No.

16                    THE COURT:  -- a porous grate --

17                    MR. MILLER:  No.

18                    THE COURT:  -- for dumping the dirty water and the

19      debris into a basin below?

20                    MR. MILLER:  No.

21                    THE COURT:  Was it the type of filtering system?

22      That is what it seemed like to me.

23                    MR. MILLER:  I think the connection to the

24      filtering system had something to do with it.

25                    MR. FOSTER:  I could address that real quick.  On
```

1   the face of the 298 patent and the 792 says that the two

2   things that were out there were the permanent concrete wash

3   pads that had the grate and basin and in concrete, and then

4   kind of a mat where you had a mat and then kind of a

5   perimeter that was portable, but it was not this type, so

6   the portability of this with a grate and a portable basin

7   was purportedly new.

8          THE COURT:  I have long wondered, and patent law

9   has a theory and is based on the theory that you invent

10  something and you tell the entire world what it is so they

11  won't do it for 20 years.  It is always difficult for me to

12  go back in these patent cases, and not always, but often to

13  figure out what was it that got them that patent.  I was

14  curious about that.  I appreciate this last argument just

15  for academic reasons.

16         MR. MILLER:  Well, go to the next slide, Sherry.

17         THE COURT:  It may not be entirely academic,

18  because it has occurred to me before, and I thought the

19  reason Hydro got a patent may be the very thing that they

20  are claiming is equivalent and, therefore, violates their

21  patent under the doctrine of equivalents, which was just a

22  thought that has gone through my head often in this case

23  when I have entertained the possibility of the doctrine of

24  equivalents argument.  Wait a second.  Why did Hydro get a

25  patent on this?  It wouldn't have been nonobvious.  It would

1    have been obvious by the prior art.  I don't know.

2              MR. MILLER:  Well, you're on exactly the right

3    track.  If you look at these cases on this slide the Federal

4    Circuit has said this nonobviousness and this doctrine of

5    equivalents are sister doctrines.  If the patent office has

6    granted a patent on the product that they are claiming is

7    the equivalent, then that is strong evidence that it is not

8    equivalent.  It says right here that there is a strong

9    argument that an equivalent cannot be both nonobvious and an

10   insubstantial change.

11             The Siemens case says where the alleged equivalent

12   is claimed in a separate patent, this fact may make

13   equivalency considerably more difficult to make out.  So

14   that concept that Your Honor is talking about is exactly

15   what makes their burden to prove equivalents in this case a

16   lot harder, because that is already on our side of the

17   scale.

18             Now, what did they present in summary judgment

19   that could even outweigh this?

20             Go to the next slide, Sherry.

21             Conclusory expert testimony.  We have cases and we

22   have cited them in our brief and there is no shortage of

23   case law from the Federal Circuit that says a conclusory

24   expert opinion about the doctrine of equivalents is not

25   enough to survive summary judgment.

1          Next slide, Sherry.

2          You can see in docket number 219, page 22, note

3    10, we cite a lot of those cases there.

4          Next one, Sherry.

5          My partner and I litigated a case, this K-Tec

6    versus Vita-Mix case, and Judge Campbell from this court

7    granted summary judgment of infringement.  The other side

8    presented a really long expert report from a Ph.D. trying to

9    show noninfringement.  She still granted summary judgment of

10   infringement.  When they went on appeal to the Federal

11   Circuit, they argued, hey, we have a Ph.D. in engineering,

12   and the Federal Circuit affirmed the summary judgment and

13   said you can't manufacture an issue of fact just by getting

14   an expert report, and it says here especially when the

15   technology is easily understandable.  It is simple

16   technology.  That is what we have here.  In that case it was

17   the geometry of a blending jar.  In this case it is the

18   geometry of a wash pad.  It is a static structure.

19          Now, if the Court were to grant our summary

20   judgment motion, Mr. Lobbin would be up at the Federal

21   Circuit and his argument would be you should reverse under

22   the doctrine of equivalents.  We presented this Ph.D.

23   statement that it was equivalent, and I know exactly what

24   the Federal Circuit would say.

25          Sherry, go to the next slide and play it.

```
1              (WHEREUPON, the presentation was played.)

2              UNIDENTIFIED SPEAKER:  On the claim chart, this is

3    a claim chart and this was submitted.  In opposition to the

4    motion for summary judgment we submitted an expert report

5    from Dr. Alford Corvales, a Ph.D. in engineering.

6              UNIDENTIFIED SPEAKER:  You don't need a Ph.D. in

7    anything to see that that red portion is really two lines,

8    two side walls with a curved portion in between.

9              (WHEREUPON, the presentation was concluded.)

10             MR. MILLER:  That is exactly what they would say.

11   I don't care if you got a Ph.D. to say something about your

12   argument.  There is no substantial evidence to support a

13   doctrine of equivalents here.

14             Next slide, Sherry.

15             This represents 100 percent of Riveer's evidence

16   on the doctrine of equivalents for the claim limitation

17   grate.  It is one sentence from Dr. Paulus that says it is

18   the same, function, way and result.  No analysis.  Same

19   function, way, result.

20             Next slide, Sherry.

21             This is 100 percent of the evidence Riveer

22   presents for the bottom surface limitation being equivalent.

23   It is the same function, way and result.  Dr. Paulus even

24   misses the result.  He calls the result of the bottom

25   surface diverting wash water below the surface.  There is
```

1   nothing in their patent, in the claim language, or in the

2   Court's claim construction that says the bottom surface

3   diverts water.  It collects water.  The patent says

4   collecting, the claim says collecting, the Court's claim

5   construction says collecting.

6          He used divert.  Why did he use divert?  Because

7   that is the function of the water channels in Hydro's pad.

8   They divert the water off to the side.  He even picked the

9   wrong result of the patent.

10          In any event, even if you were to allow them to

11   amend their contentions, it wouldn't change the outcome.

12   That is what makes it a futile contention, and there is case

13   law that says when people are proposing a futile amendment,

14   you don't allow the futile amend.

15          To wrap up here --

16          THE COURT:  What is the standard of review on

17   appeal on that?

18          MR. MILLER:  That is abuse of discretion too.  A

19   District Court's decision on amending pleadings or amending

20   contentions is all abuse of discretion.

21          THE COURT:  Even on a finding of futility?

22          MR. MILLER:  I believe so, Your Honor.

23          THE COURT:  I don't know.  It would seem like that

24   that would take more of an exploration of the substantive

25   issue underlying it all.  Okay.

1          MR. MILLER:  So what my client is asking this

2    Court to do is to deny the motion to amend so that the

3    summary judgment order, if you were to rule in our favor,

4    could have the alternative grounds of both waiver and on the

5    merits for no doctrine of equivalents.

6          Now, as far as our motion asking the Court to

7    clarify claim construction, the purpose of that motion was

8    just -- Mr. Lobbin at our last hearing started talking about

9    porous in a way that they have never talked about that word

10   before.  We put it in our brief and it was clear to the

11   Court and to us and to Petter what porous meant.  They

12   equated porous to holes that allow it to go all the way

13   through.  That is how they equated it.

14         In fact, they even referred to the George Forman

15   Grill that they use as an example of our wash pad because it

16   is undulating and they called that non-porous in their

17   briefing.  Because of the shift in their view on porous, we

18   filed that motion simply to tell the Court that it might be

19   a good idea to clarify what the Court meant, because what

20   the Court meant I thought was pretty clear in the order.

21   Either way we only did that so that they can't misrepresent

22   what the Court's claim construction was on appeal.

23         Right now this is our suspenders argument, because

24   we already have the belt on this claim, because we already

25   have summary judgment of laches.

1          THE COURT:  That is what I have the pending motion

2     on to reconsider?

3          MR. MILLER:  Yes.

4          THE COURT:  Thank you, Mr. Miller.

5          Mr. Lobbin?

6          MR. LOBBIN:  Thank you, Your Honor.

7          MR. FORD:  Can you switch the output to us?

8          Thank you.

9          MR. LOBBIN:  There were a lot of arguments on lots

10     of other subjects like summary judgment and the merits of

11     the doctrine of equivalents argument which were not part of

12     the motion to amend but we can talk about that.

13          I think because you mentioned the laches issue and

14     on that motion for reconsideration, and I know we are not

15     talking about that today, but the Federal Circuit in a

16     couple of weeks is going to hear en banc the laches issue

17     that is central to that motion.  I suppose I'm saying it is

18     okay that Your Honor has not decided it yet because the law

19     may change soon.

20          I think Your Honor hit it right on the head in

21     terms of the prejudice issue.  Undue prejudice and the

22     reason why we didn't address it in a more long form in our

23     motion was because Your Honor is right.  Prejudice is where

24     you were not aware of it.  We didn't tell them sooner.

25     Well, we told them in April of last year and we discussed it

1    at the deposition ad nauseam.  Mr. Miller just went through

2    a whole doctrine of equivalents analysis to tell you his

3    positions on why there is no infringement under the doctrine

4    of equivalents.  They knew all along that not only was the

5    issue in play, but that they had their reasons why there was

6    not infringement under the doctrine of equivalents.

7              THE COURT:  Your final infringement contentions

8    were submitted, I gather, in September?

9              MR. LOBBIN:  September of '14.

10             THE COURT:  And you say that they knew this very

11   well by April, the previous April?

12             MR. LOBBIN:  Well, April was our initial

13   infringement contentions in which we --

14             THE COURT:  I am just trying to understand what

15   you said just a couple of minutes ago.  Didn't you say they

16   knew it very well by April?

17             MR. LOBBIN:  Yes.

18             THE COURT:  Which year are you talking about?

19             MR. LOBBIN:  April of last year.  So what I'm

20   saying is that our initial infringement contentions were

21   served in April of 2014, and we had taken the deposition of

22   Mr. McCormick, an all-day deposition where we went through

23   all of the facts underlying the infringement theories and

24   the doctrine of equivalents.  Mr. Miller just explained to

25   you with his slides why they believe there is no

```
 1    infringement under the doctrine of equivalents, and he made
 2    some drawings that were supposed to show what the patent was
 3    all about, but those drawings are not correct, but I
 4    understand that is his argument and that is fine.
 5            My only point is it is clear from the discussion
 6    here today that the early discovery put them on notice, and
 7    Your Honor said prejudice is where they don't tell you
 8    sooner, and we told them sooner, in April of '14 and --
 9            THE COURT:  In April of '14, though, all you did
10    was reserve.
11            MR. LOBBIN:  Well, yes, but we told them that the
12    issue was in play in the case, and --
13            (WHEREUPON, a noise was heard.)
14            THE COURT:  What was that?
15            Go ahead.
16            MR. LOBBIN:  -- was in play in the case, depending
17    on how the claim construction worked out, which is exactly
18    what local Patent Rule 3.4 envisions.
19            THE COURT:  Those were infringement contentions.
20    I am just seeing how this squares with what you said that
21    they knew in April of 2014, but they didn't know.  All they
22    knew is that you were reserving.
23            MR. LOBBIN:  Right, but what I'm saying is he has
24    just walked you through his analysis of the doctrine of
25    equivalents, and images supposedly from our patent, which
```

 1    aren't, but he explained to you his whole theory of why

 2    there is no doctrine of equivalents infringement, and so he

 3    has known what the issue was about and he has known his

 4    positions on those issues since last year.

 5            THE COURT:  Well, he knows it now because you have

 6    finally gotten around to giving him whatever you have got on

 7    it.  Their argument is simple.  Look, you had a chance in

 8    your infringement contentions to tell us what you were

 9    alleging was the basis for your infringement contentions.

10    You didn't do it.  You didn't support it.  We didn't know

11    about it.  We were surprised.  We argued early on in our

12    summary judgment motion that you had waived it.  You didn't

13    even counter that effectively.

14            As I recall --

15            MR. LOBBIN:  We did counter --

16            THE COURT:  -- in our hearing on summary judgment

17    it struck me that Hydro was being required at that time to

18    respond to your new porous argument under a doctrine of

19    equivalents theory for the first time.  I don't know if that

20    is true, but that is what I gathered from the hearing.

21            MR. LOBBIN:  No, because that was briefed in the

22    summary judgment in December and January.  Again, at the

23    hearing --

24            THE COURT:  Not that particular argument or it

25    missed me.

1          MR. LOBBIN:  Well, their whole summary judgment

2    motion was based on their inclusion of the word porous from

3    their proposed construction as a basis for summary judgment.

4          THE COURT:  To put it simply, because we talk a

5    lot and cite cases, but boiled down it seems to me that they

6    were entitled to know at some point in time that you were

7    making an argument that if the Court buys their claim

8    construction contention that the 298 patent requires a

9    porous grate, something that allows dirty water and debris

10   to fall through it, that they construe it as a porous

11   surface which Hydro contended all along, that if the Court

12   buys that argument --

13         MR. LOBBIN:  Yes.

14         THE COURT:  -- then we believe that they infringe

15   anyway, because we think that what they do in their Hydro

16   apparatus is equivalent.

17         MR. LOBBIN:  Right, and so the --

18         THE COURT:  I think that is the basis and it seems

19   like that is the basis or a large part of the basis of your

20   doctrine of equivalents argument.  I didn't understand that

21   until the summary judgment hearing, not from the briefing, I

22   didn't, and maybe you could say that I missed it and should

23   have seen it in the briefing, but I didn't see it.

24         They are arguing now in this motion in opposition

25   to yours that they didn't know about it.  They didn't have

1    time to consider how to defend against it.  You say we

2    didn't have to tell them that earlier on because we were

3    just going to reserve it until we decided that it was a good

4    idea.

5              MR. LOBBIN:  I think we have to look at --

6              THE COURT:  This is not difficult.

7              MR. LOBBIN:  We have to look at the time line,

8    Your Honor, again.  We walked through this in my opening and

9    I don't want to belabor it.  The initial infringement

10   contentions were in April of '14.  The final infringement

11   contentions were in September of '14.

12             THE COURT:  Neither of which contained this

13   argument.

14             MR. LOBBIN:  Well, they both identified the

15   argument and put them on notice so that they can't say that

16   you didn't tell us that sooner.

17             THE COURT:  You didn't tell the Court until we

18   heard it in a summary judgment hearing.  That is the way I

19   have viewed it.  Now you're saying they knew it all along.

20             MR. LOBBIN:  They did.

21             THE COURT:  Mr. Miller in his brief did a good job

22   of showing you that in the April deposition, which was four

23   days before your initial infringement contentions, that Mr.

24   McCormick clearly told you that the grating in your patent

25   was pervious and that their pad was impervious.  Nothing

1   falls through it, he said.  The water falls onto it and

2   slopes to a gutter.  It does not flow through a grate.  This

3   is a grate and this is a top plate.

4          You know at least what Mr. McCormick's position

5   was, and that that was Hydro's position, yet you didn't say

6   if it turns out that your construction of our grate surface

7   is adopted by the Court, then we want to argue this doctrine

8   of equivalents theory.

9          MR. LOBBIN:  What he leaves out is the part in the

10  deposition where we talked about summary judgment, where I

11  went through all of the embodiments with Mr. McCormick, and

12  he said a grate is a grate is a grate and you pull that pan

13  up and it is still a grate.  Okay.  There is no discussion

14  of porous.  There was no discussion of, well, we don't think

15  so.  After that deposition, our infringement theory was

16  still literal infringement under the claims as written of

17  the 298 patent, which we included in our infringement

18  contentions, and this was a literal infringement case.  We

19  gave them notice of the doctrine of equivalents.

20         Mr. Miller argues, and he tries to make light of

21  the court's local rules, but if you look at local Rule 2.3,

22  and he made light of this, but the court says -- I mean,

23  local patent rules go through lots of revisions and there

24  are lots of smart people figuring it out, and the local rule

25  says for each element of the asserted claim, whether that

1    element is claimed to be present in the accused device

2    literally or under the doctrine of equivalents.

3            There are a lot of cases that get filed where you

4    as a plaintiff know that, well, okay, the accused product is

5    not literally infringing our claim, but we think that there

6    is a close enough connection and there are insubstantial

7    differences and this is a doctrine of equivalents case.  The

8    local patent rules spell that out.

9            I think that if you look at all of these local

10   rules, and look at the fact that there has been no case law

11   from this Court, and look at the fact that me and Mr. Ford

12   are looking at these rules and saying what do we have to do

13   here, and it looks like we have to say at the initial stage

14   what is our contention.  Do we contend literal infringement

15   or do we contend doctrine of equivalents?  Of course we

16   contend literal infringement.

17           THE COURT:  I just wonder, is there any case that

18   says that or means that you have to pick one or the other?

19   What about his quoting the Federal Circuit on this point,

20   and I have forgotten the quote, but it was pretty direct and

21   said that it defies common sense or something.

22           MR. LOBBIN:  Again, I could go through them all,

23   and I have most of them in my --

24           THE COURT:  Do you have a case, any case that says

25   that that language is construed to mean you have to pick

1    either literal infringement or doctrine of equivalents

2    infringement when you bring a patent case?

3              MR. LOBBIN:  Yes.

4              THE COURT:  That makes no sense at all.  A local

5    rule is requiring you to choose between the two --

6              MR. LOBBIN:  Absolutely.

7              THE COURT:  -- when so many patent cases involve

8    both?  Look, we allege literal infringement, and if we don't

9    win there, we certainly think that their apparatus is

10   infringing under the doctrine of equivalents.  It is common

11   as common.  So you think we adopted a local rule that makes

12   people choose early on whether they are going to go with one

13   or the other and they can't go with both?  Isn't that what

14   you are saying it means?

15             MR. LOBBIN:  No.  I am not saying that they can't

16   go with both, but if their case is a literal infringement

17   case, and you need a claim construction to do an analysis,

18   and --

19             THE COURT:  Wait.  Let's go back to that.  You say

20   that the rule then allows you to do both?  I thought your

21   entire construction rested on the proposition that it

22   requires you to do one or the other.

23             MR. LOBBIN:  It requires you to do one or the

24   other.  You can do whatever you want.  You can go through

25   and write a whole tome in your initial contentions about

1    why -- a long form tome, meaning like a book -- about why

2    there is literal infringement.  Hey, let's imagine some

3    claim construction that comes down different from what we

4    are proposing.  So all of a sudden there is no literal

5    infringement anymore, and now we have to take those

6    hypothetical claims, claim interpretations and do what the

7    doctrine of equivalents requires, which is an element by

8    element analysis that says here is the claim and how it has

9    been interpreted, and here is the function of that claim

10   interpretation, and here is the way and the result.

11        Well, without that claim interpretation, there is

12   no way to do the analysis.  You could do it as a

13   hypothetical and we can write a 50-page thing that says, all

14   right, but remember that at the time we were doing these

15   contentions we had no idea what their claim construction

16   was.

17        THE COURT:  I have no idea what you just said.  It

18   is like me asking you do you want oral argument or not.  I

19   have given you a choice of one or the other.  That seems to

20   be your argument here.  You can claim literal infringement

21   or doctrine of equivalents.  That seems to be your argument.

22   That means that you have to pick one or the other.

23        MR. LOBBIN:  Well, that is what the rule requires

24   and that is what I'm saying.  I am not saying you have to

25   pick one or the other.  I am saying you can, but you can --

1          THE COURT:  How can you say that that is what the

2     rule requires, that I'm not saying that you have to pick one

3     or the other --

4          MR. LOBBIN:  Well, it is like if I say you have to

5     get up tomorrow by 9:00, you can get up by 8:00, but I'm

6     requiring you to get up at 9:00, but you can go above and

7     beyond.  That is the point here.

8          I mean, you could do a hypothetical exercise that

9     says under some imaginary claim construction there would be

10    doctrine of equivalents because we would have lost on our

11    claim construction, or the literal words of the claims,

12    because you have to have a starting point for the analysis.

13    The starting point for the analysis has to be either the

14    words of the claims or the words of the claims plus what a

15    court ended up saying those words mean, i.e., the claim

16    construction.

17         So at the point of doing contentions, all we have

18    are the words of the claim.  We don't even have Hydro's

19    proposed construction.  We certainly don't have the Court's

20    proposed construction.  So to hypothesize what that would be

21    and what this would be, would be the or.  We could have said

22    here are our contentions, and then it says literally or

23    the -- here is the or part, and pages 6 through 27 give a

24    hypothetical Hydro construction, which we don't know yet,

25    and here is the analysis of the doctrine of equivalents, and

```
 1    then pages 15 through 32 give somewhere in between that,

 2    again, a hypothetical on a hypothetical, and then we could

 3    have said, okay, so now under these hypothetical claim

 4    elements, here is the function, way, result for that

 5    element, and here is the function, way, result for that

 6    element, et cetera, et cetera.  This is an entirely

 7    hypothetical exercise if you say that at the point of us

 8    doing our contentions that we had to do this alternative

 9    thing.

10           We did what we knew at the time, which was we said

11    here is what the claims say, and we think the claims mean

12    what the claims say, and here is why there is literal

13    infringement based on those claim elements.

14           THE COURT:  I am wondering why in September of

15    2014 then after you had the discovery --

16           MR. LOBBIN:  We didn't have their construction.

17           THE COURT:  I am not finished.

18           MR. LOBBIN:  I'm sorry.

19           THE COURT:  Then you had the deposition testimony,

20    and then apparently, if I'm understanding your argument,

21    both sides knew that this doctrine of equivalents theory was

22    on the table --

23           MR. LOBBIN:  Yes.

24           THE COURT:  -- and why then wouldn't you include

25    it in your final infringement contentions in September?
```

```
 1              MR. LOBBIN:  Well, like I said, we were getting
 2    the discovery to confirm our literal infringement case, and
 3    we still didn't have any claim construction from Hydro and
 4    we didn't have any claim construction from the Court.  All
 5    we had to go on was the same thing, which was the literal
 6    language of the claims, our own contentions about what those
 7    claims mean, and our own contentions about why under those
 8    claims, based on the discovery, there was infringement and
 9    literal infringement.
10              Based on what we knew at the time, there was no
11    reason to go there, but, of course, we wanted to give them
12    notice by telling them, hey, to the extent your construction
13    is different, to the extent the Court ends up with a
14    different construction, there is obviously going to be --
15    under Rule 3.4, what it says is where the Court's
16    construction is different from what we propose, we have an
17    opportunity to amend our contentions.  That is exactly what
18    we did and that is how everything transpired therefrom.
19              So we think a fair reading of the local rules and
20    a fair reading of the case law, and I can go through all of
21    the distinctions of the cases that they cite, but usually if
22    you look at the facts of the cases they are citing, there
23    was an egregious lapse of notice.  There was a party that
24    comes in after claim construction and says, oh, by the way,
25    now we think the doctrine of equivalents is in play.  That
```

1    is not the case here.

2           I don't think any fair reading of our interaction

3    with counsel -- again, remember, although complicated in its

4    twists and turns, this case is fundamentally about

5    mechanical technology that Hydro says over and over is

6    simple.  You saw their analysis saying there is no doctrine

7    of equivalents.  This is not a case where they are

8    sandbagging us because they only told us really in short

9    form about the doctrine of equivalents.  All of the cases

10   they cite are situations where you come in at the eleventh

11   hour, and now you're trying to bring in something really new

12   on patents that are typically quite complicated and really

13   do require the restarting of the clock and prejudice.

14          Those cases just don't apply to the facts of this

15   case, and the cases that we have cited certainly do apply,

16   like the Robocast case that we talked about before where the

17   court said, of course, you know, where the court comes out

18   with a claim construction different from what the patentee

19   proposed, the doctrine of equivalents arguments are based on

20   the court's claim construction rulings and Microsoft was on

21   notice.

22          THE COURT:  He brought up his motion, so it would

23   be appropriate for you to respond to that now.

24          MR. LOBBIN:  Yes.

25          Like I said before, I think these motions are

1    somewhat connected, because if Your Honor is inclined to do

2    a little more claim construction, supplementing its prior

3    claim construction based on their request about this word

4    porous, and we don't think it is necessary as we explained

5    in our papers, but if the Court decides that supplementation

6    or further construction is necessary, I think that really

7    puts us over the top on the first motion and the fact of,

8    wait a minute, you know, local Rule 3.4 says if the claim

9    construction is different from what we, Riveer, proposed, we

10   get an opportunity to amend our contentions.  So now it

11   would be a situation where the Court's initial claim

12   construction is different than what we proposed, and then

13   there is the supplemental, so we're getting more and more

14   within the letter and spirit of local Patent Rule 3.4.

15        In terms of porous, you know, if I could take an

16   aside, and I want to address Your Honor's question, and I

17   know you are confused about what the heck is the invention

18   here, and we have talked about it before, but Riveer's

19   patent was the first wash rack to separate out the level of

20   the vehicle, and the level of the wash water spilling off of

21   the vehicle, and the fact that you have got a closed loop

22   system that runs without stopping the washing process such

23   that you have got the second level that provides the

24   opportunity to have the water and debris fall off of that

25   water that is being washed, and you can keep washing it, and

1   while you're doing that, the water and debris gets channeled

2   into a side trough, which is disclosed in the 298 patent,

3   and claim, despite their arguments to the contrary, and we

4   went through that last time at the hearing where I showed

5   you where in the specification it is.

6        Then that wash water and debris is allowed to --

7   the solids are allowed to be taken out and the liquids are

8   allowed to flow through that filtration process and flow

9   back into the washing apparatus, and all of that is going on

10  at the same time.  That system is the invention.

11       Now, yes, Hydro got a patent on what they believe

12  was an improvement to that system.

13       THE COURT:  A different way to do it.

14       MR. LOBBIN:  Well, a different construction of the

15  two levels.  That is the whole point.  Is that a substantial

16  difference?  Yes, they point to cases that say, well, if you

17  get a later patent on a feature that is claimed to be

18  infringing the earlier patent, that, you know, is probative

19  of whether there is equivalency and we are not going to

20  dispute that.  This is a question for the jury.  How

21  probative is it?  How different is it?

22       THE COURT:  Doesn't your argument that you just

23  made, which was very cogent by the way, and I understood

24  it --

25       MR. LOBBIN:  Thank you.  Contrary to my other

59

```
 1    arguments, some of them.

 2            THE COURT:  Isn't that very argument supporting

 3    their position that you have known all along, that that is

 4    what this case was about, whether their slanted side trough

 5    system that they got a patent on was the equivalent of your

 6    client's apparatus?

 7            MR. LOBBIN:  Well, no.  It always has to be --

 8            THE COURT:  It would seem to me, look, they got a

 9    patent on this and the patent office thought they were doing

10    it in a new and novel way.  They don't have the bottom basin

11    with whatever difficulties they claim were there in getting

12    the debris out and this is easier because of the side trough

13    that allows you to scrape out the debris, as I understand

14    it, and the water to be refilled and recirculated, and they

15    are doing it a different way and they got a patent on it.

16            Now we are going to sue them for infringement.

17    There is a good chance we're not going to win on literal

18    infringement, because this is something that the patent

19    office found novel enough to give them a patent on, and I

20    think we have a doctrine of equivalents case here.  This is

21    not that complicated.  Why wasn't that your contention in

22    the first place?  All the patent rules are designed to do is

23    to try to get the parties together in a way so that they

24    understand what are you suing us for?  What do you think we

25    are doing wrong?  Why should we get a license from you and
```

```
 1    what do you want from us?

 2            MR. LOBBIN:  Right.

 3            THE COURT:  You don't tell them that in your

 4    initial infringement contentions, you don't mention it in

 5    your final contentions, and you barely give any space to it

 6    in your expert's declaration or in your briefing for summary

 7    judgment.  Then you come in after the Court construes the

 8    claims and ask for leave to file amended infringement

 9    contentions.

10            MR. LOBBIN:  Well, some of the Court's

11    characterizations of how things went I would dispute.  I

12    mean, we did mention it all the time.  You're right that the

13    spirit of the rule is for counsel to get together and say

14    what the heck are you suing us for?

15            Instead of doing that, instead of calling me on

16    the phone and asking what is this footnote about the

17    doctrine of equivalents?  Can you explain more about that?

18    We talked before about what would have happened.  We

19    probably would have been before the Court and we would have

20    clarified it early.  Yes, let's do that.  How about being a

21    reasonable litigation opponent and call opposing counsel and

22    ask them what the heck is this about, instead of waiting

23    almost a year and say, a-ha, this doctrine of equivalents

24    theory that they told us about they didn't tell us about in

25    detail enough, and how about a little bit of collegiality
```

1    and professionalism and call me up.  Ask in an

2    interrogatory.  It is right there.  The fact that Your Honor

3    just said we didn't mention it, we didn't mention it, yeah,

4    we mentioned it.

5            You are right at the 10,000-foot level.  We knew

6    they got a patent, so obviously at that level you are like,

7    okay, maybe this is a doctrine of equivalents case, but that

8    is not what goes into your pre-case analysis.  You look at

9    the claims and you say the doctrine of equivalents is an

10   equitable theory, so we have to look at the claims to see

11   whether our literal infringement analysis plays out, and the

12   fact that they constructed those two levels differently to

13   us still fell within the literal scope of those claims.

14           For example, if I got a patent on a four-legged

15   table and somebody gets a patent later on a five-legged

16   table, well, that fifth leg might have provided additional

17   stability and the patent office might have said, yes, you

18   have improved on the four-legged table.  Just because they

19   got a patent on that does not mean that my infringement case

20   where my claim says four legs is not a literal case.  It is

21   literal infringement because that table has four legs.  Yes,

22   it adds a fifth, but my claims require four legs.  That is

23   literal infringement.

24           Just by virtue of the fact that someone gets a

25   patent on the accused infringing product has little to do

1    with whether the infringement theory is literal or doctrine

2    of equivalents.  You really have to get into the --

3            THE COURT:  You knew very early on their position

4    was that they didn't have a porous grate and you did.

5            MR. LOBBIN:  Well, the word porous didn't come up

6    until November when they first mentioned that work in their

7    claim construction, proposed claim construction.  That was

8    not really at issue.

9            On the porous issue, and I got off on that

10   tangent, but what I was about to say was that all we have

11   here is the English language.  We operate in words and we

12   are trying to find issues that can be decided as a matter of

13   law without the necessity for a jury or whether there are

14   issues that require a jury.  Whether we're looking at a

15   patent claim or a patent claim plus the court's

16   construction, or a patent claim plus the court's

17   construction plus the court's supplemental construction, we

18   are still left with words.  So we have to decide whether

19   that claim construction obviates the need or the requirement

20   that a jury be able to look at the accused product and say

21   does this product fall within the scope of those claims,

22   either as originally written or as construed first by the

23   court or as supplementary construed.

24           I think it is important because we are now getting

25   into the Court's claim construction, which is supposed to be

63

1    a somewhat insular exercise and, yes, you look at the

2    context of the case and you know what the accused products

3    are about, but now with this supplemental exercise, we are

4    really getting into a free summary judgment motion for

5    Hydro, because they are saying, well, now we need to

6    construe what porous means, and not only like in the context

7    of the products at issue, but specifically with reference to

8    the accused products.  Basically they are saying, Your

9    Honor, please do a supplemental construction that cuts with

10   a fine scalpel the accused infringing product outside of the

11   scope of the claims.  That is improper.

12          The Federal Circuit has said over and over again

13   that claim construction is an exercise that cannot be done

14   with a specific view of the accused infringing product and

15   how to get infringement or how to avoid infringement.  That

16   was in our papers, but I just think that that is important.

17          Your Honor, I think you made a little light of me

18   at the last hearing, and maybe appropriately so, when I said

19   that the jury has to be able to decide, and when I was doing

20   my little explanation about what Your Honor's claim

21   construction means, porous, framework, okay, and I said that

22   this is an issue, and we have done the claim construction

23   briefing, we have done the argument and the Court has come

24   out with its claim construction, and now at some point you

25   have to say words are words and the jury is entitled to view

1   the evidence and decide whether the structure of the accused

2   product comes within those literal claims and the claims as

3   construed, and to do more of that exercise, I think,

4   especially with a specific view to the accused infringing

5   product, prejudices our side and frustrates the ability of

6   patent infringements to be resolved like any other case by a

7   jury.

8           Thank you.

9           THE COURT:  Thank you, Mr. Lobbin.

10          Did you want to say anything else, Mr. Miller?

11          MR. MILLER:  I would like to say a couple more

12   things.

13          THE COURT:  Let's try to keep it brief.

14          MR. MILLER:  I will.

15          The real quick thing I want to address is Mr.

16   Lobbin said porous didn't come up until November.  The word

17   porous was in our noninfringement contentions in May of

18   2014.  We attached that to our briefing in their motion to

19   amend, and those contentions said point-blank, just like

20   Your Honor has pointed out, that the difference is we're

21   porous and they are not porous.  That word porous was right

22   there.

23          He alluded to the idea that if the Court were to

24   clarify the claim construction, well, then that would put

25   them over the top on getting to amend their contentions.  I

1    don't think that is true at all.  What the Court meant by

2    porous was plain from the Court's position, and that that is

3    is consistent with what Hydro has said in Alan McCormick's

4    testimony in April, in our noninfringement contentions in

5    May, and in our final noninfringement contentions in

6    September, and in our claim construction position in

7    November, and we have never shifted.  The summary judgment

8    briefing was consistent.

9           There has never been a shift on what the Court and

10   Hydro and Petter thought porous meant.  It meant holes where

11   things fall straight through the surface.  That is how they

12   briefed summary judgment and that is how they briefed claim

13   construction.  There was never a suggestion that porous

14   could be interpreted a different way.  They raised that the

15   first time in the last hearing, and that is why we filed the

16   motion, and we don't think the Court needs to file a

17   separate supplemental claim construction order, but if the

18   Court is inclined to grant our motion for summary judgment,

19   it might be advisable to simply identify that it is clear

20   what porous meant in the claim construction order, and their

21   argument that it could mean other things is not valid.

22          THE COURT:  Thank you, Mr. Miller.

23          I think I still have the motion to reconsider on

24   laches issue, and I appreciate hearing that that case may be

25   coming down soon.  Is it being argued soon?

1          MR. LOBBIN:  It is June, early June.  The en banc

2   hearing will be in the S.C.A. Hygiene case.  That is the

3   name of the case.

4          THE COURT:  That is when it is argued, not when it

5   is going to be --

6          MR. LOBBIN:  Correct.

7          THE COURT:  -- decided?

8          MR. LOBBIN:  Okay.

9          MR. MILLER:  It is June 19th and it will be

10  decided probably about eight months from then based on

11  general statistics.

12          THE COURT:  Really?  That long?

13          MR. MILLER:  Well, because it is an en banc case

14  they take longer, and it could be three months, but --

15          THE COURT:  All right.  Well, thank you for your

16  arguments.  I have that motion to reconsider before me and I

17  will take under advisement the two matters we heard today

18  and try to get something out relatively quickly.

19          Thank you.

20          Anything else?

21          MR. MILLER:  Did you want a copy of my slides?

22          THE COURT:  No.

23          Anything else from either side?

24          Court is in recess.

25          (Proceedings concluded.)